UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x

AENERGY, S.A. and COMBINED CYCLE
POWER PLANT SOYO, S.A.,

              Plaintiffs,

      v.

REPUBLIC OF ANGOLA; MINISTRY OF
ENERGY AND WATER OF THE REPUBLIC OF
ANGOLA; MINISTRY OF FINANCE OF THE
REPUBLIC OF ANGOLA; EMPRESA PÚBLICA
DE PRODUÇÃO DE ELECTRICIDADE, EP; and
EMPRESA NACIONAL DE DISTRIBUIÇÃO DE
ELECTRICIDADE,

              Angola Defendants,

    and

GENERAL ELECTRIC COMPANY; GENERAL
ELECTRIC INTERNATIONAL, INC.; and GE
CAPITAL EFS FINANCING, INC.,

           GE Defendants.

------------------------------------------------- x

**20 CV 3569**

**JUDGE NATHAN**

CIVIL ACTION NO. _____

COMPLAINT

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................. 1

THE PARTIES..................................................................................................... 9

JURISDICTION AND VENUE ............................................................................. 10

FACTUAL BACKGROUND ................................................................................. 13

I.    RICARDO MACHADO FOUNDS AND DEVELOPS AE, AND AE DEVELOPS  THE
      MARKET FOR GE'S PRODUCTS IN ANGOLA ........................................... 13

II.   ANGOLA AWARDS THIRTEEN CONTRACTS TO AE AND THEN  REPUDIATES
      THEM AS A DIRECT RESULT OF GE'S TORTIOUS  MISCONDUCT ...................... 15

   A.    The Contracts Among AE, Angola, and GE ............................................. 15

      1.   AE Wins Thirteen Critically Important Contracts From Angola .................. 15

      2.   AE Signs Supply Contracts With GE Affiliates....................................... 17

      3.   Angola Secures Financing From GE Capital ████████████████
           ███████████████████████████████████████████████ ..18

   B.    GE Employees Forge Amendments To The AE-MINEA Contracts ............................ 22

      1.   GE "Discovers" The Discrepancy Between The Number Of Turbines Called For
           Under The Various Contracts And Recognizes The Risks.............................22

      2.   AE, Angola And The GE Defendants Discuss Expanding The Scope Of The AE-
           MINEA Contracts To Add Turbines ................................................. 25

      3.   Angola Declines To Proceed As GE Desired, And GE Resorts To Desperate (And
           Illegal) Measures ................................................................27

   C.    Angola Draws On The Facility And GE Pays Itself For Twelve Turbines ................... 32

   D.    GE's Forgeries Come To Light, And GE Tortiously Blames AE For Them................. 35

      1.   Angola Informs AE and GE of a Shift in Priorities, and AE and Angola Discuss
           Alternate Ways For Angola To Purchase The Four Turbines Subject To The October
           2017 Letters ....................................................................35

      2.   GE Presents Forged Documents To Thwart AE's Proposed Alternate Agreement with
           Angola, Falsely Blames AE For The Forgeries, and Falsely States That Angola Had
           Already Purchased Twelve Turbines................................................38

i

    3.    GE Sticks By Its False Story Even While AE And MINEA Denounce The Fake Letters As Forgeries.................................................................................40

    4.    AE Raises These Matters To Senior GE Officers, And GE Maintains Its Misinformation Campaign To Further GE's Interests And To Interfere With AE's Contracts And Relationship With MINEA.................................................................46

III.    ANGOLA IMPROPERLY TERMINATES AE'S SOYO II CONCESSION .................. 61

IV.    ANGOLA EXPROPRIATES AE'S PROPERTY IN VIOLATION OF INTERNATIONAL LAW ........................................................................................ 63

    A.    Angola Expropriated Plaintiffs' Property, With GE's Support...................................... 63

    B.    Angola's Conduct Violated International Law ............................................................ 65

V.    ACTS AND EFFECTS IN THE UNITED STATES GIVING RISE TO AND RESULTING FROM ANGOLA'S COMMERCIAL BREACHES.................................. 66

COUNT ONE: BREACH OF CONTRACT—AE-MINEA CONTRACTS ................................ 71

COUNT TWO: BREACH OF CONTRACT—SOYO II CONCESSION .................................... 73

COUNT THREE: UNJUST ENRICHMENT.............................................................................. 74

COUNT FOUR: TAKING IN VIOLATION OF INTERNATIONAL LAW—PHYSICAL ASSETS................................................................................................................. 75

COUNT FIVE: TAKING IN VIOLATION OF INTERNATIONAL LAW—INTANGIBLE ASSETS ............................................................................................................ 77

COUNT SIX: CONVERSION ...................................................................................................... 79

COUNT SEVEN: TORTIOUS INTERFERENCE WITH CONTRACT .................................... 80

COUNT EIGHT: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS ................................................................................................................................ 81

COUNT NINE: ACCOUNTING.................................................................................................. 83

COUNT TEN: AIDING AND ABETTING .................................................................................. 83

PRAYER FOR RELIEF ............................................................................................................... 85

Plaintiffs Aenergy, S.A. ("AE") and Combined Cycle Power Plant Soyo, S.A. (collectively, "Plaintiffs"), as and for their complaint against defendants the Republic of Angola (the "Republic"), the Ministry of Energy and Water of the Republic of Angola ("MINEA"), the Ministry of Finance of the Republic of Angola ("MINFIN"), Empresa Pública de Produção de Electricidade, EP ("PRODEL"), and Empresa Nacional de Distribuição de Electricidade ("ENDE") (collectively referred to as the "Angola Defendants" or "Angola"), and against defendants General Electric Company ("GE Co."); General Electric International, Inc.; and GE Capital EFS Financing, Inc. ("GE Capital") (collectively referred to as the "GE Defendants" or "GE," and, collectively with the Angola Defendants, "Defendants"), with knowledge as to themselves and as to the facts within their possession, and otherwise on information and belief, hereby allege as follows:

## PRELIMINARY STATEMENT

1. This action arises out of the Angola Defendants' repudiation of commercial contracts with Plaintiffs for the construction, extension, refurbishment, operation, and maintenance of power plants in the Republic of Angola—and out of the GE Defendants' tortious procurement of that repudiation by covering up the fabrication and misuse of false documents by GE employees, falsely blaming AE for that criminal misconduct, and making false and misleading statements about the relationship between and among AE, GE, MINEA. Plaintiffs also seek to remedy an unlawful expropriation of property in violation of international law orchestrated by the Angola Defendants with GE's complicity. Plaintiffs request compensatory damages for their losses, which they preliminarily estimate at no less than $550 million, and, in view of the outrageous, tortious, and criminal conduct described herein, an award of punitive damages.

1

2.      Plaintiff AE was founded in 2012 by Ricardo Leitão Machado, a Portuguese investor who, relying on his deep insight into the African market, identified an opportunity to provide reliable and competitive energy solutions to Angola and surrounding countries.  Through his efforts, Machado and his enterprise, AE, were able to deliver power-plant projects to Angola at roughly half the cost per megawatt that other suppliers were offering before AE's entry—all while providing top-quality maintenance and operation services.  AE was able to do this in large measure by taking a stance against the sort of corruption that is rampant in some parts of Africa, including Angola—corruption that had driven up the price of energy.  In the process, AE became the first African-incorporated company certified for its anti-bribery practices.

3.      To carry out its mission, AE entered into a commercial partnership with GE to develop the African market for energy and transportation solutions, including by using GE-manufactured products.  AE would work with GE, acquiring GE turbines manufactured in the United States and installing them in Africa, while working hand in glove with GE employees.

4.      In August 2017, as a result of AE's sustained efforts, including in particular in respect of lowering the per-megawatt costs of power-plant projects, Angola's state-owned energy companies awarded AE a total of thirteen contracts worth $1.1 billion (the "AE-MINEA Contracts").  These contracts contemplated that AE would purchase and use GE products manufactured in the United States to construct, operate, and maintain power plants in Angola, and that AE would sell and install eight new GE turbines for use by PRODEL, ENDE, and MINEA, and the Angola Defendants, generally.  The GE Defendants internally described this project, ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

2

5.      At around the same time, Angola obtained financing from GE to pay for MINEA's obligations to AE under MINEA's contracts with AE. Angola's Finance Ministry, MINFIN, thus secured a $1.1.-billion credit facility structured and signed by GE Capital (the "GE Credit Facility"). ████████████████████████████████████████ ████████████████████████████████████.

6.      AE's work started in earnest. AE began installing turbines acquired from GE, and provided competitive and reliable energy solutions to Angola and its people.

7.      Starting in the fall of 2017 and through 2018, AE and Angola discussed various ways for Angola to acquire, and for AE to install, four additional GE-manufactured turbines— beyond the eight turbines already covered by the AE-MINEA Contracts. AE had already agreed to buy six additional turbines from GE (beyond the eight AE had committed to sell to Angola); AE did so to be in a position to meet Angola's energy needs as they arose, and hoped to sell some or all of those additional turbines to MINEA (should MINEA commit to buy them, in line with Angola's 10-year strategic plan for the development of the power sector).

8.      In October 2017, Angola's state-owned entities signed non-binding letters of intent stating that they would consider amending two of the thirteen AE-MINEA Contracts to reduce the scope of those two contracts so as to make room to instead purchase four additional turbines from AE. But, by August 2018, Angola's priorities had changed, and the Government stated that it wished to complete the two AE-MINEA Contracts as originally agreed back in August 2017, rather than reduce their scope to purchase four more turbines (as proposed in October 2017).

9.      Discussions between AE and Angola continued, and, by the fall of 2018, Angola had settled on a different approach to acquire the four additional turbines. At that time, Angola

3

proposed to reduce the scope of a different contract between AE and MINEA—a long-term service contract for the maintenance of a power plant—from five years to three years. This reduction in scope, a reduction worth $154 million, would make room to acquire the four turbines and related work from AE while ensuring that the total value of the AE-MINEA Contracts remained at $1.1 billion—the amount of the GE Credit Facility—so as to permit Angola to finance the four turbines. AE agreed to proceed as proposed by MINEA, as did the President of Angola.

10.    But this approach, if implemented, would have cost GE dearly. For starters, of the $154 million proposed to be cut from the then-in-force contracts to make space for the purchase of four more turbines, roughly $100 million would have gone to GE as a supplier to AE. GE would have lost that revenue if the contracts were amended as MINEA proposed.

11.    GE had another reason to scuttle MINEA's revised plan to acquire the four turbines: proceeding with that plan risked exposing the criminal misconduct of its employees, including the then-CEO of GE's Angola business, Wilson da Costa, and threatened GE's bottom line in other ways. As noted, back in October 2017, the Government of Angola had issued non-binding letters of intent to buy from AE four more GE-manufactured turbines, subject to certain conditions. Unbeknownst to AE, however, Mr. da Costa and other GE employees working with him had worked together to Photoshop the October 2017 letters of intent and created fake, binding amendments to the AE-MINEA Contracts that purported to require MINEA to buy the four turbines unconditionally. Mr. da Costa and other GE employees had then passed these fake documents on internally at GE, and used them to support GE's financial and accounting objectives (thus earning Mr. da Costa a promotion and a sizeable bonus at year-end 2017).

MINEA's proposal in late 2018 to acquire the same four turbines the forgeries had already purported to commit MINEA to acquire would expose this wrongdoing.

12.     So, to support GE's bottom line and cover up the misdeeds of GE's employees, GE's representatives began to take steps to tortiously interfere with AE's relationship with Angola.  At first, Mr. da Costa played dumb—revealing the fake documents to the Angolan authorities and taking the position that the AE-MINEA Contracts had already been amended and that, in light of those amendments, Angola had already paid for the four turbines.  When Angola and AE both denounced the documents as forgeries—with AE demanding that the authorities launch a criminal investigation—Mr. da Costa started to point the finger at AE.

13.     Mr. da Costa's colleagues at GE were all too happy to maintain Mr. da Costa's false narrative.  So they maintained the lie that Angola had already paid for the four additional turbines.  This claim, again, was demonstrably false.  The amendment letters, as noted, were complete fabrications.  Moreover, the AE-MINEA Contracts contemplated that Angola would purchase only eight turbines; AE had invoiced Angola only for eight turbines; MINEA had approved only those invoices (which covered only the eight turbines to be installed under the AE-MINEA Contracts, as well as other goods and services to be provided by AE); and AE has completed the work called for by the contracts and invoices in line with all contractual milestones.  Angola thus did not purchase any additional turbines from AE.

14.     Nevertheless, over the course of the days, weeks, and months that followed, GE maintained its false narrative— ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████ GE soon received an additional reason to stay the course—at GE's behest, Angola proposed to take the work from AE and hand it to GE.

15.     Remarkably, GE's scheme worked:  Angola ultimately accepted GE's false claim that it had bought twelve turbines rather than eight, and blamed AE for Mr. da Costa's wrongdoing—alleging that AE had engaged in "irregularities" with respect to the GE Credit Facility (to which AE is not even a party).  Accepting that false narrative gave Angola the pretext to stiff AE on its bills.  And because GE was willing to take over the relationship (and had pushed for that result) Angola decided, on that basis and as a direct and proximate result of GE's tortious efforts, to repudiate all its contracts with AE and to assign them to GE instead.

16.     Angola had no basis in fact to terminate the AE-MINEA Contracts.  The documents refute GE's false claim that Angola bought twelve turbines from AE; Angola has only ever paid AE for eight turbines; AE has performed the work that it invoiced in line with all contract milestones; and as of the date of termination, AE had already performed work worth more than $100 million beyond what it was paid by Angola.

17.     And there is clear evidence that Mr. da Costa created the fake letters—evidence GE covered up so as to point the finger at AE—including an email from Mr. da Costa saying *he* had collected the fake letters from Angola and had them signed by Angola.  This was a plain lie, given that all parties agree that the documents are fake and Angola never signed them.  On the other hand, there is no evidence that AE created the fake documents, and no reason AE would have done so.  GE's accusation was thus entirely devoid of factual substance, and yet Angola credited it, even after Angola had separately accused Mr. da Costa of falsifying other GE business records unrelated to AE, and *arrested him for falsifying his own identity documents*.

