# REDACTED PUBLIC COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

:

AENERGY, S.A., and COMBINED CYCLE
POWER PLANT SOYO, S.A.,

                  Plaintiffs,

    - vs -

REPUBLIC OF ANGOLA; MINISTRY OF
ENERGY AND WATER OF THE
REPUBLIC OF ANGOLA; MINISTRY OF
FINANCE OF THE REPUBLIC OF
ANGOLA; EMPRESA PÚBLICA DE
PRODUÇÃO DE ELECTRICIDADE, EP; and
EMPRESA NACIONAL DE DISTRIBUIÇÃO
DE ELECTRICIDADE,

              Angola Defendants,

    and

GENERAL ELECTRIC COMPANY;
GENERAL ELECTRIC INTERNATIONAL,
INC.; and GE CAPITAL EFS FINANCING,
INC.,

              GE Defendants.

No. 1:20-CV-03569-AJN

--------------------------------------------------------x

## GE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 6

    A.    AE and GE Packaged Power Enter into an Agreement to Sell Turbines to Angola .................................................................................................... 6

    B.    AE and GE International Enter into a Collaboration Agreement ......................... 7

    C.    Angola Enters into Agreements with AE and Obtains a Loan from GE Capital EFS .......................................................................................... 8

    D.    The New Angolan Government Terminates Its Contracts with Plaintiffs ............. 9

    E.    Plaintiffs Pursue Remedies in Angola ................................................... 10

    F.    AE Initiates Arbitration Against GE Packaged Power ....................................... 12

    G.    Plaintiffs Sue Angola and Various GE Entities in This Court ........................... 12

ARGUMENT ..................................................................................................... 14

    A.    The Court Should Dismiss This Case Under the Doctrine of *Forum Non Conveniens* .......................................................................................... 14

          1.    Plaintiffs' Choice of Forum Is Not Entitled to Deference ...................... 15

          2.    Angolan Courts Offer an Adequate Forum—and the Appropriate One ...................................................................................................... 18

          3.    The Public and Private Factors Overwhelmingly Favor Dismissal ......... 24

    B.    This Action Should Be Dismissed Under Section 3 of the FAA Because the Claims Here Are Referable to Arbitration Under Multiple Agreements ....... 31

          1.    Plaintiffs' Claims Against GE International Are Referable to Arbitration Under the Collaboration Agreement ..................................... 32

          2.    Plaintiffs' Claims Should Be Dismissed or Stayed Pursuant to the Framework Agreement and the GE France Contract .............................. 34

    C.    GE Capital EFS and GE International Should Be Dismissed Under Rule 12(b)(2) .............................................................................................. 41

**TABLE OF CONTENTS**
(continued)

Page

    1.    The Court Lacks Specific Personal Jurisdiction Over Either GE Subsidiary ............................................................................... 42

    2.    Jurisdiction Over GE Company Does Not Extend to Either GE Subsidiary ............................................................................... 44

D.    The Claims Against the GE Defendants Should Be Dismissed Under Rule 12(b)(6) ............................................................................... 45

    1.    Plaintiffs Fail to Make Particularized Allegations Against Each Defendant ............................................................................... 45

    2.    Plaintiffs Have Not Sufficiently Alleged a Claim for an Accounting ............................................................................... 47

    3.    Plaintiffs Have Not Adequately Pleaded a Claim for Aiding and Abetting ............................................................................... 48

E.    Comity Warrants Dismissal of Claims Against the GE Defendants ................... 49

CONCLUSION ............................................................................... 50

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re A2P SMS Antitrust Litig.*,
    972 F. Supp. 2d 465 (S.D.N.Y. 2013).......................................................................31, 35, 38

*Abelesz v. Magyar Nemzeti Bank*,
    692 F.3d 661 (7th Cir. 2012) ...............................................................................................48

*Aboutaam v. L'Office Federale De La Culture De La Confederation Suisse*,
    2019 WL 4640083 (S.D.N.Y. Sept. 24, 2019).....................................................................48

*Acosta v. JPMorgan Chase & Co.*,
    219 F. App'x 83 (2d Cir. 2007) .................................................................................6, 15, 16

*In re Alcon S'holder Litig.*,
    719 F. Supp. 2d 263 (S.D.N.Y. 2010)..................................................................................29

*Alfadda v. Fenn*,
    159 F.3d 41 (2d Cir. 1998)...................................................................................................28

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
    994 F.2d 996 (2d Cir. 1993)...................................................................................25, 26, 27

*Alpha Cap. Anstalt v. Real Goods Solar, Inc.*,
    311 F. Supp. 3d 623 (S.D.N.Y. 2018)..................................................................................47

*In re App. of Aenergy, S.A.*,
    1:19-mc-00542-VEC (S.D.N.Y.) ......................................................................................2, 11

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009)..............................................................................................................34

*Astra Oil Co., Inc. v. Rover Navigation, Ltd.*,
    344 F.3d 276 (2d Cir. 2003).............................................................................................40, 41

*Auxer v. Alcoa*,
    406 F. App'x 600 (3d Cir. 2011) ..........................................................................................28

*Banco De Serguros Del Estado v. J.P. Morgan Chase & Co.*,
    500 F. Supp. 2d 251 (S.D.N.Y. 2007)..............................................................................14, 17

*Base Metal Trading SA v. Russian Aluminum*,
    253 F. Supp. 2d 681 (S.D.N.Y. 2003)...........................................15, 17, 18, 19, 20, 22, 23, 29

*BFI Grp. Divino Corp. v. JSC Russian Aluminum*,
    298 F. App'x 87 (2d Cir. 2008) ...........................................................................17, 18, 22, 23

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Birmingham Assocs. Ltd. v. Abbott Labs.*,
    547 F. Supp. 2d 295 (S.D.N.Y. 2008).................................................................41

*Blanco v. Banco Indus. de Venezuela, S.A.*,
    997 F.2d 974 (2d Cir. 1993)............................................18, 19, 20, 23, 27

*Boehner v. Heise*,
    734 F. Supp. 2d 389 (S.D.N.Y. 2010)...........................................................47

*Borden, Inc. v. Meiji Milk Prod. Co.*,
    919 F.2d 822 (2d Cir. 1990)..........................................................................19

*Cavlam Bus. Ltd. v. Certain Underwriters at Lloyd's, London*,
    2009 WL 667272 (S.D.N.Y. Mar. 16, 2009) ..............................................15

*CDC Cap. v. Gershon*,
    723 N.Y.S.2d 166 (N.Y. App. Div. 2001) ...................................................35

*Chamberlain v. City of White Plains*,
    986 F. Supp. 2d 363 (S.D.N.Y. 2013)............................................................7

*Chesley v. Union Carbide Corp.*,
    927 F.2d 60 (2d Cir. 1991).............................................................................19

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
    746 F.3d 42 (2d Cir. 2014).............................................................................49

*Chung Chang v. Warner Bros. Ent., Inc.*,
    2019 WL 5304144 (S.D.N.Y. 2019).............................................5, 34, 39, 40, 41

*Contec Corp. v. Remote Sol., Co., Ltd.*,
    398 F.3d 205 (2d Cir. 2005)...........................................................................33

*Cortec Corp. v. Erste Bank Ber Oesterrichischen Sparkassen AG*,
    535 F. Supp. 2d 403 (S.D.N.Y. 2008)............................................................21

*Curley v. AMR Corp.*,
    153 F.3d 5 (2d Cir. 1998)...................................................................18, 29, 30

*D'Andrea v. Rafla-Demetrious*,
    146 F.3d 63 (2d Cir. 1998).............................................................................50

*De Melo v. Lederle Labs.*,
    801 F.2d 1058 (8th Cir. 1986) .......................................................................26

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Del Ponte v. Universal City Dev. Partners, Ltd.*,
  2008 WL 169358 (S.D.N.Y. Jan. 16, 2008) ..........................................................43

*Do Rosario Veiga v. World Meteorological Organisation*,
  486 F. Supp. 2d 297 (S.D.N.Y. 2007)..................................................................15

*Esheva v. Siberia Airlines*,
  499 F. Supp. 2d 493 (S.D.N.Y. 2007)..................................................................19

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
  665 F.3d 384 (2d Cir. 2011)................................................................14, 30, 31

*Fitzgerald v. Texaco, Inc.*,
  521 F.2d 448 (2d Cir. 1975)................................................................................26

*Flores v. Southern Peru Copper Corp.*,
  253 F. Supp. 2d 510 (S.D.N.Y. 2002)..........................................................21, 27

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
  371 F. Supp. 2d 571 (S.D.N.Y. 2005)..................................................................41

*Fundo Soberano De Angola and others v Santos and others*
  [2018] EWHC 2199 (Comm)................................................................................22

*Ge Dandong v. Pinnacle Performance Ltd.*,
  966 F. Supp. 2d 374 (S.D.N.Y. 2013)..................................................................43

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
  140 S.Ct. 1637 (2020)..................................................................................32, 34

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
  667 F. Supp. 2d 308 (S.D.N.Y. 2009)..................................................................44

*Hammerstein v. Fed. Republic of Germany*,
  2011 WL 9975796 (E.D.N.Y. Aug. 1, 2011).......................................................49

*Hanson v. Denckla*,
  357 U.S. 235 (1958)............................................................................................42

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*,
  743 F. App'x 442 (D.C. Cir. 2018)......................................................................48

*In re Herald*,
  540 F. App'x 19 (2d Cir. 2013) ..........................................................................19

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hoffman v. Finger Lakes Instrumentation, LLC*,
  789 N.Y.S.2d 410 (N.Y. Sup. Ct. 2005) ...............................................................35

*Ilusorio v. Ilusorio-Bildner*,
  103 F. Supp. 2d 672 (S.D.N.Y. 2000)............................................................26, 28

*In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz
  of Ukraine*,
  311 F.3d 488 (2d Cir. 2002).........................................3, 16, 19, 20, 21, 23, 27, 34

*Int'l Mins. & Res., S.A. v. Pappas*,
  96 F.3d 586 (2d Cir. 1996)..................................................................................29

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*,
  863 F.2d 315 (4th Cir. 1988) ..............................................................................37

*Jazini v. Nissan Motor Co., Ltd.*,
  148 F.3d 181 (2d Cir. 1998)................................................................................44

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
  387 F.3d 163 (2d Cir. 2004)..................................................................32, 34, 40

*JP Morgan Chase Bank v. Altos Hornos De Mexico, S.A. DE C.V.*,
  412 F.3d 418 (2d Cir. 2005)................................................................................49

*Keramchemie GmbH v. Keramchemie (Canada) Ltd.*,
  771 F. Supp. 618 (S.D.N.Y. 1991) ......................................................................43

*Kiobel v. Royal Dutch Petroleum Co.*,
  621 F.3d 111 (2d Cir. 2010)................................................................................49

*Krepps v. Reiner*,
  588 F. Supp. 2d 471 (S.D.N.Y. 2008)..................................................................42

*La. Power & Light Co. v. City of Thibodaux*,
  360 U.S. 25 (1959)..............................................................................................30

*Lan Assocs. XVIII, L.P. v. Bank of Nova Scotia*,
  1997 WL 458753 (S.D.N.Y. Aug. 11, 1997)........................................................44

*Laumann v. Nat'l Hockey League*,
  989 F. Supp. 2d 329 (S.D.N.Y. 2013)..................................................................41

*Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*,
  337 F. Supp. 3d 274 (S.D.N.Y. 2018)..................................................................17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lismore v. Société Générale Energy Corp.*,
  2012 WL 3577833 (S.D.N.Y. Aug. 17, 2012) ........................................................32, 35, 37

*Lueck v. Sundstrand Corp.*,
  236 F.3d 1137 (9th Cir. 2001) ...........................................................................................28

*In re Lyondell Chem. Co.*,
  543 B.R. 127 (Bankr. S.D.N.Y. 2016) ...............................................................................44

*Mende v. Milestone Tech., Inc.*,
  269 F. Supp. 2d 246 (S.D.N.Y. 2003)................................................................................43

*Mercier v. Sheraton Int'l, Inc.*,
  981 F.2d 1345 (1st Cir. 1992)............................................................................................26

*Metro Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996).........................................................................................42, 43

*In re Mexican Gov't Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019)...............................................................................45

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017)..................................................................................................6

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)........................................................................................................32, 35

*Murray v. British Broad. Corp.*,
  81 F.3d 287 (2d Cir. 1996)................................................................................................14

*In re N. Sea Brent Crude Oil Futures Litig.*,
  2017 WL 2535731 (S.D.N.Y. June 8, 2017) .....................................................................42

*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*,
  112 F. Supp. 3d 83 (S.D.N.Y. 2015).................................................................................50

*Norcom Elecs. Corp. v. CIM USA Inc.*,
  104 F. Supp. 2d 198 (S.D.N.Y. 2000)...............................................................................37

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*,
  85 F. Supp. 2d 282 (S.D.N.Y. 2000).................................................................................26

*Ole Media Mgmt., L.P. v. EMI April Music, Inc.*,
  2013 WL 2531277 (S.D.N.Y. June 10, 2013) ...................................................................50

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Parex Bank v. Russian Sav. Bank*,
　116 F. Supp. 2d 415 ...............................................................................23

*Perry v. Thomas*,
　482 U.S. 483 (1987).................................................................................31

*Piper Aircraft Co. v. Reyno*,
　454 U.S. 235 (1981).............................................................................28, 29

*Pittman by Pittman v. Grayson*,
　149 F.3d 111 (2d Cir. 1998)......................................................................47

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
　329 F.3d 64 (2d Cir. 2003).......................................................14, 16, 18, 29

*Postol v. El-Al Israel Airlines, Ltd.*,
　690 F. Supp. 1361 (S.D.N.Y. 1988)...........................................................25

*Potomac Capital Inv. Corp. v. Koninklijke Luchtvaapt Maatschapplj N.V.*,
　1998 WL 92416 (S.D.N.Y. Mar. 4, 1998) ..................................................15

*Ragone v. Atl. Video at Manhattan Ctr.*,
　2008 WL 4058480 (S.D.N.Y. Aug. 29, 2008)............................................35

*Rasoulzadeh v. Associated Press*,
　574 F. Supp. 854 (S.D.N.Y. 1983) ............................................................21