18.     Leaving aside the factual implausibility of GE's and Angola's accusations, Angola also had no basis in law to justify termination of the AE-MINEA Contracts anyway, because even if AE employees had been involved in creating the forgeries (and they weren't),

6

that would not be a ground for termination of the AE-MINEA Contracts. Indeed, as noted, AE was *not* a party to the GE Credit Facility—in connection with which the forged amendments were used—so AE was legally incapable of breaching that contract. And there was never any accusation that AE had breached its own obligations to Angola, whether under the AE-MINEA Contracts or otherwise.

19.     Moreover, Angola and GE did not just unlawfully deprive AE of the benefits of its bargain under the AE-MINEA Contracts, including hundreds of millions in lost profits that AE would have earned had the AE-MINEA Contracts not been repudiated. As noted, Angola has continued to stiff AE on more than $100 million in receivables due on the AE-MINEA Contracts—for work that AE completed before the repudiation, as called for under the AE-MINEA Contracts beyond the work that Angola paid for on account of AE invoices. And Angola then proceeded to use the same false charges to terminate without factual or legal justification a separate, unrelated concession Angola had awarded to AE-subsidiary Combined Cycle Power Plant Soyo, S.A., itself worth over a hundred million U.S. dollars.

20.     Not content to leave it at that, Angola, with GE's active assistance and participation, proceeded to take possession and assume control of the four turbines that its President had authorized his government in the fall of 2018 to acquire from AE for $154 million. GE's false claim that Angola had paid for twelve turbines gave Angola the pretext to take AE's four turbines without paying *any* compensation to AE.

21.     Initially, Plaintiffs tried to cause Angola to re-evaluate its position on these matters by pressing administrative proceedings before MINEA, the President of Angola, and the Angolan courts. In support, AE sought discovery from GE under 28 U.S.C. § 1782. Although it took several motions and judicial orders—including admonitions from this Court addressed to

7

GE's litigation tactics and "obvious gamesmanship"—GE ultimately produced damning evidence of ███████████████████████████████████. Some of that evidence is set forth below: it shows ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ AE believes that evidence is just the tip of the iceberg.

22.     Faced with this evidence, the most damning of which AE presented to the Angolan executive and judicial authorities, to date Angola has done *nothing* to right the wrongs against AE, or hold GE accountable for its wrongs against AE.[1]  And why would Angola care? GE's false charges have allowed Angola to avoid paying AE hundreds of millions of dollars, while continuing to use the financing provided by GE Capital.

23.     Given the passage of time, it appears painfully obvious Angola intends to live up to its poor international reputation.  As the U.S. State Department reported in 2018 (when the conduct here at issue took place)—and as it still reports today, essentially verbatim—"[t]he [Angolan judicial] system lacks resources and independence to play an effective role and the legal framework is obsolete" with "Courts remain[ing] wholly dependent on political power."[2] Meanwhile, in Angola, "[c]orruption remains pervasive and institutionalized."[3]  Given the wealth of damning evidence to which the Angolan government has stubbornly turned a blind eye, it is difficult to otherwise explain Angola's conduct toward AE.

---

[1] AE submitted additional evidence obtained from GE in the Section 1782 proceedings just this week, in the hope of spurring the Angolan court to favorable action.  But given that court's failure to cause the matter to progress, AE is pessimistic that the Court will provide AE any due process.

[2] "2018 Investment Climate Statements: Angola," U.S. Department of State, *available at* https://www.state.gov/reports/2018-investment-climate-statements/angola/.

[3] *Id.*

24.     To date, the Angolan legal system has provided AE no due process. AE, which has been crippled by the conduct alleged herein, now invokes this Court's jurisdiction to clear its name and obtain just compensation from Angola and GE, as well as punitive damages.

## THE PARTIES

25.     Plaintiff Aenergy, S.A. ("AE") is a Portuguese-shareholder-owned corporation constituted under the laws of the Republic of Angola with its principal place of business in Angola. AE, which was previously known as Aenergia, S.A., was founded in 2012 by non-party Ricardo Leitão Machado, who is a Portuguese citizen and who owns 99.9% of AE's stock.

26.     Plaintiff Combined Cycle Power Plant Soyo, S.A. is a wholly owned subsidiary of plaintiff AE. It is incorporated in Angola and maintains its principal place of business there.

27.     Defendant the Republic of Angola (the "Republic") is a "foreign state" within the meaning of 28 U.S.C. § 1603(a). As noted, the U.S. State Department has recognized that Angola's legal system does not provide due process, and advises that corruption in the country is pervasive. ███████████████████████████████████████

████████████████████████████████████████████

28.     Defendant Ministry of Energy and Water of the Republic of Angola ("MINEA"), a ministry of the Republic of Angola, is a political subdivision of the Republic and is thus a "foreign state" under 28 U.S.C. § 1603(a). Although a foreign state under the Foreign Sovereign Immunities Act ("FSIA"), MINEA is responsible for providing power and water and conducts various commercial activities in relation to that function.

29.     Defendant Ministry of Finance of the Republic of Angola ("MINFIN"), a ministry of the Republic of Angola, is a political subdivision of the Republic and is thus a "foreign state" under 28 U.S.C. § 1603(a). As noted herein, it entered into a credit facility, which is a commercial contract, in order to finance the commercial work at issue in this case.

30.     Defendant Empresa Pública de Produção de Electricidade, EP ("PRODEL"), a subsidiary entity of MINEA (which is a ministry of the Republic of Angola), is an "agency or instrumentality" of Angola under 28 U.S.C. § 1603(b) because (1) as a public company, it is a separate legal person; (2) it is an organ or political subdivision of the foreign state; and (3) it is not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c). Accordingly, PRODEL is a "foreign state" under 28 U.S.C. § 1603(a), which defines a "foreign state" to include an "agency or instrumentality of a foreign state."

31.     Defendant Empresa Nacional de Distribuição de Electricidade ("ENDE"), a subsidiary entity of MINEA (which is a ministry of the Republic of Angola), is an "agency or instrumentality" of Angola under 28 U.S.C. § 1603(b) because (1) as a public company, it is a separate legal person; (2) it is an organ or political subdivision of the foreign state; and (3) it is not a citizen of any state of the United States as set forth under 28 U.S.C. § 1332(c). Accordingly, ENDE is a "foreign state" under 28 U.S.C. § 1603(a), which defines a "foreign state" to include an "agency or instrumentality of a foreign state."

32.     Defendant General Electric Company ("GE Co.") is a New York corporation with its principal place of business in Boston, Massachusetts.

33.     Defendant General Electric International, Inc. is a Delaware corporation with its principal place of business in Shelton, Connecticut.

34.     Defendant GE Capital EFS Financing, Inc. ("GE Capital") is a Delaware corporation with its principal place of business in Norwalk, Connecticut.

### JURISDICTION AND VENUE

35.     This Court has subject-matter jurisdiction over the claims asserted against the Angola Defendants under 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall

have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" within the meaning of 28 U.S.C. § 1603(a).

36.     This Court also has subject-matter jurisdiction over Counts One, Two, Three, Six, Nine, and Ten under 28 U.S.C. § 1605(a)(2) because, as described herein (including in Part V of this Complaint), these claims are based upon "an act performed in the United States in connection with a commercial activity of [the Angola Defendants] elsewhere" and/or because they are based upon "an act outside the territory of the United States in connection with a commercial activity of [the Angola Defendants] elsewhere" that "cause[d] a direct effect in the United States," such that the Angola Defendants are not immune from suit for those claims.

37.     This Court has subject-matter jurisdiction over Counts Four through Six under 28 U.S.C. § 1605(a)(3) because these are claims for property taken in violation of international law, such that the Angola Defendants are not immune from suit for those claims.

38.     The Court has subject-matter jurisdiction over the claims asserted against the GE Defendants under 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000 and Plaintiff is a citizen of a foreign state while the GE Defendants are all citizens of a U.S. state.

39.     This Court has jurisdiction over the Republic of Angola under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

40.     This Court has jurisdiction over MINEA under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

41.     This Court has jurisdiction over MINFIN under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

42.     This Court has jurisdiction over PRODEL under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

11

43.     This Court has jurisdiction over ENDE under 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(b).

44.     This Court has general personal jurisdiction over GE Co. because it is a New York corporation.

45.     This Court has personal jurisdiction over the remaining GE Defendants on the basis that:

    a. The GE Defendants are a wholly-owned group of companies that, at least in the circumstances giving rise to this action, have stated that they have—and have in fact—operated as a single enterprise and in furtherance of a common project, such that they are subject to personal jurisdiction in New York based on GE Co.'s contacts and conduct; and/or

    b. General Electric International, Inc. and GE Capital each individually and purposefully availed themselves of the privilege of conducting business with GE Co. in the United States, and more specifically in New York; plaintiffs' claims arise from or relate to that conduct; and it is reasonable to adjudicate plaintiffs' claims against all GE Defendants in New York; and/or

    c. GE Co. undertook substantial acts in New York from which this lawsuit arises or to which it relates, including in furtherance of the plot to oust AE, and the remaining GE Defendants were aware or should have been aware of these acts.

46.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(f)(1), in that a substantial and material part of the events or omissions giving rise to the Complaint occurred within this district.

## FACTUAL BACKGROUND

**I.** **RICARDO MACHADO FOUNDS AND DEVELOPS AE, AND AE DEVELOPS THE MARKET FOR GE'S PRODUCTS IN ANGOLA**

47.     Ricardo Machado is a Portuguese investor and entrepreneur.  He observed that energy companies operating in certain African countries often were not just unreliable but also supplying energy at very high prices.  Exacerbating the problem, he observed, local energy companies in Angola typically acted as agents or distributors for international conglomerates, and did not develop long-term, sustainable solutions based on local know-how.

48.     Sensing an opportunity, he believed he could change the way business was done in Angola and, in the process, deliver cost-effective, reliable, and environmentally-friendly energy solutions.  The idea was to build a fully functioning enterprise from the ground up, leverage local know-how, invest in training, and partner with an international manufacturer.

49.     Machado and AE first put their vision to the test in 2013, when AE initiated its first significant project in Angola—the construction of Malange Power Plant.  Although this was a relatively small project (relative to the Angolan power grid), it permitted AE to prove the viability of its founding principles—and show it could deliver cost-efficient and reliable solutions.  This first project was also the start of AE's relationship with GE—to complete the project, AE acquired GE turbines from the United States, and deployed them locally.

50.     The successful execution of this first project led AE and GE to execute two memoranda of understanding covering, respectively, the energy and transportation sectors in Angola.  At the time, GE did not have a commercial team in Angola covering these areas. Following the successful work in Malange and the execution of the two MOUs, AE worked in earnest, in partnership with GE, to develop the Angolan market for GE products and services.

13

51.     In 2014, the two companies approached the Export-Import Bank of the United States in Washington, D.C., to seek a funding solution for energy and transportation projects being discussed with Angola to deploy GE products manufactured in the United States. This led the Export-Import Bank to begin negotiations with Angola over a possible credit facility, and even to sign an memorandum of understanding ("MOU") in the United States. Those negotiations and that MOU were the critical beginning of a process that ultimately led to GE extending credit to Angola—via its GE Capital subsidiary—under the credit facility described in this Complaint.

52.     Meanwhile, AE continued to work with GE to provide energy solutions to Angola for projects commissioned by MINEA, PRODEL, and ENDE. Time and again, the AE team provided timely, reliable, and cost-effective solutions to Angolan power plants—including in moments of crisis and in response to various emergencies—while supplying GE-manufactured equipment made in the United States. In December 2014, for example, following a massive power crisis, AE supplied a mobile power generator manufactured by GE in just 22 days—addressing a crisis in record time with reliable technology.

53.     Beyond building power facilities, AE also introduced the concept of long-term service contracts covering the maintenance of power plants. The introduction of those contracts helped to ensure that power plants in Angola could reliably supply energy to the power grid, while avoiding recurrent maintenance and performance issues. AE executed its first service contract in Angola in 2015, covering the Malembo Power Plant; AE subcontracted some of the work to GE. Again, the model proved to be reliable, efficient, and cost-effective.

54.     With the business relationship between AE and GE continuing to develop, AE entered into several new contracts with U.S.-based affiliates of the GE Co. pursuant to which AE bought GE-manufactured produces and GE-provided services.



## II.     ANGOLA AWARDS THIRTEEN CONTRACTS TO AE AND THEN REPUDIATES THEM AS A DIRECT RESULT OF GE'S TORTIOUS MISCONDUCT

### A. The Contracts Among AE, Angola, and GE

#### 1.  AE Wins Thirteen Critically Important Contracts From Angola

58.     In or around August 2017, AE entered into the thirteen AE-MINEA Contracts with PRODEL and ENDE (which are overseen by MINEA) to construct, extend, refurbish, and

maintain power plants in Angola—and thus, in GE's words, to "provide critical electricity infrastructure" in Angola, where many still lacked access to power. Ex. 1 at '495.

59.    These thirteen AE-MINEA Contracts were approved by a series of presidential decrees dated July and August 2017.

60.    The contracts were then signed by duly-authorized representatives of PRODEL and ENDE, as applicable.

61.    In summary, and as most relevant here, these thirteen contracts contemplated the following work:

- Under AE-MINEA Contracts 1, 3, 7, and 13, Angola agreed to purchase, respectively, two, three, two, and one new TM2500 turbines (a total of eight such turbines) manufactured by GE in connection with four public-works projects.

- Under Contract 6, Angola agreed to a 5-year contract for AE to service the Soyo power-plant facility.

- Under Contract 11, Angola retained AE to provide and install certain power-generation kits (including domestic generators and solar kits).

- Under Contract 12, Angola agreed to pay AE for the supply and installation of water systems to suburban and rural parts of the country.

- The balance of the contracts covered various goods and services in connection with energy projects in Angola.

62.    Collectively, the contracts called for PRODEL and ENDE to pay AE roughly $1.1 billion in U.S. dollars.

### 2. AE Signs Supply Contracts With GE Affiliates

63.     At around the same time, AE also entered into several contracts with GE (beyond the contracts described above), including for the supply of additional goods and services.