*Reyes v. Gracefully, Inc.*,
　2018 WL 2209486 (S.D.N.Y. May 11, 2018) ............................................34

*Ross v. Am. Exp. Co.*,
　547 F.3d 137 (2d Cir. 2008)......................................................................40

*In re Royal Grp. Techs. Sec. Litig.*,
　2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005).............................................16

*In re S. Afr. Apartheid Litig.*,
　643 F. Supp. 2d 423 (S.D.N.Y. 2009)........................................................44

*Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*,
　81 F.3d 1224 (2d Cir. 1996)..................................................................24, 27

*Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*,
　2014 WL 288705 (S.D.N.Y. Jan. 27, 2014) ..............................................48

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Smith/Enron Cogeneration Ltd. P'ship., Inc. v. Smith Cogeneration Int'l., Inc.*,
  198 F.3d 88 (2d Cir. 1999) ............................................................................... 35, 36

*Societe Generale v. Fl. Health Scis. Ctr., Inc.*,
  2003 WL 22852656 (S.D.N.Y. Dec. 1, 2003) ............................................................. 42

*Soley v. Wasserman*,
  823 F. Supp. 2d 221 (S.D.N.Y. 2011) .................................................................... 47, 48

*In re SSA Bonds Antitrust Litig.*,
  420 F. Supp. 3d 219 (S.D.N.Y. 2019) ........................................................................ 45

*Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*,
  421 F. Supp. 2d 741 (S.D.N.Y. 2006) ............................................................ 15, 24, 25

*Tarazi v. Truehope Inc.*,
  958 F. Supp. 2d 428 (S.D.N.Y. 2013) ........................................................................ 49

*In re Terrorist Attacks on Sept. 11, 2001*,
  349 F. Supp. 2d 765 (S.D.N.Y. 2005) ........................................................................ 42

*Troma Ent., Inc. v. Centennial Pictures, Inc.*,
  729 F.3d 215 (2d Cir. 2013) ..................................................................................... 41

*Universal Trading & Inv. Co., Inc. v. Credit Suisse (Guernsey) Ltd.*,
  560 F. App'x 52 (2d Cir. 2014) ................................................................................ 43

*Varnelo v. Eastwind Transp., Ltd.*,
  2003 WL 230741 (S.D.N.Y. Feb. 3, 2003) ............................................................ 24, 27

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
  751 F.2d 117 (2d Cir. 1984) ..................................................................................... 44

*World GTL Inc. v. Petroleum Co. of Trinidad and Tobago Ltd*,
  2010 WL 3291673 (S.D.N.Y. Aug. 11, 2010) ............................................................. 33

*WorldCrisa Corp. v. Armstrong*,
  129 F.3d 71 (2d Cir. 1997) ....................................................................................... 39

*Yanez Osuna v. Citigroup Inc.*,
  2020 WL 3989084 (2d Cir. July 15, 2020) ................................................................. 16

*In re Zinc Antitrust Litig.*,
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) .................................................................... 45, 47

# TABLE OF AUTHORITIES
### (continued)

Page(s)

**Statutes**

9 U.S.C. § 3.................................................................................................................31, 41

**Other Authorities**

Restatement (Third) of the Foreign Relations Law of the United States......................................48

**Rules**

CPLR § 301.................................................................................................................42

CPLR § 302.................................................................................................................42

Fed. R. Civ. P. 12(b)(2)...................................................................................................6

Fed. R. Civ. P. 12(b)(6)...................................................................................................6

**Constitutional Provisions**

Angola Const., art. 174....................................................................................................22

## INTRODUCTION

This lawsuit—involving Angolan plaintiffs, the Angolan government, Angolan contracts, power projects of national importance in Angola, and Angolan law—does not belong in this Court. Plaintiffs are Angolan companies with no connection to this forum. The Defendants include the government of Angola and its subdivisions. Plaintiffs' claims are based on conduct that allegedly occurred in Angola, and are substantially duplicative of claims *already* being pursued in Angola— *and* in an arbitration, administered by the London Court of International Arbitration (the "LCIA Arbitration"), which Plaintiff Aenergy S.A. ("AE") filed on the same day as this suit, in which it seeks ███████████████████████. This classic case of forum shopping should be dismissed under *forum non conveniens* or, alternatively, under Section 3 of the Federal Arbitration Act because the claims are referable to arbitration under multiple agreements. In any event, Plaintiffs' claims against General Electric Company, General Electric International, Inc., and GE Capital EFS Financing, Inc. (the "GE Defendants") should be dismissed for failure to state a claim, for lack of personal jurisdiction over two of the entities, and because threshold issues will be resolved in already-ongoing proceedings.

AE is an Angolan company that markets itself as offering energy solutions to Angola and surrounding African countries. In 2017, AE signed contracts with the Angolan government to build, operate, and maintain several government-owned power plants in Angola (the "AE-MINEA Contracts"). AE contracted with GE Packaged Power, Inc. ("GE Packaged Power")—a non-party to this suit that AE sued in the LCIA Arbitration—to purchase equipment, including turbines, for these plants in an agreement with an arbitration clause. On January 10, 2019, Angola informed AE of its intent to terminate the AE-MINEA contracts. Plaintiffs allege that this termination was a breach of contract by Angola. They further allege that "GE"—Plaintiffs' catch-all name for any company associated with General Electric, whether or not parties to this suit—caused the Angolan

government to terminate the AE-MINEA Contracts through alleged acts of misrepresentation in Angola.  Plaintiffs claim that "GE" did so in order to sell turbines directly to Angola.  Plaintiffs also allege that the Angolan government unlawfully "expropriated" four power turbines and that GE aided and abetted this government act.

With all these events taking place in Angola, AE unsurprisingly first challenged the Angolan government's termination of the AE-MINEA Contracts in Angola.  On January 10, 2020, after AE failed to convince the President of Angola to reconsider the government's termination of the AE-MINEA Contracts, AE filed an action to review in the Supreme Court of the Republic of Angola, which remains pending.  AE's factual allegations in that case mirror those asserted here: that the Angolan government wrongfully terminated the AE-MINEA Contracts and did so due to alleged misrepresentations by "GE."  AE filed an application in *this* Court pursuant to 28 U.S.C. § 1782 to secure discovery "from General Electric Company . . . and its affiliates" "for use in the Angolan litigation."  *In re App. of Aenergy, S.A.*, 1:19-mc-00542-VEC (S.D.N.Y.) (Dkt. 3). During the Section 1782 action, AE never disclosed that it was contemplating filing this suit, that it believed litigation in this Court was appropriate, or that it believed pursuing its claims in Angola would be fruitless.  AE's Section 1782 application was granted, General Electric Company and its affiliates produced voluminous discovery, and AE submitted some of that discovery to the Angolan Supreme Court, which will adjudicate the validity of the government's termination of the AE-MINEA Contracts and potentially GE's role (if any) in that termination.

***Angola is the Appropriate Forum***.  Plaintiffs' allegations make clear that if their claims belong in any court, Angola is the appropriate forum.  Both Plaintiffs are Angolan companies, and most of the Defendants are agencies of the sovereign nation of Angola, as well as the Republic of Angola itself.  The AE-MINEA Contracts were executed in Angola, performed in Angola, concern

the sale of equipment and services to the Angolan government, and are governed by Angolan law. The Angolan government's alleged breach of those contracts plainly occurred in Angola, as did "GE's" alleged misrepresentations that purportedly caused the government to terminate the AE-MINEA Contracts.   And critical non-party witnesses—including Wilson da Costa, identified throughout the Complaint as the "GE" perpetrator of the alleged misdeeds—reside in Angola. Neither Plaintiffs, nor their claims, have any connection to this forum.   To try to create one, Plaintiffs improperly sued General Electric Company ("GE Company"), which is incorporated in New York, even though it has no connection to the alleged misconduct other than being the publicly traded parent of the General Electric business.

Plaintiffs have, by their actions, all but conceded the appropriateness and suitability of an Angolan forum.   They sought relief in the Angolan courts, submitted discovery from the Section 1782 proceedings to the Angola Supreme Court, and continue to seek deposition testimony in the 1782 action for the Angolan suit.   The Angolan legal system addresses the types of claims Plaintiffs brought here, and the GE Defendants are amenable to service of process in Angola.

Plaintiffs' claimed excuse for filing in this Court rather than in Angola—that Angola is corrupt and its legal system lacks due process—is unsubstantiated, disingenuous, and undercut by Plaintiffs' own conduct, including their decision to do business in Angola for many years.   The law of this Circuit is clear that a plaintiff who *chooses* to do business in a country faces a nearly insurmountable bar when later complaining that the country's courts are inadequate.   *In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002).   This legal principle applies with full force here.   In addition, just ten months ago, AE invoked Section 1782 seeking evidence for use in these same Angolan legal proceedings, never once suggesting that the Angolan courts were too "corrupt" to decide claims

arising from their business dealings in Angola.  All of the *forum non conveniens* factors weigh in favor of dismissal for an Angolan forum.

> ***This Case Is an End Run around Arbitration***.  In addition to filing this action in the wrong court, Plaintiffs intentionally and tactically sued the wrong defendants in an attempt to avoid mandatory arbitration agreements and contractual limitations on liability.

First, Plaintiffs' claims against GE International, Inc. ("GE International") are subject to a mandatory arbitration clause in AE's Collaboration Agreement with GE International, providing for ███████████████████████.

Second, *all* of Plaintiffs' claims are subject to arbitration agreements under the contracts AE signed with GE Packaged Power affiliates governing the events at issue.  In 2016, GE Packaged Power and AE entered into a "Framework Agreement" providing for ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████  AE filed the LCIA Arbitration *on the same day it filed this suit*, and its claims in this Court substantially overlap with its claims in arbitration.  The Framework Agreement also contains ████████████████████████████████████ █████████████████████████████████████  Similarly, the claims Plaintiffs assert here about the Soyo II project—another project where Angola chose to terminate its relationship with Plaintiffs—relate to their contracts with GE Energy France SNC ("GE Energy France"), which supplied turbines and services to AE pursuant to *another* contract that contains a mandatory arbitration clause and limitation of liability provisions.  All of the tortious conduct alleged by AE

was performed by "GE" in connection with the equipment and services sold under these contracts, which can be resolved only in arbitration pursuant to the express terms of the contracts. Similarly, the sale-purchase agreements pursuant to which AE bought TM2500 turbines—the turbines that are front and center of AE's allegations here—provide for mandatory ICC arbitration, and, today, GE Packaged Power and its affiliate GE Global Parts & Products GmbH commenced ICC arbitrations seeking payment of the millions of dollars AE owes under these agreements.

In a blatant effort to avoid these obstacles to their suit, Plaintiffs try to masquerade what are fundamentally claims against GE Packaged Power and GE Energy France as claims against the GE Defendants. Plaintiffs try to obfuscate this through group pleading—lumping together the GE Defendants, GE Packaged Power and its affiliates, GE Energy France, and other non-party General Electric affiliates, as "GE." In fact, the named GE Defendants have little, if anything, to do with Plaintiffs' core tort allegations. Even if Plaintiffs had claims against the GE Defendants, under this Circuit's law, those claims would belong in arbitration—because they "arise under the subject matter of the underlying [Framework and Soyo II] agreement[s]," and "there is a close relationship between [GE Packaged Power and GE Energy France] and the non-signatory" GE Defendants. *Chung Chang v. Warner Bros. Ent., Inc.*, 2019 WL 5304144, at *4 (S.D.N.Y. 2019). If this case against the GE Defendants is not dismissed under *forum non-conveniens*, equitable estoppel mandates that it be dismissed under Section 3 of the Federal Arbitration Act ("FAA").

### *Plaintiffs Have Not Alleged Personal Jurisdiction or a Plausible Claim for Relief*.
Plaintiffs' group pleading strategy fails in additional ways. First, Plaintiffs have not alleged that GE International and GE Capital EFS Financing, Inc. ("GE Capital EFS") have any ties to this forum, and certainly no ties arising from the claims in this case. Nor have Plaintiffs alleged any facts about the three GE Defendants that would allow this Court to extend its jurisdiction over the

parent company, GE Company, to either subsidiary.  Second, Plaintiffs cannot state a claim against the three specific GE Defendants merely by alleging that Plaintiffs were harmed by an amorphous entity called "GE."  Plaintiffs' group pleading strategy violates Rule 8 and demonstrates their inability to plead specific facts satisfying Rule 12(b)(2) or Rule 12(b)(6).  And Plaintiffs have not even *attempted* to plead facts supporting their accounting and aiding and abetting claims.

***Threshold Issues Will Be Decided Elsewhere***.  Finally, comity militates against maintaining an action here that depends on the findings of other adjudicative forums.  The AE-MINEA Contracts and the "Soyo II Concession" between Plaintiff Combined Cycle Power Plant Soyo, S.A. ("Cycle Power") and the Angolan government require that Angolan arbitrators applying Angolan law determine whether the contracts were breached.  Plaintiffs' interference claims against the GE Defendants depend on the existence of such a breach.  And the Angolan Provincial Court will determine whether Angola lawfully seized turbines—the act on which Plaintiffs predicate their aiding and abetting claim against the GE Defendants here.  These threshold issues must be decided before claims against the GE Defendants can be resolved.

Plaintiffs' claims against the GE Defendants do not belong in this Court.  All signs—the doctrine of *forum non conveniens*, Section 3 of the FAA, Rules 12(b)(2) and 12(b)(6), and comity—point to dismissal.  Plaintiffs' claims against the GE Defendants should be dismissed.

## FACTUAL BACKGROUND[1]

### A.    AE and GE Packaged Power Enter into an Agreement to Sell Turbines to Angola

AE was founded by Ricardo Leitao Machado, who used his past success securing contracts

---

[1]   "It has long been the law of this Circuit that 'in the determination of a motion to dismiss for *forum non conveniens*, the court may consider affidavits submitted by the moving and opposing parties,' and make findings of fact." *Acosta v. JPMorgan Chase & Co.*, 219 F. App'x 83, 85 (2d Cir. 2007) (citation omitted).  An arbitration-related motion also may be based on "all relevant, admissible evidence submitted by the parties," including pleadings, admissions on file, and affidavits.  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017).

with the Angolan government to market AE as a local partner to foreign companies doing business in Angola.  Compl. ¶ 2.  In 2016, AE secured a contract with GE Packaged Power[2] to serve as its exclusive "channel partner" in Angola and to re-sell power generation equipment and services to the Angolan government.  This relationship was governed by a "Framework Agreement," signed on June 30, 2016, which is ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  Around the time the parties signed the Framework Agreement, AE entered into purchase agreements for three of the 15 turbines,[5] and purchased a total of 14 turbines from GE Packaged Power and its affiliate over the next year.  Compl. ¶¶ 65-66.