64.     ███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

███████████████████████████████████

65.     AE also contracted with two GE affiliates to purchase additional GE turbines and parts. As noted, AE had already contracted, in June 2016, to acquire three TM2500 turbines from GE. But it needed and wished to buy more. Thus, AE contracted to acquire another seven TM2500 turbines in March 2017 and another four TM2500 turbines in June 2017.

66.     In total, during this time, AE agreed to purchase a total of fourteen TM2500 turbines from GE—six more than necessary for AE to fulfill its contractual duties to Angola (under Contracts 1, 3, 7, and 13).

67.     AE bought this excess inventory for its own commercial reasons, including because it wished to have access to power-generation turbines for potential future public-works projects in Angola (including for work already being discussed with Angola as a possibility, but not finalized or reflected in the thirteen AE-MINEA Contracts). AE thus took on the risk that it would acquire turbines Angola would not want.

68.     But this risk was mitigated by the total value of the thirteen AE-MINEA Contracts—over $1 billion—and the margin those contracts gave AE to cover the costs of acquiring additional turbines to keep in reserve. AE also thought the risk was reasonable given

17

its knowledge of the Angolan market and the expected energy-generation needs. In that respect, MINEA had adopted a ten-year strategic plan to develop the power sector over the years 2015 through 2025, and AE was optimistic it could sell Angola additional turbines. AE wished to be in pole position to satisfy Angola's needs as they arose.

### 3. Angola Secures Financing From GE Capital 

69.     In August 2017, the Angola Defendants, through MINFIN, entered into a $1.1 billion financing agreement with GE Capital (i.e., the GE Credit Facility) to permit Angola to pay AE the amounts due under the thirteen AE-MINEA Contracts.

70.     AE was not a party to the GE Credit Facility and was not involved in the negotiation or approval of that facility, or in setting any of the terms in the governing documentation. Nor did AE have first-hand knowledge of the details of the facility. And, obviously, AE (a non-party) did not have any obligations under or related to the Credit Facility.







77.

GE assumed—

—that MINEA *had already agreed* to purchase *twelve* GE-manufactured TM2500 turbines from AE, and would *likely* buy an additional two (for a total of *fourteen*). In fact, as noted and as Mr. da Costa was told by AE in real time, the AE-

MINEA Contracts called for AE to provide to Angola and install *only eight* new TM2500 turbines—and AE had agreed to purchase *fourteen* GE turbines (an additional six) *for its own commercial reasons* rather than to satisfy then-existing obligations to Angola.





## B.  GE Employees Forge Amendments To The AE-MINEA Contracts

### 1.  GE "Discovers" The Discrepancy Between The Number Of Turbines Called For Under The Various Contracts And Recognizes The Risks

83.      It was only after the loan agreement was signed in late August 2017 that GE's senior executives discovered the disconnect between the number of turbines that MINEA had agreed to buy from AE (only eight turbines) and the number of turbines GE believed were covered by the AE-MINEA Contracts (twelve turbines), to say nothing of the number of turbines AE had agreed to buy from GE (fourteen turbines).



22







### 2. AE, Angola And The GE Defendants Discuss Expanding The Scope Of The AE-MINEA Contracts To Add Turbines

91.     Although this was a really a problem that GE had created for itself—both in its negotiations with Angola over the Credit Facility and in its internal approval and diligence processes—GE decided to approach AE to try to get AE's help to fix it.  Specifically, GE requested that AE work with GE to find a way to immediately sell to Angola additional turbines beyond the eight turbines covered in the scope of work specified in the then-in-force AE-MINEA Contracts.  GE impressed upon AE that accommodating the short-term needs of GE—AE's principal partner and a key supplier of goods and services for AE—would ultimately redound to AE's benefits in the long term, in view of the AE-GE commercial partnership.

92.     AE ultimately agreed to look for a short-term solution to sell additional turbines (beyond the eight) to the Angolan government, even if that meant AE would have to give up (for the time being) some of the margin it expected to receive on the AE-MINEA Contracts that it had secured from the Government of Angola.  AE did not have to do this, and indeed from its perspective it had signed contracts with Angola that required Angola to pay AE $1.1 billion for the work set forth therein.  AE agreed to work with GE (and to try to help GE achieve its short-

term objectives) solely in response to the commercial pressure that GE (AE's principal supplier) exerted upon AE at the time, in the spirit of promoting the AE-GE commercial partnership, and in view of the long-term expectations AE had in view of Angola's 10-year strategic plan.

93.     What AE and GE settled upon in September 2017 was for AE to request that MINEA amend Contract 7 between AE and MINEA to include four TM2500 turbines in that project—rather than the two turbines set forth in the signed contract—and for AE to use its "best efforts" to seek to add four more turbines to the projects reflected in Contracts 11 and/or 12 between AE and MINEA. The goal was to keep the overall value of the AE-MINEA contracts at $1.1 billion (*i.e.*, the amount that was available for funding under the GE Capital facility); thus, if MINEA agreed to buy additional turbines, MINEA would (at least for now) also reduce the scope of goods or services that were otherwise to be provided in those contracts to be funded by the credit facility, and thus revise the projects it had contracted for AE to complete.

94.     Although AE agreed to try to make this happen in the interest of the AE-GE commercial partnership, it was a departure from the business strategy AE had been seeking to implement. Indeed, as noted above, AE had bought those turbines for its own purposes. AE's business strategy had been to try to sell them in connection with other projects in the business pipeline then being discussed with Angola (projects not connected to the thirteen contracts).

95.     In or around September 2017, GE came to the view that, if Angola signed letters meeting certain specifications, and in which Angola expressly agreed to amend the scope of Contracts 7 and 11 to add two turbines to each of the two contracts (for a total of four), no presidential action would be required to effectuate these scope changes. GE believed, however, that it would take a formal presidential decree for Angola to purchase the thirteenth and

fourteenth GE TM2500 turbines (through Contract 12), and that it was likely impractical to obtain such a decree by year-end given the then-recent presidential election.

96.      As a result, in the period starting early September 2017, and at GE's request, AE formally asked MINEA to sign amendment letters conforming to GE's requests (and meeting GE's specifications), under which Angola would purchase two more turbines under Contract 7 and two more turbines under Contract 11.



98.      In turn, at GE's request, AE's representatives requested that the Angolan government adopt amendment letters meeting GE's wording requirements.

### 3. Angola Declines To Proceed As GE Desired, And GE Resorts To Desperate (And Illegal) Measures

99.      By early October 2017, although some progress was being made in discussions with Angola, the amendments GE desired were still not approved,



██   ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

101.    Finally, on October 12, 2017, Angola formally responded to the request.

102.    But Angola's response came in the form of letters stating that Angola's agencies would *consider* purchasing four additional turbines beyond the eight contracted-for turbines. Those letters did *not* reflect the proposed text that GE and GE Capital wanted (under which ENDE and PRODEL would unconditionally agree to take the four turbines and reduce the balance of the scope for Contracts 7 and 11), ████████████████████████████████ ████████████████████████████ Instead, ENDE and PRODEL's letters of intent stated that they were open to acquiring four more turbines in the existing projects (two additional turbines in Contract 7 and two additional turbines in Contract 11), but that any purchase would be subject to completing a technical analysis and to satisfying certain legal requirements necessary to amend the scope of work.  Copies of these letters (the "October 2017 Letters of Intent") are enclosed with loose translations as Exhibits 2 and 3.

████    That same day, GE's representatives in Angola—including Mr. da Costa and Leslie Nelson (who was then in charge of the GE Power's Sub-Saharan Africa business, ████████ ████████████████████████████████████████████████████████████████ ██████████████████—obtained copies of the October 2017 Letters.  They realized that the letters did *not* match the text of the draft letter that GE said was necessary to make the amendments work ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

28

104.    So that afternoon, unbeknownst to AE or Angola, GE's team took matters into their own hands, and created false business records in order to satisfy the goals and requirements of the greater GE organization.

105.    During that day, GE employees used Adobe Photoshop to fabricate "signed" versions of the amendment letters that replaced the text of the real letters MINEA had signed—*i.e.*, the October 2017 Letters—with the text GE had requested, thus creating fake letters that appeared to reflect the formal amendments GE believed to be so "critical." We call these the "Fake Letters"; the metadata associated with them shows the real letters were scanned and then these scans were Photoshopped to create fake documents that superimposed the text GE wanted on the real letters (thus placing the text GE wanted between the letterhead of Angola's agencies and the signature of Angola's officials). As detailed below, all parties—AE, Angola, and GE—now agree the Fake Letters are forgeries.

106.    Further demonstrating that the Fake Letters originated with GE and Mr. da Costa, shortly before 6:00pm that day, Mr. da Costa <u>sent</u> blank emails attaching PDFs of the Fake Letters to an AE employee who was in AE's offices in Luanda, but who had no involvement in the discussions with GE or Angola over the proposed amendments. GE has taken the position that this AE employee counter-signed the Fake Letters. The AE employee denies that he did. And neither he nor any other AE employee was involved in the creation or use of the Fake Letters. (Meanwhile, GE did not show AE copies of the letters supposedly bearing his signature until late 2019, after AE had requested them multiple times, and GE has <u>never</u> provided paper copies of the letters for examination of the signature—despite AE's repeated requests for them.)

107.   At around 8:00pm that same day, October 12, 2017, ███████████████

████████████, Mr. da Costa took iPad photos of the Fake Letters, and then promptly

sent those photos by email to various GE employees, including Ms. Flanagan and Mr. Galvin,

passing them on as real documents.  Ex. 4.

108.   Mr. da Costa's email falsely recited that Angola had provided him letters

reflecting the specific language GE Capital was requesting, when in fact Angola had declined to

do so and he had fabricated forgeries that he was passing on to others at GE.  Enclosing the

photos taken in his home, Mr. da Costa reported, falsely, that "[w]e spend time at PRODEL to go

over all the details on the amendments and made sure we got some the intended letters.  We got

the contract number 7 signed with the languages that we agreed on and countersigned by AE.

We then went to ENDE where we got contract number 11 amendment signed with the language

approved by Brad [Galvin of GE Capital] and then counter signed by AE."  *See* Ex. 4.



110.   The fabricated documents satisfied GE for the time being.  ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████



111.    For its part, as noted, AE did not know that GE's employees had fabricated the Fake Letters; neither AE nor any of its employees had any involvement in their creation; and AE never used the Fake Letters.  Indeed, AE did not even learn of their existence until more than one year later.  Moreover, unlike GE and its employees, AE and its employees had no reason or motive to create or use the falsified documents, as MINEA had responded formally with the October 2017 Letters of Intent, and AE already had in place contracts with MINEA for payment of $1.1 billion, which (given the margin AE was expecting on those contracts) was sufficient to cover AE's costs, including for the purchase of all fourteen turbines.

112.    The next day, on October 13, 2017, AE received word from GE Capital that "reports came in last night that the on-sale contract amendments are now signed."  AE took that to mean that GE found the letters actually signed by MINEA—*i.e.*, the nonbinding letters of intent stating that MINEA would consider taking four turbines, subject to the satisfaction of certain conditions—were sufficient for GE's purposes.



31

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

## C. Angola Draws On The Facility And GE Pays Itself For Twelve Turbines

114.    In 2017, AE submitted $1.1 billion worth of invoices to MINEA for all the work contracted to be performed under the AE-MINEA Contracts.

115.    In December 2017, however, MINEA only approved AE invoices for approximately $644 million worth of goods and services (out of the $1.1 billion).  The balance of the invoices remained subject to review and approval at a later time.

116.    Importantly, the invoices submitted by AE to MINEA (and those approved by MINEA) reflected *only* goods and services set forth in the AE-MINEA Contracts as signed by PRODEL and ENDE and approved by the President of Angola.

117.    Thus, the AE invoices that were submitted to MINEA covered only *eight* TM2500 turbines (the eight set forth in the AE-MINEA Contracts) and no additional TM2500 turbines.  And when MINEA approved certain of AE's invoices in December 2017, it agreed to pay only for those *eight* turbines, consistent with the executed AE-MINEA Contracts—and none of the turbines subject to the October 2017 Letters of Intent.

118.    In December 2017, AE provided the MINEA-approved AE invoices to Mr. da Costa, who forwarded them to GE Capital for funding purposes.

[REDACTED]    Reflecting the conflict of interest in which GE had placed itself (as both lender and supplier), [REDACTED]

[REDACTED]



121.     Consistent with all of this, over the course of December 2017, GE sought AE's agreement to pay GE Power as much as possible from the revenues (and profits) AE stood to earn on account of the AE invoices that MINEA had approved under the AE-MINEA Contracts. If AE agreed, then, as a matter of mechanics, the funds could be disbursed directly from GE Capital to GE Power in satisfaction of AE's obligations to GE under AE-GE supply contracts.

122.     In light of GE's efforts to pressure AE to help GE meet its short-term goals, and of the fact that AE stood to receive significant revenues from Angola on account of the AE-MINEA Contracts, AE ultimately agreed to use approximately 60% of its revenues on account of the MINEA-approved invoices to pay GE for GE goods and services.  At the time, AE owed GE significantly more than this amount, and so there was no contemporaneous agreement by AE and GE to allocate this amount to specific GE invoices or specific GE-AE supply contracts.

123.     Because AE agreed to pay GE by using AE revenues earned by AE on account of the MINEA-approved AE invoices (for eight turbines and other goods and services), and because AE stood to obtain this revenue from GE Capital (on account of a disbursement request made by

33

Angola), AE agreed that GE Capital could send the money that AE agreed to pay to GE for GE goods and services straight to GE Power rather than routing it first to AE.

124.    Following this, on or about December 24, 2017, Angola's MINFIN made a utilization request under the GE Credit Facility.  The request stated that Angola wished to borrow from the GE Credit Facility to make payments owed under the AE-MINEA Contracts. The utilization request referenced the specific AE invoices, by invoice number, that MINEA had approved under the AE-MINEA Contracts, and these invoices (which set forth the specific goods and services that MINEA was paying for, including for eight TM2500 turbines) were enclosed with the utilization request.  The request further instructed the capital agent under the GE Capital loan to direct the proceeds of the loan directly to various accounts for AE and GE; this allocation reflected AE's overall agreement, noted above, that roughly 60% of the funds could be disbursed directly to GE Power (as noted in the prior paragraphs).  *See* Ex. 6.