**B.   AE and GE International Enter into a Collaboration Agreement**

On June 2, 2017, AE and GE International entered into a Collaboration Agreement.  GE International agreed to provide AE with technical and services support for AE's projects in Angola.

---

[2]  GE Packaged Power is owned by GE Company, and is part of the "GE Power" business, which sells power turbines and services.  Snyder Decl. Ex. 16.

[3]  The Framework Agreement defines ████████████████████████████████████████████████
████████████████████████████████████████

[4]  Plaintiffs allege that "AE entered into several new contracts with U.S.-based affiliates of the GE Co. pursuant to which AE bought GE-manufactured products and GE-provided services."  Compl. ¶ 54.  The Framework Agreement was the central means by which AE enjoyed exclusivity to sell GE products and services in Angola, and therefore may be considered by the Court on this Motion.  *See Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 379 (S.D.N.Y. 2013) (where "no dispute exists regarding the authenticity or accuracy of the document[s]," court "may consider documents upon the terms and effect of which the complaint relies heavily").

[5]  The purchase agreements are governed by ███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████  Snyder Decl. Exs. 5, 6, 8, 9.  The first was between AE and GE Packaged Power; the subsequent three were between AE and GE Packaged Power's affiliate GE Global Parts & Products GmbH, which is also part of GE Power business and a non-party here.  *Id.*  Due to AE's non-payment under the contracts, GE Packaged Power and GE Global Parts & Products GmbH today commenced ICC arbitration proceedings against AE seeking, respectively, a minimum of $4,129,486 and $56,947,745.  Snyder Decl. ¶¶ 24, 25.

Snyder Decl. Ex. 7 ¶ 2; Compl. ¶ 64.  The Agreement is governed ███████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Snyder Decl. Ex. 7 ¶ 8.

## C.   Angola Enters into Agreements with AE and Obtains a Loan from GE Capital EFS

In 2017, two Angolan state-owned utilities (PRODEL and ENDE), subsidiaries of the Angolan Energy Ministry ("MINEA"), entered into the 13 contracts with AE, Compl. ¶ 58, to provide 300MW of new power generation—projects of national importance, which required the Angolan President's approval and issuance of presidential decrees, to bring electricity to many in Angola who lacked access to power.  *Id.* ¶ 59.[6]  The AE-MINEA Contracts are the subject of Plaintiffs' breach-of-contract claims against the Angola Defendants.  *Id.* ¶¶ 227-34.  All are governed by Angolan law and provide that any dispute arising out of the agreements shall be arbitrated (11 of the contracts explicitly provide for arbitration in Angola; the other two do not identify a location).  Abecasis Decl. (ECF No. 47) Exs. 1 –13.

To finance these projects, Angola's Finance Ministry negotiated a $1.1 billion credit facility with GE Capital EFS.  Compl. ¶ 69.  According to the Complaint, GE Capital EFS, which is part of GE Capital's financial services business, understood it was financing the purchase of 12 GE Power turbines, but AE had existing commitments from Angola to purchase only *eight* turbines—a discrepancy "GE" discovered after the loan was executed.  *Id.* ¶ 83.  Because Angola's purchase of 12 GE Power turbines was a condition precedent to funding the loan (and AE would not be paid by Angola unless the loan was funded), "GE" and AE agreed that AE would ask MINEA to amend its contracts to purchase four more turbines.  *Id.* ¶¶ 96-99.  According to AE, MINEA refused, leading Mr. da Costa—whom the Complaint describes as "GE's representative

---

[6]  The Complaint calls these contracts the "AE-MINEA Contracts," Compl. ¶ 4, and this motion follows that convention.  But as the Angola Defendants explain in their motion, the contracts were not executed by MINEA.

in Angola"—to "fabricate[] forgeries" of contract amendments by MINEA that he "pass[ed] on to others at GE." *Id*. ¶¶ 103-09, 225.  In fact, it was AE that had every incentive for the forgery it seeks to pin on "GE."  AE owed GE Packaged Power and its affiliate hundreds of millions of dollars for the turbines it had purchased, but AE planned to pay its debt only after the government first paid AE using the loan funds—so AE needed to ensure that the conditions precedent to the loan's funding were satisfied.  *Id*. ¶¶ 69, 73.

The forged documents were sent to GE Capital EFS, which believed that they showed that the amendments had been agreed to by MINEA, and GE Capital EFS approved a loan disbursement in December 2017—with $376 million of the disbursement attributable to AE.  *Id.* ¶ 125.  Additional funds were disbursed to GE Packaged Power and its affiliate GE Global Parts & Products GmbH to pay for turbines and services purchased by AE, including the four turbines AE had previously purchased and was now believed to have re-sold to MINEA.  *Id.* ¶ 126.

AE alleges that the situation began to fray in December 2018, when, during meetings in Angola among MINEA, AE, and "GE," Mr. da Costa showed MINEA the contract amendments for the four additional turbines and noted that payment for those turbines was made from the loan proceeds.  *Id.* ¶¶ 140-41; *id.* Ex. 8.  This led to further communications and meetings with MINEA in Angola during which AE alleges that Mr. da Costa and Mr. Sezan (GE Packaged Power's CEO for Sub-Saharan Africa, based in Ghana, *id.* ¶ 160; *id.* Ex. 9) continued to maintain "the false narrative that AE had caused Angola to pay AE for twelve turbines."  *Id.* ¶¶ 148, 149(g), 173; *see also id.* Ex. 10.  Plaintiffs allege that Mr. da Costa and Mr. Sezan (both located in Africa) "were at the center" of these purported misrepresentations.  *Id.* ¶ 162.

**D.    The New Angolan Government Terminates Its Contracts with Plaintiffs**

On August 23, 2017, the Angolan people elected a new President, João Manuel Gonçalves Lourenço.  President Lourenço replaced José Eduardo dos Santos, who had served as Angola's

President from 1979 to 2017.  After taking office on September 26, 2017, President Lourenço launched an aggressive campaign to investigate the corrupt patronage system of his predecessor, arresting several of his predecessor's allies and family members on charges of corruption and money laundering.  Snyder Decl. Ex. 11, at 10; *id.* Ex. 12, at 2.  In early December 2018, the Lourenco administration rolled out an ambitious five-year strategy to tackle corruption, money laundering, and other economic and financial crimes, instituting a number of anti-corruption initiatives.  *Id.* Ex. 12, at 6-7.

On January 10, 2019, MINEA informed AE of its intent to terminate AE's contracts with the Ministry, based on "irregularities" in AE's conduct and AE's "breach of trust."  Abecasis Decl. Ex. 20.  MINEA also noted its intent to seek a transfer of its turbine contracts to GE Packaged Power.  *Id.*  AE alleges that "GE" "encourage[d]" MINEA to terminate AE through communications—made in Angola—between Mr. da Costa, Mr. Sezan, and MINEA in March 2019, which allegedly confirmed the willingness of "GE" to take over AE's obligations if the AE-MINEA Contracts were terminated.  Compl. ¶¶ 172-75, 183-84; *see also id.* ¶ 178 & Ex. 16.  On 23, 2019, President Lourenço terminated the contracts.  Abecasis Decl. Ex. 19.

On October 23, 2019, Angola also terminated the "Soyo II Concession" involving the construction of a "Soyo II" power plant, citing "the same purported irregularities invoked in support of Angola's decision to terminate the AE-MINEA Contracts."  Compl. ¶¶ 200-02.  The following month, the Angolan government initiated an injunction-like proceeding that resulted in preliminary relief in the form of an order that the four disputed turbines in AE's possession be turned over to a court-appointed trustee, an action that "GE" allegedly supported by giving testimony.  *Id.* ¶¶ 212-15; *see* Abecasis Decl. ¶¶ 15-16 (describing the preliminary relief process).

**E.     Plaintiffs Pursue Remedies in Angola**

Contending that Angola's termination of the AE-MINEA Contracts and the court-ordered

seizure of turbines were wrongful, Plaintiffs litigated this conduct in two sets of legal proceedings in Angola and are contemplating a third:

1. *Angola's Termination of the AE-MINEA Contracts.*   AE appealed the termination of the AE-MINEA Contracts to MINEA, then to the President of Angola, and, finally, to the Angolan Supreme Court—even filing a Section 1782 application in this Court on November 22, 2019, to obtain discovery in aid of their Angolan Supreme Court action.   *See In re App. of Aenergy, S.A.*, 1:19-mc-00542-VEC (S.D.N.Y.).   AE's submission in the Angolan proceeding mirrors the allegations in their Complaint here, including the claim that the government wrongfully terminated the AE-MINEA Contracts, Abecasis Decl. Ex. 26 (1/10/2020 AE Filing), and a lengthy recitation of the alleged misrepresentations made by "GE."  *Id.* ¶¶ 274-18, 547-55, 567.   The Angolan Supreme Court will determine whether Angola's termination of the AE-MINEA Contracts was valid and has also been asked to address GE's role in that termination decision.

2. *The Turbine Seizure.*   Plaintiffs also are litigating the seizure of four turbines from AE's warehouse in Angolan Provincial Court, which will determine whether the turbines rightfully belong to AE, Abecasis Decl. ¶ 19—a claim Plaintiffs are duplicating here.  *See* Compl. ¶¶ 249-77 (alleging "expropriation" and conversion by the Angola Defendants); *id.* ¶¶ 294-98 (alleging that the GE Defendants aided and abetted this "expropriation").[7]

3. *The Soyo Appeal.*   AE filed an administrative challenge to the Angolan government's termination of the Soyo II Concession.   Snyder Decl. Ex. 15 ¶ 10.   AE has represented that if it is "unsuccessful before the agency, it intends to appeal to the President of Angola and then, if necessary, to the Supreme Court of Angola."  *Id.*

---

[7]  On October 8, 2019, the Angolan State filed a provisional application for seizure of the four turbines.  *See* Abecasis Decl. Ex. 24.  On December 5, 2019, the Angolan Provincial Court issued a *Sentenca Arresto*—a provisional attachment order for the turbines.  *See id.* Ex. 25.  Angola is now litigating whether the provisional relief should be made permanent and whether the turbines and other items are property of the Angolan State.

**F.      AE Initiates Arbitration Against GE Packaged Power**

On May 7, 2020, the same day it filed this case, AE filed a Request for Arbitration ("RFA")

against GE Packaged Power in the LCIA, ███████████████████████████████████████

██████████████████[8] AE's RFA seeks ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ Indeed, in an April 29, 2019 breach notice, AE characterized its present

tortious interference allegations as a "breach of the Framework Agreement." *Id.* Ex. 13.

The LCIA Arbitration also will resolve whether ████████████████████████

████████████████████████████████████████████████████████████

████████████████████. *Compare id.* Ex. 17 (RFA) ¶¶ 46-59, *with* Compl. ¶¶ 176-77 (alleging

Angola acted wrongfully in "transferring" contracts to "GE," *i.e.*, GE Packaged Power), ¶¶ 278-

83 (alleging tortious interference with contract based on this "transfer").  Notably, the Framework

Agreement prohibits ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ Snyder Decl. Ex. 2, Art. XI.  Knowing that this limitation poses a substantial hurdle

to recovery in London, AE filed these duplicative claims here.

**G.      Plaintiffs Sue Angola and Various GE Entities in This Court**

In a blatant attempt at double recovery, Plaintiffs filed their Complaint in this Court on the

---

[8]  The Framework Agreement is governed by English law.  Snyder Decl. Ex. 2, Art. VI.

same day they filed the RFA, seeking the *same* damages for alleged interference with the AE-MINEA Contracts, the Soyo II Contract, and Plaintiffs' purported future business opportunities that Plaintiffs are already trying to recover in London.  Compl. ¶¶ 279-80, 285.  Plaintiffs also allege that the GE Defendants aided and abetted Angola's "expropriation" of several turbines and seek an accounting of the value and profits derived from this property.  *Id.*  ¶¶ 291-93; 295-96.

Although Plaintiffs repeatedly allege that an amorphous group known as "GE" harmed them, they allege little about the GE Defendants they sued.  The sole allegations against GE International are that it entered into a technical Collaboration Agreement and an Authorized Channel Partner Master Agreement with AE, *id.* ¶¶ 55, 64, both of which have arbitration clauses, Snyder Decl. Exs. 7 & 1.  There are no allegations of misconduct specifically attributed to GE International.  Similarly, the only factual allegations against GE Company are that it (1) is a corporate parent to other defendants, and (2) provided an internal loan guarantee to GE Capital EFS so that GE Capital EFS could make its loan to Angola.  *Id.* ¶¶ 54, 82.  The Complaint does not allege that GE Capital EFS harmed Plaintiffs either—rather, it simply alleges that GE Capital EFS extended financing to Angola to enable it to buy the TM2500 turbines from AE under a credit facility agreement.  There is no claim that this financing agreement was breached nor any specific allegation that GE Capital EFS engaged in tortious conduct.  *See id.* ¶¶ 69-74.