125.    Pursuant to these requests, of the approximately $644 million that was borrowed by Angola and disbursed by GE Capital, approximately $376 million in U.S. dollars was disbursed from GE accounts in the United States to other GE accounts in the United States and elsewhere in satisfaction of certain AE obligations to GE under the AE-GE supply contracts. The balance went to AE accounts.

126.    According to AE's accounting, the net effect of these disbursements is that Angola borrowed $644 million from GE Capital to pay AE's invoices for $644 million (*i.e.*, for the eight turbines and other goods and services reflected in the approved invoices for work to be performed under the AE-MINEA Contracts), and that, of AE's $644 million in revenues on those approved invoices, $376 million was used to pay GE for goods and services under AE-GE supply contracts (with AE getting the balance).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



127.   GE was happy.  Thanks to the hard work over the holiday period, the money flowed in time to help GE meet its revenue and profit objectives for fiscal-year 2017.  And given the contributions of Mr. da Costa and his colleagues, GE gave Mr. da Costa a promotion and a sizeable bonus.  His GE colleagues, too, received handsome year-end rewards for their efforts culminating in the December 2017 disbursements.

### D.   GE's Forgeries Come To Light, And GE Tortiously Blames AE For Them

#### 1.   Angola Informs AE and GE of a Shift in Priorities, and AE and Angola Discuss Alternate Ways For Angola To Purchase The Four Turbines Subject To The October 2017 Letters

128.   Although the Fake Letters helped GE achieved its short-term objectives for 2017, trouble started to brew for GE on August 9, 2018.  On that date, MINEA held an in-person meeting with AE and the CEO of GE's Angola business (Mr. da Costa).  MINEA informed AE and Mr. da Costa it would not change the AE-MINEA Contracts in the manner set forth in the October 2017 Letters of Intent, because, among other things, MINEA's priorities had shifted.

129.   Thus, the minutes of the August 9, 2018 meeting prepared by MINEA reflect that Angola informed AE's representatives and GE's Mr. da Costa that the government wished to

complete the scope of Contracts 7 and 11 as originally agreed in August 2017. And, contrary to the October 2017 Letters of Intent (and the Fake Letters), MINEA would *not* reduce the scope of those contracts to take four more turbines. MINEA did express a willingness to work with AE and GE to find another way to purchase additional turbines that did not entail a reduction to the scope of Contracts 7 or 11. *See* Ex. 7 (MINEA meeting minutes, with approximate English translation).

130.    This development meant that, unless the situation changed, the forgeries would soon come to light: The Fake Letters reflected (falsely) that Angola had *already* and *unconditionally* agreed to buy twelve turbines. Now, Angola had made clear to GE's da Costa that it would do no such thing. Moreover, the AE invoices that MINEA had approved covered the work set forth in Contracts 7 and 11 as signed by MINEA; Angola paid AE for that work (and not for additional turbines); and MINEA wanted AE to complete all the work set forth in Contracts 7 and 11 (and the related invoices that MINEA had approved and MINFIN had paid).

131.    Tellingly, Messrs. da Costa and Nelson ████████████████████████████ ██████████████████████████████████████, in their interactions with AE, they acted as though nothing unusual had transpired. Leslie Nelson wrote to an AE employee who was in attendance at the meeting, copying Mr. da Costa, that Mr. Nelson had "received a very positive report [from Mr. da Costa] from our joint meeting today." Mr. Nelson, who knew it was just a matter of time before the Fake Letters came to light, left GE within a month.

132.    Meanwhile, and having no knowledge that Mr. da Costa had passed on falsified documents to others at GE as real (and that the Fake Letters had been used by GE for its own internal accounting and other purposes), AE sought to work constructively with GE, its commercial partner, and MINEA, its customer, to accomplish MINEA's objectives. On August

21, 2018, AE's Jorge Morgado wrote to Mr. da Costa urging him and GE to work with AE to identify alternate means for AE to sell additional turbines (beyond the eight set forth in the AE-MINEA Contracts) to Angola that would permit use of the GE Capital Credit Facility.

133.    GE's da Costa, however, ignored AE's requests.

134.    As a result, AE continued the discussions with MINEA unilaterally.  In those discussions, AE and MINEA discussed alternate scenarios under which AE could sell to Angola (and install) the four turbines that had been the subject of the October 2017 Letters of Intent for new projects in lieu of those projects described in the October 2017 Letters of Intent.  In one of the more promising scenarios, AE and Angola would amend another existing AE-MINEA Contract (Contract 6), which was a five-year contract for the service of a power facility, to reduce it by two years, thus freeing up approximately $154 million with which Angola could purchase the four additional turbines and have AE install and perform related work at a different facility.

135.    This proposed change to Contract 6 would have the benefit of allowing Angola to finance the additional turbines under the existing $1.1 billion GE Credit Facility, assuming GE were to allow a new draw, because only $644 million had been drawn from the facility; MINEA had not yet approved AE's invoice for the $154 million in services to be reduced from Contract 6; and, by the same token, Angola had not borrowed money to pay for the services to be omitted from Contract 6.

136.    MINEA approved the proposal to (a) purchase four additional TM2500 turbines for $154 million for installation by AE and (b) reduce the scope of services to be provided under Contract 6 by $154 million.

137.    On October 31, 2018, MINEA requested that the President of Angola approve

MINEA's proposal, and AE understands and alleges that the President did approve the change.

But, as explained below, the amendment was never implemented, because GE blew it all up.

**2.  GE Presents Forged Documents To Thwart AE's Proposed Alternate Agreement with Angola, Falsely Blames AE For The Forgeries, and Falsely States That Angola Had Already Purchased Twelve Turbines**

138.    GE was in a bind.  AE was preparing to agree with MINEA to amend Contract 6

to shift to AE more than $100 million in revenue that might have otherwise flowed to GE (in the

form of subcontracted services) so that MINEA could buy turbines from AE that AE had already

bought from GE, and for which GE was already paid.  Just as importantly, the Fake Letters were

about to come to light.  Cornered, GE resorted to desperate and tortious measures.

139.    Matters came to a head during meetings among MINEA, AE, and GE on

December 5 and 7, 2018, initially called for to discuss, among other things, amending Contract 6

in the manner AE and MINEA agreed, MINEA had recommended, and the President approved.

140.    At these meetings, to the surprise of AE and MINEA, GE's da Costa took the

position that the AE-MINEA Contracts had *already* been amended and that, under the

amendment, AE had *already* agreed to provide four additional turbines to MINEA.  Not only

that, GE's representative took the position that the Government of Angola had *already* paid AE

for the four turbines.  All of this was categorically untrue, of course, and also known by Mr. da

Costa to be false.

141.    At the December 7, 2018 meeting, to support his false claims, Mr. da Costa

showed Angola's representatives his cellular telephone, on which he brazenly displayed digital

copies of the Fake Letters he had created (and provided to his GE colleagues).  The letters, which

reflected the signatures of PRODEL and ENDE officials (but not AE's), purported to show a binding amendment to Contracts 7 and 11.

142.   The outcry was immediate. AE's representatives denounced these digital documents as forgeries; so did the representatives of MINEA. MINEA even checked its files for the original October 2017 Letters of Intent, the review of which confirmed that the Fake Letters da Costa presented were, indeed, forgeries. The meeting ended abruptly with the Minister of Energy and Water demanding that AE and GE clarify their positions on these serious matters.

143.   After the meeting, GE maintained the position that Angola had *already* paid AE for the shipment and installation of the four at-issue turbines.

144.   AE pushed back and denounced GE's statements as false. AE never invoiced MINEA for the four turbines. MINEA did not approve any payment to AE for the four turbines. AE's invoices for Contracts 7 and 11 reflect work called for by those contracts—work that AE had either already completed in accordance with the relevant contractual milestones or that AE would complete as MINEA said it wanted on August 9, 2018—and work for which AE was entitled to payment. AE thus only received payment for work it was contracted to perform for MINEA under the AE-MINEA Contracts. As such, there is no sense in which Angola ever paid for or bought the four turbines from AE. And although GE did pay itself for these four turbines from amounts drawn from the GE Capital facility, that disbursement reflects the economic reality, described above, that *AE's profits and revenues* on the goods and services that AE invoiced MINEA under the AE-MINEA Contracts (i.e., eight turbines and other goods and services) were used to pay GE for amounts due under the GE-AE supply contracts.

145.   AE also denied responsibility for the fabrication or use of the Fake Letters, upon their presentation by Mr. da Costa, in the immediate aftermath, and today. AE is not aware that

any of its employees was complicit in GE's creation of the forgeries, and neither GE nor Angola has ever presented any evidence that AE was involved in their creation—despite repeated requests by AE, including through court processes, for the production of evidence.

146.    In response to GE's false accusations, AE sent a number of communications to Angola, in which it sought to clarify the situation. It stated that AE had purchased more than eight turbines from GE for its own reasons; that AE had title to the turbines that had not yet been sold to Angola (*i.e.*, the six turbines beyond the eight that MINEA had purchased from AE under the AE-MINEA Contracts); and that funds from the GE Credit Facility had been used to pay for four of the extra six turbines in the sense that AE's revenues on account of amounts invoiced by AE to Angola were used to pay GE Power. Meanwhile, Mr. Machado, AE's CEO, requested that the Angolan authorities launch a criminal investigation to get to the bottom of things.

147.    But MINEA ignored AE's clarifications and requests, and, also ignoring Angolan law, did not alert the Angolan Attorney General at the time that a crime had apparently been committed involving the falsification and use of fake documents issued by public entities supervised by MINEA and related to government contracts. Instead, and although AE did not know it at the time, Angola chose to simply accept Mr. da Costa's versions of the facts and to protect him, and ultimately GE—without any fair and independent investigation of the facts, or any due process being accorded to AE— ████████████████████████

### 3.   GE Sticks By Its False Story Even While AE And MINEA Denounce The Fake Letters As Forgeries

148.    In the days, weeks, and months following the December 2018 meeting, GE doubled down on its false accusations while covering up Mr. da Costa's misdeeds, leveraging the corruption of Angolan officials and the lack of due process.

149.   GE thus maintained the false narrative that AE had caused Angola to pay AE for twelve turbines even while Mr. da Costa (GE's principal spokesperson with Angolan authorities) knew this was false, and even as evidence of the falsity of the narrative that GE had given the authorities continued to mount at GE and elsewhere.

a.   On December 6, 2018 (the day between the two AE-GE-MINEA meetings), AE's acting general counsel wrote to two GE Capital employees, Raghuveer Kurada and Brad Galvin, to alert them to AE's position on the turbines—namely, that the AE-MINEA Contracts contemplated the purchase by MINEA of only eight turbines; that MINEA had provided letters of intent expressing an openness to add four turbines but "conditioned [on] impact analysis of such change and the necessary formal legal approval"; that the formal steps set forth in the letters of intent did not materialize; and that there had been a "change of needs and priorities from MINEA" such that MINEA wanted its contracts to be completed as originally agreed.

41

d.   At the December 7, 2018 meeting, as noted above, both MINEA and AE, the two purported signatories to the Fake Letters, denounced the Fake Letters as forgeries, and both confirmed that they had in their files only the October 2017 Letters of Intent, which were conditional and did not match the Fake Letters.  Moreover, both AE and MINEA agreed that the AE-MINEA Contracts covered only eight turbines and had never been amended.

e.   On or about December 13, 2018, MINEA sent Mr. Sezan of GE a formal letter about the four at-issue turbines.  See Ex. 9.  MINEA's letter stated that MINEA had only *"agreed to acquire a total of 8 (eight) units TM 2500"*; that it was aware of "the entry into our territory of 4 (four) units TM 2500 more"; and that, "[a]fter verifying and confirming [with] the CEO of GE Angola, Mr. Wilson da Costa, we conclude that the *four (4) units TM 2500 more were acquired with recourse to the credit granted by GE Capital to the Republic of Angola,* which constitutes a serious irregularity, to the extent, which have not been requested, and *no addendum or valid document has been issued which would justify changing the scope of the contracts and the prices."  Id.* (emphasis added.)  Mr. Sezan forwarded the letter—which made it clear both that Angola considered it had purchased only eight turbines and that the Fake Letters on which GE had relied for its own accounting and credit purposes were forgeries—to various GE employees, including Mr. Galvin.

f.   On December 17, 2018, Mr. Machado sent an email to MINEA, copying Messrs. da Costa and Sezan, reciting AE's perspective on the relevant facts leading to the December 5-7, 2018 meetings and providing additional detail relating thereto.  The email again recounted that the October 2017 Letters of Intent were conditional (*i.e.*, MINEA "expressed [its] availability to

analyse the feasibility of the proposed amendments, provided that said amendments would be

duly evaluated and approved pursuant to applicable law"), that the government's priorities had

changed, and that Angola had only ever purchased eight turbines.

██The next day, December 18, 2018, Messrs. Sezan and da Costa met in person with

MINEA—without AE. ██████████████████████████



h.   In a December 20, 2018 recap of this December 18 meeting Mr. Sezan had with

MINEA, Mr. Sezan told his GE colleagues he had "clarified the TMs that have been funded"—

namely, twelve—and noted that MINEA's representatives "mentioned that his contract with AE only included 8 TMs"—confirming again that the Fake Letters were forgeries—and he wanted "AE and GE to share with him the documentations used to fund the 4 additional TMs." *See* Ex. 10.

      i.   The next day, December 21, 2018, AE's Machado sent GE's Strazik a detailed letter stating, consistent with what Angola was telling GE, that the AE-MINEA Contracts covered only eight turbines and that, although Angola had signed letters of intent in October 2017, those were conditional and did not amend the AE-MINEA Contracts. That letter was widely disseminated within the broader GE organization.

      150.   While GE was maintaining the false narrative that Angola had purchased twelve turbines, GE knew that Angola had drawn on the GE Credit Facility on account of AE invoices that covered only eight turbines, and also came to know that the Forged Letters were fake. (Mr. da Costa, who acted at all times on GE's behalf and whose acts are fully attributable to GE, was always aware of the Fake Letter's falsity, given the incriminating note he wrote tying himself to the letters.) Indeed, GE had copies of AE's MINEA-approved invoices and MINFIN's funding request (which covered only eight turbines), while both MINEA and AE (the two purported signatories to the Fake Letters) told GE the Fake Letters were fake.