Plaintiffs also allege that AE "entered into subcontracts with a GE affiliate to buy U.S. manufactured equipment for the [Soyo II] project," *id.* ¶ 201, but they allege no breach of those contracts—which are not even identified in the Complaint.  Plaintiffs presumably are referring to a September 2018 sales contract between GE Energy Products France SNC ("GE Energy France"), a French entity, and AE (the "Soyo II Contract"), which contains ███████████████  ███████████████████  Snyder Decl. Ex. 10, Arts. 12.1 & 12.2.1.  The Soyo II

Contract also contains ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

**ARGUMENT**

**A.      The Court Should Dismiss This Case Under the Doctrine of *Forum Non Conveniens***

The doctrine of *forum non conveniens* "permits a federal court to dismiss a case over which it has jurisdiction and in which venue is otherwise proper when 'dismissal would best serve the convenience of the parties and the ends of justice.'" *Banco De Serguros Del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 258–59 (S.D.N.Y. 2007) (quoting *Murray v. British Broad. Corp.*, 81 F.3d 287, 290 (2d Cir. 1996)).[9]  The dismissal "is confided to the sound discretion of the district court, to which substantial deference is given." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003).  The *forum non conveniens* analysis proceeds in three "stages." *Id.*  First, the court evaluates "whether the plaintiff's choice [of forum] is entitled to more or less deference." *Id.*  Second, the court considers "whether an adequate alternative forum exists." *Id.*  Third, the court "balance[s] factors of private and public interest to decide, based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant." *Id.*

Here, all factors strongly warrant dismissal of this Angola-centric dispute.  As the Second Circuit has repeatedly held, claims by foreign plaintiffs based on events that largely transpired in foreign countries should be heard in foreign courts, even if one defendant happens to have

---

[9]   In fact, this Court does *not* have jurisdiction over any of Plaintiffs' claims:  the FAA removes jurisdiction over the claims against the GE Defendants, and the Foreign Sovereign Immunities Act ("FSIA") removes jurisdiction over the claims against the Angola Defendants (*see* ECF No. 46).  But the Court can dismiss Plaintiffs' entire suit under *forum non conveniens* without reaching the jurisdictional issues.  *See Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 389 (2d Cir. 2011).

connections to New York.  *See, e.g.*, *id.* at 76 (affirming *forum non conveniens* dismissal of tort and contract claims because "alleged fraud and misrepresentations primarily occurred [in England]," "plaintiffs' allegations of breach of contract and breach of fiduciary duty arise out of contracts entered into in London," and "New York's generalized interest in overseeing [a defendant] . . . headquartered in New York" was "small"); *Acosta v. JPMorgan Chase & Co.*, 219 F. App'x 83, 87 (2d Cir. 2007) (affirming *forum non conveniens* dismissal of case against New York bank where "alleged fraudulent acts occurred in Uruguay and Argentina").[10]  Dismissal is particularly appropriate here, because Plaintiffs' claims relate to the provision of power to the people of Angola.  Plaintiffs' claims are of infinitely more importance to Angola than New York, and should be resolved by an Angolan court.  *See Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 746, 772 n.26 (S.D.N.Y. 2006) (dismissing ownerships claims to a large "power plant[] in the United Kingdom," as New York's interest in the suit "does not compare to the public interest England has in adjudicating a dispute that will affect exponentially more of its residents who receive their power from [the plant]").  The Court should dismiss this case in favor of an Angolan forum.

### 1.     Plaintiffs' Choice of Forum Is Not Entitled to Deference

Because neither Plaintiffs nor this lawsuit have any connection to New York, Plaintiffs' choice of a New York forum is not entitled to deference.  Plaintiffs chose this forum solely to

---

[10]  *See also, e.g.*, *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 713 (S.D.N.Y. 2003), *aff'd*, 98 F. App'x 47 (2d Cir. 2004) (dismissing civil RICO, contract, and tortious interference claims filed by Russian plaintiffs concerning business transactions in Russia); *Cavlam Bus. Ltd. v. Certain Underwriters at Lloyd's, London*, 2009 WL 667272, at *9 (S.D.N.Y. Mar. 16, 2009) (dispute regarding execution of contract in London should be litigated in England); *Do Rosario Veiga v. World Meteorological Organisation*, 486 F. Supp. 2d 297, 307 (S.D.N.Y. 2007) ("Because the core events, operative facts, and associated private and institutional interests at issue are local to Switzerland, the dispute should be resolved in that country."); *Potomac Capital Inv. Corp. v. Koninklijke Luchtvaapt Maatschapplj N.V.*, 1998 WL 92416, at *10 (S.D.N.Y. Mar. 4, 1998) (dismissing tort claim based on conduct in the Netherlands in favor of adjudication in the Netherlands; fact that defendant was headquartered in New York "is of no consequence in this case, since the tort and the resulting damage both occurred elsewhere").

forum-shop, and courts do not defer to a plaintiff's strategic forum selection.

Although a *New York plaintiff's* choice to sue in New York is entitled to "great deference," the same is not true for a *foreign* plaintiff that has no connections with the state. *Monegasque*, 311 F.3d at 498. This is for good reason: "when a foreign plaintiff sues in a United States forum . . . one may not easily presume that choice is convenient." *Pollux*, 329 F.3d at 71. "[I]t is more likely that forum-shopping for a higher damage award or for some other litigation advantage was the motivation for plaintiff's selection." *Id.* Thus, a foreign plaintiff's choice of an American forum is suspect—and not entitled to deference—unless there is a "*bona fide* connection the plaintiff has with that forum." *Id.*; *see In re Royal Grp. Techs. Sec. Litig.*, 2005 WL 3105341, at *2 (S.D.N.Y. Nov. 21, 2005). That is not the case here. Plaintiffs are Angolan corporations with no bona fide connection to New York. *See* Compl. ¶¶ 25-26; *Yanez Osuna v. Citigroup Inc.*, 2020 WL 3989084, at *3 (2d Cir. July 15, 2020) ("[P]laintiffs, as foreign residents, are afforded 'less consideration'" in the deference analysis); *Acosta*, 219 F. App'x at 86 ("All plaintiffs . . . are foreign nationals," which counseled against deferring to their decision to sue in SDNY).

Even the *Defendants* have no relevant connection to New York. The primary defendants are the sovereign state of Angola and arms of its government—all based in Angola. Compl. ¶¶ 27-31. Two of the three GE Defendants are not domiciled in New York either. *Id.* ¶¶ 33-34. Even if one defendant, GE Company, is deemed at "home" in New York, "litigants rarely are concerned with promoting their adversary's convenience at their own expense," so Plaintiffs' "choice of the defendant's home forum over other fora . . . suggests the possibility that plaintiff's choice was made for reasons of trial strategy." *Pollux*, 329 F.3d at 74. This is all the more true here, where only *one* of *eight* defendants is connected to New York, and where that defendant, GE Company, is not alleged to have directly participated in the alleged tortious conduct at issue (*see supra*

Factual Background, Part G)—which occurred in Angola.

Any deference to Plaintiffs' choice of a U.S. forum is further undermined by the fact that they are Angolan companies that *chose* to do business in Angola and submit to its court system. *BFI Grp. Divino Corp. v. JSC Russian Aluminum*, 298 F. App'x 87, 91 (2d Cir. 2008) (U.S. plaintiff's choice of U.S. forum entitled to little deference because plaintiff "had chosen to invest in Nigeria"); *Base Metal*, 253 F. Supp. 2d at 696 (little deference due plaintiff's U.S. forum choice, where it "chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country"). Plaintiffs knew their multi-million-dollar business with the Angolan government would be subject to the jurisdiction of the Angolan legal system. In fact, 11 of the 13 AE-MINEA Contracts call for dispute resolution by arbitration in Angola, where appeals would be made to the Angolan courts (Abecasis Decl. Exs. 1– 13). *See Base Metal*, 253 F. Supp. 2d at 697-98 ("[P]laintiffs should not have expected that any of their disputes would be litigated in the United States" where forum selection clauses in contracts "provided for a Russian forum or arbitration in Russia, Stockholm, or London[.]"); *see Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F. Supp. 3d 274, 298 (S.D.N.Y. 2018), *aff'd*, 785 F. App'x 18 (2d Cir. 2019) ("Since Plaintiff conducts business abroad, it can expect to litigate in another nation's courts.").[11]

Deference is particularly inappropriate given that Plaintiffs already filed legal proceedings in the Angolan courts (and an arbitration in London), raising many of the same allegations they assert here. *See supra* Factual Background, Parts E & F. Plaintiffs fear a loss in Angola and in the LCIA Arbitration, and hope to circumvent any adverse rulings by litigating their claims here. This forum-shopping is entitled to no deference. *See, e.g.*, *Banco De Serguros*, 500 F. Supp. 2d at

---

[11]   None of Plaintiffs' eight contracts with GE-related parties pertaining to this matter contain a dispute resolution clause calling for litigation in the United States either, Snyder Decl. Exs. 1, 2, 5-10. All of these contracts provide for mandatory arbitration outside of the United States.

261 ("[v]arious other civil and criminal matters pertaining to the same alleged events and losses as this case have been proceeding in Uruguayan venues," which supported dismissal); *see also Base Metal*, 253 F. Supp. 2d at 696-98 (no deference to plaintiffs' choice of New York forum when plaintiffs had already "pursued various remedies in the Russian court system" and "[t]he record before the Court points to nothing but forum shopping by the plaintiffs").

### 2.   Angolan Courts Offer an Adequate Forum—and the Appropriate One

#### a.   Angola's Courts Can Hear Plaintiffs' Claims

"An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux*, 329 F.3d at 75. This is true here. The GE Defendants consent to service in Angola, and the Court can condition its dismissal on that concession. *See Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 983–84 (2d Cir. 1993) (*forum non conveniens* dismissals may be "appropriately conditioned to protect the party opposing dismissal"). And the Angola Defendants are amenable to suit in their home country—AE is already litigating against them in *two* Angolan courts.

The subject matter of this dispute can also plainly be litigated in Angola. Under New York's choice-of-law rules, *all* the claims in the Complaint are governed by Angolan law, *see supra* Factual Background, Part C, so Angolan courts obviously "permit[] litigation of the subject matter of the dispute." *Pollux*, 329 F.3d at 75 (given that plaintiff's claims arose "under English statutory law," England clearly offered an adequate forum); *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (New York choice-of-law rules apply in diversity cases filed in the state).[12]

---

[12] Even if this Court disagrees with the choice-of-law analysis and would apply different law than the Angolan courts, the Angolan courts and Angolan law will provide Plaintiffs with more than adequate relief. As explained in the affidavit of Angolan Law Professor Sofia Vale, Angolan law supports recovery for every claim alleged in the Complaint. Vale Decl. ¶¶ 2.4.1–2.4.8. The availability of Angolan remedies for Plaintiffs' claims precludes a finding of inadequacy. *See BFI Grp.*, 298 F. App'x at 91–92 (Nigerian forum was adequate, even though Nigeria had "no cause of action analogous to [the] unfair competition" claim raised by plaintiff, because Nigeria had "causes of action analogous to" some of the plaintiff's other claims).

Although Angola's civil litigation procedures may differ from this Court's, "it is well established" that the fact that Angolan court procedures may differ from this Court's procedures "does not render [Angolan courts] inadequate." *In re Herald*, 540 F. App'x 19, 28 (2d Cir. 2013) ("'[T]he unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate.'" (quoting *Blanco*, 997 F.2d at 982)); *see also Borden, Inc. v. Meiji Milk Prod. Co.*, 919 F.2d 822, 829 (2d Cir. 1990) (rejecting argument that alternative forum must resolve a case "in the same time-frame" as the United States). Plaintiffs' claims would be governed by Angola's established civil rules and procedures, which are more than adequate. Vale Decl. ¶¶ 2.1.1–2.1.6.17 (describing the civil procedure process that would govern Plaintiffs' claims in Angola). Angola "permits litigation of the subject matter of the dispute," and is an adequate forum. *Monegasque*, 311 F.3d at 499.

### b.   Plaintiffs' Attempt to Smear the Angolan Justice System Fails

Plaintiffs allege that Angola is an inadequate forum because all aspects of the Angolan government, including its judiciary, are infected by "corruption." Compl. ¶ 193. This hyperbole is unsupported and disingenuous—particularly because Plaintiffs *chose* to seek out Angolan government contracts governed by Angolan law, and Plaintiffs are *already* litigating in Angola.

"The 'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly impressive track record." *Base Metal*, 253 F. Supp. 2d at 706 (collecting cases rejecting argument). The Second Circuit has "repeatedly emphasized that '[i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.'" *Blanco*, 997 F.2d at 982 (quoting *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991)). "'[C]onclusory submissions' and 'sweeping generalizations' about [alleged corruption] do not establish the forum is inadequate[.]" *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493, 499 (S.D.N.Y. 2007) (quoting *Monegasque*, 311 F.3d at 499).

Here, "sweeping generalizations" of corruption are all that Plaintiffs offer. *Id.* Notably, Plaintiffs do not allege that the Angolan Supreme Court—the court that would hear this action if this motion is granted, Vale Decl. ¶ 2.1.1—is corrupt. Indeed, *Plaintiffs already filed suit* in the Angolan Supreme Court, essentially admitting that it is adequate to hear their claims.[13] Further, in the Section 1782 action it filed against GE Company in this Court, AE introduced two sworn declarations from Angolan counsel describing the Angolan legal proceedings and explaining how AE's requested discovery would aid those Angolan proceedings. Neither declaration suggests that the Angolan proceedings that AE initiated—and which AE demanded discovery to support—were subject to "rampant" corruption. *Compare* Snyder Decl. Exs. 14 & 15 (declarations submitted by AE in Section 1782 action), *with* Compl. ¶ 193. It is only now that Plaintiffs have filed yet another suit that they have suddenly discovered concerns about the Angolan court system.

The *only* support Plaintiffs cite for their vague allegations of "corruption" is a highly generalized U.S. State Department report. *See* Compl. ¶ 193 n.6 (citing two versions of the same report). But as Courts in this district have held, these reports merely flag governance issues for potential investors, and are insufficient to establish the inadequacy of a foreign judiciary. *See Base Metal*, 253 F. Supp. 2d at 708 n.23 (rejecting "plaintiffs' citations to United States Department of State reports that provide only minimal information about the Russian judiciary" because "[s]uch reports do not suffice to show the [foreign] forum inadequate").[14] The Second Circuit has held that even more detailed evidence—like "an affidavit . . . that describes both systemic deficiencies in the [alternative forum's] system of justice and specific difficulties experienced in [the plaintiff]'s pursuit of its claims herein in the courts of [the alternative forum]"—is *still* insufficient

---

[13] Plaintiffs allege that the Provincial Court deciding whether seizure of the turbines is proper employs "a corrupt adjudicative process," Compl. ¶ 259, without identifying any facts suggesting that the Court is "corrupt."