152.



153.    GE also knew that Mr. da Costa was directly implicated in the creation of the Fake Letters. He had implicated himself. Recall that on October 12, 2017, when Mr. da Costa sent the Fake Letters to his GE colleagues, he said (in an email that went to Mr. Strazik and other senior GE executives) that *he* had obtained the letters directly from MINEA, which couldn't be true given that the letters are forgeries. ("***We spend time at PRODEL*** to go over all the details on the amendments and *made sure* ___we___ *got some the intended letters.* ___We got the contract___ ___number 7 signed___ with the languages that we agreed on and countersigned by AE. ___We then went___ ___to ENDE where we got contract number 11 amendment signed with the language approved by___ ___Brad [Galvin of GE Capital] and then counter signed by AE___").

154.    ███████ GE's persistence in the contrary narrative—that GE was an innocent bystander—cannot be excused as a matter of short memory. To the contrary, in January 2019, GE's employees also dug up and re-circulated internally Mr. da Costa's incriminating October 12, 2017 email. *See* Ex. 12. But rather than come clean, GE decided to cover up what it knew about the Fake Letters—even while MINEA had expressly asked GE to see the documentation,

and even though the <u>only</u> documentation GE had on what GE had considered to be a critical issue in the fall of 2017 consisted of poor photos taken on a mobile device (indeed, Mr. da Costa had 'ignored' Mr. Galvin's November 2017 request for better copies of this documentation).

155.    Consider Mr. Galvin's words, in the January 2019 email recirculating Mr. da Costa's damning October 12, 2017 email: "Per our chat this morning, attached are the amendment letters counter-signed by AE. *I have left Wilson's commentary at the top to give this group some context <u>but would think we should delete before showing MINEA</u>." Id.* (emphasis added.)  Putting lipstick on this piggish coverup, Mr. Galvin added, "Nothing untoward in it, but it is intra-GE commentary." *Id.*

156.    Of course, Mr. da Costa's false narrative (that he had obtained the letters directly from MINEA) was not "commentary," but incriminating evidence about GE employees that GE decided to conceal in order to protect itself at AE's expense.  It is damning that GE kept this information from Angola at the same time as MINEA was expressly asking GE about the documentation related to the false claim, made by GE, that Angola bought twelve turbines.  And GE never did provide MINEA the complete truth—indeed, as noted below, GE did not even provide MINEA a copy of the Fake Letters until September 2019, after the contracts were terminated.

### 4. AE Raises These Matters To Senior GE Officers, And GE Maintains Its Misinformation Campaign To Further GE's Interests And To Interfere With AE's Contracts And Relationship With MINEA

157.    During this period, AE tried its best to salvage its reputation, correct the false and misleading statements that GE was leveling (at least those of which AE was aware), and put a stop to GE's campaign of misinformation.

158.    Concerned by Mr. da Costa's implication in the criminal conduct he was blaming

AE of committing—and his continued involvement representing GE in meetings with MINEA—

AE repeatedly sought to bring these matters to the attention of GE's senior executives.

159.    To that end, AE's lawyers wrote multiple emails and had multiple meetings with

senior executives at GE.

160.    For example, on December 19, 2018, AE's lawyer wrote again to Messrs. Kurada

and Galvin of GE Capital to complain that AE had "tried to contact you … several times" to no

avail to try to address the "series of allegations and doubts raised by GE Power representative"

(i.e., Mr. da Costa) at the December 7 meeting.  GE Capital's response was to defer to the CEOs

of its Angola and sub-Saharan businesses, Messrs. Da Costa and Sezan, while responding that

"GE's notes from the meeting to which we think you refer are not wholly consistent with the

narrative in your email."

161.    Similarly, Mr. Machado attempted to get Mr. Strazik and other senior GE officers

to step in.  On December 21, 2018, Mr. Machado sent a detailed, six-page letter to Mr. Strazik

explaining that GE's personnel on the ground was spreading false information about AE.  As

noted above, the letter explained that the AE-MINEA Contracts covered only eight turbines, and

that these had never been formally amended, given that the October 2017 Letters of Intent were

non-binding and conditional.

162.    Mr. Strazik and his colleagues, however, again chose to continue to rely on the

very people who were at the center of things, with Mr. Sezan (copying Mr. da Costa) telling Mr.

Strazik that Messrs. Sezan and da Costa would "manage and reach out if we need help."  And

throughout this time, GE made it clear it was relying on Mr. Sezan (and, until his departure, Mr.

da Costa) to—in the words of senior GE executive Frederic Ribieras—"run[] the region for GE" and "own the[] relationships."

163.    Why did GE do all this?  Going into December 2018, GE had multiple reasons to blame AE and to assert, falsely, that Angola had already paid AE for twelve turbines rather than eight—most having to do with the conflicts of interest that GE had created for itself:

a.    <u>Expected Revenues, Profits, and Credit Exposure</u>.  If Angola implemented the change that MINEA and AE proposed before the December 5, 2018 meeting (*i.e.*, reducing the scope of contract 6 by $154 million to pay for the four turbines), this would have cut into GE's expected revenues.  As noted above, of the $154 million in services that Angola proposed to eliminate from Contract 6, roughly $100 million would have gone to GE as a supplier under corresponding AE-GE supply contracts.  If Contract 6 were amended to reduce the scope by two years as proposed, GE would have lost that revenue and, to the extent GE funded the work, it would have further increased its credit exposure.

b.    

c.    <u>Accounting Issues</u>.  GE was already under scrutiny by the Securities and Exchange Commission ("SEC") and Department of Justice ("DOJ") for its accounting practices, including in particular with respect to the Power business.  Meanwhile, recall that GE had booked its revenues on the AE-GE supply contracts early, and then apparently justified the

accounting treatment at year-end 2017 by using the Fake Letters Mr. da Costa had created.  An internal GE accounting probe apparently found that GE's decision to book revenues on turbines sold to AE when it did was improper—indeed, the *Wall Street Journal* reported in 2019 that *"[a]n internal probe two years ago [i.e., in the fall 2017, at the time the Fake Letters were created] found that in at least two quarters, GE recorded sales of mobile power turbines to a customer in Angola before they were transferred, according to people familiar with the investigation. It found that nearly $100 million of sales had been prematurely booked, usually just as a quarter was ending, and needed to be moved to different periods, one of the people said."*[4]  Given that AE had exclusivity for the Angolan market, and that the fourteen TM2500 turbines sold by GE to AE were "mobile power turbines," there is little doubt that the *Wall Street Journal* article refers to TM2500 turbines subject to the AE-GE supply contracts.  The Fake Letters made these accounting matters that much worse, implicating potential accounting fraud.



---

[4] Thomas Gryta, "Larry Culp's GE Plan: a Fix, Not a Reinvention," WALL STREET JOURNAL (Oct. 17, 2019), *available at* https://www.wsj.com/articles/some-expected-larry-culp-to-break-apart-ge-instead-hes-trying-to-fix-it-11570460349.

e. Troubles In GE's Power Business. These matters came up at a difficult time for the GE Power business. In the October 7, 2019 *Wall Street Journal* article noted above, the authors wrote that Mr. Culp, GE's chair, had spent much of the year 2019 focusing on GE's power business, which "has been at the core of GE's financial and operational problems," including on account of "excess gas-turbine inventory after misjudging demand several years ago." The article stated further that "[t]he power business is working through poorly structured deals that were signed to grab market share," and that "securities regulators are investigating how the division accounted for service contracts." These issues were obviously on the horizon in December 2018 and the early-2019 period during which the Fake Letters came to light.

GE thus had ample reason to blame AE for this misconduct, and to maintain the false version of the facts first spun by GE's da Costa. It soon got one more reason to stay the course: *the possibility of taking over AE's contracts with MINEA*.

165.      ▮▮▮▮▮▮▮▮▮. And so, over the next several months, GE's employees acting at the direction of Mr. Strazik and others actively maintained the false narrative in service of a full-court-press effort to take over AE's contracts and relationship with MINEA.

### E. Angola Accepts GE's False Accusations, And Repudiates The AE-MINEA Contracts To Award Them To GE

166.    GE's tortious conduct worked. Mr. da Costa told his colleagues in December 2018 that MINEA would terminate all its contracts with AE as a result of his efforts. And starting in January 2019, Angola informed AE of its intent to terminate them. Angola did not identify a breach of the AE-MINEA Contracts or any legitimate basis in law or fact to terminate the contracts. Rather, it stated that it believed GE's claims—without any fair and impartial investigation being conducted, or any due process being afforded to AE—and had decided to cut the contracts off.

167.    Remarkably, GE continued to blame AE, and MINEA continued to blindly accept GE's false narrative, even though Mr. da Costa—the GE representative who had produced the Fake Letters and directly implicated himself in their creation in internal GE communications— had been *accused by one of MINEA's agencies (GAMEK) of falsifying business records unrelated to AE* and was temporarily arrested by Angolan authorities for *falsifying his own identity papers*. Mr. da Costa's arrest occurred in *January 2019*, the very same time these events were ongoing. It has also been reported that Mr. da Costa lied about his credentials on his job applications. (In May 2019, Mr. da Costa left GE under suspicious circumstances, after being placed on administrative leave.)

168.    It is also shocking that GE maintained, and MINEA accepted, the false narrative that Angola bought twelve turbines even though the AE-MINEA Contracts provided for AE to sell only eight turbines, even though MINEA signed invoices covering only eight turbines, and even though AE provided, and continued to provide, all goods and services called for under the AE-MINEA Contracts and set forth in the MINEA-approved invoices in accordance with all contractual milestones.  AE never received any additional money from MINEA that could be allocated to the four turbines.

169.    AE attempted to stop Angola's repudiation and GE's efforts to procure that repudiation (including, as noted above, by repeatedly asking GE to correct the false accusations GE had made).  But AE's efforts were to no avail given GE's false claim that AE was seeking double payment for four turbines; GE's very-eager campaign to take over the AE-MINEA Contracts from AE; Mr. da Costa's continued reliance on and use of the Fake Letters with MINEA; and MINEA's outrageous, ostrich-like refusal to refer the matter to the public prosecutor's office for a formal criminal investigation.  The false narrative, of course, gave MINEA a basis to stiff AE on its bills and avoid paying hundreds of millions AE is due.

170.





Although MINEA was willing to terminate the AE-MINEA Contracts as GE wanted (and indeed all too happy to accept a situation that would allow it to avoid paying AE), MINEA didn't want to terminate the contracts without GE's assurance that GE's products, services, and financing would remain available to Angola, so

175.    GE responded by letter on March 19, 2019, again to encourage Angola to terminate the AE-MINEA Contracts and for GE to take them over.  The letter, enclosed as exhibit 15, stated among other things that (1) "GE confirm[ed] its availability and capacity to" take over AE's contracts, and (2) "GE [was] willing to execute the projects."  GE added, in

another false and misleading statement designed to put the final dagger in the AE-MINEA relationship, that GE "can confirm that Aenergia is a long-term client of GE's" but that "we do not have any kind of legal partnership, consortium or joint venture of any sorts with this entity." As noted below in paragraph 184, that last statement was false—and, given the context, knowingly made to cause MINEA to terminate the AE-MINEA Contracts, just as Mr. da Costa had explained he wanted MINEA to do just a few days before.



177.   By the end of August 2019, these parallel tracks had led to the President of Angola's desk.  Agreeing to MINEA's request, he adopted a resolution to permit MINEA to take two connected steps—terminating the AE-MINEA Contracts and transferring the work to GE.





181.    On September 2, 2019, Angola sent AE a formal termination letter (the "Termination Letter").  A copy of that letter is enclosed as Exhibit 17.

182.   The Termination Letter stated that MINEA would be seeking to award the remaining work under the AE-MINEA Contracts to GE, and that it was seizing four of the turbines that AE had acquired from GE Power under the AE-GE Contracts.

183.   In seeking to justify the termination, the Termination Letter stated, among other things, that there were purported but unspecified irregularities by AE related to the acquisition "of 4 Turbines under the credit line made available by GE Capital"—apparently an implicit reference to the Fake Letters that GE had created.  The Termination Letter also noted concerns relating to a purported lack of support by GE for AE (based on the March 19, 2019 letter from GE to MINEA, in which Mr. Sezan stated there was no relationship between AE and GE).

184.   The March 19, 2019 statement by Mr. Sezan about a lack of support by GE—on which Angola relied in repudiating the AE-MINEA Contracts—was knowingly false.  Consider the following, by way of example:

a.   Over the course of 2012 through 2017, AE and GE had worked on numerous projects together in a commercial joint venture whereby AE was working to develop the Angolan energy and transportation markets for GE products, and GE recognized that AE had substantially supported GE in the region. *See* paragraphs 49–57, above.



c.   GE entered into multiple contracts with AE committing GE to provide technical and other support to AE and pursuant to which AE and GE agreed to work together, with AE as GE's exclusive distributor, to develop the power market in Angola.

d.   On multiple occasions, GE relied on its commercial partnership with AE—and the mutual benefits that would inure to the benefit of both if they worked together—in order to get AE's agreement to give up short-term profit in the interest of the long-term enterprise, including, notably, when it obtained AE's agreement to request that MINEA amend the AE-MINEA Contracts to reduce the scope of work that AE was to provide under the AE-MINEA Contracts, and, in December 2017, when it obtained AE's agreement to pay more money to GE out of the revenues obtained on account of the invoices approved by MINEA.

e.   GE repeatedly touted the commercial partnership it had with AE in correspondence with AE and the government.  Mr. Nelson wrote to AE on December 30, 2017, that "this is the partnership that is changing the face of Africa."  On re-signing a deal to work together on the development of another power plant (Soyo II), he observed that "[t]his [wa]s a very significant milestone for this partnership and Angola."  And GE repeatedly described AE as its partner to MINEA, including in letters to the Minister of Energy and Water.

f.   In late June 2018, GE was continuing to offer AE discounts "[i]n recognition of the fruitful *partnership* between AENERGIA and GE," and "look[ing] forward to an *even stronger partnership* as we expand our successful Business relationship across Africa."