[14] These reports do not state that "there is no due process of law" in Angola as Plaintiffs allege. *See id.* ¶ 193.

to prove inadequacy. *Blanco*, 997 F.2d at 981; *see also Monegasque*, 311 F.3d at 499 (holding that general allegations of corruption in Ukraine—similar to Plaintiffs' allegations about Angola— were insufficient to show inadequacy, because only allegations like those in *Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983), where the plaintiffs "would probably be shot" if forced to litigate in Iran, are sufficient). Plaintiffs' allegations "of general corruption in the body politic of that nation" are not enough "to find foreign courts 'corrupt.'" *Monegasque*, 311 F.3d at 499; *Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG*, 535 F. Supp. 2d 403, 411 (S.D.N.Y. 2008) (A "series of news reports and government statements, suggesting that there may be political corruption in the Croatian judiciary . . . does not afford a sufficient basis for me to conclude that Croatian courts are unable to dispense 'basic justice'[.]").

Further, these same reports correctly observe that Angola is a rapidly changing nation that has undergone (and continues to undergo) substantial reform since the election of President Lourenco in August 2017, after 38 years of rule by former President dos Santos. They note that President Lourenco has emerged as "an open, reform-minded politician" who has engaged in "a sweeping reform agenda" by "prioritizing anticorruption and the fight against nepotism." Snyder Decl. Ex. 11, at 1, 10, 36. "In early December 2018, the Lourenco administration rolled-out an ambitious five-year strategy to tackle corruption, money laundering, and other economic and financial crimes. . . . These strong anti-corruption initiatives led to the detention of several high level public and private figures." *Id.* Ex. 12, at 2. Earlier this year, the Lourenco administration established a Commission for the Reform of Justice and Law comprised of the most senior members of the Angolan legal community. *Id.* Ex. 18. This demonstrates a continued commitment to the rule of law and further undermines Plaintiffs' attempt to smear Angola's judicial system as hopelessly corrupt. *See Flores v. Southern Peru Copper Corp.*, 253 F. Supp. 2d 510, 539

(S.D.N.Y. 2002) (finding Peru court system adequate notwithstanding allegations of corruption under a prior, longstanding president, in part based on "well-documented reform measures taken since President Fujimori was removed 20 months ago, and the publicly expressed resolve of his successor" to fight corruption); *Base Metal*, 253 F. Supp. 2d at 708 (rejecting plaintiffs' concerns about corruption in the Russian courts based, in part, on "the avowed commitment to judicial reform by the highest levels of the Russian government").[15]

The Angola judiciary is independent and impartial, and separate from the executive branch. *See* Vale Decl. ¶¶ 2.2.2 (judges cannot carry out any other public or private functions or have any political association), 2.2.1 & n.52 (citing Article 174 of the Constitution:  "When carrying out jurisdictional functions, courts are independent and impartial, and shall only obey the Constitution and the law."); *see also generally id.* ¶ 2.3 (independence of the Angola judiciary).  In fact, the judiciary regularly hears and upholds cases against members of the executive branch.  *See id.* ¶ 2.2.6 (citing cases).  Other courts—including in England, for example—have found the Angolan courts to be appropriate forums for the resolution of Angolan disputes.  *See Fundo Soberano De Angola and others v Santos and others* [2018] EWHC 2199 (Comm), *available at* https://www.oeclaw.co.uk/images/uploads/judgments/Bastos.pdf (raising no concerns about adequacy of Angolan courts and rejecting jurisdiction of English courts in favor of Angolan ones).

Moreover, the Second Circuit and courts in this District have repeatedly held that a plaintiff—like Plaintiffs here—that *chooses* to do business in a country faces a nearly insurmountable bar when later complaining that the country's courts are inadequate.  In *BFI Group*, for example, the Second Circuit affirmed dismissal for *forum non conveniens* in a case— largely analogous to this one—involving the defendants' alleged tortious interference with the

---

[15]  Angola's ranking in Transparency International's Corruption Perceptions Index—cited in State Department reports relied on by Plaintiffs—improved 19 places over the past year, from 165th to 146th.  Snyder Decl. Ex. 12.

plaintiff's $410 million infrastructure contract with the government of Nigeria.  298 F. App'x at 88–89.  Although the plaintiff complained "that Nigerian courts were biased" against it, the appellate panel rejected the argument—and agreed with the district court "that this argument was unpersuasive given [the plaintiff]'s desire to engage in a multi-million dollar operation in Nigeria." *Id.* at 92.  Likewise, in *Monegasque*, the appellate court rejected the claim that Ukrainian courts were inadequate, noting that the plaintiff's predecessor-in-interest "voluntarily conducted business with Ukragazprom, a Ukrainian company, and must have anticipated the possibility of litigation in Ukraine."  311 F.3d at 499.  In another analogous case involving a plaintiff that sought out multi-million dollar contracts in a foreign country, the Second Circuit explained that:

> It is at least anomalous for a Venezuelan corporation to contract with a Venezuelan bank for the financing of a housing project in Venezuela, specify in both pertinent contracts that litigation concerning them may be brought in Venezuela, and then argue to an American court that the Venezuelan system of justice is so endemically incompetent, biased, and corrupt as not to provide an adequate forum for the resolution of such contractual disputes.

*Blanco*, 997 F.2d at 981.  Here, it is worse than "anomalous" for an Angolan corporation to contract with the Angolan government to build power plants in Angola, specify in contracts that arbitration concerning them may be brought in an Angolan arbitral forum applying Angolan law subject to appeals to the Angolan courts, file litigation in Angola challenging the termination of those contracts, and then argue to an American court that the Angolan justice system is so corrupt that it cannot provide an adequate forum for disputes arising from those contracts.  *Id.*; *see also Base Metal*, 253 F. Supp. 2d at 707 ("There is a substantial temerity to the claim that the forum where a party has *chosen* to transact business is inadequate." (emphasis added) (alterations adopted)).

Plaintiffs sought "to engage in a multi-million dollar operation in [Angola]," and were happy to consent to the country's justice system when it suited them.  *BFI Grp.*, 298 F. App'x at 92; *Parex Bank v. Russian Sav. Bank*, 116 F. Supp. 2d 415, 425 (finding it "notable that [plaintiff]

did not find Russia to be an inadequate forum due to lack of procedural fairness or discrimination when it filed its initial complaint in the Moscow Arbitration Court"). They cannot avoid that justice system now, simply because they fear an unfavorable result. Angola is the proper forum to hear this Angolan dispute.

### 3. The Public and Private Factors Overwhelmingly Favor Dismissal

The final stage of the *forum non conveniens* analysis requires analyzing the various "private" and "public" factors set forth in the Supreme Court's *Gilbert* decision to determine what forum would be most convenient for the parties and which forum has the greatest interest in the case. Here, virtually every factor—private and public—points to an Angolan forum.

### a. The Private Interest Favors Favor Dismissal

"Private interests will favor dismissal where most of the relevant witnesses and other evidence are located in the foreign forum," which is the case here. *Varnelo v. Eastwind Transp., Ltd.*, 2003 WL 230741, at *18 (S.D.N.Y. Feb. 3, 2003). The AE-MINEA Contracts were approved, executed, and terminated in Angola, Compl. ¶¶ 58-62; *all* of the Angola Defendants' witnesses and documents are in Angola, *id.* ¶¶ 27-31; Plaintiffs are Angolan companies whose employees and documents are largely, if not entirely, in Angola (none are alleged to be in the United States), *see id.* ¶¶ 25-26; and the witnesses and documents associated with GE's Angolan operations (to the extent such documents were not already produced in the Section 1782 action) are in Angola or elsewhere in Africa, *id.* ¶¶ 103, 106-08. *See Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1233 (2d Cir. 1996) (district court properly inferred "that most of the potential witnesses are in Great Britain," given that "all of the alleged assurances and agreements took place in Great Britain, and the improper actions alleged . . . were taken by British Caledonian's former directors, most of whom reside in Great Britain"). "Where most of the witnesses and documentary evidence reside in a foreign country, conducting trial in the U.S. could

impose such significant burdens on the parties that dismissal is favored." *Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 766 (S.D.N.Y. 2006).

Additionally, "[t]he fact that defendant's [or Plaintiffs'] nonparty witnesses are not subject to the Court's compulsory process weighs heavily in favor of dismissal." *Id.* at 768; *Postol v. El-Al Israel Airlines, Ltd.*, 690 F. Supp. 1361, 1364 (S.D.N.Y. 1988) (dismissal because "foreign non-party witnesses [] are not subject to the subpoena power of this court").[16]  This Court could not compel the appearance of Mr. da Costa—who, according to Plaintiffs, is *the most important witness* in the case.  The Complaint alleges that Mr. da Costa committed many of the acts of interference on which AE's claims against the GE Defendants are based:  allegedly misleading GE Capital EFS about the number of turbines AE sold to the government, perpetrating the alleged forgery, and then misrepresenting the truth to the Angolan government.  Compl. ¶¶ 11-13, 17, 64, 77, 84, 100-09, 128-33, 139-43, 149(g), 153, 166-67, 172-73, 188.  But Mr. da Costa is beyond the subpoena power of this Court.  Plaintiffs allege Mr. da Costa was the former "CEO of GE's Angola business," *id.* ¶ 64, but acknowledge he is no longer employed by any GE-related company, *id.* ¶¶ 167-176, 213, and he is believed to reside in Angola, Snyder Decl. ¶ 3.  This case cannot be fairly considered or tried without access to Mr. da Costa's testimony.  *See Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (affirming dismissal because "primary perpetrators of the alleged fraudulent activity . . . cannot be compelled to appear at trial in New York").  He is not the only witness outside of this Court's subpoena power—other important non-party witnesses in Angola include:  (1) Leslie Nelson, who Plaintiffs allege "was then in charge of the GE Power's Sub-Saharan Africa business" and a witness to Mr. da Costa's conduct, but also is no longer employed by any GE-related company, *id.* ¶¶ 103, 109, 131, 188, and is believed to

---

[16]  Angola is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, so even the Convention's limited deposition process will be unavailable for non-party witnesses.

reside in Angola, Snyder Decl. ¶ 3; (2) representatives of the companies associated with the "projects … both in Angola and elsewhere in Africa" that form the basis for AE's interference with economic relations claim, Compl. ¶¶ 285, 287; and (3) any witnesses no longer employed by AE or the Angola Defendants who participated in these events and likely reside in Angola.

Courts routinely dismiss on *forum non conveniens* grounds where they lack the power to subpoena witnesses who "directly participated in the events which gave rise to" the litigation and whose testimony was critical to the plaintiffs' theory of liability. *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 451–52 (2d Cir. 1975) (dismissing in favor of English forum, where witnesses were subject to compulsory process); *Allstate*, 994 F.2d at 1001; *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 308 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001) (dismissing because "'critical' non-party witnesses [were] located in England"); *Ilusorio v. Ilusorio-Bildner*, 103 F. Supp. 2d 672, 677 (S.D.N.Y. 2000) (dismissing where critical witnesses, including the "recipients" of the allegedly tortious communications, resided in the Philippines "beyond the subpoena power of the Court"). Indeed, courts have dismissed for *forum non conveniens* even where "a substantial body of the relevant evidence" favored the plaintiffs' chosen domestic forum (which is not the case here), if litigation in the United States would "box out [the defendant] from access to concededly important evidence upon which its defense may well rest." *De Melo v. Lederle Labs.*, 801 F.2d 1058, 1062–63 (8th Cir. 1986); *see also Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1355–56 (1st Cir. 1992) (dismissal appropriate even though U.S. plaintiffs had elected to sue the defendant, a Massachusetts corporation, in Boston, because principal witness was located in Turkey and not subject to compulsory process).

The GE Defendants understand that the Angola Defendants seek dismissal under the FSIA. If this Court dismisses those parties, then all their documents and current employees would also

lie beyond the reach of any U.S. court.  Those documents and witnesses are critical to these proceedings as they bear on the core questions of what information was provided to the Angola Defendants, what facts influenced their decision to terminate contracts with AE, and whether they would have continued to do business with AE.  *See Allstate*, 994 F.2d at 1001 (that foreign party was dismissed and its "officers, directors and other key witnesses no longer [were] within the subpoena power of the federal court" supported dismissal).  In addition, party witnesses that *can* be subpoenaed (all of AE's and the Angola Defendants' witnesses, plus the GE-related parties' African employees) will expend significant costs traveling from Angola.  *See Scottish Air*, 81 F.3d at 1232–33 (affirming *forum non conveniens* dismissal based on considerable "difficulty, cost, and disruption of requiring the attendance of [U.K.] witnesses in New York"); *Varnelo*, 2003 WL 230741, at *21 (collecting cases of *forum non conveniens* dismissal based on travel costs).

Also weighing in favor of dismissal is the fact that every key contract and many important communications are in Portuguese, which means that litigating this case in New York will require voluminous translation.  *See Monegasque*, 311 F.3d at 500 (that "the pertinent documents are in the Ukrainian language" supports dismissal).  All of the Angola Defendants' documents are likely to be in Portuguese, as are most, if not all, of AE's internal communications and communications with the Angola Defendants, many of the GE-related parties' communications with the Angola Defendants, and many of AE's communication with GE-related representatives in Angola.  *See, e.g.*, Compl. Exs. 2, 3, 7, 15, 17-19.  Further, most of the Angola Defendants' witnesses and some of AE's witnesses are likely to have limited or no English proficiency—which means that interpreters also will be necessary.  *See Blanco*, 997 F.2d at 982 (need for translation "militates strongly in favor of Venezuela as a more appropriate forum for this litigation"); *Flores*, 253 F. Supp. 2d at 541 (dismissal warranted where "many of the witnesses . . . speak only Spanish," "most

if not all of the pertinent documents are in Peru, and all documents in the Peruvian government's files and virtually all of the operating documents in the Company's files would be in Spanish").

In short, the "sources of proof relevant to this matter—documents and witnesses—are located overwhelmingly in [Angola]." *Ilusorio*, 103 F. Supp. 2d at 676. While Plaintiffs may argue that the GE Defendants have some tangential witnesses and documents in the U.S., Plaintiffs already had access to these U.S. documents through the Section 1782 action. Even assuming there is more that Plaintiffs would contend is relevant, that additional information is minimal and tangential compared to all of the witnesses and documents in the possession of AE and the Angola Defendants in Angola, plus the prejudicial effect of the GE Defendants' inability to subpoena key non-party witnesses located in Angola. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257–58 (1981) (dismissing in favor of Scottish proceedings notwithstanding the presence of some sources of proof relevant to tort claims in the U.S., because "[a] large proportion of the relevant evidence [wa]s located in Great Britain" and "fewer evidentiary problems would be posed if the trial were held in Scotland"); *Auxer v. Alcoa*, 406 F. App'x 600, 605 (3d Cir. 2011) (dismissing where almost all plaintiffs lived in Australia and most third-party evidence was in Australia); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1147 (9th Cir. 2001) (private factors favored dismissal "because the district court cannot compel production of much of the New Zealand evidence, whereas the parties control, and therefore can bring, all the [U.S.] evidence to New Zealand").