185.   MINEA's assertions in the Termination Letter were not just without factual substance—they did not provide a lawful basis to terminate the AE-MINEA Contracts anyway. Indeed, the Angola Defendants have never identified any breach of a contract or other obligation on the part of AE, and there was no breach by AE of any representation or obligation.

186.    Angola's decision to award AE's contracts to GE only demonstrates the extent to which GE's false narrative worked. Among AE and GE, the only party with obligations to Angola under the GE Credit Facility—and the only party that could possibly have engaged in irregularities "under the credit line made available by GE Capital"—is *GE*, not AE, and yet, at the end of this tale, *GE was left holding the contracts.*

187.    Moreover, when MINFIN (which was a party to the Credit Facility) engaged in discussions with AE in the middle of July 2019 over these matters, MINFIN did not say that AE had engaged in any misconduct or that there had been any irregularities with respect to the GE Credit Facility; MINFIN knew better (it had submitted the disbursement request, which included AE's invoices for <u>eight</u> turbines). Instead, MINFIN simply—and tellingly—noted that the GE funding Angola desperately wanted was not then available because of a dispute between AE and GE! *See* Ex. 18.

188.    Amazingly, although Mr. da Costa was right in the middle of all this misconduct (and had implicated himself in GE emails), months later, Angola signed a memorandum of understanding with Mr. da Costa awarding significant work to his new employer, New Fortress Energy, where Mr. Nelson now also works.[5]

189.    And, to date, MINEA has never pursued Mr. da Costa for falsifying the GAMEK letters described above, and he has not been prosecuted for falsifying his identity documents (though he was charged and arrested—then curiously released).



---

[5] "Executivo negoceia «na calada» monopólio do gás natural," ANGONOTICIAS (Dec. 22, 2019) *available at* http://www.angonoticias.com/Artigos/item/63258/executivo-negoceia-na-calada-monopolio-do-gas-natural.

████████████████████ GE did not provide a copy until September 5, 2019—
under cover of correspondence falsely stating that the Fake Letters reflected documentation used
to sell twelve TM2500 turbines (when, as GE well knew, AE had bought those turbines from GE
months before the date of these letters, and even before the GE Credit Facility was executed).
And GE never provided Angola with the damning evidence within its possession demonstrating
Mr. da Costa's involvement in the fabrication of the Fake Letters—in keeping with Mr. Galvin's
view that the "intra-GE commentary" should not be shared outside the organization.

191.   And GE's statement (accepted by MINEA) that MINEA paid AE for the four at-
issue turbines in December 2017 was not just inconsistent with the relevant contracts and
invoices (as explained above), but also with the work AE in fact performed for MINEA.  By
AE's estimation, although AE received approximately $644 million from Angola in December
2017 (some of which was disbursed directly by GE Capital to GE Power, as supplier to AE), by
the time the contracts were terminated, AE had in fact performed work for Angola worth more
than $750 million.  This means that, although GE and Angola contend that AE was already paid
by Angola for the four turbines, in fact AE is <u>owed</u> more than a hundred million dollars by
MINEA for work already done under the AE-MINEA Contracts (without counting the four
turbines).

192.   Indeed, even when, in April 2019, MINEA commissioned a review of the work
that AE had performed for MINEA, that review concluded that, for contracts 7 and 11 (the
relevant contracts under the Fake Letters), AE had already conducted $162 million worth of real
work under those contracts, while it had been paid approximately $169 million.  Aurecon, an
Australian engineering advisory firm, appointed by AE to conduct an assessment on the status of
the 13 Contracts, did another review in August 2019, and concluded that AE had completed

work under those two contracts worth $190 million (against a payment of $169 million). (As noted, the four turbines are worth over $100 million.)

193.     MINEA's outrageous conduct is, sadly, in keeping with what the U.S. State Department reports about the Angolan legal and political system: corruption is rampant, with Angola consistently ranked in the very bottom of the world on corruption indices by independent watchdogs, and there is no due process of law.[6]  Meanwhile, it has been reported that the Minister of Energy and Water is under investigation in France for corruption in connection with the award of government contracts related to Eiffage, and also that he was involved in soliciting bribes related to contracts with U.S.-based APR Energy.  Plaintiffs would not be surprised to find—and expect discovery will show—corruption on the part of Angolan officials here.

### F.  AE Asks Angola to Reconsider Its Wrongful Termination

194.     Seeking to escape the Kafkaesque tale in which it found itself, AE sought to have Angola reconsider its position through administrative proceedings.

195.     At first, AE appealed the decision to terminate the contracts to MINEA, which denied the administrative appeal on September 30, 2019 in a letter alleging, falsely, that Angola had purchased twelve turbines; that AE was responsible for creating the Forged Letters; and that

---

[6] *E.g.,* 2018 Investment Climate Statements: Angola," U.S. Department of State, *available at* https://www.state.gov/reports/2018-investment-climate-statements/angola/ ("Corruption remains pervasive and institutionalized. It has substantially raised the cost of doing business in Angola and has had a corrosive impact on international market investment opportunities and on the broader business climate. Transparency International's 2017 Corruption Perceptions Index ranks *Angola 167 out of 175 countries in its corruption level survey*. Prevalent in all sectors of the Angolan society, corruption has remained widespread due to a lack of political will to combat it effectively, appropriate checks and balances, insufficient institutional capacity, and a culture of impunity." (emphasis added)).
         Although publicly, "President Lourenco has prioritized the fight against corruption," old habits die hard. *See also* 2019 Investment Climate Statements: Angola," U.S. Department of State, *available at* https://www.state.gov/reports/2019-investment-climate-statements/angola/ ("Corruption remains a strong impediment to doing business in Angola and has had a corrosive impact on international market investment opportunities and on the broader business climate.  Transparency International's 2019 Corruption Perceptions Index ranks Angola *165 out of 175 countries in its corruption level survey,* down two places from the previous year due to ongoing efforts to bring down corruption to lower levels.").

there was no relationship whatsoever between AE and GE beyond a customer-supplier relationship.

196.    AE then appealed the decision to the President of Angola, who denied it on November 13, 2019 in a one-sentence decision.  The office of the President never provided arguments, evidence, or any documentary support for his decision, even after AE requested it.

197.    AE then filed an appeal in the Angolan Supreme Court, and provided that Court with evidence obtained from GE in the United States under 28 U.S.C. § 1782 (including some of the evidence described in this Complaint).

198.    But, to date, the Angolan Supreme Court has done nothing—disregarding its own procedural deadlines without explanation—and the Angolan state, the respondent in those administrative proceedings, has also not responded to AE's filings.

█████  ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

## III.    ANGOLA IMPROPERLY TERMINATES AE'S SOYO II CONCESSION

200.    Shortly after repudiating the thirteen AE-MINEA Contracts on the basis of the Fake Letters, Angola proceeded to terminate another important project it had awarded to the AE group of companies, as well as related contracts (the "Soyo II Concession").

201.    Specifically, on or about August 21, 2018, Angola and its agencies had awarded a twenty-five year concession and related contracts to Combined Cycle Power Plant Soyo, S.A., a wholly owned subsidiary of AE, to build and do various work related to a new power plant at Soyo II, in the Zaire province of Angola.  AE was to provide and install various gas and steam

turbines to build out the Angolan power grid. The work would take three years to complete, following which power would be provided for twenty-five years under the concession. As with the thirteen AE-MINEA Contracts, AE entered into subcontracts with a GE affiliate to buy U.S.-manufactured equipment for the project.

202.    On October 23, 2019, however, the President of Angola purported to terminate, surreptitiously and without warning, the work and the concession, which decision was followed by a termination letter issued by MINEA. *See* Ex. 19. The MINEA termination letter cited the same purported irregularities invoked in support of Angola's decision to terminate the AE-MINEA Contracts. Since that time and as a direct result of Angola's actions, Plaintiffs have been completely unable to obtain the financial benefits to which they were entitled under the Soyo II Concession.

203.    This termination of the Soyo II Concession was without basis in fact or law, and was the direct and proximate result of conversations and meetings between Angola and GE, including those described above, in which GE made numerous false statements about AE, and GE sought to take over AE's contracts and relationship with Angola and its agencies.



IV.    ANGOLA EXPROPRIATES AE'S PROPERTY IN VIOLATION OF
       INTERNATIONAL LAW

   A.    Angola Expropriated Plaintiffs' Property, With GE's Support

       205.    Angola has lived true to its reputation in another respect—"Expropriation without
compensation remains a common practice" in Angola.[7]

       206.    As noted above, MINEA's September 2019 Termination Letter repudiating the
thirteen AE-MINEA Contracts stated, on the authority of the President of Angola, that four of
the six turbines that AE had purchased from GE with its own funds (*i.e.*, the four turbines subject
to the October 2017 Letters of Intent) belonged to Angola because, according to Angola, they
were "purchased on behalf of MINEA, which means MINEA holds the property of the same."

       207.    For the reasons explained above, this statement is not true.  AE drew on its own
resources and bank loans to make partial payment on the four turbines.  In addition, AE agreed to
pay GE certain additional amounts using its own revenues and profits on the amounts invoiced to
MINEA in 2017 (for only *eight* turbines and certain other goods and services) toward AE's
obligations on AE's own supply contracts with GE (which contemplated the purchase by AE of
additional turbines among other equipment and services).

       208.    Although the four at-issue turbines thus belonged to AE—and not MINEA—GE
employees repeatedly sought to take possession of these turbines, apparently so that GE could
deploy those turbines for the benefit of its new would-be customer, Angola, and based on GE's
false narrative (adopted by MINEA) that Angola had already paid for the turbines.

       209.    At first, GE sought to simply take the turbines from the location where AE stored
them.  GE's written communications thus show that it tried to have its employees and/or agents

---

[7] 2018 Investment Climate Statements: Angola," U.S. Department of State, *available at*
https://www.state.gov/reports/2018-investment-climate-statements/angola/.

pick up AE's turbines and ship them to locations identified by Angola—all while trying to keep AE in the dark. That plan proved unsuccessful.

210.    As a result, following MINEA's formal termination of the thirteen AE-MINEA Contracts on September 3, 2019, MINEA and GE worked together to cement their control of the four turbines.



212.    On November 29, 2019, Angola furthered its control over the four at-issue turbines, as well as other equipment belonging to AE worth millions of dollars, by initiating an abusive, *ex parte* injunction proceeding before the Luanda Provincial Court in Angola.

213.    Witnesses appearing in support of the expropriation at a December 10, 2019 hearing included, but were not limited to, the Chairman of the Board of PRODEL, the Chairman of the Board of ENDE, and Mr. da Costa's replacement as Chief Executive Officer of GE Angola, Mr. Jaime Morais, whom Mr. da Costa accompanied to the courthouse.

214.    These witnesses testified *ex parte*, and led the Angolan court to believe, falsely, that the turbines belonged to the state of Angola. In particular, the record of the proceeding states that GE's representative, Mr. Morais, who was apparently coached by Mr. da Costa, testified "that AENERGY purchased twelve turbines with resort to funds made available by GE Capital. Initially the agreement foresaw the supply of eight turbines, however . . . AENERGY

had presented a document requesting four additional turbines." This is a blatantly untrue statement, for the reasons stated herein (including that AE bought the turbines from GE under supply contracts signed well before September and October 2017). (In addition, GE's Morais stated "he became aware of the[se] facts in his capacity of Chairman of the Board of Directors of General Electric," even though Larry Culp is Chairman of the Board of GE.)

215.    In the injunction proceeding, Angola also relied on the Fake Letters provided by GE, and GE's September 5, 2019 letter, which falsely stated that these reflected the documentation used to substantiate Angola's purchase of twelve turbines.

216.    As of the time of the filing of this lawsuit, AE has been entirely deprived of the control, use, and economic value of the four turbines, as well as other AE-owned equipment stored in the Republic of Angola, all without compensation. Indeed, Angolan authorities thereafter showed up at AE's warehouses, with the police, and took all the property that was there, including not just the turbines, but also spare small engines, oil, equipment, parts, etc.

217.    The value of the seized property totals more than $112.8 million.

**B. Angola's Conduct Violated International Law**

218.    Under international law, a state may seize property only if it provides just compensation, meaning that the compensation must be prompt, adequate, and effective. But Angola has failed to provide *any* compensation, much less just compensation, for the seizure of AE's turbines, having taken the position and testified, falsely, that Angola already paid for the property. The seizure was therefore without compensation and violated international law.

219.    Moreover, the property was taken arbitrarily and without due process, by means of an illegal and abusive *ex-parte* injunction proceeding designed to brush over the *de facto* expropriation, which followed the illegal termination of AE-MINEA Contracts. To date, AE has

received no process, much less a fair adjudication regarding the prompt, adequate, and effective compensation to which AE is entitled under international law. Instead, Angola has sought to take AE's property based on false statements and without any compensation.

220.    Beyond that, it is plain that AE's property was targeted and expropriated at least in part because AE is owned by Ricardo Machado, who is Portuguese; on account of the citizenship of the ultimate beneficial owner of the property; and because of the stance AE had taken against corruption. Indeed, a decision issued in connection with the seizure proceedings cites as an additional justification for the injunction of AE's property the claim that AE "is a subsidiary of a foreign group."

221.    On information and belief, PRODEL and ENDE will be the users and holders of title to the expropriated property given that they (and MINEA) have been in active discussions with GE about the installation of these very turbines. Both PRODEL and ENDE have been and are engaged in significant commercial activity in the United States within the meaning of 28 U.S.C. § 1603. Moreover, Angolan property that has been exchanged for Plaintiffs' unlawfully taken property is present in the United States in connection with Angola's commercial activity on the basis that stolen property is now mixed with Angola's general revenues, which on information and belief are being used to fund Angola's U.S.-based commercial operations.

## V.    ACTS AND EFFECTS IN THE UNITED STATES GIVING RISE TO AND RESULTING FROM ANGOLA'S COMMERCIAL BREACHES

222.    As stated herein, the Republic, MINEA, PRODEL, and ENDE engaged in commercial conduct and this suit, and the claims stated herein against the Angola Defendants, are based on their commercial activity.