### b.   The Public Interest Factors Favor Dismissal

The public interest factors also strongly favor dismissal. "[T]he interest in having local disputes settled locally weighs heavily against the United States as a forum." *Alfadda v. Fenn*, 159 F.3d 41, 46 (2d Cir. 1998). This suit involves the alleged breach of contracts between Angolan companies and the Angolan government; that are governed by Angolan law; and that were entered (and terminated) by Angolan Presidential Decree for the purpose of providing critical power to the

Angolan people.  *See supra* Factual Background, Part C.  The allegedly tortious forgery was purportedly carried out in Angola, and the meetings and communications by which da Costa and other "GE" employees allegedly interfered with Plaintiffs' contracts took place in Angola.  *See supra* Factual Background, Parts C, D.  And all of the alleged injury occurred in Angola.  "All of the principle [sic] events in this case transpired in [Angola] and the action's connection to the Southern District of New York is far too attenuated to justify asking the citizens of this district to resolve the parties' dispute."  *Base Metal*, 253 F. Supp. 2d at 712; *see also In re Alcon S'holder Litig.*, 719 F. Supp. 2d 263, 275 (S.D.N.Y. 2010) (contracts largely negotiated in Switzerland and executed in Switzerland should be litigated in Switzerland).  The interests of Angola eclipse any minimal interest New York has in adjudicating this dispute.

New York's choice-of-law rules dictate that every one of Plaintiffs' claims are governed by Angolan law, which militates in favor of an Angolan forum as well.  *Piper*, 454 U.S. at 241, 260 & n.29; *Pollux*, 329 F.3d at 76 (affirming dismissal for *forum non conveniens* where "choice of law considerations strongly tipped in favor of . . . England").[17]  Plaintiffs allege that the Angola Defendants breached a number of contracts, *see* Compl. ¶¶ 227-40, all containing Angolan choice-of-law clause.  Abecasis Decl. Ex. 17.  Plaintiffs have not suggested that the choice-of-law provisions to which they agreed are invalid based on "fraud or violation of public policy," and their contract claims are thus controlled by Angolan law.  *See, e.g.*, *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996).  Plaintiffs' conversion and unjust enrichment claims against the Angola Defendants are plainly governed by Angolan law as well, as the government's alleged taking of AE's property occurred entirely in Angola via court proceedings before the

---

[17]  Angolan law—which is based on a civil code rather than common law—indisputably differs from New York common law.  *See Curley*, 153 F.3d at 14 (Mexican law conflicts with New York law, because Mexico, like Angola, is a "civil law jurisdiction"); Vale Decl. ¶ 2.4 (describing the Angolan law governing Plaintiffs' claims).

Luanda Provincial Court in Angola.  *See* Compl. ¶¶ 205-06, 212-17.  Plaintiffs' tort claims against GE are likewise subject to Angolan law, as Angola has a far greater interest than New York in regulating alleged interference with Angolan government contracts, particularly contracts that were approved by the President of Angola due to their importance to the nation's electricity grid and that contain Angolan governing law provisions.  *See Curley*, 153 F.3d at 12 (torts governed by law of jurisdiction most interested in regulating the conduct; test is largely controlled by "the parties['] domiciles and the locus of the tort").  Plaintiffs are domiciled in Angola, Compl. ¶¶ 25-31, and all of the key acts of alleged tortious interference occurred in Angola, *see supra* Factual Background, Parts C, D.  The alleged forgery is alleged to have occurred in Angola; all of the meetings where the Angolan government was allegedly deceived by "GE" were held in Angola; and all of the alleged verbal and written misrepresentations by "GE" were communicated by "GE" personnel located in Angola (or elsewhere in Africa) and directed to representatives of MINEA located in Angola.  *See supra* Factual Background, Parts C, D; Compl. ¶¶ 208-09, 212-16 (allegedly "GE" assisted the government's purportedly illegal seizure of Plaintiffs' equipment through efforts to take possession of the turbines in Angola).

Also weighing in favor of dismissal is the fact that this case involves the legal and sovereign authority of Angola's government, which should be decided by Angolan courts.  When "litigation is 'intimately involved with sovereign prerogative,'" American courts should allow the courts of the foreign sovereign to adjudicate the dispute.  *Figueiredo*, 665 F.3d at 392 (quoting *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28–29 (1959)).  Thus, in *Figueiredo Ferraz E Engenharia De Projecto Ltda. v. Rep. of Peru*, a lawsuit had to be dismissed for *forum non conveniens* when it "ar[ose] (1) from a contract executed in Peru (2) by a corporation then claiming to be a Peruvian domiciliary (3) against an entity that appear[ed] to be an instrumentality of the

Peruvian government, (4) with respect to work to be done in Peru." *Id.*

This lawsuit arises "(1) from a contract executed in [Angola] (2) by a corporation then claiming to be a[n] [Angolan] domiciliary (3) against an entity that appears to be an instrumentality of the [Angolan] government, (4) with respect to work to be done in [Angola]." *Id.* The power of the Angolan government through its President to terminate infrastructure contracts—and its ability to contract with a different party, like GE Packaged Power, for its infrastructure needs—"is surely 'intimately involved with sovereign prerogative,'" as is the right of a sovereign government to sue to recover property it has paid to use in national power projects. *Id.* "[A]nd the [Angolan] courts are 'the only tribunal[s] empowered to speak authoritatively'" on the Angolan government's authority under Angolan law. *Id.* This case should be dismissed in favor of an Angolan forum.

**B.     This Action Should Be Dismissed Under Section 3 of the FAA Because the Claims Here Are Referable to Arbitration Under Multiple Agreements**

The claims against the GE Defendants should also be dismissed under Section 3 of the Federal Arbitration Act ("FAA"), because the claims are covered by multiple overlapping agreements between these parties and related non-parties that include mandatory arbitration clauses, including the Collaboration Agreement, Framework Agreement, and the GE France Contract.[18] All of Plaintiffs' claims in this case are "referable to arbitration under an agreement in writing" because they arise under the subject matter of these various agreements. 9 U.S.C. § 3.

The FAA embodies the strong federal policy favoring enforcement of arbitration agreements. *Perry v. Thomas*, 482 U.S. 483, 489–90 (1987). Under Section 3, the court should stay "any suit . . . upon any issue referable to arbitration under an agreement in writing for such

---

[18]   The GE Defendants move to stay or dismiss this action pursuant to 9 U.S.C. § 3, rather than to compel arbitration. Plaintiffs have *already* brought an arbitration—the LCIA proceeding against GE Packaged Power—and there is no need to initiate another one. *See In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 498 (S.D.N.Y. 2013) (Nathan, J.) (motion to stay appropriate where defendant's "position is not that they are interested in arbitrating these disputes, but rather in having the Court conclude that if Plaintiffs are interested in bringing the disputes, they must do so through the agreed upon arbitration procedures").

arbitration."  9 U.S.C. § 3.  "[T]he federal policy favoring the liberal enforcement of arbitration clauses [] applies with particular force in international disputes" like this one, *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) (citation omitted), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  A court may dismiss rather than stay an action if, as here, all issues raised in a complaint are subject to arbitration.  *Lismore v. Société Générale Energy Corp.*, 2012 WL 3577833, at *9 n.3 (S.D.N.Y. Aug. 17, 2012) (Nathan, J.).

The Collaboration Agreement between GE International and AE contains ██████████ ████████████████████████████████████████  The Framework Agreement between AE and GE Packaged Power—████████████████████████████████████████████ ████████████████████████████████—also applies.  Although GE Packaged Power is not a party here, the non-signatory GE defendants can enforce that agreement against AE under the doctrine of equitable estoppel.  *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S.Ct. 1637, 1648 (2020) (non-signatory may invoke an arbitration agreement against a signatory under "principles of equitable estoppel").  Plaintiffs' claims regarding the Soyo II Project are subject to a mandatory arbitration provision between AE and GE France, which also is enforceable here under the doctrine of equitable estoppel.

1.     **Plaintiffs' Claims Against GE International Are Referable to Arbitration Under the Collaboration Agreement**

In June 2017, GE International and AE entered into a Collaboration Agreement "under which GE International agreed to provide technical and other support to AE for a period of eight years," including support for AE's various projects in Angola.  Compl. ¶ 64.

The Collaboration Agreement contains ████████████████████████████████████ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████   Snyder Decl. Ex. 7 Art. 8.

Under the LCIA Rules, the "Arbitral Tribunal shall have the power to rule upon its own jurisdiction and authority, including any objection to the initial or continuing existence, validity, effectiveness or *scope* of the Arbitration Agreement." *Id.* Ex. 20 (emphasis added).  The Second Circuit "ha[s] held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol.*, *Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005).  As a result, any dispute regarding whether Aenergy's claims against GE International are covered by the arbitration clause should be decided by the LCIA arbitrators.  *See World GTL Inc. v. Petroleum Co. of Trinidad and Tobago Ltd*, 2010 WL 3291673, at *3 (S.D.N.Y. Aug. 11, 2010) (noting "that Plaintiffs assert[ing] certain claims in tort does not preclude arbitration of these issues" and staying the action under Section 3) (citation omitted).

AE's claims against GE International are subject to █████████████████████ in the Collaboration Agreement.  Indeed, the only specific allegation of GE International's involvement is its participation in the Collaboration Agreement[19].  Compl. ¶ 64.  The Collaboration Agreement is also central to AE's claim that "GE" misled the Angolan government into believing that AE lacked GE's technical support.  *Id.* ¶ 184(c); *see also* Abecasis Decl. Ex. 26 ¶¶ 448-56.  In addition, to the extent AE has sought to avoid this arbitration clause by alleging claims on behalf of its wholly-owned subsidiary, Cycle Power (based on the face of the complaint, it is unclear if Cycle Power is actually asserting any claims against GE International), any such claims by Cycle Power

---

[19]   The complaint also refers to a now expired Authorized Channel Partner Master Agreement (*see* Compl. ¶ 55), which also ████████████████████.  Snyder Decl. Ex. 1 ¶ 15.1.

are equitably estopped for the reasons explained in Section C.2 *infra*.

### 2.    Plaintiffs' Claims Should Be Dismissed or Stayed Pursuant to the Framework Agreement and the GE France Contract

Plaintiffs' claims are also referable to arbitration under multiple agreements between AE and the GE Packaged Power affiliates, even though the GE Defendants are not parties to those contracts.  Indeed, Plaintiffs appear to have brought this suit as a calculated effort to avoid the arbitration clauses—and limitation of liability provisions—in those agreements.  This is improper, as recognized by the Supreme Court in recently holding that a non-signatory may enforce an arbitration agreement against a signatory pursuant to "principles of equitable estoppel."  *See GE Energy Power Conversion France SAS, Corp.*, 140 S.Ct. at 1648; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *c.f. Monegasque*, 311 F.3d at 495 (identifying theories under which nonsignatories may enforce arbitration agreements, including incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel).  As the Second Circuit has explained, estoppel may apply "where a careful review of 'the relationship among the parties, the contracts they signed [], and the issues that [arose]' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Indus.*, 387 F.3d at 177 (citation omitted).  Application of equitable estoppel requires "a close relationship between the signatory and the non-signatory party."  *Chung Chang*, 2019 WL 5304144, at *4.

### a.    Plaintiffs' Claims Are Intertwined with the Framework Agreement

AE's claims "arise under the subject matter of the [Framework Agreement]" and "there is a close relationship between the signatory [GE Packaged Power] and the non-signatory party," the GE Defendants here.  *Id.*; *see also Reyes v. Gracefully, Inc.*, 2018 WL 2209486, at *4 (S.D.N.Y.

May 11, 2018); *Lismore*, 2012 WL 3577833, at *6–7.[20]  "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 473 (citation omitted).

Here, all of AE's dealings with "GE" arise from, and center on, the sale of turbines and services to AE for on-sale to MINEA—sales that were made under the Framework Agreement. These turbine sales are central to the Complaint.[21]  Indeed, AE's tortious interference claim against the GE Defendants is based on the allegation that "GE" induced Angola to breach the AE-MINEA Contracts so that GE Packaged Power could start selling equipment and services directly to Angola rather than through AE, effectively breaking GE Packaged Power's exclusivity obligation to AE under the Framework Agreement.  *See* Compl. ¶¶ 165 ("GE's employees acting at the direction of Mr. Strazik and others actively maintained the false narrative in service of a full-court-press effort to take over AE's contracts and relationship with MINEA."), 176 (alleging that a key work stream for GE's takeover of the AE-MINEA Contracts was "GE/AE commercial contracts to be terminated").  As noted, GE's exclusivity obligations to AE under the Framework Agreement

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

*In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 479 (granting stay in similar circumstances).

---

[20]  Courts apply federal common law to the question of whether a non-signatory can invoke an arbitration agreement, *cf. Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24  (explaining that there is "a body of federal substantive law of arbitrability"); *Smith/Enron Cogeneration Ltd. P'ship., Inc. v. Smith Cogeneration Int'l., Inc.*, 198 F.3d 88, 96 (2d Cir. 1999) ("When we exercise jurisdiction under Chapter Two of the FAA, we have compelling reasons to apply federal law, which is already well-developed, to the question of whether an agreement to arbitrate is enforceable."), or sometimes state law, which, for purposes of equitable estoppel, does not create a different result. *Ragone v. Atl. Video at Manhattan Ctr.*, 2008 WL 4058480, at *4 n.5 (S.D.N.Y. Aug. 29, 2008) (recognizing that "there is no reason to believe that the result would be any different under New York law" because "there is support [under New York law] for applying equitable estoppel as a means of compelling a party to arbitrate with a non-signatory"(citing *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (N.Y. Sup. Ct. 2005), and *CDC Cap. v. Gershon*, 723 N.Y.S.2d 166, 168 (N.Y. App. Div. 2001))), *aff'd*, 595 F.3d 115 (2d Cir. 2010).