223.    For the reasons set forth herein, the Angola Defendants are properly sued in the United States and not subject to immunities because Plaintiffs' claims against them are based

upon "act[s] performed in the United States in connection with a commercial activity of [Defendants] elsewhere" and/or because they are based upon "an act outside the territory of the United States in connection with a commercial activity of [Defendants] elsewhere" that "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

224.   To begin, the conduct described herein constitutes "commercial activity" under the FSIA in that the entry into, performance under, and repudiation of the AE-MINEA Contracts and of the Soyo II Concession are all conduct taken as a private participant in a market rather than a regulator of it.

225.   Moreover, as described in this complaint, Plaintiffs' claims arise out of and are based upon a number of "act[s] performed in the United States in connection with" Angola's "commercial activity" in Angola and elsewhere, including specifically and without limitation:

■ On or about August 2017, GE Capital in the United States entered into a credit facility denominated in U.S. Dollars to permit Angola to finance the AE-MINEA Contracts that Angola improperly repudiated and expropriated. As explained above, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

67



c.  On or about December 28, 2017, as noted above, GE Capital paid GE Power

approximately $376 million in U.S. Dollars from accounts at Deutsche Bank in

New York, to accounts in New York for further credit either in the United States

or abroad.  These payments were made by GE Capital using funds that Angola

drew from the GE Capital Facility to pay for AE's invoices to MINEA (to pay AE

for eight turbines and additional goods and services), and the money was directed

to GE directly to ensure that GE would be paid from the GE Capital facility on

account of amounts due by AE to GE under the AE-GE supply contracts.  These

U.S.-based payments by GE Capital to GE Power (some of which went to GE

Power in the United States) are at the core of all the claims set forth in the instant

complaint, given that, according to GE and Angola, they were used to pay for the four at-issue turbines.

d. AE purchased the turbines at issue in the AE-MINEA Contracts from GE in U.S. Dollars.

e. GE manufactured the engines for all the TM2500 turbines at issue in this case in the United States, and these were initially shipped from the United States.



g. Angola's repudiation of the contracts was procured by tortious conduct taken by and under the direction and control of GE personnel in the United States, among other places, as set forth herein.

226.   Moreover, for the reasons described in this complaint, Plaintiffs' claims are also based upon commercial conduct occurring outside the United States having "direct effects" in

the United States, such effects being felt by both Plaintiffs and by third-parties—including specifically and without limitation each and every one of the U.S.-located "acts" set forth in the prior paragraph, as well as the following:

 While the AE-MINEA Contracts and Soyo II Concession were in effect, their performance (including in particular on account of the amounts that remains due to AE) had direct effects in the United States, including on GE's financial results and performance, which were reported in U.S. securities filings.

b.   As explained herein, when Angola repudiated the AE-MINEA Contracts and Soyo II Concession, this had a direct effect on GE in the United States, given that Angola did so to award the business to GE.  Not only that,

Indeed, as explained herein, Angola only repudiated its contracts with AE



c. As a result of the termination, Plaintiffs have suffered specific, direct and immediate injuries in the United States. Among other things, it led to the suspension of discussions AE was having with U.S.-based Energy Storage, LLC, with which AE had been negotiating to develop and deploy energy-storage technology and innovative batteries in Angola and other locations in Africa.

### COUNT ONE

**BREACH OF CONTRACT—AE-MINEA CONTRACTS**
*Alleged Against the Angola Defendants*

227. Plaintiffs repeat and reallege paragraphs one through 226 as if fully set forth herein.

228. The AE-MINEA Contracts were binding and enforceable contracts.

229. AE fully performed all of its obligations under the AE-MINEA Contracts, and satisfied all conditions to Angola's performance.

230. Angola repudiated the AE-MINEA Contracts by terminating them without legal or factual justification in order to reassign them to GE. As explained herein, the stated reasons for termination—allegations of irregularities in connection with the GE Capital Credit Facility and a supposed lack of a partnership with GE—are without factual support. Regardless, even if the reasons were true, they would fail to provide a legal basis for termination of the contracts. As a result, Angola's purported termination was simply a repudiation, and breach, of contract.

231. Angola also breached the AE-MINEA Contracts by failing to pay amounts that were and remain due under those Contracts for work performed by AE and for which AE has

71

never received payment. Indeed, AE performed work for Angola beyond the work set forth in the AE-issued invoices that MINEA has approved and paid to date, and, at a minimum, Angola must pay AE for this work. Aurecon, an Australian engineering advisory firm, has preliminarily assessed that, as of August 2019, AE had performed work worth more than $111.8 million for which it received no payment at all from Angola (after netting all payments made by Angola on the thirteen AE-MINEA Contracts, not counting interest or fees for late payments, and without counting the value of the four at-issue turbines, which have been expropriated).

232.    As set forth above, Angola has paid only for eight TM2500 turbines by drawing on the GE Capital facility in December 2017, because the AE invoices that Angola paid for on that date reflect only <u>eight</u> turbines. Angola has stated that it paid AE for <u>twelve</u> turbines, even though the additional four turbines are not reflected in any MINEA-approved or MINFIN-paid invoices, and even though the AE-MINEA Contracts were never amended to include those additional four turbines. If the finder of fact agrees with Angola and concludes that, although Angola has only paid AE amounts that were set forth in AE's invoices, Angola's payment on account of those invoices include payment for four additional turbines *not* reflected in AE's MINEA-approved invoices, then it follows that (a) Angola did not pay for certain of the goods and services that *are* reflected in the approved invoices (which goods and services AE has provided to AE), and (b) therefore, beyond the $111.8 million owed for work performed by AE but not paid for by Angola under a MINEA-approved invoice (described in the prior paragraph), Angola also owes AE the value of the goods and services that are covered in the MINEA-approved invoices but that MINEA did not pay for—which amounts Aenergy estimates preliminarily at another $112.8 million.

233.    AE suffered various injuries and damages as a result of the breach of contract set forth herein, including to its business and reputation, and is entitled to receive substantial damages in an amount to be proved at trial.  Without limitation, Angola has failed to pay AE for all the work that AE performed under the AE-MINEA Contracts and owes AE at least $111.8 million, plus another $112.8 million corresponding to the value of the four at-issue turbines. Beyond and in addition to these amounts, by repudiating the AE-MINEA Contracts, Angola has deprived AE of the many millions of dollars in profits AE would have made on the contracts had they not been repudiated.

234.    Given the outrageous conduct set forth herein on the part of Angola's state-owned entities and employees, they should be required to pay punitive damages.

## COUNT TWO

### BREACH OF CONTRACT—SOYO II CONCESSION
*Alleged Against the Angola Defendants*

235.    Plaintiffs repeat and reallege paragraphs one through 234 as if fully set forth herein.

236.    The contracts reflecting the Soyo II Concession were binding and enforceable contracts.

237.    Plaintiffs fully performed their obligations under the Soyo II Concession contracts, and satisfied all conditions to Angola's performance.

238.    Angola repudiated the Soyo II Concession by terminating the relevant contracts without legal or factual justification.  As explained herein, the stated reasons for termination— allegations of irregularities in connection with the GE Capital Credit Facility and a supposed lack of partnership with GE—are without factual support.  Regardless, even if the reasons were true,

they would fail to provide a legal basis for termination.  As a result, Angola's purported termination was simply a repudiation, and breach, of contract.

239.   AE suffered various injuries and damages as a result of the breach of contract set forth herein, including to its business and reputation, and in the form of out-of-pocket losses and lost profits, and is entitled to receive substantial damages in an amount to be proved at trial.

240.   Given the outrageous conduct set forth herein on the part of Angola's state-owned entities and employees, they should be required to pay punitive damages.

## COUNT THREE

### UNJUST ENRICHMENT
*Alleged Against the Angola Defendants*

241.   Plaintiffs repeat and reallege paragraphs one through 240 as if fully set forth herein.

242.   Through the conduct set forth herein, the Angola Defendants gained goods and services from Plaintiffs in power-generation output and services without providing compensation to Plaintiff for said output and services.

243.   AE conferred a benefit upon the Angola Defendants by providing power-generation output and services for the Angola Defendants and the people of Angola.

244.   The Angola Defendants appreciated the benefit that Plaintiffs conferred upon them and upon the people of Angola, accepting the power-generation output and services, all without providing compensation for the output and services.

245.   It would be unjust and inequitable for the Angola Defendants to retain the benefit conferred—the substantial amounts of power-generation output and services, including the work

performed by AE and the value of the goods and services it obtained from AE—without paying Plaintiffs the value thereof.

246. Plaintiffs asserts in the alternative to their contract and other claims that they have no adequate remedy at law for this injury.

247. As a result of the foregoing, in the alternative to their contract and other claims, Plaintiffs assert that they are entitled to a substantial award of damages on the ground of unjust enrichment, in an amount to be proved at trial.

248. Given the outrageous conduct set forth herein on the part of Angola's state-owned entities and employees, they should be required to pay punitive damages.

## COUNT FOUR

### TAKING IN VIOLATION OF INTERNATIONAL LAW: PHYSICAL ASSETS
*Alleged Against the Angola Defendants*

249. Plaintiffs repeat and reallege paragraphs one through 248 as if fully set forth herein.

250. The Angola Defendants are a "foreign state" within the meaning of the FSIA.

251. The Angola Defendants have treated non-party Machado and Plaintiffs AE and Combined Cycle Power Plant Soyo, S.A. as if they were a single entity—assigning responsibility to one for the purported actions of the other—and have treated all of them as a foreign group. Non-party Machado is a Portuguese citizen. Plaintiff AE is wholly owned by citizens of Portugal; in justifying the seizure of AE's turbines, Angola has relied on the assertion that AE is "a subsidiary of a foreign group;" and at the time the AE-MINEA Contracts were signed, AE was considered a foreign company under Angolan private investment law. The Angola

Defendants assigned responsibility to Plaintiff Combined Cycle Power Plant Soyo, S.A. for the conduct of AE. As such, Plaintiffs are foreign nationals under international law.

252.   Prior to the expropriation, Plaintiffs had full control and ownership of the assets described herein that were confiscated, and no entity other than AE held legal title to them, as both GE and Angola have acknowledged.

253.   Today, as a result of the Angola Defendants' conduct, PRODEL and ENDE control the assets that were confiscated, while AE has no ability or power to control, use, or direct the use of its confiscated property. Indeed, the Angolan authorities came to AE's warehouses and seized all the equipment that was there, including not just the turbines, but also small spare engines, parts, oil, etc.

254.   PRODEL and ENDE have extensive commercial activities in the United States. Among other things, they have direct commercial relations with GE related to the provision of power in Angola.

255.   Moreover, Angolan property that has been exchanged for Plaintiffs' unlawfully taken property is present in the United States in connection with Angola's commercial activity on the basis that stolen property is now mixed with Angola's general revenues, which on information and belief are being used to fund Angola's U.S.-based commercial operations.

256.   The Angola Defendants' acts of expropriation are in violation of international law.

257.   The Angola Defendants' expropriation of Plaintiffs' assets is discriminatory and based on Plaintiffs' foreign status—that is, Portuguese.

258.   The Angola Defendants' expropriation of Plaintiffs' assets was undertaken without prompt, adequate, and effective compensation. The Angola Defendants have been

explicit and clear that they will not provide any payment for their unlawful taking of property, and they refused to provide any adequate forum or process to obtain compensation, much less the actual payment of prompt, adequate, and effective compensation as required by international law.

259.    Moreover, as set forth herein, the Angolan Defendants' taking of Plaintiffs' assets was undertaken and cemented through a corrupt adjudicative process that violates international law.  The Angolan Defendants have never accorded Plaintiffs due process and instead instituted an abusive *ex parte* injunction proceeding to cement their unlawful taking.  And Angolan legal process will never provide prompt, adequate, and effective compensation for the Angola Defendants' unlawful taking of assets.

260.    Given the outrageous conduct set forth herein on the part of Angola's state-owned entities and employees, they should be required to pay punitive damages.

<u>**COUNT FIVE**</u>

**TAKING IN VIOLATION OF INTERNATIONAL LAW:
INTANGIBLE ASSETS**
*Alleged Against the Angola Defendants*

261.    Plaintiffs repeat and reallege paragraphs one through 260 as if fully set forth herein.

262.    The Angola Defendants are each a "foreign state" within the meaning of the FSIA.

263.    The Angola Defendants have treated non-party Machado and Plaintiffs AE and Combined Cycle Power Plant Soyo, S.A. as if they were a single entity—assigning responsibility to one for the purported actions of the other—and have treated all of them as a foreign group. Non-party Machado is a Portuguese citizen.  Plaintiff AE is wholly owned by citizens of

77

Portugal; in justifying the seizure of AE's turbines, Angola has relied on the assertion that AE is "a subsidiary of a foreign group"; and at the time the AE-MINEA Contracts were signed, AE was considered a foreign company under Angolan private investment law. The Angola Defendants assigned responsibility to Plaintiff Combined Cycle Power Plant Soyo, S.A. for the conduct of AE. As such, Plaintiffs are foreign nationals under international law.

264.    Prior to the expropriation of Plaintiffs intangible rights under the AE-MINEA Contracts and the Soyo II Concession, Plaintiffs had full ownership of those intangible assets and no other entity held lawful title to them.

265.    Today, as a result of the conduct of the GE Defendants and the Angola Defendants, the GE Defendants are poised to hold AE's unlawfully expropriated property.

266.    Property exchanged for Plaintiffs' expropriated intangible property is poised to be controlled by PRODEL and/or ENDE, both of which are engaged in commercial activity in the United States.

267.    Angolan property that has been exchanged for the unlawfully taken property is present in the United States in connection with Angola's commercial activity on the basis that the stolen property is now mixed with Angola's general revenues, which are being used to fund Angola's U.S.-based commercial operations.

268.    The Angola Defendants' acts of expropriation are in violation of international law.

269.    The Angola Defendants' expropriation of Plaintiffs' assets is discriminatory and based on Plaintiffs' foreign status—that is, Portuguese.

270.    Defendants' expropriation of Plaintiffs' intangible assets was undertaken without prompt, adequate, and effective compensation. Defendants have been explicit and clear that they

will not provide any payment for their unlawful taking of Plaintiffs' property, and they have completely failed to provide any adequate forum and process to obtain compensation, much less the actual payment of prompt, adequate, and effective compensation that is required by international law. Moreover, Angolan legal process will never provide Plaintiffs prompt, adequate, and effective compensation for Defendants' unlawful taking.