[21]  AE admits it had no connection to GE Capital EFS's financing to the government.  Compl. ¶ 70.

Indeed, in the LCIA Arbitration, ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████. Snyder Decl. 17 (RFA) ¶ 46 ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████. In its RFA, AE explicitly alleges, as here, that ████████████████

████████████████████████. *Id*. ¶ 43. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. *Id*. It

therefore will inevitably be addressed in the arbitration.[22]  Moreover, in an April 29, 2019 breach

notice to GE Packaged Power, AE identified the same conduct as breaches of the Framework

Agreement, alleging that "[t]he actions of GE's representatives to undermine the supplier customer

relationship between AE and MINEA, and direct negotiations between MINEA and GE in relation

to the assignment of the AE & GoA Contracts, without the prior knowledge of AE, *are a deliberate

and fundamental breach of the Framework Agreement*." *Id.* Ex. 13 (emphasis added).

The Framework Agreement also includes a provision that ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[22]  That the legal causes of action differ between the LCIA Arbitration and this case is inconsequential because, as
the Second Circuit has emphasized, the focus of the estoppel analysis is "on the factual allegations in the
complaint rather than the legal causes of action asserted."  *Smith/Enron Cogeneration*, 198 F.3d at 99.

██████████████████████████████████████ *Id.* Ex. 17 (RFA) ¶ 46.  As a result,

to the extent Plaintiffs' claims are that any of the GE Defendants interfered with Plaintiffs' sale of

turbines to Angola or their service contracts with the Angolan authorities for Soyo II, such claims

also touch on and are intertwined with the Framework Agreement's ████████████ (as well

as the GE France Contract, *see infra* Part B.2.b).  Finally, putting aside the fanciful request for

punitive damages here, the damages AE seeks in this action are ████████████████████

████████████████████.  *Compare* Compl. ¶ 1 (requesting compensatory damages

"at no less than $550 million"), *with* Snyder Decl. Ex. 17 (RFA) ¶ 59 ████████████████

███████████████████████████  AE thus simply repackages its claim in the

LCIA Arbitration that ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.  These claims thus

"plainly touch[] upon matters covered by the Agreement [with the arbitration clause]," and are

thus "arbitrable."  *Norcom Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 204 (S.D.N.Y.

2000); *Lismore*, 2012 WL 3577833, at *7 (holding that if claims "arise from the 'subject matter'

of the agreement with the arbitration clause," estoppel is appropriate).  Because the claims here

"are based on the same facts and are inherently inseparable" from those asserted against GE

Packaged Power in the LCIA Arbitration, estoppel is appropriate.  *J.J. Ryan & Sons, Inc. v. Rhone

Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir. 1988).

Plaintiffs do not even mention the Framework Agreement in their Complaint, and for good

reason.  Plaintiffs' allegations against the GE Defendants are an attempted end-run around its

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████   Snyder Decl. Ex. 2, Art. XI (emphases added).

This case is remarkably similar to *In re A2P SMS Antitrust Litigation*, in which this Court stayed a class action in favor of arbitration where the defendants "[were] not only mentioned or referred to in the Agreement, [but] [were] also vested with rights and responsibilities,"[23] with the Court finding that "it is [] compelling that [the non-signatory defendants] have active roles in the Agreement." 972 F. Supp. 2d at 479. Here too, the Framework Agreement ████████████ ████████████████████████████████████████████████████. As in that case, it would be inequitable to permit Plaintiffs to circumvent the arbitration and limitation of liability clauses of the Framework Agreement "on the ground that [they] had made no agreement with [the non-signatory] [GE Defendants]" when their claims are inherently intertwined with the transactions that were carried out under, and the obligations imposed by, the Framework Agreement. *Id.* (alterations in original and citation omitted).[24]

Indeed, equitable estoppel is meant to prevent the kind of legal maneuvering in which AE has engaged by bringing this case to circumvent mandatory arbitration and limitation of liability

---

[23]  Here, GE Packaged Power's affiliates and parents are████████████████████████████████ ██████████████████████████. *See* Snyder Decl. Exs. 3 ¶ 4.2 & 4 ¶ 5.2.

[24]  The Complaint is also replete with other allegations of wrongful conduct attributed to "GE," but that actually pertain to GE Power's business. For example, while Mr. da Costa's actions are routinely attributed to "GE," the Complaint acknowledges that he was a "GE Power representative." Compl. ¶ 160. Key participants Nelson and Sezan are similarly alleged to have been representatives of "GE Power's Sub-Saharan Africa business." *Id.* ¶¶ 103, 131, 160 & Ex. 9. The turbine purchases at the heart of this case that were made from unspecified "GE affiliates" under the so-called "AE-GE supply contracts" refer to AE's purchase contracts with GE Packaged Power and its affiliate GE Global Parts & Products GmbH. *Id.* ¶¶ 56, 65-66, 72-74, 78-79. The accounting of revenue from these same "AE-GE supply contracts" on GE Power's books allegedly motivated the alleged wrongs, *id.* ¶¶ 80-81, 87, 163(a), (c) and (e), and GE Power management allegedly directed the need for the contract amendments, *id.* ¶ 85. Another central theme of the tortious interference claim revolves around GE Power's alleged misallocation of the loan proceeds to four turbines not purchased by the Angolan government. *Id.* ¶¶ 119-26, 140, 143-44, 146, 149(d), 151. The allegation of "commercial pressure that GE (AE's principal supplier) exerted" is similarly a reference to GE Packaged Power and its affiliate's supply contracts with AE. *Id.* ¶ 92. All of these actions are, in fact, attributable to GE Packaged Power and its Power affiliate GE Global Parts & Products GmbH. Plaintiffs' allegations thus are plainly subject to arbitration.

provisions in agreements to which it is a party. *See WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) ("[W]here a party to an arbitration agreement attempts to avoid that agreement by suing a related party with which it has no arbitration agreement in the hope that the claim will be adjudicated first and have preclusive effect in the arbitration, '[s]uch a maneuver should not be allowed to succeed'") (citation omitted).  Here, Plaintiffs have sued GE Packaged Power and GE Energy France's related entities to avoid mandatory arbitration clauses.  The risk of an inconsistent result with the ongoing LCIA Arbitration is significant—warranting, at a minimum, a stay of this action. *See id.* (staying litigation in favor of arbitration pursuant to the court's inherent powers).[25]

    **b.**  **Plaintiffs' Claims Are Intertwined with the GE France Contract**

    Similarly, the GE France Contract requires dismissal of Plaintiffs' claims with respect to the Soyo II project, because those claims "arise under the subject matter" of the GE France Contract, which contains ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Chung Chang*, 2019 WL 5304144, at *4. Plaintiffs' claims against the GE Defendants for tortious interference with contracts between Cycle Power and Angola (Count 7), and tortious interference with prospective business relations between Cycle Power and Angola (Count 8), are based on the theory that the GE Defendants interfered with Cycle Power's interest in "providing and installing various gas and steam turbines" for the Soyo II project.  But the relationship between AE and "GE" for Soyo II is memorialized in the GE France Contract, which covers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That Agreement contains ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[25] As previously noted, the purchase agreements AE signed with GE Packaged Power and its affiliates for specific turbine sales also included arbitration clauses.  As such, there can be no question that AE expected and understood that its claims relating to these turbine deals would be arbitrated.



.[26]

###### c.   The GE Defendants Have a Sufficiently Close Relationship with GE Packaged Power and GE Energy France for Equitable Estoppel

The GE Defendants also satisfy the second prong, requiring "a close relationship between the signatory and the non-signatory party." *Chung Chang*, 2019 WL 5304144, at *4.

GE Company is the ultimate parent of GE Capital EFS and GE International, and of non-defendants GE Packaged Power and GE Energy France. Snyder Decl. Ex. 16 (GE Company 10-K Ex. 21). And GE Capital EFS and GE International are affiliates of GE Packaged Power and GE Energy France. These are sufficiently close relationships for the purposes of estoppel. *See Ross v. Am. Exp. Co.*, 547 F.3d 137, 144 (2d Cir. 2008) (cases in which estoppel has been applied "have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party; that is, this Court has applied estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities"); *see also JLM Indus.*, 387 F.3d at 177–78, 183 (compelling arbitration where contracts containing arbitration clauses were entered into by subsidiaries, rather than the parent companies themselves); *Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276, 280 (2d Cir. 2003) (compelling arbitration where

---

[26] For the reason explained below, AE cannot seek to avoid these provisions by manufacturing a claim on behalf of its wholly owned subsidiary Cycle Power. *See infra* Part B.2.c.

non-signatory corporation acted toward affiliate of signatory corporation "as if it were a signatory to the charter party"); *Chung Chang*, 2019 WL 5304144, at *5 (holding that "[t]he relationship between Warner Bros. and Digital Labs—two corporate affiliates—is sufficiently close to support equitable estoppel here"); *Laumann v. Nat'l Hockey League*, 989 F. Supp. 2d 329, 336 (S.D.N.Y. 2013) (equitable estoppel may be warranted where "non-signatory is a parent company, corporate successor, guarantor, or corporate affiliate of a signatory"); *Birmingham Assocs. Ltd. v. Abbott Labs.*, 547 F. Supp. 2d 295, 304 (S.D.N.Y. 2008) (compelling arbitration where non-signatory parent company was "directly involved in negotiating" contract containing arbitration clause, putting signatory plaintiff on notice that it could be required to arbitrate with parent); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 371 F. Supp. 2d 571, 578 (S.D.N.Y. 2005) (estoppel warranted where non-signatory "owned 99 percent of" signatory).

And because Cycle Power is AE's wholly owned subsidiary, it too is estopped from litigating claims AE agreed to arbitrate with GE Packaged Power and GE Energy France. *See Astra Oil*, 344 F.3d at 281 (finding claims by a non-signatory plaintiff belong in arbitration where the non-signatory plaintiff was closely related to a party to the contract with the arbitration clause and the claims with the subject matter of that contract).

Because Plaintiffs' claims are "referable to arbitration," 9 U.S.C. § 3, and "arise under the subject matter of the underlying agreement[s]" to arbitration, and because there is a close relationship between the parties to the agreements and the GE Defendants, dismissal is appropriate. *Chung Chang*, 2019 WL 5304144, at *4.

## C.     GE Capital EFS and GE International Should Be Dismissed Under Rule 12(b)(2)

The claims against GE Capital EFS and GE International should be dismissed under Rule 12(b)(2). The plaintiff bears the burden of establishing jurisdiction, *Troma Ent., Inc. v. Centennial Pictures, Inc.*, 729 F.3d 215, 217 (2d Cir. 2013), and must make specific "averments of fact that,

if credited . . ., would suffice to establish jurisdiction." *Krepps v. Reiner*, 588 F. Supp. 2d 471, 478–79 (S.D.N.Y. 2008).  The court must "determine whether the plaintiff has shown that the defendant is amendable to service of process under the forum state's laws; and . . . whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." *Metro Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).  New York provides for general (CPLR § 301) or specific jurisdiction (CPLR § 302).  The "due process test" involves the "'minimum contacts'" and "'reasonableness'" inquiries.  *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 810 (S.D.N.Y. 2005) (quoting *Metro. Life*, 84 F.3d at 567).

### 1.     The Court Lacks Specific Personal Jurisdiction Over Either GE Subsidiary

Minimum contacts exist where a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  Demonstrating that the defendant "had the requisite minimum contracts with the forum" is not sufficient.  *In re N. Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at *5 (S.D.N.Y. June 8, 2017) (citation omitted).  "[T]he Court must evaluate whether the suit 'arises out of or relates to [defendant's] contacts with the forum.'"  *Id.* (citation omitted).  Here, Plaintiffs allege that GE Capital EFS and GE International "purposefully availed themselves" of the privilege of conducting business in New York and that Plaintiffs' claims "arise from or relate to that conduct."  Compl. ¶¶ 45, 225.  These are unsupported, conclusory allegations.  In fact, there is *no* allegation of *any* New York-related conduct by GE International.

The sole New York-related allegation pertaining to GE Capital EFS is of one wire transfer to GE Packaged Power using a bank account in New York.  *Id.* ¶ 225.  This single bank transfer, without more, is insufficient to confer jurisdiction.  *Societe Generale v. Fl. Health Scis. Ctr., Inc.*, 2003 WL 22852656, at *4 (S.D.N.Y. Dec. 1, 2003) ("[M]aintenance of a bank account in New York is usually insufficient to confer personal jurisdiction over a non-domiciliary defendant, even

in suits arising from the account."); *Keramchemie GmbH v. Keramchemie (Canada) Ltd.*, 771 F. Supp. 618, 623 n.6 (S.D.N.Y. 1991) ("The passage of funds through the two bank accounts in New York . . . may not suffice to show that this Court had personal jurisdiction . . . .").

Even if a single wire transfer could give rise to jurisdiction, it would not here—because none of Plaintiffs' claims arise from that transaction. *See Universal Trading & Inv. Co., Inc. v. Credit Suisse (Guernsey) Ltd.*, 560 F. App'x 52, 55 (2d Cir. 2014) (explaining, in context of a bank transfer, that "plaintiff must still establish 'at a minimum, a relatedness between the transaction[] and the legal claim such that the latter is not completely unmoored from the former'") (citation omitted).  Specific jurisdiction requires a "substantial nexus" between business transacted and the cause of action alleged.  *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 255 (S.D.N.Y. 2003).

Plaintiffs suggest that the wire transfer was made to reimburse GE Packaged Power for amounts AE owed under its supply contracts with GE Packaged Power.  Compl. ¶ 225.  But Plaintiffs do not claim that the wire transfer interfered with Plaintiffs' contractual or prospective business relationships or aided and abetted the Angola Defendants' alleged expropriation of property belonging to Plaintiffs.  The alleged wire transfer is unrelated to Plaintiffs' claims, and therefore cannot support a constitutional exercise of jurisdiction over GE Capital EFS.  *See Del Ponte v. Universal City Dev. Partners, Ltd.*, 2008 WL 169358, at *8 n.6 (S.D.N.Y. Jan. 16, 2008).