271.   Given the outrageous conduct set forth herein on the part of Angola's state-owned entities and employees, they should be required to pay punitive damages.

## COUNT SIX

### CONVERSION
*Alleged Against the Angola Defendants*

272.   Plaintiffs repeat and reallege paragraphs one through 271 as if fully set forth herein.

273.   Plaintiffs owned and had the right to possess personal property that was illegally taken by the Angola Defendants, as described above, and has never been returned to it.

274.   The Angola Defendants' actions were intentional, arbitrary, and in violation of international law.

275.   The Angola Defendants deprived Plaintiffs of such property, and the possession and the use thereof.

276.   The Angola Defendants' unlawful actions caused severe injury and damages to Plaintiffs.

277.   Given the outrageous conduct set forth herein on the part of Angola's state-owned entities and employees, they should be required to pay punitive damages.

## COUNT SEVEN

### TORTIOUS INTERFERENCE WITH CONTRACT
*Alleged Against the GE Defendants*

278.    Plaintiff repeats and realleges paragraphs one through 277 as if fully set forth herein.

279.    The AE-MINEA Contracts were binding contracts between AE and Angola, and their existence and terms were well known to the GE Defendants.  By the same token, the Soyo II Concession reflected a binding set of contracts between Combined Cycle Power Plant Soyo, S.A. and Angola, the existence of which was also known to the GE Defendants.

280.    As set forth herein, the GE Defendants, without justification, wrongfully, tortiously, knowingly, and intentionally induced Angola to breach and repudiate its contracts with AE and Combined Cycle Power Plant Soyo, S.A.  The GE Defendants' wrongful and tortious conduct is set forth herein and includes, without limitation, intentionally inducing Angola to terminate the foregoing contracts ███████████████████████████████ ████████████████████████████████████████████████████████████ ████; falsely accusing AE of using public moneys to purchase turbines for AE's own accounts; falsely representing that Angola had paid for four more turbines than the turbines set forth in the MINEA-approved invoices; creating and using false and fabricated documents for its own benefit, and then falsely blaming AE for these false documents; covering up and concealing the misconduct of GE and its employees; making and repeating false and misleading statements about the nature of AE's relationship with GE; and failing to correct the false and misleading statements set forth herein while under a duty to correct, and otherwise omitting material information while under a duty to state it.

281.    As a direct, foreseeable, proximate, and intended result of the GE Defendants'
tortious conduct, Angola breached the AE-Angola Contracts by failing to make payments
thereunder and breached the AE-Angola Contracts as well as the Soyo II Concession by
repudiating all these contracts altogether without justification.

282.    Plaintiffs have been and will continue to be damaged by the repudiation the GE
Defendants tortiously caused.  Plaintiffs are thus entitled to compensatory damages from GE, in
an amount to be proved at trial, to remedy these injuries.

283.    Moreover, because of the outrageous and indeed criminal nature of the wrongful
conduct that caused Angola to breach its contracts with Plaintiffs, Plaintiffs should also be
awarded punitive damages.

## COUNT EIGHT

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE BUSINESS RELATIONS
#### *Alleged Against the GE Defendants*

284.    Plaintiffs repeat and reallege paragraphs one through 283 as if fully set forth
herein.

285.    Given the facts and circumstances set forth herein, Plaintiffs AE and Combined
Cycle Power Plant Soyo, S.A. had a reasonable probability of further business relations.  This
includes, to the extent it is deemed that the terminated contracts between Plaintiffs and Angola
could be terminated at will, the work reflected in those contracts.  It also includes projects
beyond those set forth in Plaintiffs' contracts with Angola, both in Angola and elsewhere in
Africa.  Without limitation, at the time GE began to tortiously interfere with Plaintiffs'
relationship with MINEA, AE and MINEA were already in advanced negotiation for AE to work
on projects in Angola worth many hundreds of millions of dollars, including (a) a gas-to-power

initiative, (b) an overhaul of units at Xitoto (pursuant to which AE had already initiated transportation services), (c) expansion of the power station at Malembo, (d) expansion of the power station at Ondjiva, (e) work on a new power plant at Arimba, (f) work on a new power plant at Luena, (g) work on a new grid line of over 100 km, and (h) a nationwide contractual services agreement.

286.   As set forth herein, the GE Defendants, without justification, wrongfully, tortiously, and intentionally interfered with these and other opportunities, including without limitation by falsely accusing Plaintiffs of using public moneys to purchase turbines for AE's own accounts; falsely representing that Angola had paid for four more turbines than the turbines set forth in the MINEA-approved invoices; creating and using false and fabricated documents for its own benefit, and then falsely blaming AE for these false documents; covering up and concealing the misconduct of GE and its employees; making and repeating false and misleading statements about the nature of AE's relationship with GE; and failing to correct the false and misleading statements set forth herein while under a duty to correct, and otherwise omitting material information while under a duty to state it.

287.   In this way, GE, in concert with Angola, has tortiously damaged Plaintiffs' reputation and their business prospects and opportunities in significant markets in Africa.

288.   As a result of the GE Defendants' tortious conduct, Plaintiffs have been damaged and will continue to be damaged, and are entitled to compensatory damages in an amount to be proved at trial.

289.   Moreover, because of the outrageous and indeed criminal nature of the wrongful conduct that tortiously interfered with Plaintiffs' business relations, Plaintiffs should be awarded punitive damages.

## COUNT NINE

### ACCOUNTING
### *Alleged Against All Defendants*

290.    Plaintiffs repeat and reallege paragraphs one through 289 as if fully set forth herein.

291.    Defendants have never accounted for or paid the value of Plaintiffs' property or the profits which Defendants have derived from that property.

292.    As a result of their property having been forcibly taken from them, against their will and without just payment by Defendants, Plaintiffs are unable to use or invest those assets.

293.    As a result of Defendants' wrongful acts, Plaintiffs have been damaged and demand an accounting of their stolen property, and the profits earned thereby by Defendants.

## COUNT TEN

### AIDING AND ABETTING
### *Alleged Against All Defendants*

294.    Plaintiffs repeat and reallege paragraphs one through 293 as if fully set forth herein.

295.    Each Defendant—to the extent each Defendant is a distinct entity and not an alter ego of the Republic of Angola—independently engaged in wrongful conduct as set forth above, consisting of the conversion of Plaintiffs' personal property and the expropriation of Plaintiffs' property in violation of international law.

296.    Each Defendant substantially assisted and encouraged the other Defendants in their unlawful activities towards Plaintiffs, as alleged hereinabove.

297.   Each Defendant had actual knowledge of the wrongful conduct of the other Defendant(s), and well understood the role of both in their unlawful misconduct toward Plaintiffs.

298.   Plaintiffs suffered severe damages caused by Defendants' unlawful conduct as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.     Grant judgment against all Defendants, and award Plaintiffs such damages,

    including compensatory damages, as may be proved at trial, as well as costs.

2.     Award Plaintiffs an award of punitive damages from PRODEL and ENDE under

    28 U.S.C. § 1606.

3.     Award Plaintiffs an award of punitive damages from the GE Defendants.

4.     Enter an order requiring Defendants to pay pre- and post-judgment interest.

5.     Grant Plaintiffs such other and further relief as the Court deems just and proper.


DATED:   New York, New York                Respectfully submitted,
         May 7, 2020


                                           **HOLWELL SHUSTER & GOLDBERG LLP**


                                           By:  _____*/s/ Vincent Levy*_____

                                           Vincent Levy
                                           Scott M. Danner
                                           Kevin D. Benish
                                           Brian T. Goldman*
                                           425 Lexington Avenue, 14th Floor
                                           New York, NY 10017
                                           (646) 837-5151
                                           vlevy@hsgllp.com
                                           sdanner@hsgllp.com
                                           kbenish@hsgllp.com
                                           bgoldman@hsgllp.com

                                           *Counsel for Plaintiffs*
                                           *\*Application for admission pending*

# EXHIBIT 1

[FILED UNDER SEAL]

# EXHIBIT 2



**PRODEL**
Empresa Pública de Produção de Electricidade

Gabinete do Presidente do Conselho de Administração

À
**AENERGIA, SA.**

<u>LUANDA</u>

003119
REF.ª _____/1111/GPCA/2017

**ASSUNTO:** Contrato de Fornecimento e Assistência Técnica para a Realização de Revisões Capitais e Constituição de um Banco de Peças para Cobertura Nacional - Contrato 7 da Linha de Financiamento da GE Capital.

Prezados Senhores,

Na sequência da avaliação da viabilidade económica de recuperação de capacidade de produção térmica instalada no País, e também de reforço da mesma, e resultante das diversas abordagens com a Administração da Aenergia, S.A., vimos manifestar interesse de, na eventualidade dessa avaliação assim o recomendar, procedermos à negociação da aquisição de quatro Turbinas Móveis GE TM2500+GEN8, incluindo todo o Bop Eléctrico e Mecânico, no âmbito do Contrato de Fornecimento e Assistência Técnica para a Realização de Revisões Capitais e Constituição de um Banco de Peças para Cobertura Nacional

De todo o modo, uma decisão só deverá ser tomada após aprovação, nos termos do quadro legal vigente.

Sem outro assunto, queiram aceitar os nossos melhores cumprimentos.

Gabinete do Presidente do Conselho de Administração da PRODEL-E.P, em Luanda, aos 12 de Outubro de 2017.

O PRESIDENTE DO CONSELHO DE ADMINISTRAÇÃO

JOSÉ ANTÓNIO NETO

C.C.- Sua Excelência Ministro da Energia e Águas

NIF: 5410770189
MORADA: Gaveto entre a Estrada do Camama e Via Expresso próximo ao Centro de Produção da TPA
TELEFONE: +244 913 953 111 / 928 204 655

Translation

**PRODEL**

Office of the Chairman of the Board of Directos

To:

AENERGIA, S.A.

LUANDA

Reference number 003119/1111/GPCA/2017

**SUBJECT: Supply and Technical Assistance Agreement for the Execution of Capital Revisions and the Establishment of a National Coverage Parts Bank – Contract 7 of the GE Capital Credit Line**

Dear Sirs,

Pursuant to our evaluation of the economic viability of revising the country's thermic energy production capacities, as well as the reinforcement of the same, and also pursuant to several contacts established between ourselves and Aenergia S.A.'s directorship, we hereby communicate that we are interested, should it be recommended so, to commence negotiations for the purpose of acquiring four GE TM2500+GEN8 Mobile Turbines, including the whole Electrical and Mechanical Bop, in the context of the Supply and Technical Assistance Agreement for the Execution of Capital Revisions and the Establishment of a National Coverage Parts Bank.

In any case, a decision shall only be taken after approval under the prescribed terms of the applicable law.

Without further issue at the moment we extend our sincerest regards,

**Office of the Chairman of the Board of Directors of PRODEL-EP, in Luanda, on October 12th 2017.**

**THE CHAIRMAN OF THE BOARD OF DIRECTORS**

**JOSÉ ANTÓNIO NETO**

**With copy to: His Excellency the Minister of Power and Water**

# EXHIBIT 3

 **EN/DE** EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE-EP

À

AENERGIA, SA

**LUANDA**

| V/REF.ª | 002560 | N/REF.ª 0425/PCA/ENDE/2017 | DATA: 12.10.17 |

**ASSUNTO:** Contrato de Fornecimento, Montagem e Assistência Técnica de Geradores Industriais, Geradores Domésticos, Kits de Geração Fotovoltaica e de Redes de MT, BT e IP, Ligações Domiciliares para Sistemas Eléctricos Isolados – Contrato 11 da Linha de Financiamento da GE Capital.

Prezados Senhores,

Na sequência da avaliação da viabilidade económica de recuperação de capacidade de produção térmica instalada e também de reforço da mesma, e resultante das diversas abordagens com a Administração da Aenergia, S.A., Vimos manifestar interesse de, na eventualidade dessa avaliação assim o recomendar, procedermos à negociação da aquisição de duas Turbinas Móveis GE TM2500+GEN8, incluindo todo o Bop Eléctrico e Mecânico, no âmbito do Contrato de Fornecimento, Montagem e Assistência Técnica de Geradores Industriais, Geradores Domésticos, Kits de Geração Fotovoltaica e de Redes de MT, BT e IP, Ligações Domiciliares para Sistemas Eléctricos Isolados.

De todo o modo, uma decisão só deverá ser tomada após aprovação, nos termos do quadro legal vigente.

Sem outro assunto, queiram aceitar os nossos melhores cumprimentos.

Conselho de Administração da ENDE, em Luanda, aos 12 de Outubro de 2017.

O Presidente do Conselho
de Administração

Francisco Talino

C/C: - Sua Excelência Ministro da Energia e Águas

Translation

ENDE – EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE-EP

TO

AENERGIA, S.A.

<u>LUANDA</u>

Your ref. 002560        Our ref. 0425/PCA/ENDE/2017        Date: 12/10/2017

**SUBJECT:** Agreement for the Supply, Installation, Commissioning and Provision of Technical Assistance Services related to Industrial Generators, Domestic Generators, Solar Power Generation Kits and Equipment Supply for the assemblage of MT, BT and IP networks, and for residential connections to Isolated Electrical Systems – Agreement 11 of the GE Capital Credit Line

**Dear Sirs,**

Pursuant to our evaluation of the economic viability of revising the country's thermic energy production capacities, as well as the reinforcement of the same, and also pursuant to several contacts established between ourselves and Aenergia S.A.'s directorship, we hereby communicate that we are interested, should it be recommended so, to commence negotiations for the purpose of acquiring two GE TM2500+GEN8 Mobile Turbines, including the whole Electrical and Mechanical Bop, in the context of the Agreement for the Supply, Installation, Commissioning and Provision of Technical Assistance Services related to Industrial Generators, Domestic Generators, Solar Power Generation Kits and Equipment Supply for the assemblage of MT, BT and IP networks, and for residential connections to Isolated Electrical Systems.

In any case, a decision shall only be taken after approval under the prescribed terms of the applicable law.

Without further issue at the moment we extend our sincerest regards,

ENDE Board of Directors, in Luanda, on October 12th 2017.

**The Chairman of The Board Of Directors**

Francisco Talino

**With copy to: His Excellency the Minister of Power and Water**