Here, minimum contacts is not a close question because no contacts are alleged for GE International at all, and the claims in this case do not arise from the single alleged bank transfer involving GE Capital EFS.  Even if the minimum contacts question were a close one, the exercise of jurisdiction would be "decidedly unreasonable."  *Metro. Life Ins. Co.*, 84 F.3d at 575; *see also Ge Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 384 (S.D.N.Y. 2013) (listing reasonableness factors).  Neither Plaintiffs nor the GE subsidiaries are New York corporations,

and Plaintiffs do not allege that they suffered harm in New York.  New York has little to no interest in adjudicating a dispute among foreign corporations over events that transpired outside the forum. *In re S. Afr. Apartheid Litig.*, 643 F. Supp. 2d 423, 431 (S.D.N.Y. 2009) (when plaintiff is not a forum resident, "[the forum's] legitimate interests in the dispute have considerably diminished").

The "center of this controversy" lies outside of New York.  Exercising jurisdiction over GE Capital EFS and GE International—two out-of-state entities with little connection to this dispute—would be unreasonable.  *See Lan Assocs. XVIII, L.P. v. Bank of Nova Scotia*, 1997 WL 458753, at *6 (S.D.N.Y. Aug. 11, 1997) ("None of the parties is a citizen of New York, and no events occurred here other than an alleged wire transfer of funds, which was not significant to this action . . . .  Were such a minimal contact with New York to be deemed significant, this Court, . . . would be burdened with countless international financial disputes having no real, substantive link to New York.") (citations omitted).

### 2.     Jurisdiction Over GE Company Does Not Extend to Either GE Subsidiary

Plaintiffs plea for this Court to exercise jurisdiction over GE International and GE Capital EFS "based on GE Co.'s contacts."  Compl. ¶ 45(a).  But Plaintiffs have not shown that either subsidiary is a "mere department" or "alter ego" of its parent.  *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009).  Plaintiffs have not pled any "disregard" for corporate separateness at all.  *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984); *see also, e.g., Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) ("conclusory[,] non-fact-specific jurisdictional allegation" insufficient for vicarious jurisdiction).  Plaintiffs have pled only common ownership, which is an insufficient basis for any finding of jurisdiction over GE Capital EFS or GE International here.  *See, e.g., In re Lyondell Chem. Co.*, 543 B.R. 127, 144-45 (Bankr. S.D.N.Y. 2016) (noting that "a showing of mere corporate ownership or common management will not be sufficient to justify veil piercing").

44

**D.      The Claims Against the GE Defendants Should Be Dismissed Under Rule 12(b)(6)**

**1.      Plaintiffs Fail to Make Particularized Allegations Against Each Defendant**

Plaintiffs have failed to state a claim against any of the GE Defendants, instead offering only allegations primarily directed against an amalgamation they call "GE"—comprised of numerous different corporations and individuals, many not named in the Complaint.  *See, e.g.*, Compl. ¶ 12 (alleging "GE" engaged in a conspiracy to harm Plaintiffs).  This lack of specificity is intentional:  Plaintiffs are trying to obscure the fact that their real dispute is with GE Packaged Power and its alleged scheme to take over the AE-MINEA Contracts, because Plaintiffs want to avoid the arbitration clauses and liability limitations that govern those claims.  This Court should not permit Plaintiffs to use indiscriminate group pleading as an end-run around these contractual protections or to avoid their obligation to plead a cause of action against each GE Defendant.

"Allegations in the form of a group pleading are insufficient, even for affiliated corporate entities."  *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 233 (S.D.N.Y. 2019).  "The fact that two separate legal entities may have a corporate affiliation—perhaps owned by the same holding company—does not alter [the] pleading requirement[s]."  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016).  Plaintiffs must allege that each *specific* defendant named in the Complaint engaged in *specific* acts that form the basis for liability—which they have not done.  *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) ("[A] complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim.") (emphasis in original).  Plaintiffs cannot side-step this problem by simply lumping the GE Defendants together as "GE" and then vaguely attributing all wrongful conduct to this ill-defined amalgamation, Compl. at p.1 ("collectively" defining three GE Defendants as "'GE'").  *See In re Zinc*, 155 F. Supp. 3d at 384 (insufficient to "group[] multiple defendants who are affiliated together with a single name").

Stripped of the "GE" pleading artifice, the allegations against the actual GE Defendants named in this case are minimal:

_GE Company_.  The *only* allegations specifically made against GE Company are that it (1) exists, Compl. ¶ 32; and (2) provided an internal parent "guarantee" to GE Capital EFS, backing GE Capital EFS's $1.1 billion loan to the Angolan finance ministry, *id.* ¶¶ 5, 82.  AE admits it had no involvement with this financing arrangement, *id.* ¶ 70, and there is no allegation that GE Company's guarantee harmed Plaintiffs—much less that there was any intent to cause harm.

_GE International_.  Plaintiffs allege only that GE International signed two contracts with AE:  (1) a "Channel Partner" agreement, and (2) a "Collaboration Agreement."  *Id.* ¶¶ 55, 64. Plaintiffs do not allege that GE International breached the contracts or did anything to harm them.

_GE Capital EFS_.  The allegations about GE Capital EFS at best indicate that it was a *victim* of da Costa's alleged misconduct, not a perpetrator of wrongdoing.  According to Plaintiffs, GE Capital EFS (1) agreed to lend Angola's finance ministry $1.1 billion, *id.* ¶¶ 5, 69; (2) did so on the basis of misinformation from da Costa regarding the number of turbines AE had sold to the government, *id.* ¶ 84; (3) upon discovery of this discrepancy, told da Costa that AE and Angola needed to amend their turbine purchase agreements to satisfy the loan's condition precedent, *id.* ¶¶ 86, 97; (4) was "lie[d]" to by da Costa, who falsely claimed that MINEA signed binding amendments, *id.* ¶¶ 100, 108; (5) was fooled by the false amendments into disbursing $644 million in loan funds in December 2017, *id.* ¶¶ 124-26; and (6) received an email in December 2018 from AE stating that the amendments were not binding, *id.* ¶¶ 149(a)-(c).  Far from alleging that GE Capital EFS *harmed* AE, Plaintiffs allege that GE Capital EFS was deceived into disbursing hundreds of millions of dollars *to AE* that AE never should have received.  *Id.* ¶¶ 278-98.

These allegations do not state *any* claim against *any* GE Defendant, regardless of whether

the Complaint is governed by Angolan or New York law.  *See* Vale Decl. ¶¶ 2.4.2–2.4.8 (elements

of Angolan actions); *Alpha Cap. Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 632

(S.D.N.Y. 2018) (tortious interference with contract requires factual allegations showing

defendant "intentionally procured" breach of contract); *Boehner v. Heise*, 734 F. Supp. 2d 389,

405 (S.D.N.Y. 2010) (interference with prospective relations requires facts showing defendant

"intentionally interfere[d] with" a "business relationship"); *Pittman by Pittman v. Grayson*, 149

F.3d 111, 123 (2d Cir. 1998) ("aiding-and-abetting" requires intentional "substantial assistance"

to tortfeasor and "know[ing] the wrongful nature of the primary actor's conduct"); *Soley v.*

*Wasserman*, 823 F. Supp. 2d 221, 237 (S.D.N.Y. 2011) (accounting requires a "fiduciary

relationship between the plaintiff and defendant and a breach of that fiduciary duty").

    This is not a "technical" pleading problem that can be overlooked or cured by

amendment—because there simply are no factual grounds to hold the three GE Defendants liable

to Plaintiffs.  Plaintiffs *know* their claims against the three GE Defendants are baseless and that

their real complaint is with GE Packaged Power, which is why they utilize the "GE" pleading

artifice.  But Plaintiffs cannot use this group pleading strategy to state a claim against the *particular*

defendants named in the Complaint by alleging acts that are attributable to *other* GE affiliates.

*See, e.g.*, *supra* n.26; *see also In re Zinc*, 155 F. Supp. 3d at 384 (dismissing when, as here,

"Plaintiffs' allegations as to a number of defendants . . . are sparse to the point of near non-

existence or are grouped together with specific allegations relating to their affiliated but legally

separate entities").  The Complaint does not state any claim against any GE Defendant, and the

GE Defendants should be dismissed from this case.

## 2.    Plaintiffs Have Not Sufficiently Alleged a Claim for an Accounting

    In both Angola and New York, accounting requires a fiduciary relationship.  *See* Vale Decl.

¶ 2.4.8.3; *Soley*, 823 F. Supp. 2d at 237.  Plaintiffs have not alleged that any GE Defendant owed

or breached any fiduciary duty to them.  For that reason as well, Plaintiffs' accounting claim fails.

### 3.      Plaintiffs Have Not Adequately Pleaded a Claim for Aiding and Abetting

Plaintiffs' claim that the GE Defendants aided and abetted the Angola Defendants' "conversion of Plaintiffs' personal property and the expropriation of Plaintiffs' property in violation of international law," Compl. ¶ 295, also fails as a matter of law.  Before Plaintiffs can assert a taking under international law in this court, they must exhaust Angolan court remedies. *Aboutaam v. L'Office Federale De La Culture De La Confederation Suisse*, 2019 WL 4640083, at *5 (S.D.N.Y. Sept. 24, 2019), *appeal docketed*, No. 19-3481 (2d Cir. Oct. 23, 2019); *see Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 679 (7th Cir. 2012), *aff'd sub nom. Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015); Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. f ("Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies . . . [listing exceptions].").  Plaintiffs have not exhausted Angolan domestic remedies and, in fact, are actively litigating the Angolan government's termination of the AE-MINEA Contracts and alleged taking of turbines in the Angolan courts.  *See supra* Factual Background, Part E.  Plaintiffs cannot circumvent the requirement to exhaust domestic remedies by repackaging the same allegations as an aiding and abetting claim.

Plaintiffs also do not have a cognizable takings claim under international law because they are Angolan entities.  Their takings claim against the Angola Defendants "is a matter of domestic, not international, law under the domestic-takings rule."  *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 448 (D.C. Cir. 2018); *see also Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, 2014 WL 288705, at *9 (S.D.N.Y. Jan. 27, 2014). Plaintiffs' claim for aiding and abetting conversion of their property in Angola also fails because "conversion and property damage in a foreign country are not legally significant events in the

United States, even when related events occur within the United States, including the transfer of funds from a New York bank to a foreign sovereign and financial loss to a U.S. plaintiff." *Hammerstein v. Fed. Republic of Germany*, 2011 WL 9975796, at *4 (E.D.N.Y. Aug. 1, 2011).

More fundamentally, Plaintiffs' claim is foreclosed because "corporate liability is not presently recognized under customary international law." *Chowdhury v. Worldtel Bangladesh Holding, Ltd*., 746 F.3d 42, 50 n.6 (2d Cir. 2014); *see Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 120 (2d Cir. 2010) (holding that "customary international law has steadfastly rejected the notion of corporate liability for international crimes"), *aff'd on other grounds*, 569 U.S. 108 (2013). In any event, the sole action "GE" allegedly took to support the seizure was allowing an employee to testify in an Angolan court, Compl. ¶ 214, which is not aiding and abetting.

## E.     Comity Warrants Dismissal of Claims Against the GE Defendants

At a minimum, the doctrine of international comity requires dismissing—or at least staying—this action while threshold issues are litigated in other fora. The comity doctrine involves "the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction." *JP Morgan Chase Bank v. Altos Hornos De Mexico, S.A. DE C.V.*, 412 F.3d 418, 424 (2d Cir. 2005). "A court may 'dismiss or stay an action'" under the doctrine of comity based on "the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." *Tarazi v. Truehope Inc.*, 958 F. Supp. 2d 428, 432–33 (S.D.N.Y. 2013).

In the Angolan Provincial Court, AE and Angola are already litigating whether the four turbines were lawfully seized—and if Angola prevails, Plaintiffs' claim that the GE Defendants somehow aided and abetted an *unlawful* seizure must fail. *See supra* Factual Background, Part E. Thus, the "issue raised in the [Angolan Provincial Court] action" is a "key issue that will undoubtedly affect, likely significantly, the resolution of this action"—and therefore "the interest

of judicial economy" warrants "avoiding duplicative litigation of [that] identical issue" here.  *Ole Media Mgmt., L.P. v. EMI April Music, Inc.*, 2013 WL 2531277, at \*4 (S.D.N.Y. June 10, 2013).

In addition, and as explained in the Angola Defendants' brief, the AE-MINEA Contracts and Soyo II Concession require that an Angolan arbitrator applying Angolan law determine whether the contracts were breached.  *See supra* Factual Background, Part C (AE-MINEA Contracts); Abecasis Decl. Ex. 14, at Arts. 66 & 60 (Soyo II Concession).  And if Angolan adjudicators decide that Angola is *not* liable for breach of contract, then the GE Defendants cannot be liable for tortiously interfering with contracts that were never breached.  *See* Vale Decl. ¶ 2.4.4.[27] Similarly, if the arbitrator decides that AE's malfeasance justified Angola's decision to break of its business relations, AE cannot blame the GE Defendants for its loss of prospective business opportunities.  *Id.* ¶ 2.4.6.[28]  These threshold determinations should be made by an Angolan adjudicator before this Court (or any other forum) adjudicates Plaintiffs' interference claims.

## CONCLUSION

The Court should dismiss, or at a minimum stay, all claims against the GE Defendants.

Dated: September 18, 2020
     New York, New York

                                  GIBSON, DUNN & CRUTCHER LLP

                            By:  */s/ Orin Snyder*_____
                                    Orin Snyder
                                    Anne Champion
                                    200 Park Avenue
                                    New York, NY  10166-0193
                                    Telephone:  212.351.2400

---

[27]  As explained (*see supra* Argument, Part 3.b), Angolan law governs Plaintiffs' claims.  But even if New York law applied, a decision that Angola did *not* breach its contracts would bar Plaintiffs' tortious interference claims against GE.  *See D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 65 (2d Cir. 1998).

[28]  A plaintiff cannot prove interference with economic relations unless the defendant was the cause of the loss of relations.  *See, e.g., Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 116 (S.D.N.Y. 2015).

Facsimile:  212.351.6335
osnyder@gibsondunn.com
achampion@gibsondunn.com

Samuel Liversidge (*pro hac vice*)
Ilissa Samplin
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.6354
sliversidge@gibsondunn.com
isamplin@gibsondunn.com

*Attorneys for General Electric Company,*
*General Electric International, Inc., and*
*GE Capital EFS Financing, Inc.*