**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| AENERGY, S.A. and COMBINED CYCLE POWER PLANT SOYO, S.A., <br><br> Plaintiffs, <br><br> v. <br><br> REPUBLIC OF ANGOLA; MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA; MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA; EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP; and EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE, <br><br> Angola Defendants, <br><br> and <br><br> GENERAL ELECTRIC COMPANY; GENERAL ELECTRIC INTERNATIONAL, INC.; and GE CAPITAL EFS FINANCING, INC., <br><br> GE Defendants. | 20-CV-3569 (JPC) |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Vincent Levy
Scott M. Danner
Gregory Dubinsky
Brian T. Goldman
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 7

    A.    The Parties ...................................................................................................... 7

    B.    AE Signs Power Contracts, and Angola Obtains Financing from GE Capital ......... 8

    C.    Discovery of the Error, and Fabrication of the Fake Letters ................................. 10

    D.    Angola Draws on the Credit Facility and the Forgeries Come to Light ................. 12

    E.    GE Tortiously Procures Angola's Repudiation of Its Contracts With AE ............. 13

    F.    Litigation and Arbitration Proceedings.................................................................. 16

ARGUMENT ......................................................................................................................... 18

I.     THIS COURT HAS JURISDICTION OVER ANGOLA UNDER THE FSIA ................ 18

    A.    The "Commercial Activity" Exception Applies to Counts 1-3, 6, and 9-10 .......... 18

    B.    The "Expropriation" Exception Applies to Counts 4 and 5.................................... 26

II.    THIS COURT IS NOT AN INCONVENIENT FORUM........................................... 34

    A.    Plaintiffs' Choice of Forum Was Legitimate and Warrants Substantial Deference 34

    B.    Plaintiffs' Well-Founded Corruption Concerns Underline Choice of Forum. ........ 41

    C.    Private And Public Interests Favor Litigation in the United States ........................ 43

III.   PLAINTIFFS' CLAIMS ARE NOT SUBJECT TO ARBITRATION............................ 51

    A.    The GE Defendants Cannot Avoid this Suit with a Hodge Podge of Unrelated

           Contracts Providing for Arbitration of Unrelated Claims...................................... 51

    B.    The Claims Against the Angola Defendants Are Not Subject to Arbitration.......... 58

IV.   THERE IS NO BASIS TO ABSTAIN ON COMITY OR OTHER GROUNDS.............. 65

V.    GE'S PERSONAL-JURISDICTION OBJECTIONS ARE MERITLESS....................... 68

VI.   THE COURT SHOULD REJECT DEFENDANTS' RULE 12(B)(6) OBJECTIONS.... 72

    A.    Defendants' "Group Pleading" Objection Is Meritless............................................ 72

    B.    Plaintiffs State an Aiding-and-Abetting Claim Against GE .................................... 75

    C.    The Court Should Construe Plaintiffs' Accounting Claim as a Constructive-Trust

           Claim .................................................................................................................... 76

CONCLUSION...................................................................................................................... 77

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdullahi v. Pfizer, Inc.*,
   562 F.3d 163 (2d Cir. 2009)...................................................................... 41, 43

*Aboutaam v. L'Office Federale De La Culture De La Confederation Suisse*,
   2019 WL 4640083 (S.D.N.Y. Sept. 24, 2019) .............................................. 28

*Accent Delight Int'l Ltd. v. Sotheby's*,
   394 F. Supp. 3d 399 (S.D.N.Y. 2019).......................................................... 36

*Alfandary v. Nikko Asset Mgmt. Co.*,
   337 F. Supp. 3d 343 (S.D.N.Y. 2018).......................................................... 45

*Allstate Ins. Co. v. Mun*,
   751 F.3d 94 (2d Cir. 2014)........................................................................... 63

*Altshul Stern & Co., Inc. v. Mitsui Bussan Kaisha, Ltd.*,
   385 F.2d 158 (2d Cir. 1967).......................................................................... 54

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
   170 F.3d 349 (2d Cir. 1999).......................................................................... 55

*Am. Stock Exch., LLC v. Towergate Consultants Ltd.*,
   2003 WL 21692814 (S.D.N.Y. July 21, 2003) ............................................. 41

*Amisil Holdings Ltd. v. Clarium Capital Management*,
   622 F. Supp. 2d 825 (N.D. Cal. 2007) ......................................................... 54

*Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*,
   2009 WL 3049604 (S.D.N.Y. Sept. 23, 2009)..................................... 37, 40, 41

*Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*,
   600 F.3d 171 (2d Cir. 2010)................................................................... 18, 27

*Apollo Theater Foundation, Inc. v. W. Int'l Syndication*,
   2004 WL 1375557 (S.D.N.Y. June 21, 2004)............................................... 59

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   813 F.3d 98 (2d Cir. 2016).................................................... 3, 20, 24, 25

*AXA Verischerung AG v. N.H. Ins. Co.*,
    708 F. Supp. 2d 423 (S.D.N.Y. 2010) ................................................................. 64

*Bailey v. Grand Trunk Lines New England*,
    805 F.2d 1097 (2d Cir. 1986) ............................................................................. 31

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990) ............................................................................... 68

*Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*,
    822 F.2d 230 (2d Cir. 1987) ............................................................................... 27

*Banco Nacional de Cuba v. Farr*,
    383 F.2d 166 (2d Cir. 1967) ........................................................................... 3, 31

*Banco Nacional de Cuba v. Sabbatino*,
    307 F.2d 845 (2d Cir. 1962) ............................................................................... 30

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................... 72

*Bigio v. Coca-Cola*,
    448 F.3d 176 (2d Cir. 2006) ............................................................................... 35

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017) ....................................................................................... 30

*British Marine PLC v. Aavanti Shipping & Chartering Ltd.*,
    2014 WL 2475485 (E.D.N.Y. June 3, 2014) ...................................................... 46

*Bugliotti v. Republic of Argentina*,
    952 F.3d 410 (2d Cir. 2020) ............................................................................... 67

*Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*,
    50 F.3d 388 (7th Cir. 1995) .......................................................................... 59, 60

*Canatxx Energy Ventures, Inc. v. Gen. Elec. Capital, Corp.*,
    2007 WL 9735888 (S.D. Tex. Apr. 10, 2007) .................................................. 6, 69

*CardioNet, Inc. v. Cigna Health Corp.*,
    751 F.3d 165 (3d Cir. 2014) ............................................................................... 63

*Carey v. Bayerische Hypo-Und Vereinsbank AG*,
    370 F.3d 234 (2d Cir. 2004) .......................................................................... 44, 47

iii

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ................................................................................ 71

*Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*,
567 F.3d 1191 (10th Cir. 2009) ......................................................................... 65

*Chettri v. Nepal Rastra Bank*,
834 F.3d 50 (2d Cir. 2016) ................................................................................ 28

*Chevron U.S.A. Inc., By & Through Chevron Res. Co. v. Consol. Edison Co. of New York*,
872 F.2d 534 (2d Cir. 1989) .............................................................................. 63

*Chung Chang v. Warner Bros. Entmt*,
2019 WL 5304144 (S.D.N.Y. Oct. 21, 2019) ................................................... 56

*Collins & Aikman Prod. Co. v. Bldg. Sys.*, Inc.,
58 F.3d 16 (2d Cir. 1995) ............................................................................ 51, 55

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) .......................................................................................... 66

*Commercial Bank of Kuwait v. Rafidain Bank*,
15 F.3d 238 (2d Cir. 1994) ................................................................................ 24

*Com-Tech Associates v. Computer Associates Int'l, Inc.*,
938 F.2d 1574 (2d Cir. 1991) ............................................................................ 61

*Contant v. Bank of Am. Corp.*,
385 F. Supp. 3d 284 (S.D.N.Y. 2019) ............................................................... 71

*Contec Corp. v. Remote Sol., Co.*,
398 F.3d 205 (2d Cir. 2005) .............................................................................. 52

*Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*,
600 F.3d 661 (D.C. Cir. 2010) .......................................................................... 24

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) ........................................................................ 33, 73

*Cyberscan Tech., Inc. v. Sema Ltd.*,
2006 WL 3690651 (S.D.N.Y. Dec. 13, 2006) .................................................. 46

*Denney v. Jenkens & Gilchrist*,
412 F. Supp. 2d 293 (S.D.N.Y. 2005) ............................................................... 57

*DiRienzo v. Philip Serv. Corp.*,
   294 F.3d 21 (2d Cir. 2002).........................................................................41

*EM Ltd. v. Banco Cent. De La Republica Argentina*,
   800 F.3d 78 (2d Cir. 2015).........................................................................25

*Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
   2017 WL 2491999 (S.D.N.Y. May 15, 2017)..............................................34

*Fabry's S.R.L. v. IFT Int'l, Inc.*,
   2003 WL 21203405 (S.D.N.Y. May 21, 2003)......................................63, 64

*Farr & Co. v. Cia. Intercontinental de Navegacion de Cuba, S.A.*,
   243 F.2d 342 (2d Cir. 1957).......................................................................61

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
   665 F.3d 384 (2d Cir. 2011).......................................................................50

*Filartiga v. Pena-Irala*,
   630 F.2d 876 (2d Cir. 1980).......................................................................30

*Filetech S.A. v. France Telecom, S.A.*,
   212 F.Supp.2d 183 (S.D.N.Y. 2001)...........................................................23

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
   150 F.3d 172 (2d Cir. 1998).......................................................................34

*Fournier v. Starwood Hotels & Resorts Worldwide, Inc.*,
   908 F. Supp. 2d 519 (S.D.N.Y. 2012).........................................................36

*Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*,
   575 F.3d 693 (7th Cir. 2009).....................................................................62

*Garb v. Republic of Poland*,
   440 F.3d 579 (2d Cir. 2006).......................................................................26

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
   140 S. Ct. 1637 (2020)...............................................................................56

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
   667 F. Supp. 2d 308 (S.D.N.Y. 2009).........................................................71

*Genesco, Inc. v. T. Kakiuchi & Co.*,
   815 F.2d 840 (2d Cir. 1987).......................................................................54

v

*Grumhaus v. Comerica Securities, Inc.*,
  223 F.3d 648 (7th Cir. 2000) ........................................................................ 59

*Gucci Am., Inc. v. Weixing Li*,
  135 F. Supp. 3d 87 (S.D.N.Y. 2015) ...................................................... 21, 68

*Hammerstein v. Fed. Republic of Germany*,
  2011 WL 9975796 (E.D.N.Y. Aug. 1, 2011) ............................................... 76

*Hanil Bank v. PT. Bank Negara Indonesia (Persero)*,
  148 F.3d 127 (2d Cir. 1998) ......................................................................... 23

*Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*,
  137 F. Supp.2d 431 (S.D.N.Y. 2001) ........................................................... 46

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venzuela*,
  743 F. App'x 442 (D.C. Cir. 2018) .......................................................... 29, 30

*Henfield's Case*,
  11 F. Cas. 1099 (C.C.D. Pa. 1793) .............................................................. 75

*Hungry Horse LLC v. E Light Elec. Servs., Inc.*,
  569 F. App'x 566 (10th Cir. 2014) ............................................................... 65

*In re A2P SMS Antitrust Litig.*,
  972 F. Supp. 2d 465 (S.D.N.Y. 2013) .......................................................... 56

*In re Am. Express Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011) ......................................................................... 63

*In re Citigroup Inc. Sec. Litig.*,
  2014 WL 470894 (S.D.N.Y. Feb. 6, 2014) ................................................... 49

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) .......................................................... 73

*In re Koreag, Controle et Revision S.A.*,
  961 F.2d 341 (2d Cir. 1992) ......................................................................... 76

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  2010 WL 532855 (S.D.N.Y. Feb. 8, 2010) ................................................... 59

*In re Mexican Gov't Bonds Antitrust Litig.*,
  412 F. Supp. 3d 380 (S.D.N.Y. 2019) .......................................................... 72

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) ........................................................ 71

*In re SSA Bonds Antitrust Litig.*,
    420 F. Supp. 3d 219 (S.D.N.Y. 2019) ........................................................ 72

*In re Terrorist Attacks on Sept. 11*,
    714 F.3d 659 (2d Cir. 2013) ...................................................................... 68

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) ........................................................ 73

*Iragorri v. United Tech. Corp.*,
    274 F.3d 65 (2d Cir. 2001) ................................................................*passim*

*Ji Dong Cheng v. HSBC Bank USA, N.A.*,
    2020 WL 3165214 (E.D.N.Y. June 15, 2020) ........................................... 65

*JLM Indus., Inc. v. Stolt-Nielsen*,
    387 F.3d 163, (2d Cir. 2004) ..................................................................... 56

*Kensington Int'l Ltd. v. Itoua*,
    505 F.3d 147 (2d Cir. 2007) ...................................................................... 25

*Khan v. Parsons Global Services, Ltd.*,
    521 F.3d 421 (D.C. Cir. 2008) ................................................................... 59

*Khulumani v. Barclay Nat'l Bank, Ltd.*,
    504 F.3d 254 (2d. Cir. 2007) ............................................................... 75, 76

*Kitaru Innovations Inc. v. Chandaria*,
    698 F. Supp. 2d 386 (S.D.N.Y. 2010) ....................................................... 66

*Klonis v. Nat'l Bank of Greece, S.A.*,
    487 F. Supp. 2d 351 (S.D.N.Y. 2006) ....................................................... 66

*Kramer v. Hammond*,
    943 F.2d 176 (2d Cir. 1991) ...................................................................... 59

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*,
    67 F.3d 20 (2d Cir. 1995) ................................................................*passim*

*Leopard Marine & Trading, Ltd. v. Easy St., Ltd.*,
    896 F.3d 174 (2d Cir. 2018) ........................................................ 6, 66, 67

*Levitin v. Sony Music Entmt.*,
    101 F. Supp. 3d 376 (S.D.N.Y. 2015) ............................................................. 38

*Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    626 F.3d 156 (2d Cir. 2010) ............................................................................ 58

*Manu Int'l, S.A. v. Avon Prods., Inc.*,
    641 F.2d 62 (2d Cir. 1981) ....................................................................... 45, 49

*Mastafa v. Chevron Corp.*
    770 F.3d 170 (2d Cir. 2014) ............................................................................ 75

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
    708 F.2d 1458 (9th Cir. 1983) ......................................................................... 63

*Metito (Overseas) Ltd. v. General Electric Co.*,
    2006 WL 2320301 (S.D.N.Y. Nov. 7, 2006) ..................................... 4, 45, 46, 47

*Microsoft Corp. v. Samsung Elecs. Co.*,
    60 F. Supp. 3d 525 (S.D.N.Y. 2014) ............................................................... 65

*Ministry of Supply, Cairo v. Universe Tankships, Inc.*,
    708 F.2d 80 (2d Cir. 1983) ............................................................................. 26

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ............................................................................... 5, 55, 65

*Mulvaney v. City of Rochester*,
    2019 WL 2250014 (W.D.N.Y. May 22, 2019) .................................................. 75

*N.H. Ins. Co. v. Canali Reins. Co., Ltd.*,
    2004 WL 769775 (S.D.N.Y. Apr. 12, 2004) ..................................................... 63

*Nadeau v. Equity Residential Props. Mgmt. Corp.*,
    251 F. Supp. 3d 637 (S.D.N.Y. 2017) ............................................................. 62

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
    770 F.3d 1010 (2d Cir. 2014) ......................................................................... 52

*Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. NCR Corp.*,
    376 F. App'x 70 (2d Cir. 2010) ...................................................................... 58

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C.*,
    2003 WL 2118042 (S.D.N.Y. May 20, 2003) ................................................... 35

*Nau v. Vulcan Rail & Constr. Co.*,
  286 N.Y. 188 (N.Y. 1941) .................................................................................. 64

*Nemariam v. Fed. Dem. Republic of Ethiopia*,
  491 F.3d 470 (D.C. Cir. 2007) ......................................................................... 27

*Nicholas v. KBR, Inc.*,
  565 F. 3d 904 (5th Cir. 2009) .......................................................................... 60

*NIKE, Inc. v. Wu*,
  349 F. Supp. 3d 346 (S.D.N.Y. 2018) .............................................................. 68

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
  416 F.3d 146 (2d Cir. 2005) ..................................................... 34, 35, 36, 37

*NovaSparks SA v. EnyxFPGA*,
  344 F. Supp. 3d 666 (S.D.N.Y. 2018) .............................................................. 66

*Olympic Corp. v. Societe Generale*,
  462 F.2d 376 (2d Cir. 1972) ............................................................................. 49

*Peregrine Myanmar Ltd. v. Segal*
  89 F.3d 41 (2d Cir. 1996) ................................................................................. 41

*Permanent Mission of India to the United Nations v. City of New York*,
  551 U.S. 193 (2007) ..................................................................................... 18, 19

*Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A.*,
  895 F.3d 194 (2d Cir. 2018) ...................................................................... *passim*

*Petersen Energia Inversora S.A.U. v. Argentine Republic*,
  2020 WL 3034824 (S.D.N.Y. June 5, 2020) ...................................... 44, 45, 46, 49

*Philipp v. Fed. Republic of Germany*,
  894 F.3d 406 (D.C. Cir. 2018) ......................................................................... 75

*PPG Industries, Inc. v. Webster Auto Parts, Inc.*,
  128 F.3d 103 (2d Cir. 1997) ............................................................................. 58

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
  784 F. App'x 4 (2d Cir. 2019) .......................................................................... 25

*Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*,
  760 F.2d 390 (2d Cir. 1985) ............................................................................. 51

*R. Maganlal v. M.G. Chem. Co., Inc.*,
   942 F.2d 164 (2d Cir. 1991) ............................................................. 49

*Reers v. Deutsche Bahn AG*,
   320 F. Supp. 2d 140 (S.D.N.Y. 2004) .................................................. 49

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) ................................................................ *passim*

*Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*,
   466 F.3d 88 (2d Cir. 2006) ............................................................. 66

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010) ............................................................ 70

*Satcom Int'l Grp. PLC v. Orbcomm Int'l Partners, L.P.*,
   49 F. Supp. 2d 331 (S.D.N.Y. 1999) ......................................... 5, 58, 60

*Satcom Int'l Grp. PLC v. Orbcomm Int'l Partners, L.P.*,
   205 F.3d 1324 (2d Cir. 1999) ..................................................... 60, 61

*Schmidt v. Polish People's Republic*,
   579 F. Supp. 23 (S.D.N.Y. 1984) ...................................................... 26

*Servaas Inc. v. Republic of Iraq*,
   653 F. App'x (2d Cir. 2011) ....................................................... 22, 23

*Shapiro v. Republic of Bolivia*,
   930 F.2d 1013 (2d Cir. 1991) .......................................................... 26

*Skanga Energy & Marine Ltd. v. Arevenca S.A.*,
   875 F. Supp. 2d 264 (S.D.N.Y. 2012) ............................... 23, 36, 43, 48

*Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*,
   2014 WL 288705 (S.D.N.Y. Jan. 27, 2014) .......................................... 27

*Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*,
   198 F.3d 88 (2d Cir. 1999) ........................................................ 55, 56

*Sportvision, Inc. v. MLB Advanced Media, LP*,
   2020 WL 1957450 (S.D.N.Y. Apr. 23, 2020) ....................................... 63

*State of New York v. Oneida Indian Nation of New York*,
   90 F.3d 58 (2d Cir. 1996) .............................................................. 65

x

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
    559 U.S. 662 (2010) ........................................................................................ 63

*Tanasi v. New Alliance Bank,*
    786 F.3d 195 (2d Cir. 2015) ........................................................................... 56

*Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.,*
    725 F. Supp. 2d 438 (S.D.N.Y. 2010) ............................................... 37, 44, 48

*Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.,*
    752 F. Supp. 2d 438 (S.D.N.Y. 2010) ........................................................... 43

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.,*
    688 F. Supp. 2d 303 (S.D.N.Y. 2010) ..................................................... 45, 46

*The Navemar,*
    102 F.2d 444 (2d Cir. 1939) ........................................................................... 32

*This Is Me, Inc. v. Taylor,*
    157 F.3d 139 (2d Cir. 1998) ........................................................................... 64

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,*
    204 F.3d 384 (2d Cir. 2000) ........................................................................... 26

*U.S. v. Int'l Bus. Machines Corp.,*
    90 F.R.D. 377 (S.D.N.Y. 1981) ..................................................................... 45

*Universal Trading & Inv. Co., Inc. v. Credit Suisse (Guernsey) Ltd.,*
    560 F. App'x 52 (2d Cir. 2014) ...................................................................... 68

*UPS v. Lexington Ins. Grp.,*
    2013 WL 1897777 (S.D.N.Y. May 7, 2013) ............................................ 63, 64

*Verlinden B.V. v. Cent. Bank of Nigeria,*
    461 U.S. 480 (1983) ........................................................................... 36, 50, 51

*Washington v. Barr,*
    925 F.3d 109 (2d Cir. 2019) ........................................................................... 75

*Wave Studio, LLC v. Gen. Hotel Mgmt. Ltd.,*
    712 F. App'x 88 (2d Cir. 2018) ...................................................................... 34

*World Film Servs., Inc. v. RAI Radiotelevisione Italiana S.p.A.,*
    1999 WL 47206 (S.D.N.Y. Feb. 3, 1999) ...................................................... 49

*World GTL Inc. v. Petroleum Co. of Trinidad & Tobago,*
   2010 WL 3291673 (S.D.N.Y. Aug. 11, 2010) .......................................................... 52

*Zappia Middle E. Const. Co. Ltd. v. Emirate of Abu Dhabi,*
   215 F.3d 247 (2d Cir. 2000) .................................................... 26, 30, 34, 74

*Zwitserse Maatschappij Van Levensverzekering en Lijfrente v. ABN International Capital Mkts.
Corp.,*
   996 F.2d 1478 (2d Cir. 1993) .............................................................. 60

**Statutes**

28 U.S.C. §1605(a)(3) ............................................................................. 26, 32

28 U.S.C. § 1602 ................................................................................... 18, 19

28 U.S.C. § 1603(a)(3) .................................................................................. 31

28 U.S.C. § 1603(e) ...................................................................................... 26

28 U.S.C. § 1605(a)(2) ............................................................... 19, 20, 25, 26

28 U.S.C. § 1782 .......................................................................................... 16

**Rules**

Fed. R. Civ. P. 1 ........................................................................................... 46

Fed. R. Civ. P. 43 ......................................................................................... 46

**Other Authorities**

Gibson Dunn, *Kiobel Three Years On: Alien Tort Statute Scope and Litigation Trends* ............. 75

Restatement (Second) of Contracts (1981) .............................................................. 64

Restatement (Third) of Foreign Relations Law (1987) .......................................... 27, 29, 33

Transparency International, *Corruption Perceptions Index 2019* ................................. 42

U.S. Department of State, *2019 Country Reports on Human Rights Practices: Angola* .............. 42

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| Abecasis Decl. | Declaration of Henrique Abecasis (Dkt. 59) |
| Ang. Br. | Angola Defendants' Memorandum of Law in Support of Motion to Dismiss (Dkt. 61) |
| Compl. | Complaint (Dkt. 10) |
| GE Br. | GE Defendants' Memorandum of Law in Support of Motion to Dismiss (Dkt. 71) |
| Levy Decl. | Declaration of Vincent Levy, filed with Plaintiffs' Opposition to Defendants' Motions to Dismiss |
| Machado Decl. | Declaration of Ricardo Machado, filed with Plaintiffs' Opposition to Defendants' Motions to Dismiss |
| Raimundo Decl. | Declaration of Alberto Raimundo, filed with Plaintiffs' Opposition to Defendants' Motions to Dismiss |
| Snyder Decl. | Declaration of Orin Snyder (Dkt. 72) |
| Vale Decl. | Declaration of Sofia Vale (Dkt. 53) |

## PRELIMINARY STATEMENT

This is a case centering on GE's tortious interference with Portuguese-owned companies' $1.1 billion energy contracts with Angola – U.S.D.-pegged contracts paid for via a U.S.-based GE loan to Angola – which tortious conduct caused Angola to terminate all its energy contracts with Plaintiffs and to expropriate Plaintiffs' property in violation of international law.

Until mid-2019, Plaintiffs had significant contracts with Angola that called upon them to, among other things, sell, install, and maintain GE power turbines manufactured in whole or in part in the United States. In 2017, to pay AE for the turbines and related work, Angola borrowed $644 million from U.S.-based GE Capital under a New York-based $1.1 billion facility. Angola used the "direct payment" feature in the facility, directing that the borrowed funds be sent from GE Capital accounts in New York not only to AE (via New York correspondent banks), but also directly to GE (AE's subcontractor) in the United States and elsewhere. In 2019, Angola terminated all its energy contracts with Plaintiffs because GE told Angola that AE had engaged in purported "irregularities" in respect of the direct payments to GE.

As Plaintiffs will show, GE's charge that AE engaged in "irregularities" was a demonstrably false narrative that GE's employees maintained to deflect from the criminal conduct of GE's own employees, who had falsified business records to satisfy GE accounting and financial targets in the United States. But AE was scapegoated by GE not just to deflect responsibility; the false charges also allowed GE to take over Plaintiffs' lucrative contracts. And Angola's officials glibly accepted GE's false claims without investigation – remarkably, Angola terminated the contracts on the basis of the false documents before it even had a copy of them.

Through this action (and this alone), Plaintiffs seek their damages from Angola for breach of contract and from GE for its tortious conduct. Plaintiffs claim Angola wrongly

1

terminated the contracts and took Plaintiffs' property, in violation of Angola's commercial-law obligations and international law, because AE did not engage in any "irregularities."  Rather, GE employees falsified Angolan government letters to allow it to book certain revenue early and meet accounting objectives in the United States, and then tortiously pinned it on AE.

Plaintiffs sued in the United States because its courts are independent and jurisdiction is proper over everyone.  Plaintiffs, run by executives in Portugal, submit themselves to this Court's jurisdiction.  GE is at home in the United States.  And Angola may be sued here under the FSIA given, among other things, the $644 million U.S. payments at the heart of the case. Thus, this Court will hear from all parties and render impartial justice.

Defendants, unfortunately, wish to avoid an impartial adjudication of these claims.  As their motions demonstrate, they have no defense to the core of Plaintiffs' complaint – other than the misbegotten assertion that Plaintiffs improperly "grouped" them together.  That aside, Angola does not dispute that the pleaded facts state commercial wrongs and contract breaches, and GE does not dispute that the complaint states the elements of a tortious-interference claim.

Instead, in a classic case of the pot calling the kettle black – where the pot is black and the kettle not – they accuse Plaintiffs of "forum shopping," and spill all their ink on 95 pages of briefing asserting a litany of procedural objections – FSIA, *forum non conveniens*, arbitration, comity, abstention, personal jurisdiction, etc.  These are meritless.  Indeed, it is Defendants who seek a forum they think will favor them and deprive Plaintiffs of impartial justice.  *See Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71, 75 (2d Cir. 2001) ("Courts should be mindful that … defendants also may move for dismissal under the doctrine of *forum non conveniens* not because of genuine concern with convenience but because of similar forum-shopping reasons.").  Regardless of motivation, Defendants' arguments are all foreclosed.

2

*First*, jurisdiction over Plaintiffs' "commercial" claims against Angola is predicated in part on the fact that any Angola-based repudiatory conduct had "direct effects" on GE. Angola does not dispute the complaint's allegations that there were "direct effects" upon GE in the United States – indeed, it could not. Instead, citing nothing, Angola contests jurisdiction on the basis that Plaintiffs "make no allegation of a direct effect on Plaintiffs, but instead misdirect their focus to alleged direct effects *on GE*." The Circuit has rejected this assertion: "an FSIA plaintiff need only show a direct effect on **someone** in the United States, **plaintiff or not**." *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 111 (2d Cir. 2016) (emphasis added). Angola's failure to dispute that there were U.S. "direct effects" on GE makes the case for jurisdiction over Plaintiffs' "commercial" claims exceedingly straightforward.

*Second*, Angola asserts that FSIA jurisdiction over Plaintiffs' "expropriation" claims is improper because Plaintiffs are supposedly Angolan. Again, Second Circuit law says otherwise. Plaintiffs plead, and it is not disputed here, that they were treated as a "foreign group" of companies because of the nationality of AE's shareholder (Portuguese). And, the Circuit has held, "[w]hen a foreign state treats a corporation in a particular way because of the nationality of its shareholders, it would be inconsistent for us to in passing on the validity of that treatment to look only to the 'nationality' of the corporate fiction." *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 185 (2d Cir. 1967). That controls, and Angola's other arguments are meritless.

*Third*, Defendants seek dismissal on *forum non conveniens* grounds (it is indeed GE's lead argument) on the basis that all the evidence is supposedly in Angola, while the United States supposedly has little interest in the case. That is just not true. And Defendants misstate the law.

Emblematic of Defendants' untenable factual distortions here is the declaration of Angola's supposed lawyer, who is in fact not licensed to practice law in any jurisdiction in which

any case is pending, and who remarkably states under oath that (other than himself) "all of the individuals with knowledge of the underlying facts giving rise to the judicial proceedings … as well as this New York litigation, reside in Angola, and all of their documents are maintained in Angola."  Abecasis Decl. ¶¶ 1, 21 (emphasis added).  GE also says in its briefing (citing only the complaint) that Plaintiffs' "employees and documents are largely, if not entirely, in Angola," as are "the witnesses and documents associated with GE's Angolan operations."  GE Br. 24.

That is unequivocally false.  Plaintiffs' key executives and documents are in Portugal, and GE's are mostly outside of Angola.  GE all but gave up the game with its initial disclosures, served last week, identifying individuals _GE_ thinks "likely to have discoverable information." Putting aside roughly 20 Angolan officials (one of whom is deceased), GE identifies 35 AE and GE persons – **_3 reside in Angola_**.  For the rest, there are **_9 GE witnesses in the United States, 13 AE witnesses in Portugal, and another 10 persons outside of Angola (3 in the UK, 2 in Ghana, 2 in Kenya, 1 in Dubai, 1 in France, and 1 in Nigeria)_**.  How could GE possibly represent the facts it does in briefing, or assert the United States is not convenient – but _Angola_ is?

Consider also Defendants' claim that the United States has minimal interests in this case. As Judge Lynch explained in denying a similar _forum non conveniens_ motion filed **_by GE_** in a case alleging wrongdoing in the Middle East, "New York State … has an interest in the conduct of 'industrial giants like General Electric' that are incorporated in New York, and whose 'far-flung' activities may affect perceptions of the United States and New York State in countries around the world."  _Metito (Overseas) Ltd. v. General Electric Co._, 2006 WL 2320301, at *6 (S.D.N.Y. Nov. 7, 2006).  And this case is not about some far-flung conduct.  It centers on GE's tortious procurement of a contract breach, to benefit its bottom line here (reflected in securities and accounting filings here), by means of false statements about "irregularities" with respect to

4

New York-based payments, for the purchase of U.S. goods.  In fact, even before this suit, GE's

accounting behavior in relation to its sale of these power turbines has been the subject of an

internal accounting investigation by GE here, and reporting in the *Wall Street Journal*.

**Fourth**, GE and Angola both invoke various arbitration clauses.  However appealing the

arguments may seem at first glance, GE's chief problem is that Plaintiffs' tort claims do not

depend on the contracts GE invokes, and would stand even if these were void.  In the Second

Circuit, "legally distinct" torts that are "factually … related" to a contract dispute are not

arbitrable where the tort claim "extends to matters beyond the parties' contractual relationship."

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995).

And although GE seeks to draw something sinister from the fact that AE brought a

contract claim in arbitration "*on the same day it filed this suit*" (GE Br. 4 (emphasis in original)),

AE did so because ***it had to*** – as the Supreme Court instructs, federal law "***requires*** piecemeal

resolution when necessary to give effect to an arbitration agreement," *Moses H. Cone Mem'l

Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2–3 (1983).  There is nothing untoward about this.

AE's contract claims are subject to arbitration, but its tort claims are not.[1]

Angola fares no better.  Angola's first problem is that it chose to invoke the judicial

system first, seeking judicial relief and obtaining a preliminary injunction over Plaintiffs'

property.  It is settled in the Second Circuit that, as Angola did here, filing suit and litigating

through the preliminary-injunction phase is a waiver of arbitration.  *Satcom Int'l Grp. PLC v.

Orbcomm Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 341 (S.D.N.Y. 1999) (Cote, J.), *aff'd on the*

---

[1] Proving the point, after this suit was filed, GE filed two entirely new ICC arbitrations against AE for purported non-payment of invoices – contract claims that AE disputes.  The arbitration clause did not designate a forum or language; GE requested an English-language arbitration in London.

*basis of Judge Cote's reasoning*, 205 F.3d 1324 (2d Cir. 1999).  And the clauses do not even

apply – so the Court should not toss this one case for 15 separate arbitrations.

      *Fifth*, Defendants claim the Court should abstain in favor of (1) a suit that Angola started

to give a fig leaf of legality to its seizure of Plaintiffs' turbines and (2) an administrative

challenge to the termination decision (similar to an action under the APA) that Plaintiffs filed to

seek reversal of the administrative action terminating their contracts – ***but not their damages***.

Circuit authority forecloses this argument, too.  "[T]he general rule is that concurrent

proceedings regarding the same question are tolerated."  *Leopard Marine & Trading, Ltd. v.*

*Easy St., Ltd.*, 896 F.3d 174, 191 (2d Cir. 2018) (quotation marks and alterations omitted).

Defendants cannot possibly show the "exceptional circumstances" required to justify abstention.

      *Sixth*, despite donning the mantle of "convenience," GE Capital and GE International

object to being sued here on the ground of an alleged lack of jurisdiction over their persons,

taking the position it would be better to be sued across state lines in Connecticut, where both are

headquartered, while a parallel case proceeds here against Angola and GE Co.  Anyway, the

objection lacks merit.  As noted, the suit centers upon whether there were "irregularities" as

regards the $644 million payments directed to be made in and out of New York.

      And, regardless, the GE Defendants acted as one, making suit against all of them proper

here.  Indeed, in seeking to abuse the corporate form by making a baseless jurisdictional

argument, GE is engaging in the very sort of obfuscation that has drawn at least one federal court

to rebuke "GE Power" and "GE Capital" for abusing the corporate form by organizing "business

segments" having no relation to legal entities. *Canatxx Energy Ventures, Inc. v. Gen. Elec.*

*Capital, Corp.*, 2007 WL 9735888, at *2 (S.D. Tex. Apr. 10, 2007) ("[T]he evidence shows that

within various [GE] corporations, employees formed entities that were not registered as such for their own convenience and perhaps for obfuscation concerning which entity was involved.").

*Finally*, by the time they get around to addressing the merits, Defendants have precious little to say.  Citing a handful of antitrust decisions, they say Plaintiffs improperly engaged in "group pleading."  In the antitrust cases Defendants cite, however, the plaintiffs were required to plausibly plead a conspiracy under substantive antitrust law, and the Supreme Court has held (indeed it was the specific holding of *Twombly*) that allegations of "parallel conduct" are inadequate.  That explains the holding of those cases.  Here, by contrast, Plaintiffs do not bring antitrust or any other claims that have a conspiracy as an element and, in any event, Plaintiffs include more than enough detail – particularly given GE's abuse of the corporate form.

## BACKGROUND

### A.    The Parties

Plaintiff AE was founded in 2012 by Portuguese entrepreneur Ricardo Machado to deliver cost-effective and reliable energy solutions to Africa and, particularly, Angola.  Plaintiff CCPP is a wholly-owned AE subsidiary that held a 25-year power concession at Soyo II.

The Angola Defendants are the Republic of Angola, along with its energy ministry (MINEA), its finance ministry (MINFIN), and two state-owned energy entities (PRODEL and ENDE).  Until mid-2019, Plaintiffs worked with them to develop the power sector in Angola.

General Electric Co., "incorporated in New York City and headquartered in Boston," is a "leader in Power, Renewable Energy, Aviation, and Healthcare"; "an American company with a global footprint" "in more than 170 countries" (https://www.ge.com/faq).  Along with GE International, Inc. and GE Capital EFS, Inc., both U.S.-incorporated subsidiaries, they are the GE Defendants.

B.      AE Signs Power Contracts, and Angola Obtains Financing from GE Capital

Over the course of several years, AE worked in partnership with GE to develop the

Angolan market for GE-manufactured power products.  AE's early successes with projects in

Angola, and its sustained efforts to partner with GE and Angola to develop the power sector, led

Angola (through MINEA, PRODEL, and ENDE) to enter into 13 energy contracts with AE (the

"AE-MINEA Contracts") worth $1.1 billion.  Compl. ¶ 58.  Among other things, these expressly

called upon AE to supply, install, and maintain <u>eight</u> GE-manufactured TM2500 turbines.[2]

At around the same time, AE entered into four supply contracts with GE affiliates to

purchase <u>fourteen</u> TM2500 turbines and related services.  Although this was six more than the

eight TM2500s that AE needed to fulfill its obligations to Angola, AE purchased excess

inventory for future projects, including some then being discussed with Angola.

Also at around the same time, Angola, through MINFIN, entered into a $1.1 billion credit

agreement with U.S.-based GE Capital, financing extended to Angola to permit it to pay its

obligations to AE under the AE-MINEA Contracts (the "GE Credit Facility").  Compl. ¶ 69;

Compl. Ex. 1 (GE credit approval memorandum: "[t]he proceeds of the Loan will be used by

MINFIN to make payments under contracts (the 'On-Sale Contracts') entered between AEnergia,

S.A. and Ministry of Energy and Water (MINEA)[.]").  From GE's perspective, the business

case for this financing was that, by lending money to Angola to pay AE, GE was ensuring that

AE could pay GE affiliates for turbines and services that AE had subcontracted.  In substance,

this allowed GE to convert its exposure to AE into a sovereign obligation, and GE could even

sell that exposure off to other institutions.  Compl. ¶ 75; Compl. Ex. 1.

---

[2] TM2500 turbines are trailer-mounted, aeroderivative gas turbines.  GE, *Mobile Aeroderivative Gas Turbine*, *available at* https://www.ge.com/power/gas/gas-turbines/tm2500.

GE structured the credit line to be "**as robust as possible[]** to [the] broader GE company" – including by minimizing the risks of doing business in Angola. Compl. ¶ 74. Among other things, the credit agreement initially contemplated there would be one lump-sum payment of $1.1 billion to pay for the AE-MINEA Contracts (to avoid corruption risks).

Significantly for this case, the facility also contained a "direct payment" mechanism that allowed Angola to route money borrowed by it from GE Capital (to pay for Angola's obligations to AE) directly to AE's suppliers (including the GE affiliates with which AE had subcontracts). Mechanically, this meant that if Angola so instructed it, GE Capital could transfer money borrowed by Angola directly from GE Capital in the United States to GE Power's accounts. *Id*. ¶¶ 73-74. But legally, a single "direct payment" of, say, $100M from GE Capital to GE Power reflected three events: (a) Angola borrowed funds from GE Capital, (b) Angola paid off $100M of its debt to AE (*i.e.*, debt under the AE-MINEA Contracts), and (c) AE's debt to GE Power was also satisfied.[3] The structure was designed to mitigate GE's risks – by providing for USD payment "outside of Angola," avoiding "repatriation," currency, and corruption risks. *Id*. ¶ 74. And although Angola now calls this "direct payment" structure the stuff of "murky financial machinations" (Ang. Br. 6), it is a structure that Angola and GE negotiated – without AE.

The financing was important enough that GE Co. issued a guarantee to GE Capital assuming all risks of non-payment by Angola – which GE Co. did because the loan exceeded internal risk metrics. *Id*. ¶ 75. As GE Capital explained, its $1.1 billion "loan to the Ministry of Finance, Government of Angola" is "High risk" "given the size, security, country risk and

---

[3] Under Angolan law, if a creditor (*i.e.*, AE) instructs its debtor (*i.e.*, Angola) to pay sums due on account of such debt (*i.e.*, amounts owed by Angola to AE) to the creditor's own creditors (*i.e.*, GE), such direct payment extinguishes both (a) the debt owed by the debtor (Angola) to the creditor (AE), and (b) the debt owed by the creditor (AE) to the creditor's own creditor (GE). Civil Code Arts. 769 and 770.

related risk of default."  Compl. Ex. 1, at 13; *see id.* at 3 (loan to Angola is "sub investment

grade credit").  Thus, GE Capital's "[a]pproval [wa]s recommended *solely* on the basis of the GE

guarantee and [the fact] $184MM of proceeds to AE will be held in escrow until CPs are met[.]"

*Id.* at 13 (emphasis added); *see id.* at 3 ("GE Corporate is providing a full … backstop").

But GE made a critical error when it structured the loan.  In evaluating financial risks

during approval, GE assumed – incorrectly – that the AE-MINEA Contracts called for AE to sell

<u>twelve</u> (12) TM2500s to Angola, and that Angola would likely purchase two more turbines.  *Id*.

¶ 77.  As noted, however, the AE-MINEA Contracts called for AE to sell only <u>eight</u> (8)

TM2500s (and AE contracted for an additional six (6) turbines for its own commercial reasons).

Although GE had the right number of turbines in total (14), GE incorrectly assumed that the loan

to Angola would cover at least 12 TM2500s.  *See* Compl. ¶ 78; Compl. Ex. 1 at '493.

### C.      Discovery of the Error, and Fabrication of the Fake Letters

It did not take long for GE to discover the error and escalate it to the top of the GE

organization in the United States, including the CEO of the Gas Power business (Scott Strazik,

who was also and still is an officer of GE Co.) and its CFO (Paolo Marone, then based in

Schenectady, NY).  When Marone learned of the issue, he thought it a "big set back," and stated

the AE-MINEA Contracts would "require[] amendments" promptly to bring up the total number

of turbines.  Compl. ¶ 78.  Internal GE Capital documents that made their way to Brian Ward and

Susan Flanagan, both senior executives in the United States, noted there were significant

implications beyond credit and accounting repercussions, including material "reputational risk[s]

considering GE is the lender as well as the beneficiary."  *Id.* ¶ 86.  GE also believed there were

risks to the loan's legality, putting the project in jeopardy at a critical time for the business.  *Id*.

10

GE thus approached AE to try and get AE's help, as GE's commercial partner.  What AE and GE settled upon in September 2017 was for AE to request that MINEA amend AE-MINEA Contract 7 to include four TM2500s – rather than the two turbines set forth in the contract – and for AE to use its "best efforts" to reach agreement with MINEA to amend contracts 11 and/or 12 to add four more turbines.  *Id*. ¶ 93.  The goal, given that GE Capital was financing $1.1 billion, was to maintain the $1.1 billion value of the AE-MINEA Contracts while changing their scope by eliminating services otherwise to be provided by AE in the contracts.  *Id*.  Although this would eat into AE's short-term margins, AE put its long-term interests first and agreed to try.

GE came to believe that amending Contracts 7 and 11 to include a sale of four more turbines could be done by simple letter – settling upon wording that would do the trick – but that amending Contract 12 would require a presidential decree, which was not quickly achievable.  Thus, GE and AE requested that MINEA sign letters amending contracts 7 and 11.  *Id*. ¶ 95.

On October 12, 2017, Angola's agencies responded to the request.  But they did *not* sign letters that, as AE and GE requested, would *amend* the contracts.  Instead, they signed letters stating they would *consider* purchasing four turbines, but without committing.  Compl. ¶ 102.

GE employees knew these letters of intent would not work for GE's purposes.  So, unbeknownst to AE, they took the letters of intent Angola had signed, Photoshopped the text GE Capital wanted (*i.e.*, a commitment to purchase four more turbines) on top of the actual text, and created the "Fake Letters" that ***all parties in this case acknowledge are rank forgeries***.  Compl. ¶ 105.  Mr. da Costa then circulated the Fake Letters to his colleagues at GE – including senior executives in the United States – and, in an email incriminating himself in the creation of these forgeries, celebrated that Angola had signed letters allowing GE to meet its objectives: "We got the contract number 7 signed with the languages that we agreed on and countersigned by AE.

11

We then went to ENDE where we got contract number 11 amendment signed with the language approved by [Galvin of GE Capital] and then counter signed by AE."  Compl. Ex. 4.

      **D.**     **Angola Draws on the Credit Facility and the Forgeries Come to Light**

In December 2017, Angola made its first draw on the GE Credit Facility.  Although AE submitted $1.1 billion worth of invoices to MINEA, MINEA approved only $644 million in AE invoices, with the balance subject to approval later.  Compl. ¶ 115.  AE and GE agreed that, of the $644 million AE stood to receive on these approved AE invoices (which covered, *inter alia*, the sale of eight turbines as set forth in the AE-MINEA Contracts), AE would direct $376 million to GE to partially satisfy its debts to GE.  Compl. ¶ 125.  Moreover – although GE Capital was lending money to Angola, which was paying AE, which was paying GE – AE agreed that as a practical matter the money could go straight from GE Capital to GE Power, all flowing from and through the United States, with a good chunk of it remaining here.

Thus, on or about December 24, 2017, Angola made a formal utilization request under the GE Credit Facility for $644 million; the request instructed the capital agent under the loan facility to direct the proceeds of the loan (which were drawn from USD bank accounts in New York) to various accounts for AE and GE, in an allocation reflecting the overall agreement between AE and GE.  *See* Ex. 6.  Consistent with these requests, GE disbursed $376 million from its New York accounts to other GE accounts in the United States and elsewhere, thus satisfying AE's obligations to GE.  Compl. ¶ 125.  The balance went to AE accounts abroad, via New York.  *Id*.

Trouble began on August 9, 2018.  On that date, MINEA held an in-person meeting with AE and Mr. da Costa, and stated that MINEA did not wish to proceed as set forth in the October 2017 letters of intent.  *Id*. ¶ 128.  Although AE soon worked out an alternate proposal for

12

MINEA to purchase four additional turbines (by reducing the scope of another contract, Contract 6), that opportunity never came to pass, because it would expose Mr. da Costa's misconduct.

At December 2018 meetings to discuss the possible amendment, Mr. da Costa took matters into his own hands, stating that the contracts had *already been amended*, and showing Angola and AE the Fake Letters as proof.  Compl. ¶ 140.  AE and MINEA denounced the Fake Letters as forgeries.  But da Costa stayed the course, falsely asserting that Angola had paid AE for the four additional turbines – though AE never invoiced MINEA for the turbines and Angola never paid AE for them – and stating that AE was seeking to double-charge Angola, which was a lie.  The December meeting ended with the Minister asking for clarification.  Compl. ¶ 142.

### E.    GE Tortiously Procures Angola's Repudiation of Its Contracts with AE

On or about December 13, 2018, MINEA sent Elisee Sezan, the head of the GE Power business in sub-Saharan Africa, a formal letter to inquire about the four turbines.  *See* Compl. Ex. 9.  MINEA's letter stated that it had only "agreed to acquire a total of 8 (eight) units TM 2500"; that it was aware of "the entry into our territory of 4 (four) units TM 2500 more"; and that, "[a]fter verifying and confirming [with] the CEO of GE Angola, Mr. Wilson da Costa, we conclude that the four (4) units TM 2500 more were acquired with recourse to the credit granted by GE Capital to the Republic of Angola, which constitutes a serious irregularity, to the extent, which have not been requested, and no addendum or valid document has been issued which would justify changing the scope of the contracts and the prices."  *Id*.

On December 18, 2018, Sezan and da Costa met in person with representatives of MINEA, and falsely stated that Angola had paid AE for twelve turbines – even though, as reflected in the approved AE invoices, MINEA had paid AE only for eight.  Compl. ¶ 149(g).  GE knew its position was false.  In a telling internal email sent January 14, 2019, one of GE

13

Capital's employees conceded to another that he "had another look at the AE invoices" and that "on a standalone basis [these] support payment for 8XTMs" – not 12.  *See* Compl. Ex. 11.  But GE obviously did not care that AE's invoices disproved its narrative.

GE also knew da Costa was directly implicated in the creation of the Fake Letters that MINEA was denouncing as forgeries and that MINEA was asking GE to see.  But rather than come clean to Angola, GE's employees maintained the false narrative perpetrated by da Costa. Indeed, in an email circulated among GE employees, GE Capital's Galvin told his GE colleagues that, "before showing MINEA" the Fake Letters that MINEA wanted to see, GE "should delete" Mr. da Costa's commentary, noted above, that implicated GE in the fabrications.  Compl. Ex. 12.

AE repeatedly raised these issues to senior GE executives, including U.S.-based executives such as Mr. Strazik.  Compl. ¶ 161.  But as he and others learned that da Costa's accusations provided GE an opening to take over GE's contracts (in Sezan's words to Strazik, it was "an opportunity" for GE to obtain "upside on scope"), GE doubled down.  Compl. ¶ 164.

At the time, MINEA stated it did not want to terminate the AE-MINEA Contracts unless it was assured the work would be completed.  On March 6, 2019, da Costa informed MINEA that *GE* would sign new contracts to complete the work – and make the balance of the credit facility available – but *only* "if the existing contracts between MINEA and Aenergy have been already terminated."  Compl. Ex. 14.[4]  On March 14, 2019, MINEA again sought GE's confirmation that GE could "complete the execution" of the work, and continue to make its financing available. *Id*.  On March 19, 2019, Mr. Sezan responded by letter on "GE" letterhead, reiterating that "GE"

---

[4] Around this time, da Costa was also arrested for falsifying his own identity.  Compl. ¶ 167.  He was previously accused by MINEA of falsifying documents unrelated to AE.  *Id.* ¶¶ 167, 189.

would complete the work and make the financing (issued by GE Capital and guaranteed by GE Co.) available, and stated there was no impediment to doing so.  Compl. Ex. 15.

In August 2019, the President of Angola decreed that AE had engaged in "irregularities" with respect to the GE Capital line and improperly used state funds to purchase turbines, which were the state's property; he thus authorized MINEA to terminate the AE-MINEA Contracts, seize the turbines, and "execute any agreements that may be necessary to ensure the physical or financial conclusions of the works … with General Electric, under the GE Capital credit line." Abecasis Decl. Ex. 19 at 4.  Before employing this authority, MINEA <u>again</u> met with a GE team acting under (U.S.-based, GE Co. officer) Frederic Ribieras to request reconfirmation from "GE" that it was willing to complete the work and "reactivate the remaining" financing, and also to request that GE "provide the [Fake] 'letters'" that, remarkably, Angola still did not have. Compl. Ex. 16.

On September 2, 2019, MINEA sent AE a termination letter (the "Termination Letter"). Abecasis Decl. Ex. 20.  The letter stated Angola would seek a transfer of the remaining work to GE, and declared ownership of the four turbines.  It also explained that there were purported but unspecified "irregularities" by AE related to the acquisition "of 4 Turbines under the credit line made available by GE Capital" – apparently a reference to the Fake Letters GE employees had created.  Compl. ¶¶ 182-183.  Only later did Angola get copies of the Fake Letters.  *Id.* ¶ 190.

Angola and GE did not wait long to speak again of GE's take-over.  In October 2019, Mr. Sezan sent a letter to MINEA, on "GE International" letter-head bearing a "GE" logo, with a view to "establishing a direct contractual relation between MINEA and GE," including with respect to executing a framework agreement and obtaining financing.  Levy Decl. Ex. R.

The following month, Angola terminated another project awarded to the AE group (the "Soyo II Concession"), citing the same purported "irregularities."  Abecasis Decl. Exs. 21, 22.

### F.    Litigation and Arbitration Proceedings

*Turbine Suit*.  On October 4, 2019, Angola initiated suit in Angolan court to further its control over the four turbines expropriated by executive fiat.  At an *ex parte* hearing, witnesses provided hearsay repeating GE's false charge that Angola paid AE for twelve turbines, and the court, after finding the turbines to be state property, entered a preliminary restraint.  AE later presented evidence seeking to have the writ set aside, but, for reasons AE does not comprehend, the court declined to consider any of it.  Raimundo Decl. ¶ 8.  In March 2020, Angola moved to convert the suit into a plenary civil action (*id*. ¶ 9), and AE responded on the merits (*id*.).

*Angolan Administrative Appeals.*  In an effort to obtain a return of their contracts (and ensure they would not be accused of failing to exhaust their administrative remedies), Plaintiffs contested the terminations administratively with MINEA and the President.  These challenges were denied, so Plaintiffs sought reversal in the Supreme Court of Angola, submitting evidence sought from GE Co. under 28 U.S.C. § 1782 (because, at the time, they were still hopeful Angola would come to its senses).[5]  Although Angola falsely asserts that the suit seeks damages, AE's prayer for relief *only* seeks reinstatement, and it asks for that relief after reserving the right to

---

[5] As yet another example of GE's distortions, it claims to be surprised by the filing of this suit, and complains that "[d]uring the Section 1782 lawsuit, AE never disclosed it was contemplating filing this suit [or] that it believed litigation in this Court was appropriate."  GE Br. 2.  But GE sought a protective order to prevent AE from using evidence against GE on a "tortious interference" claim and lost.  *See* Levy Decl. Ex. B at 77:20-22 ("MR. PINSKY [GE Counsel]:  AE has itself stated in its papers that many of the documents that it seeks that are the subject of this motion are also relevant to potential action against GE."); 78:3-8 ("[T]his is an unusual case in which we have evidence that one party has expressly threatened litigation against the other, and we continue to believe that at least part of this 1782 application is . . . for purposes of a future dispute against GE[.]").  The court denied GE's application, explaining that "AE, understandably, does not want to prejudice itself and potential future litigation should its efforts in the Angolan litigation to restore its contracts fail."  *Id.* at 90:7-9.

16

seek damages (if necessary) via ***different proceedings***.  Raimundo Decl. ¶¶ 20, 21.  The appeals

remain pending – though they should have already been completed under Angolan procedure.

*This Action*.  Given the lack of due process in the turbine proceeding and the unexplained

passage of time in the administrative case making contract reinstatement all but pointless, and

given GE's centrality, AE filed this action on May 7, 2020, selecting an independent forum with

jurisdiction over all defendants.  It is the **<u>only</u>** suit Plaintiffs filed seeking damages against GE

for its tortious conduct, and the **<u>only</u>** damages suit against Angola.[6]  As GE's Angolan-law

expert acknowledges, the Angolan scheme for obtaining compensation from Angola for breach

of a state contract is separate from the administrative scheme described above.  If, as Defendants

urge, this suit were dismissed, Plaintiffs would have to file a new action for damages.

*LCIA Arbitration.*  On May 7, 2020, the day Plaintiffs filed this suit, AE launched an

arbitration in London under the LCIA Rules against GE Packaged Power, Inc. a non-party to the

instant suit.  In the arbitration proceeding, AE seeks damages for GE Packaged Power's May

2019 termination of a framework agreement that had given AE exclusivity as to the sale of GE

products and services in Angola.  AE claims the contract termination, which occurred in the

middle of GE's tortious scheme, was wrongful as a matter of English contract law.

*ICC Arbitrations.*  On September 18, 2020, the same day GE filed its motion here saying

that proceeding outside of Angola was inconvenient, GE Packaged Power and an affiliate filed

two new arbitrations against AE for payment of invoices claimed to be due by AE to GE under

supply contracts.  The arbitration clauses specified these would proceed under ICC Rules (rather

---

[6] To underscore this point, counsel represents to the Court, to the extent it has any question on the matter, that Plaintiffs are not seeking their damages from Angola pertaining to these matters in any other forum.

than LCIA Rules) but did not say where or how – GE, represented by English and Swiss lawyers, proposed an English-language arbitration in London.  AE disputes that it owes the sums stated.

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION OVER ANGOLA UNDER THE FSIA

Adopted in 1976, the FSIA provides a comprehensive regime codifying when it is appropriate to exercise "jurisdiction over a foreign sovereign in the United States."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 612 (1992); *see* 28 U.S.C. § 1602 *et seq.*  Under the FSIA, to proceed against Angola, Plaintiffs need only show that their claims fall within the scope of one of the "exceptions" to immunity set forth in Section 1605.  *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007).  As to relevant jurisdictional facts, "[t]he ultimate burden of persuasion remains with" Angola.  *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010).[7]

Here, the complaint's allegations satisfy two exceptions – the "commercial activity" exception, for claims based on "private" acts, and the "expropriation" exception, for claims based on "sovereign" acts.  And because Plaintiffs' factual allegations, with one exception, are not disputed, nearly all the facts are taken as true.  *Id.* (FSIA motion entails "review of the allegations in the complaint" and "resolution of disputed issues of fact," if any).

### A.    The "Commercial Activity" Exception Applies to Counts 1-3, 6, and 9-10

The "commercial activity" exception, 28 U.S.C. § 1605(a)(2), reflects Congress's decision to "adopt[] the 'restrictive theory' of sovereign immunity, under which 'the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but

---

[7] Thus, "[o]nce the plaintiff has met its initial burden of production, the defendant bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply."  *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 560 (2d Cir. 2020).

not with respect to private acts (*jure gestionis*)." *Permanent Mission*, 551 U.S. at 199. Thus, Congress found that, "[u]nder international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned." 28 U.S.C. § 1602. And Congress specified in Section 1605(a)(2) the U.S. nexus needed for U.S. adjudication. *Id.*

In this case, there is no dispute that Counts 1-3, 6, and 9-10 are based upon activities that are in their "nature" commercial, including entering into and terminating contracts with Plaintiffs to purchase work and GE turbines manufactured in whole or part in the United States, and obtaining and using related $1.1 billion financing from U.S.-based GE Capital. *Weltover*, 504 U.S. at 614–15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods."); *Petersen Energia Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 205 (2d Cir. 2018) ("[A] foreign state's repudiation of a contract is precisely the type of activity in which a private player within the market engages."). Thus, the sole question is whether there are enough U.S. contacts to justify U.S.-court jurisdiction under the FSIA. *See* 28 U.S.C. §§ 1602, 1605(a)(2).

## 1. Jurisdiction Is Proper Under the "Direct Effects" Clause

In light of Angola's arguments, we begin with the "direct effects" clause.[8] Angola agrees, as it must, that Plaintiffs' claims against it are "based upon," at a minimum, its repudiation of the AE-MINEA Contracts, and that this was "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere." *See* 28

---

[8] Under that clause, a foreign sovereign is not immune from suit where "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

U.S.C. § 1605(a)(2).  As a result, the statute is satisfied, and jurisdiction is proper, if Angola's

repudiation "cause[d] a direct effect in the United States."  *Id.*  That is plainly so.

The Supreme Court's decision in *Weltover* articulates the relevant standard.  To meet the

"direct effects" test, the Supreme Court explained, the U.S. effects cannot be "remote and

attenuated," but they also need <u>not</u> be "substantial" or "foreseeable"; they must simply "follow[]

as an immediate consequence of the defendant's … activity."  *Weltover*, 504 U.S. at 618.

Critically, the Second Circuit has held that the effects do <u>not</u> need to be felt by the plaintiff.

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 113, 115 (2d

Cir. 2016).

This test is easily met.  MINEA's notice terminating the AE-MINEA Contracts begins by

reciting that, "[u]nder the Loan Agreement executed by the Ministry of Finance and GE Capital

… the company AEnergia, S.A. was contracted, with the essential condition of this company

being in a technical partnership with General Electric, for the execution of 13 agreements . . .

using mostly GE-brand equipment[.]"  Abecasis Decl. Ex. 20 at 2 (emphasis added).  And the

termination was based on supposed "irregularities" "in AEnergia, S.A.'s conduct" "in what

concerns the acquisition, by AEnergia, S.A., of 4 Turbines under th[at] credit line[.]"  *Id.* at 4.

The "Loan Agreement" referenced in the notice is the GE Credit Facility, entered into

with U.S.-based GE Capital and guaranteed by GE Co. in the United States, which called for

payment in U.S. dollars – reflecting GE's purposeful choice, to which Angola acceded, to avoid

Angola's currency.  Compl. Ex. 1; Compl. ¶ 75.  Moreover, the GE Credit Facility included a

"direct payment" structure – which is at the core of this case – that permitted Angola to instruct

GE Capital to route (a) amounts drawn by Angola from the facility to pay AE on account of

AE's invoices to Angola, directly to (b) the accounts of AE's suppliers (including GE).  This

structure was purposefully designed by GE (and agreed to by Angola) to make the "overall transaction and structure" "as robust as possible[] to [the] broader GE company"; it ensured GE would be paid on account of AE's subcontracts with GE "'directly' in the United States and 'outside of Angola,' thus eliminating 'repatriation' and other risks." Compl. ¶ 74.

Consistent with the GE Capital Facility, before the contracts were terminated, and as a result of GE's and AE's designation of accounts in the disbursement request (Compl. Ex. 6), Angola directed GE Capital to disburse $644 million in December 2017 from GE accounts in New York to various U.S. dollar accounts, with $376 million going to accounts belonging to GE in New York and elsewhere in the world, and the balance to AE, all of which went through New York correspondent accounts. *Cf. Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 98 (S.D.N.Y. 2015) (Sullivan, J.) (personal jurisdiction case) ("[Movant] could have chosen to process . . . wire transfers through correspondent accounts elsewhere, . . . but it did not.").

Thus, *Weltover* is foursquare. There, bondholders sued Argentina for rescheduling the maturity dates on the bonds. The plaintiffs "had designated their accounts in New York as the place of payment, and Argentina made some interest payments into those accounts before announcing that it was rescheduling the payments." 504 U.S. at 608. The Supreme Court had "little difficulty" concluding that Argentina's rescheduling of payments "necessarily had a 'direct effect' in the United States: "Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* Here too: Absent the termination, further payments would have been made in New York, including using GE's "direct payment" feature.

And there is more. As alleged – and as is ***not*** disputed on this motion – many of the contracts expressly provided that AE was to provide GE-manufactured goods put together in whole or part in the United States, *e.g.*, Levy Decl. Ex. F § 1, Levy Decl. Ex. I § 1; GE tortiously

21

procured the repudiation of AE's contracts for the purpose and with the effect of bypassing its

erstwhile partner; and the ***repudiation directly affected GE and its bottom line***.  Thus:

> ➤ MINEA's notice recites that termination was delayed from January 2019 to permit the "possibility of AENERGIA S.A. assigning its contractual position in the [13 AE-MINEA Contracts] to its technological partner, GE," Abecasis Decl. Ex. 20 at 4;

> ➤ Starting then, Angola repeatedly asked GE whether it could finish the work and continue to provide financing, Compl. ¶¶ 149, 170-177 & *see* Compl. Exs. 13, 14, 15;

> ➤ GE employees acting under the supervision of GE personnel in the United States, including Scott Strazik (an officer of GE Co.), seized upon the "opportunity for [GE] to support government directly with better performance, and even upside on scope." Compl. ¶ 164; *see also* Compl. Ex. 13 (expressing hope that Aenergy would "willingly transfer its contract to GE (which scopes still remaining, mostly GE scope [turbine] installation, CSA, O&M [i.e., maintenance contracts])");

> ➤ The President's decree terminating the AE-MINEA Contracts (Abecasis Decl. Ex. 19) did so while expressly authorizing the Minister of Energy to enter into contracts with GE and GE Capital, U.S.-based entities, to ensure continuity, *id*. at 4;

> ➤ After the President issued his decree, MINEA again verified with GE whether it could provide the continuity the President's decree contemplated, Compl. Ex. 16;

> ➤ MINEA then terminated the contracts, while again noting GE would take over the work, Abecasis Decl. Ex. 20 at 4; and

> ➤ As soon as the termination was finalized, MINEA again conversed with employees of GE to implement "GE's" take-over of the relationship, Levy Decl. Ex. R.

Considering these and the other allegations in the complaint – including that (1) GE does

not dispute that the facts pleaded in the complaint state the elements of a tortious-interference

claim and (2) GE itself characterizes this case as concerning the ability of Angola to terminate

AE's contracts *in order to award them to GE* (GE Br. 42) – there can be no question that there

are "direct effects" in the United States.  Take in that regard *Servaas Inc. v. Republic of Iraq*, 653

F. App'x 24 (2d Cir. 2011).  There, "the Ministry bought goods and services from SerVaas, an

American corporation, shipped shell casings for testing to the United States, and made payments

using a bank headquartered in Atlanta."  *Id.* at 24.  The Court held that "[a]ny of these activities

22

alone might have been sufficient to satisfy the statute; taken together they clearly do so." *Id.*
There is much more in this case than what sufficed in *Servaas*.

Against the weight of this authority and the allegations in the complaint, Angola asserts
jurisdiction is improper because the contracts do not require payment in the United States, and
the place of performance was Angola.[9]  But that is irrelevant; as the Circuit has instructed, if (as
is the case here) payment was *in fact* made in or from the United States, then the "direct effects"
test is satisfied.  *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 132–33 (2d
Cir. 1998) ("Because Hanil specified a New York bank account into which the funds were to be
deposited – and because BNI had not eliminated New York as an option in the letter of credit it
issued – its breach resulted in the failure of funds destined for New York to arrive there").  The
assertion also does not address the other (undisputed) direct effects upon GE.

Along a similar line – and again focusing only on a single strand of Plaintiffs' allegations
– Angola states without citation that **Plaintiffs** never directed Angola to make any U.S.
payments.[10]  This is legally irrelevant, because the only requirement is that there be "direct
effects," and the focus is on the **sovereign**, not the plaintiff.[11]  The claim is also factually
incorrect – AE and GE worked on the instructions together, and Angola used them to direct

---

[9] *E.g.*, Ang. Br. 23 ("The place for performance of the Angolan Defendants' obligations under the contracts was exclusively in Angola.").

[10] *E.g.*, Ang. Br. 23 ("Plaintiffs . . . never instructed . . . ."); *id.* ("Plaintiffs' invoices all instruct . . . ."); *id.* ("Plaintiffs . . .  changed their payment instructions.").

[11] *Weltover*, 504 U.S. at 619 ("Argentina made some interest payments into those [New York] accounts before [the default]."); *Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 271–72 (S.D.N.Y. 2012) ("Skanga's allegations that it made deposits in New York bank accounts *pursuant to specific instructions dictated by PDVSA* establish the requisite direct effect within the United States[.]" (emphasis added)); *cf. Filetech S.A. v. France Telecom, S.A.,* 212 F.Supp.2d 183, 197 (S.D.N.Y. 2001) ("In [*Weltover*] and its progeny, the ultimate object of the contract – the contract's *raison d'etre* – was the payment of funds in the United States.  In the case at bar, *there is no evidence that [the defendant's] activities in France intended or contemplated a specific effect in the United States*." (citation omitted)).

23

payments to, among other places, U.S. accounts; this includes the payments to GE accounts in the U.S. that Angola now says were "irregular." *See* Compl ¶¶ 124-126, 225(c) & Compl. Ex. 6.

In the end, rather than confront the complaint's allegations, Angola ignores all the "direct effects" on GE – without disputing, because it cannot, that they occurred or were "direct" for purposes of the FSIA.  Instead – citing no authority whatsoever – Angola claims jurisdiction cannot lie because Plaintiffs "make no allegation of a direct effect on Plaintiffs, but instead misdirect their focus to alleged direct effects *on GE*."  Ang. Br. 24.  But as the Second Circuit held in a case Angola itself cites, "an FSIA plaintiff need only show a direct effect on **someone** in the United States, **plaintiff or not**."  *Atlantica Holdings*, 813 F.3d at 111 (emphasis added).[12]

In the same case, the Circuit rejected another of Angola's arguments – again based on no legal authority – that FSIA jurisdiction is lacking because "Plaintiffs' claims are not 'based upon' any effect on GE of the Angolan Defendants' termination."  Ang. Br. 24.  Again, the Circuit held in *Atlantica Holdings* there is **no such requirement** – the FSIA "says that the act on which the plaintiff's claims are based must have had a domestic effect, **not that the plaintiff's claims must be based upon the act's domestic effect**."  813 F.3d at 112 (emphasis added).[13]

---

[12] The Second Circuit's pronouncement is of course controlling; it is also no outlier.  *See Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, 600 F.3d 661, 666 (D.C. Cir. 2010) ("Nothing in the FSIA requires that the 'direct effect in the United States' harm the plaintiff.").

[13] In so ruling, *Atlantica Holdings* recalled the Circuit's prior decision in *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir. 1994), which is also on point.  As the Court described the case in *Atlantica Holdings*, in *Rafidain* "a Kuwaiti bank sued two Iraqi banks for breaching certain loan agreements," and the Circuit "found jurisdiction under the direct-effect clause based on the defendants' non-payment of funds into the United States, even though 'the United States was not the place of performance of any contractual obligations owed to the plaintiff' because 'the payments were to be made not directly to the plaintiff but to New York bank accounts held by the lead banks of the various lending syndicates' in which the plaintiff participated."  *Atlantica Holdings*, 813 F.3d at 112 (alterations omitted).

In sum, the complaint alleges numerous "direct effects" upon GE in the United States –

including the allegation that the contracts were repudiated in order to award the work to GE.  The

Court should find jurisdiction on the basis of these allegations, because they are ***undisputed*** on

this motion, and because *Atlantica Holdings* expressly rejected the only legal arguments Angola

makes to avoid jurisdiction under the "direct effects" clause.

### 2.   Jurisdiction Is Also Proper in Light of Angola's U.S. Acts

As jurisdiction is proper under the "direct effects" clause, the Court need not consider the

balance of the "commercial activities" exception.  *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147,

154 (2d Cir. 2007) ("A plaintiff need only show that one of these conditions is met for the

commercial activities exception to apply.").  But jurisdiction also lies under the other clauses.

The other two sub-clauses differ slightly – the first requires commercial activity "carried

on in the United States" by Angola, while the second requires "an act" performed in the United

States "in connection with" Angolan commercial activity elsewhere.  28 U.S.C. § 1605(a)(2).

Both sub-clauses require a finding that the suit is "based upon" the U.S.-located acts; in other

words, there must be "a degree of closeness" between the gravamen of the complaint and the

U.S. acts.  *EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 78, 97 (2d Cir. 2015).

The complaint details numerous U.S. acts, Compl. ¶ 225.  Rather than reiterate them all

here, we reemphasize the most salient – massive U.S. dollar payments that ***Angola directed*** in

the United States, to GE's accounts in the United States and elsewhere, using the loan's "direct

payment" feature, relating to the purchase of power turbines manufactured in whole or in part in

the United States.  Plaintiffs' claims are plainly "based upon" these U.S. acts, and there is "a

causal relationship" between the acts and claims, given that Plaintiffs challenge Angola's (and

GE's) claim that these payments were "irregular."  *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000).[14]

Thus, in the alternative to finding jurisdiction under the "direct effects" clause, the Court should find jurisdiction as the suit is "based upon" the "act[s]" described above, which were "performed in the United States in connection with a commercial activity of the foreign state elsewhere," as there is a "causal link" between these acts, the commercial conduct, and the claims.  *Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006).  Alternatively, the U.S. acts themselves constitute "commercial activity carried on in the United States by the foreign state," 28 U.S.C. 1605(a)(2), because they constitute "commercial activity carried on by [Angola] and having substantial contact with the United States."  28 U.S.C. § 1603(e).[15]

## B.      The "Expropriation" Exception Applies to Counts 4 and 5

Next, this Court has jurisdiction as to Counts 4 and 5 claiming, respectively, a taking of physical property and intangible property (including contract rights) under the "expropriation" exception, 28 U.S.C. §1605(a)(3).  Indeed, the complaint establishes all four elements: that "(1) rights in property are in issue; (2) that the property was 'taken'; (3) that the taking was in violation of international law; and (4) that one of the two nexus requirements is satisfied." *Zappia Middle E. Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000).

---

[14] *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4, 8 (2d Cir. 2019) (action is based upon "activity [that] is the 'but for' cause of . . . the ground of this suit"); *Petersen*, 895 F.3d at 207 ("[L]awsuit is 'based on' Argentina's breach of a commercial obligation" despite some foreign activity); *Schmidt v. Polish People's Republic*, 579 F. Supp. 23, 27 (S.D.N.Y. 1984), *aff'd*, 742 F.2d 67 (2d Cir. 1984).

[15] *See Ministry of Supply, Cairo v. Universe Tankships, Inc.*, 708 F.2d 80, 84 (2d Cir. 1983) ("[T]he first clause of § 1605(a)(2) . . . withdraws immunity with respect to claims based not only on acts within the United States but also with respect to acts outside the United States if they comprise an integral part of [a] … 'particular commercial transaction' 'having substantial contact with the United States.'" (quoting 28 U.S.C. § 1603(d) & (e)); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1019 (2d Cir. 1991) (issuance of notes to U.S. company).

### 1.   "Property Rights are in Issue"

Angola does not dispute that Counts 4 and 5 implicate "rights in property."  For good

reason.  Claim 4 concerns physical property – turbines, spare engines, oil, parts, and other

equipment.  Compl. ¶ 216.  Claim 5, pleaded in addition and/or in the alternative to the contract

claims, concerns "contract rights," which are also "property rights."  *Petersen*, 895 F.3d at 201.[16]

### 2.   "The Property Was 'Taken'"

Angola again does not dispute the complaint's allegation that there was a "taking" of

Plaintiffs' intangible contract rights.  Angola's failure to dispute the allegation – which anyway

is obvious enough – disposes of the point as to Count 5.  *See Anglo-Iberia*, 600 F.3d at 175.[17]

There was also a "taking" of physical property (Count 4).  In August 2019, the President

"determine[d]" by decree that MINEA was "authorised to . . . take administrative possession of

[AE's] equipment . . . and to take all precautions . . . in what pertains to the possession of the

four turbines[.]"  Abecasis Decl. Ex. 19 at 4.  MINEA then told AE "the four turbines purchased

under GE Capital's credit line" were "in AENERGIA S.A.'s ***unlawful*** possession" and that "the

four turbines [were] purchased on behalf of MINEA, ***which means MINEA holds the property***

***of the same.***"  Abecasis Decl. Ex. 20 at 6 (emphasis added).[18]  These executive acts were a

---

[16] *E.g.*, *Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 822 F.2d 230, 238 (2d Cir. 1987) ("As defined in international law, property commonly includes intangible assets and 'any interest in property if such interest has a reasonably ascertainable value.'" (quoting Restatement of Foreign Relations Law § 191 (1965))); *Nemariam v. Fed. Dem. Republic of Ethiopia*, 491 F.3d 470, 480 (D.C. Cir. 2007) (same); *Smith Rocke Ltd. v. Republica Bolivariana de Venezuela*, 2014 WL 288705, at *5 (S.D.N.Y. Jan. 27, 2014) (FSIA covers "rights to payment under [certain] Notes").

[17] Indeed, in tandem with its expropriation of the intangible rights, PRODEL showed up at power plants across the country and "forced" "AE's personnel . . . from the premises."  Machado Decl. ¶ 18(b), (c).

[18] MINEA – citing Angolan statutes – informed AE it would "repossess[] … all equipment … includ[ing] the four turbines" in AE's "unlawful possession."  Abecasis Decl. Ex. 20 at 9.  The police then came to AE's warehouses and seized the four turbines – and spare engines, oil, equipment, and parts – "entirely depriv[ing]" AE "of the[ir] control, use, and economic value … without compensation."  Compl. ¶ 216.

"taking."  *Petersen*, 895 F.3d at 201 ("Expropriation is the governmental taking or modification of an individual's property rights.") (quotation marks omitted).  And shortly thereafter – *before* any court action – Angolan police (accompanied by a PRODEL representative) arrived at AE premises and restrained the movement of equipment, including the four turbines, which Plaintiffs could not thereafter move.  Machado Decl. ¶ 18(b), (c).

Angola's *post-hoc* attempt to cloak this nationalization in the barest fig leaf of legality – by seeking a judicial restraint – does not rescue it from suit.  Citing cases that involve temporary asset freezes in <u>criminal</u> proceedings,[19] and invoking only the say-so of its Portuguese lawyer, Angola asserts the turbines were seized in criminal proceeding to "preserve evidence."  Ang. Br. 26-27.[20]  It is difficult to understand what evidentiary value *turbines* would have in proceedings *about fake letters*, but anyway, that is not what happened.  After the President declared that PRODEL and MINEA owned the property (because they "paid" for it), the Public Prosecutor's Office invoked Angola's *civil* law, not criminal procedure; and the judicial ruling granting relief at the end of the sham process cited that same *civil* procedure.  *See* Raimundo Decl. ¶ 10.  The court awarded custody to IGAPE, an agency tasked with managing *state property*.  *Id.* ¶¶ 11-13.

---

[19] *See Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 58 (2d Cir. 2016) (freeze of funds in bank account pending "ongoing money laundering investigation" not a taking; no claim by government entities that funds were state property); *Aboutaam v. L'Office Federale De La Culture De La Confederation Suisse*, 2019 WL 4640083, at *4 (S.D.N.Y. Sept. 24, 2019) (no taking; property frozen "in connection with an ongoing criminal investigation, which serves a public purpose, not a commercial or private one" and "seizure does not appear to have been arbitrary or discriminatory"; no claim of ownership by government).

[20] Angola's brief cites paragraphs 12 and 15 of the declaration of Mr. Abecasis.  But neither of the paragraphs in question says anything about preserving evidence.  The paragraphs also provide no foundation for Mr. Abecasis, who is a Portuguese lawyer in private practice not licensed to practice law in Angola (Raimundo Decl. ¶ 26), to make those assertions.

Thus, Angola ignores the key point: unlike the cited cases involving criminal proceedings, in *this* case, Angola gave **ownership** to **state commercial enterprises** (PRODEL and ENDE).

In any event, for the same reason, the turbine proceedings cannot save Angola from suit – because it came after the President had already adjudicated Angola's ownership (and police restrained the property). That executive act constituted a "taking," because "[c]onduct attributable to a state that is *intended* to, and does, effectively deprive an alien of substantially all the benefits of his interest in property, constitutes a taking of the property … even though the state does not deprive him of his entire legal interest in the property." *Chem. Bank*, 822 F.2d at 239 (quoting Restatement of Foreign Relations Law § 192) (emphasis in original).[21]

What's more, the judicial order was obtained on the basis of a sham proceeding – an *ex parte* hearing where nobody represented Plaintiffs and the only "evidence" Angola submitted was the rank hearsay claim that GE had told Angola that AE used fake letters to cause Angola to buy the turbines; and the court declined to consider any of AE's evidence. Raimundo Decl. ¶ 5 and Ex. R-2. *See* Restatement (Third) of Foreign Relations Law § 712 (1987) cmt. *j* ("In the case of a taking of property . . . an impartial determination is required by international law[.]"). But, as just explained, this Court need not rule that Angola's turbine proceeding was a sham; it is enough that the President and MINEA decreed ownership *before* the judicial proceeding.

---

[21] *See also Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. App'x 442, 454 (D.C. Cir. 2018) ("[A] state violates international law if it takes measures that have an effect equivalent to a formal expropriation of [a foreign] shareholder's own property rights, even if the state does not formally divest the shareholders of its shares." (quotation marks omitted)); Restatement (Third) of Foreign Relations Law § 712 (1987) cmt. *g.* ("action that is confiscatory, or that prevents, unreasonably interferes with, or unduly delays, effective enjoyment of an alien's property" is "taking").

### 3.   "The Taking Was in Violation of International Law"

The complaint also pleads that Plaintiffs' property rights were "taken in violation of international law" – *i.e.*, upon "nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law, including takings which are arbitrary or discriminatory in nature." *Zappia*, 215 F.3d at 251 (quotation marks omitted). The Angola Defendants, via executive action, unilaterally and discriminatorily terminated Plaintiffs' contracts and declared their ownership. Not only was no compensation provided – violating international law – but the Angola Defendants have taken the position that Plaintiffs owe <u>them</u> money. The truth is that, setting aside their intangible rights and lost profits, Plaintiffs are now owed north of $200 million, Compl. ¶ 232.

On this element, the Angola Defendants make only one argument – they assert there can be no international-law violation because Plaintiffs are incorporated in Angola. But that argument, so far as it goes,[22] is foreclosed on these facts by Second Circuit law, because Plaintiffs plead – and on this motion it is ***undisputed*** – that they are 99.9% owned by a Portuguese national and that the property was taken for discriminatory reasons based on that foreign ownership. Compl. ¶ 251 ("The Angolan Defendants have treated non-party Machado and Plaintiffs … as if they were a single entity … and have treated all of them as a foreign group."). In *Banco Nacional de Cuba v. Sabbatino*, the Second Circuit held that such a taking *is* a violation of international law, irrespective of the place of incorporation of the company:

---

[22] As the Supreme Court has observed, "there are fair arguments that a sovereign's taking of its own nationals' property sometimes amounts to an expropriation that violates international law." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1321 (2017); *see Filartiga v. Pena-Irala*, 630 F.2d 876, 884–85 (2d Cir. 1980) ("[I]nternational law confers fundamental rights upon all people vis-a-vis their own governments.").

> The appellant argues that the Cuban decree against C. A. V. did not violate international law because C. A. V. was organized under the laws of Cuba. . . .  But over ninety per cent of C. A. V.'s shareholders were United States nationals; and the Cuban decree which expropriated C. A. V.'s property clearly indicated that the property was seized because C. A. V. was owned and controlled by Americans.  When a foreign state treats a corporation in a particular way because of the nationality of its shareholders, it would be inconsistent for us in passing on the validity of that treatment to look only to the "nationality" of the corporate fiction.  The more frequent practice in international litigation and negotiation seems to be that the nationality of the corporation is disregarded when it is different from the nationality of most of the corporation's shareholders.

307 F.2d 845, 861 (2d Cir. 1962) (citations omitted), *rev'd on other grounds*, 376 U.S. 398 (1964); *see Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 185 (2d Cir. 1967) (reaffirming on remand the foregoing principles and "prior determination that it is of no particular significance that C. A. V. is a corporation organized under Cuban law" for international-law purposes).[23]

Instead of addressing this binding law, Angola makes the bizarre claim that Plaintiffs' expropriation claim fails because, under the FSIA, Plaintiffs' nationality is dictated by the federal-diversity-jurisdiction statute. Ang. Br. 29. The FSIA does not say what Angola claims; no case so holds; the argument makes no sense; and controlling authority, including in *Farr*, states that discriminatory takings leveled against foreign owners violate international law. The sole case Angola cites for its assertion addressed an entirely different question – the meaning of the statutory provision defining "agency or instrumentality of a foreign state" (which, Congress explained, cannot be "a citizen of a State of the United States as defined in section 1332(c) and (d)," 28 U.S.C. § 1603(a)(3)). *Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097, 1100

---

[23] Plaintiffs were not just regarded as foreign in the expropriation proceeding.  AE was also deemed a foreign national under Angolan private investment law at the time AE signed its contracts with MINEA (and many of the contracts stated they were governed by "international law" too).  Raimundo Decl. ¶ 25. GE's Angolan lawyer also acknowledges Plaintiffs are considered foreign-owned.  Vale Decl. at 20 ¶ 2.4.3.2 (asserting Plaintiffs' "shareholders have the status of foreign investors, under Angolan law").

(2d Cir. 1986).  That has ***nothing*** to do with the "expropriation" exception or what international law proscribes.  On that latter point, as *Farr* makes clear, Angola's defense is without merit.

### 4.  "One of the Two Nexus Requirements Is Satisfied"

This leaves the U.S. nexus requirement.[24]  Angola does not dispute it is met (as is alleged, Compl. ¶¶ 261-271) for the intangible property, which confirms jurisdiction over Count 5.

As to the physical property (Count 4), Angola makes critical concessions.  On the second nexus prong (28 U.S.C. § 1605(a)(3)(ii)), Angola does *not* dispute Plaintiffs' allegations that (i) PRODEL and ENDE "will be the users and holders of title to the expropriated property," and (ii) "[b]oth . . . have been and are engaged in significant commercial activity in the United States."  Compl. ¶ 221.  Those undisputed allegations satisfy the nexus requirement.

Angola nonetheless asserts jurisdiction is lacking because, it says, the physical property is currently held by a government trustee following a preliminary judicial restraint.  Ang. Br. 30. But this misstates law and fact.  To repeat, the taking occurred by Presidential decree and when MINEA declared, on behalf of PRODEL and ENDE, that ***it*** "holds the property" and would repossess the turbines "unlawfully" being held by AE.  Abecasis Decl. Ex. 20 at 6.  These acts, which obviously "modif[ed]" AE's "property rights" by giving them ***to PRODEL and ENDE***, were a taking.  *Petersen*, 895 F.3d at 201; *cf. The Navemar*, 102 F.2d 444, 446–47 (2d Cir. 1939) ("The title and right of possession of the Navemar [a vessel] was transferred to the Spanish

---

[24] *See* 28 U.S.C. § 1605(a)(3) (either (i) "that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state" or (ii) "that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States").

Republic by means of an executive decree[.]").  And, before any court proceeding, police arrived to restrain AE's property, precisely because it had been expropriated.  *See* Machado Decl. ¶ 18(b), (c).

And even if the focus were on the *ex post* Angolan judicial process, the Angolan court plainly held that "***the turbines are owned by the State***" (i.e., MINEA/PRODEL/ENDE) and that the other seized items are "***State goods***."  Abecasis Decl Ex. 25 at 13 (emphasis added).  Further demonstrating the point, IGAPE is a state entity that is tasked with holding ***state property*** – including ENDE and PRODEL's property.  It is not a neutral bailor, in other words, but the financial entity that <u>manages state assets</u>.  Raimundo Decl. ¶ 11.  Thus, even assuming *arguendo* that the property may currently be in the *custody* of a 'trustee' (for a time), that does not alter the fact that PRODEL and ENDE are now the property's *owner* (as the President and MINEA declared as a matter of law) – a conclusion that IGAPE's custody confirms.

Indeed, were this contrivance enough, any foreign state could bypass the FSIA through the "Angolan two-step": (1) declare a foreign corporation's property is nationalized and expropriated and (2) start a court proceeding regarding the same, and in which the property would be placed in the hands of a state "trustee" following an *ex parte* hearing.  Guarding against such tricks, the Circuit and the Restatement proscribe *de facto* interferences with property.  *Chem. Bank*, 822 F.2d at 239 (quoting Restatement of Foreign Relations Law § 192).

In any event, in light of the allegations asserted here, the various state entities that have acted to deprive Plaintiffs of their property rights, including IGAPE, acted in concert with PRODEL and ENDE (and MINEA and the President).  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 140 (3d Cir. 2019) (Venezuela's wholly-owned oil

company "is so extensively controlled by [Venezuela] that a relationship of principal and agent is created" sufficient to overcome presumption of separateness); *Zappia*, 215 F.3d at 252 (same).[25]

## II.   THIS COURT IS NOT AN INCONVENIENT FORUM

Subject-matter jurisdiction being proper, the Court has no basis to dismiss the case on "convenience" grounds.  Under the *forum non conveniens* doctrine, "unless the balance is ***strongly*** in favor of the defendant, the plaintiff's choice of forum should ***rarely*** be disturbed." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005) (quotation marks omitted) (emphasis added).  Defendants fall woefully short of carrying their "burden" to show this is one of those ***rare*** cases – instead, their motions show that *they* are the ones engaging in improper "forum-shopping."  *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71, 75 (2d Cir. 2001). And in mischaracterizing binding law and the facts, they invite the Court to commit legal error.

### A.   Plaintiffs' Choice of Forum Was Legitimate and Warrants Substantial Deference

"At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum."  *Norex*, 416 F.3d at 153.  Contrary to the GE Defendants' arguments, a court "err[s] in relying almost exclusively on [a] presumption that a foreign plaintiff's choice of a non-home forum is inconvenient to afford [the plaintiff's] choice little deference" at step one.  *Id.* at 157.[26]  Thus, the Court should apply "a flexible sliding scale" to determine whether the

---

[25]  If the Court cannot resolve these questions, it would be appropriate to do so after discovery.  *Cf. Esso Exploration & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 2017 WL 2491999, at *4 (S.D.N.Y. May 15, 2017) (ordering "limited discovery … to verify the allegations of specific facts crucial to establishing the alter ego theory" (quotation marks omitted)); *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 177 (2d Cir. 1998) (abuse of discretion to dismiss colorable FSIA complaint without permitting discovery into alter ego questions relevant to jurisdiction).

[26]  The law is "clear that a plaintiff's status as a 'foreign' or 'domestic' entity or individual is not dispositive of a proper *forum non conveniens* analysis."  *Wave Studio, LLC v. Gen. Hotel Mgmt. Ltd.*, 712 F. App'x 88, 90 (2d Cir. 2018).  *Compare* GE Br. 15-16.

plaintiff's "decision to sue in New York was informed by genuine convenience." *Id.* at 154, 157.

"The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by

reasons that the law recognizes as valid, the greater the deference that will be given to the

plaintiff's forum choice." *Id.* at 154 (quoting *Iragorri*, 274 F.3d at 71–72).[27]

    *Bigio v. Coca-Cola* is on point.  448 F.3d 176 (2d Cir. 2006).  There, the Second Circuit

reversed the district court's dismissal on *forum non conveniens* grounds of an action brought by

Canadian individuals and their Egyptian company against U.S.-based Coca-Cola, noting that the

district court "appears … to have given the plaintiffs' choice of forum no weight whatsoever"

and "appears to have overlooked the legitimate and substantial reasons for plaintiffs choosing to

bring this suit in defendants' own country, the United States, rather than in Egypt, after

plaintiffs' efforts to seek relief from the Egyptian authorities proved abortive." *Id.* at 179.  Here,

too, Plaintiffs, controlled by Portuguese citizens and treated as a "foreign group" by Angola, had

"legitimate and substantial reasons" to sue here, in light of what occurred in Angola.[28]

    Defendants contend that "neither Plaintiffs nor this lawsuit have any connection to New

York" (GE Br. 15; *see also* Ang. Br. 35 (same)), but that is simply not the case.  Obviously,

"[t]here is a bona fide connection between the subject matter of [this] lawsuit and the chosen

forum," as <u>$644 million</u> was "transferred … into bank accounts located in New York for [AE's

and GE's] benefit," and the suit centers on ***allegations of "irregularity" concerning these very***

---

[27] Relevant factors include "[1] the convenience of the plaintiff's residence in relation to the chosen forum, [2] the availability of witnesses or evidence to the forum district, [3] the defendant's amenability to suit in the forum district, [4] the availability of appropriate legal assistance, and [5] other reasons relating to convenience or expense." *Norex*, 416 F.3d at 155 (quoting *Iragorri*, 274 F.3d at 72).

[28] "[B]ecause the doctrine of *forum non conveniens* is used to choose between foreign and United States fora . . ., the appropriate inquiry here is whether the United States as a whole, not just New York, has an interest in adjudicating the dispute." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C.*, 2003 WL 21180421, at *9 n.8 (S.D.N.Y. May 20, 2003).  GE is wrong to focus <u>only</u> on New York.

*payments* – with AE claiming that U.S.-based GE engaged in wrongdoing.  *Skanga*, 875 F. Supp.

2d at 273 (applying "considerable deference"), *aff'd sub nom. Skanga Energy & Marine Ltd. v.*

*PDVSA*, 522 F. App'x 88 (2d Cir. 2013).  Consider other indicia that Plaintiffs were motivated

by "genuine convenience" – not "forum shopping," [29] *Norex*, 416 F.3d at 157:

1. ***Subject-matter and personal jurisdiction are proper against all Defendants***.  This

means the Court can hear from everyone.  "[Plaintiffs'] decision to litigate in New York, where

all defendants [a]re amenable to suit (and where some reside or are incorporated) is properly

viewed as a strong indicator that convenience, and not tactical harassment of an adversary,

informed its decision to sue outside its home forum."  *Norex*, 416 F.3d at 155.  Indeed, ***Congress***

determined Angola's U.S. ties here suffice, and the Supreme Court expressly held that FSIA

suits can be brought by foreign plaintiffs against foreign sovereigns.  *Verlinden B.V. v. Cent.*

*Bank of Nigeria*, 461 U.S. 480, 489 (1983).

2. ***Plaintiffs forewent their jury right in order to have all parties here***.  As jury trials are

not available in FSIA cases, Plaintiffs' decision to sue Angola and GE together – so that the

Court would hear from all concerned – means Plaintiffs had to give up on the right to have a jury

hear their claims against GE.  To paraphrase Judge Furman, "weighing in favor of deference is

the fact that Plaintiffs cannot intend to exploit the generosity of American juries."  *Accent*

*Delight Int'l Ltd. v. Sotheby's*, 394 F. Supp. 3d 399, 410 (S.D.N.Y. 2019).[30]

---

[29] "Circumstances that are generally indicative of forum shopping include 'attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, [and] the inconvenience and expense to the defendant resulting from litigation in that forum.'" *Fournier v. Starwood Hotels & Resorts Worldwide, Inc.*, 908 F. Supp. 2d 519, 523 (S.D.N.Y. 2012) (quoting *Iragorri*, 274 F.3d at 72).

[30] As jury trials are not available in FSIA cases, Defendants cannot be heard to suggest that "the plaintiff's popularity or the defendant's unpopularity in the region" are relevant.  *Fournier*, 908 F. Supp. 2d at 523.

3. ***Plaintiffs are suing the GE Defendants on their home turf***.  GE Co. is incorporated in New York, and the other GE Defendants are located in the United States.  They "can hardly complain that being sued in their home location is an inconvenience."  *Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.*, 725 F. Supp. 2d 438, 442–43 (S.D.N.Y. 2010) (Rakoff, J.) ("Citi is headquartered in New York and Terra Firma's decision to sue Citi on Citi's home turf is entitled to some weight."); *Norex*, 416 F.3d at 155–56 ("substantial deference" is "generally appropriate" when a plaintiff chooses a defendant's "home forum . . . to obtain jurisdiction over defendant").[31]

4. ***A substantial number of witnesses and substantial evidence are here***.  Of the 19 GE witnesses identified in GE's initial disclosures, nine reside in the United States.  *See* Appendix B (attached hereto).[32]  The $644 million disbursement was apparently approved by U.S. persons, and the overall financing deal was apparently designed by two U.S. persons (Messrs. Kudia and Marone).  Levy Decl. Ex. S.  Substantial evidence is also already here, including GE documents and emails, hard drives, and even a November 2017 image of Mr. da Costa's iPhone.  *Id.* ¶ 8.  And although GE incredibly claims all relevant U.S. documents were produced in the Section 1782 proceeding (GE Br. 24), GE drew sharp lines on relevance in the Section 1782 case, by our count producing <u>around **_450_** documents</u> from the period starting December 1, 2018, and ***<u>one</u>***

---

[31] *Ancile Inv. Co. Ltd. v. Archer Daniels Midland Co.*, 2009 WL 3049604, at *5 (S.D.N.Y. Sept. 23, 2009) ("ADM muddies the waters by addressing its own amenability to suit in Brazil . . . .  The relevant facts for evaluating this factor are that ADM is a multinational corporation which is headquartered in the U.S. and does business in the Southern District of New York.  It cannot plausibly argue that it is not amenable to suit here.  This factor tips in favor of deference to [the plaintiff's] choice of forum.").

[32] *Ancile*, 2009 WL 3049604, at *5 ("Undoubtedly, given the nature of the disputed transactions, a significant number of potential witnesses will be located in Brazil.  At the same time, . . . other important witnesses will be located in the Southern District of New York or, at minimum, in the United States.").

***document*** post-dating September 2, 2019.  Levy Decl. ¶¶ 10, 11.  This is from 15 custodians

whose emails, laptops, and hard drives were collected for review here – there must be more here.

5.  ***By the same token, many non-US witnesses and documents are outside of Angola***.

As discussed above, Angola's "lawyer" states under oath that (other than himself) "all of the

individuals with knowledge of the underlying facts giving rise to . . . this New York litigation,

reside in Angola, and all of their documents are maintained in Angola."  Abecasis Decl. ¶¶ 1, 21.

This false assertion, substantially repeated in briefing,[33] is contradicted by the complaint and its

exhibits, which identify by name some 30 individuals who reside outside of Angola.

Similarly, GE baselessly asserts – citing only the complaint's jurisdictional allegations –

that Plaintiffs' "employees and documents are largely, if not entirely, in Angola" and that GE's

"witnesses and documents associated with GE's Angolan operations" are in Angola or Africa.

GE Br. 24.  ***That is false***.  AE's key personnel all reside in Portugal (along with AE's

documents), Machado Decl. ¶ 7, GE's non-U.S. witnesses are around the world,[34] and this does

not even consider third-parties (such as the lawyers who negotiated the credit agreement and the

designated paying agent under it – all of whom are in England).

Indeed, GE has since called a foul on itself.  When it served its Rule 26(a) initial

disclosures, GE identified the witnesses it thought "likely to have discoverable information"

about this case.  Other than some 20 Angolan state officials, GE identified 35 witnesses.  Of the

35, ***only 3 reside in Angola***.  As to the balance, ***13 are AE witnesses in Portugal***, ***9 are GE***

---

[33] Ang. Br. 41 ("[P]ractically every witness and document are located in Angola.").

[34] *Cf., e.g.*, *Levitin v. Sony Music Entmt.*, 101 F. Supp. 3d 376, 391 (S.D.N.Y. 2015) ("While a significant number of witnesses may not be located here, because of the nature of this matter, both parties will be required to call witnesses from a variety of jurisdictions, and thus this factor does not weigh heavily in Affiliate Defendants' favor." (quotation marks omitted)).

*witnesses in the United States, 4 are in Europe, and the remaining 6 are elsewhere (Ghana,*

*Kenya, Nigeria, Dubai)*.  *See* Appendices A, B (attached hereto).  Simply to state this is to refute

GE's representations to this Court that AE's and GE's witnesses are in Angola.  It is difficult to

understand how GE could have made that (demonstrably false) claim in its brief.[35]  And in the

most recent court hearing, GE appeared to acknowledge that some of Plaintiffs' witnesses and

documents are in Portugal.[36]

      6.  ***Messrs. Nelson and da Costa, who work for a New York-based company, are not***

***believed to be in Angola***.  GE contends Messrs. Nelson and da Costa are believed to reside in

Angola.  GE Br. 25-26 (citing Snyder Decl. ¶ 3).  Both are believed to be employed by New

York-based New Fortress Energy.  Mr. Nelson apparently resides in Ghana, not Angola.  Levy

Decl. ¶ 13; Machado Decl. ¶ 15.  And da Costa has a U.S. passport and family here, and spends

considerable time in Cameroon (where he apparently has property) and Portugal (a party to the

Hague Evidence Convention).  He is not believed to reside in Angola.  Machado Decl. ¶ 14.

      Moreover, when AE sought discovery from GE in New York under Section 1782, Mr. da

Costa told Mr. Machado he would come to New York to testify.  *Id.* ¶ 14(c).  And, after this case

was filed, he instructed an attorney based in New York to tell Mr. Machado he reserved the right

to "fil[e] a joinder and/or attachment motion with respect to the litigation you have commenced

against GE in the US Federal Courts of New York."  Machado Decl. Ex. A at 3.  From the

---

[35] What makes GE's representation to the Court even more concerning is the fact that GE well knows that key AE personnel are located in Portugal, given that its employees (including from the United States) have traveled to Portugal for discussions with AE – unless GE is conceding that AE had nothing to do with the "irregularities" concerning the $644 million payment.  Machado Decl. ¶ 12.

[36] *See* Tr. of Oct. 30, 2020 Conf. at 14:4-5 ("The plaintiffs' witnesses and documents are in Portugal and Angola – or Angola.  I know they are in Portugal.").

horse's own mouth.  Indeed, in GE's disclosures, *GE lists Mr. da Costa's New York attorney as his point of contact.*  Levy Decl. Ex. C at 6.  The mind boggles.

7.  ***Critical documents are in English****.*  The allegations of impropriety in this case centers on instructions issued using the "direct payment" feature of a credit agreement written in English and governed by English law.  Contrary to GE's claim that "many of AE's communication *[sic]* with GE-related representatives in Angola" are in "Portuguese" (GE Br. 27), the business practice as between AE and GE was to communicate in English.  Machado Decl. ¶ 16.

GE also falsely claims that "every key contract and many important communications are in Portuguese."  *Id.*  There will be Portuguese-language documents, but in the Section 1782 proceeding, GE represented to this Court that ***90% of the GE documents that hit search terms were in English***, Levy Decl. Ex. B at 92:12–21,[37] and substantially all of the produced documents are in English – AE has had to translate them into Portuguese to use them in Angolan court.  That includes GE documents that describe the "direct payment" feature at issue in this case.  Indeed, the discovery record shows that the credit facility was negotiated in English by lawyers based in the U.K. (Clifford Chance for GE Capital, Norton Rose for Angola).

8.  ***All parties here "have retained highly competent New York counsel who are fully capable of litigating this dispute in this forum."***  *Ancile*, 2009 WL 3049604, at *6.  This further "supports [the plaintiff's] choice of forum."  *Id.*

9.  ***The pendency of other proceedings is "of little weight."***  Grasping at straws, Defendants point to the litigation in Angola and insist this Court must, on that basis, award

---

[37] *See id.* ("THE COURT:  Out of 20,000 [GE] documents [that hit the search terms], 2,000 were in Portuguese?  MR. PINSKY [GE Counsel]: That sounds correct, your Honor.  THE COURT: So about 10 percent?  MR. PINSKY:  That sounds correct.  THE COURT:  So most of them are in English, the vast majority?  MR. PINSKY:  ***The majority of the documents are in English***.") (emphasis added).

Plaintiffs no deference.[38]  But this case is the ***only*** damages action against Angola; if it doesn't proceed here, it will have to proceed as an independent action; and plaintiffs had legitimate reasons to pick this forum.  More to the point, the Circuit has held that the fact that "a similar case . . . is already pending" in an alternate forum "is of little weight because the existence of related litigation is not one of the factors" in the *forum non conveniens* analysis.  *DiRienzo v. Philip Serv. Corp.*, 294 F.3d 21, 31 (2d Cir. 2002).  In *Peregrine Myanmar Ltd. v. Segal*, the Circuit affirmed a district court's denial of dismissal as against the defendant's argument "that, at the same time the plaintiffs began this litigation, [a plaintiff] commenced suit in Hong Kong . . . predicated on similar facts."  89 F.3d 41, 47 (2d Cir. 1996).[39]

### B.   Plaintiffs' Well-Founded Corruption Concerns Underline Their Choice of Forum.

The law also requires Defendants to show that the alternative forum they sponsor is adequate.  *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009).  Plaintiffs acknowledge that corruption concerns are generally insufficient to show inadequacy (although there is much more here).  But these concerns do underscore the legitimacy of Plaintiffs' choice of forum.

Angola has so far refused to accord AE basic due process or to consider the evidence:  It terminated AE's contracts by citing the Fake Letters before it even had a copy of them; accorded

---

[38] *See* Ang. Br. 35 (arguing that no deference is warranted "particularly . . . where, as here, Plaintiffs have already initiated legal proceedings in Angola's courts"); GE Br. 17 ("Deference is particularly inappropriate given that Plaintiffs already filed legal proceedings in the Angolan courts (an arbitration in London) . . . .  This forum-shopping is entitled to no deference.").

[39] *Ancile*, 2009 WL 3049604, at *6 ("[Defendant] points to Ancile's participation in three related proceedings … as evidence that Ancile finds Brazil to be a convenient forum.  From this, ADM asks the Court to conclude that Ancile must be engaging in forum shopping . . . .  [T]he Court will set aside ADM's arguments and instead address the four factors explained in *Iragorri*."); *Am. Stock Exch., LLC v. Towergate Consultants Ltd.*, 2003 WL 21692814, at *5 (S.D.N.Y. July 21, 2003) ("[T]he pendency of the United Kingdom action does not factor into the *forum non conveniens* decision.").

the Plaintiffs discriminatory treatment as members of a "foreign group"; and sought and obtained an injunction *ex parte* based on pure hearsay – with the court declining to consider *any* of AE's timely-filed evidence and disregarding its own procedural rules.  Raimundo Decl. ¶ 5 and Ex. R-2.  All of this shows why Defendants spurn litigating this case in an independent U.S. forum.

It also tracks with the documented understanding that there is "political influence in the decision-making process" of "the judicial system" in Angola.  U.S. Department of State, 2019 Country Reports on Human Rights Practices: Angola,[40] at 6; *see id.* at 16 ("Government corruption at all levels was widespread[.]"); Transparency International, *Corruption Perceptions Index 2019* (ranking Angola at 146 out of 198).[41]

Don't just take it from Plaintiffs and the State Department.  ***GE itself*** explained in internal documents that there is "inherent corruption risk in Angola," which led it to avoid Angola's financial system and to provide in the credit agreement that disputes under that agreement would occur in the English language in *London* – not Luanda.  GE deliberately structured its affairs with Angola and AE so that it would use the New York banking system and U.S. dollars, to avoid Angolan currency and other risks.  And when it brought ICC arbitration proceedings against AE (on the same day it filed this motion asserting it was inconvenient to be far from Angola), GE proposed to proceed in London.

Having done all that they could to limit their exposure to the Angolan judicial, economic, and political system – and with substantial energy contracts between GE and Angola now on the line – it is rich and telling in the extreme that GE strives at all costs to move this case to Angola, while composing a paean to Angola's judiciary.  This Janus-faced ploy underscores that

---

[40] *Available at* https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/angola/.

[41] *Available at* https://www.transparency.org/en/cpi/2019/results/ago.

Defendants, not Plaintiffs, are engaged in rank forum-shopping.  Hypocritical praise for Angola

in these papers might be a good business strategy for GE, but it is no proper basis for dismissal.

Regardless, given how they have structured their own affairs, GE can hardly fault Plaintiffs for

choosing to bring this suit in the United States – where GE is based.  As for Angola, it may

prefer to be in its own courts, but Congress decided Angola could be sued here, and under the

U.S. legal system, plaintiffs generally do get to choose where they sue.  Though Defendants cast

this as a forum motion, it very much reflects an unfortunate attempt to avoid scrutiny.

## C.    Private and Public Interests Favor Litigation in the United States

A "defendant does not carry the day simply by showing the existence of an adequate

alternative forum.  The action should be dismissed ***only if the chosen forum is shown to be***

***genuinely inconvenient* and *the selected forum significantly preferable***."  *Iragorri*, 274 F.3d at

74–75 (emphases added).  At step three of the analysis, "[t]he defendant bears the burden of

establishing … that the balance of private and public interest factors tilts ***heavily*** in favor of the

alternative forum."  *Abdullahi*, 562 F.3d at 189 (emphasis added).  Unsurprisingly given the

demanding standard, courts frequently deny *forum non conveniens* motions.[42]

### 1.  The Private Factors Do Not So Favor Angola As to Justify Dismissal

The private factors do not strongly support dismissal here.  These factors include:

> [T]he interests of the litigants in having the case tried in a particular forum; the relative
> ease of access to sources of proof; the availability of compulsory process for attendance
> of unwilling, and the cost of obtaining attendance of willing witnesses; … and, all other
> practical problems that make trial of a case easy, expeditious and inexpensive.

---

[42] *See, e.g.*, *Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.*, 752 F. Supp. 2d 438, 442 (S.D.N.Y. 2010) ("Although England would provide an adequate alternative forum, the Court concludes that the balance of public and private factors tip in favor of retaining this case here."); *Skanga*, 875 F. Supp. 2d at 274 ("[E]ven assuming that" Venezuela and Nigeria are "adequate alternative fora . . . the balancing of private and public interest factors tip decisively in favor of Skanga's forum choice.").

*Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004).

*First*, the litigants' interests tilt in favor of New York and the United States. As noted, Plaintiffs brought suit in this independent forum where jurisdiction is proper over both GE and Angola, and this forum is at least as well positioned as Angola to access many of the relevant witnesses and evidence (including Mr. da Costa's hard drive and iPhone); Lisbon is roughly the same distance to New York and Luanda. Moreover, if GE or Angola wishes to compel the appearance of any of the Portugal-based AE individuals who may in the interim leave AE's employ (given that Defendants have destroyed AE's business), they will be able to do so here using the Hague Convention, but not in Angola. Plaintiffs, meanwhile, will be able to seek the negotiation history of the "direct payment" structure from Defendants' lawyers in England.

And Angola is distinctly ***inconvenient*** – to say the least – for Plaintiffs, as their documents and witnesses are in Portugal, and those witnesses, including Mr. Machado, have grave security concerns about travel to Angola. Machado Decl. ¶¶ 3-6. Indeed, he has not set foot there since December 2018, was specifically warned not to return, and has received multiple threats. *Id.* ¶ 4. *Iragorri*, 274 F.3d at 75 ("[P]laintiffs claim that they fear for their safety in Cali and that various witnesses … may be unwilling to travel to Cali; if these concerns are warranted, they appear highly relevant to the balancing inquiry that the District Court must conduct.").

*Second*, as for the Angola-based witnesses and documents, "modern technologies" make their location "less important to the *forum non conveniens* analysis." *Petersen Energia Inversora S.A.U. v. Argentine Republic*, 2020 WL 3034824, at *11 (S.D.N.Y. June 5, 2020). In the time since Defendants' cases from the 1980s and 1990s, courts have stressed that "the difficulties of discovery are mitigated by instant communication and rapid transport, especially for sophisticated corporate entities[.]" *Terra Firma*, 725 F. Supp. at 443. Society's adaptions

44

during the COVID-19 pandemic have made this even more apparent, as Judge Preska observed

in denying a *forum non conveniens* motion:

> [S]ure to be one of the enduring lessons of the ongoing COVID-19 pandemic is that we can accomplish far more remotely than we had assumed previously. That lesson should apply with equal force to managing this litigation, especially given that both parties are represented by sophisticated, first-rate, international law firms. Accordingly, the private interest facts favor litigation in Argentina under rules that require use of hard copies and solely in-person testimony; in today's digital climate, however, the private interest factors approach neutral.

*Petersen*, 2020 WL 3034824, at *11. Indeed, as early as *1981*, the Second Circuit noted the

"recent sentiment in this Circuit for evaluating the *forum non conveniens* factors in light of the

increased speed and ease of travel and communication which makes, especially when a key issue

is the location of witnesses, no forum as inconvenient (today) as it was in 1947." *Manu Int'l,*

*S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 65 (2d Cir. 1981) (quotation marks omitted).[43]

More generally, the Federal Rules of Civil Procedure are well designed to ensure that in

this case – as in the many complex commercial disputes heard in this District – all parties will

have "the just, speedy, and inexpensive determination" to which the U.S. judicial system aspires.

---

[43] *See also, e.g.*, *Alfandary v. Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d 343, 355 (S.D.N.Y. 2018) ("Regarding the private interest factors, Defendants argue that . . . all the witnesses and documents relevant to the dispute are in Japan, and therefore this factor favors the foreign forum . . . [but] Defendants' concerns regarding access to evidence are mitigated by current technology."); *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 688 F. Supp. 2d 303, 317 (S.D.N.Y. 2010) ("Even assuming that a majority of the relevant evidence is in Europe, as Defendants contend, Defendants have offered no reason why transporting any evidence to New York would pose any significant hardship to the parties."); *Metito (Overseas) Ltd v. Gen. Electric Co.*, 2006 WL 3230301, at *6 ("For many years, courts in this Circuit have recognized that modern technologies can make the location of witnesses and evidence less important to the forum non conveniens analysis, particularly where the parties are major corporations."); *U.S. v. Int'l Bus. Machines Corp.*, 90 F.R.D. 377, 380 (S.D.N.Y. 1981) ("The deposition of a witness who is beyond the 100 mile limit but within the district can be used at trial[.]").

Fed. R. Civ. P. 1.[44]  There has been no showing that Angolan courts are *so much better* equipped than this one to superintend a complex-commercial, transnational dispute.

*Third*, Defendants spill much ink arguing this forum is inconvenient because Mr. da Costa "is believed to reside in Angola."  GE Br. 25.  This is the tail wagging the dog, and if they really believe AE is responsible, they don't need Mr. da Costa to prove it.  They will get AE's documents and the testimony of its witnesses.  In any event, Mr. da Costa spends significant time outside of Angola, and has expressed a willingness to testify here.  *See supra* at 39.  Perhaps he will not (or will do so remotely), but it was Defendants' burden to show he is critical and in fact missing, not just "believed to reside" in Angola based on internet searches.  *Cyberscan Tech., Inc. v. Sema Ltd.*, 2006 WL 3690651, at *10 (S.D.N.Y. Dec. 13, 2006) ("[S]ome of plaintiff's witnesses are based in England, but defendants do not identify any of these potential witnesses as being unable or unwilling to appear in New York.  This is significant, as such identification is generally required for . . . dismissal.") (Lynch, J.) (quotation marks and citation omitted).[45]

And although Defendants complain that resolving this suit will require the participation of persons from other parts of the globe and the translation of documents, this will be true *wherever* the case proceeds.  GE is a multinational conglomerate – "an American company with a global footprint" "in more than 170 countries," *supra* at 7 – and this is a truly transnational dispute.  If GE is happy to proceed in an English-language arbitration in London superintended

---

[44] "For example: depositions can be conducted via videoconference; documents located overseas can be uploaded easily and reviewed by the parties via e-discovery platforms; and, if it comes to it, the parties can request that the Court allow trial witnesses to testify via video pursuant to the good cause exception in Fed. R. Civ. P. 43."  *Petersen*, 2020 WL 3034824, at *11 n.11.

[45] *See also, e.g., British Marine PLC v. Aavanti Shipping & Chartering Ltd.*, 2014 WL 2475485, at *4 (E.D.N.Y. June 3, 2014) (same); *Terra Sec.*, 688 F. Supp. at 317 (same); *Metito*, 2006 WL 3230301, at *6 (Lynch, J.) (same); *Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*, 137 F. Supp.2d 431, 436 (S.D.N.Y. 2001) (same).

by English lawyers, where Portuguese documents would have to be translated and Mr. da Costa

could no more be compelled to appear, then why, exactly, is the United States so inconvenient as

against Angola, when, apparently, <u>roughly half of GE's witnesses reside here</u>, *see* Appendices A,

B (attached hereto), and <u>90% of GE's documents are in English</u>, Levy Decl. Ex. B at 92:12–21?

That last point bears repetition, to forestall the cries of translation difficulty from Defendants:

the overwhelming majority of GE's documents are in English, and the substantial majority of

communications between GE and AE were in English.

### 2.   Public Factors Favor Retaining Jurisdiction

The public factors include "court congestion; the interest of forums in having local

disputes decided at home; and, the interest in having issues of law decided by courts of the nation

whose law is involved."  *Carey*, 370 F.3d at 237.  These also favor Plaintiffs.

Squarely on point is *Metito (Overseas) Ltd. v. General Electric Co.*, in which this Court

refused a similar request **by General Electric** to dismiss in favor of the UAE.  2006 WL 2320301

(S.D.N.Y. Nov. 7, 2006) (Lynch, J.).  It is not "unfair," Judge Lynch explained, "to impose on

New York jurors a lawsuit involving a major American business entity incorporated in this state,

even though the dispute focuses on events taking place primarily in the Middle East."  *Id.* at *6.

To the contrary: "New York State also has an interest in the conduct of 'industrial giants like

General Electric' that are incorporated in New York, and whose 'far-flung' activities may affect

perceptions of the United States and New York State in countries around the world."  *Id.*

Similarly, here, Plaintiffs allege that the GE Defendants, American "industrial giants,"

engaged in chicanery, deception, and unethical business practices to tortiously displace a

competitor from a lucrative market in Africa – and, on this motion, they do not dispute that the

allegations state a tort claim.  Obviously, as Judge Rakoff put it, "there is a legitimate U.S.

interest in learning whether [GE], a major American [conglomerate], may be liable for fraudulent inducement, and thus subject to substantial damages." *Terra Firma*, 725 F. Supp. 2d at 443.

And the deception in this case centers on New York-based payments. As explained, the "irregularities" at the core of this case are about the $644 million loan payments that all the parties – Plaintiffs, GE, and Angola – directed to occur in New York related to the purchase of GE turbines manufactured in whole or part in the United States, which loan payment was approved by GE executives in the United States. New York and the United States plainly have a strong interest in adjudicating whether there were "irregularities" in these U.S. transfers (as Defendants claim) and, if so, who was to blame – AE, or U.S. giant General Electric. *Skanga*, 875 F. Supp. 2d at 275 (The "complaint alleges that the defendants availed themselves of the protection of the New York banking system to perpetrate a fraud. As an international financial center, New York has a great interest in the integrity of its banking system.").

There is more: Plaintiffs allege that the Fake Letters GE pinned on AE were created by GE employees to further GE's accounting objectives in the United States. The complaint states GE "booked its revenues on the AE-GE supply contracts early, and then apparently justified the accounting treatment at year-end 2017 by using the Fake Letters," all of which necessarily implicates core U.S. interests in the integrity of financial markets. Compl. ¶ 163. The *Wall Street Journal* has reported on these matters.[46] And GE's take-over was sought to support a troubled business line that folds into earnings reported on U.S. exchanges. *Id.* ¶¶ 81, 163, 226.

---

[46] Thomas Gryta, *Larry Culp's GE Plan: a Fix, Not a Reinvention*, Wall St. J., (Oct. 17, 2019) ("[I]n at least two quarters, GE recorded sales of mobile power turbines to a customer in Angola [*i.e.*, AE] before they were transferred" and thus "that nearly $100 million of sales had been prematurely booked").

Finally, the remaining factors do not meet the law's demanding standard of so clearly

supporting Defendants as to warrant dismissal.  As for court congestion, "although this District is

historically busy, there is no reason to believe that court congestion would slow the place of this

litigation." *In re Citigroup Inc. Sec. Litig.*, 2014 WL 470894, at *6 (S.D.N.Y. Feb. 6, 2014).

Moreover, although Defendants repeatedly say the AE-MINEA Contracts designated

Angola law, many also designated "international law," *e.g.*, Levy Decl. Ex. J at cl. 28, and the

"irregularities" concern payments under an English-language, English-law-governed credit

agreement.  In any event, "the need to apply foreign law is not in itself a reason to apply the

doctrine of *forum non conveniens*," *Olympic Corp. v. Societe Generale*, 462 F.2d 376, 379 (2d

Cir. 1972)[47] – courts "must guard against an excessive reluctance to undertake the task of

deciding foreign law, a chore federal courts must often perform."  *Manu Int'l*, 641 F.2d at 68.

Here, Defendants make no showing that the law involved requires more than humdrum

commercial-law principles.[48]  GE proves just the opposite, not only by filing an Angolan-law

declaration stating relevant U.S. and Angolan law are "similar" and detailing those similarities,

Vale Decl. at 18-25 (describing claims), but also by seeking substantive dismissal of aiding-and-

---

[47] *See R. Maganlal v. M.G. Chem. Co., Inc.*, 942 F.2d 164, 169 (2d Cir. 1991) (same); *World Film Servs., Inc. v. RAI Radiotelevisione Italiana S.p.A.*, 1999 WL 47206, at *8 (S.D.N.Y. Feb. 3, 1999) ("There is no reason to believe that this Court will be unable to apply Italian copyright law as necessary.  Moreover, the need to analyze foreign law . . . is not dispositive of a motion to dismiss." (quotation marks omitted)).

[48] *Cf. Petersen*, 2020 WL 3034824, at *13 ("Defendants have not made a compelling showing that any complicated questions of Argentine law will actually arise in what is, at its core, a case involving relatively standard factual allegations of breach of the YPF By-laws[,] [and] to the extent that those questions do arise, the high quality of the parties' expert submissions on Argentine law gives the Court confidence that similar future submissions will provide the Court with a more than adequate basis to inform itself and reach a decision on any potentially thorny issues." (citation omitted)); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 160 (S.D.N.Y. 2004) ("[W]hile it is likely that French law applies to this dispute, defendants have not identified any particular conflicts or difficulties likely to arise[.]").

49

abetting and accounting claims under *U.S. substantive law*, GE Br. 47-49 (citing U.S. cases). There is thus no showing that the Court will have to apply arcane foreign-law principles.[49]

This case is thus entirely unlike any decision cited by Defendants.  In *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, for example, the plaintiff sought to enforce an award entered in an arbitration having no connection to the United States – the only U.S. interest advanced was the "enforcement of arbitration agreements in international contracts." 665 F.3d 384, 392 (2d Cir. 2011).  The Circuit's decision obviously does not stand for the proposition, as GE would have it, that Angola's sovereignty defeats Plaintiffs' forum selection.

Indeed, if the Court were to accept Defendants' statement of the law, it is difficult to conceive of <u>any</u> situation in which jurisdiction would *ever* be exercised under the FSIA.  The facts adduced by Defendants in favor of dismissal – that the case implicates the interests of a foreign sovereign and that the foreign sovereign's officials reside abroad – will be true in ***any FSIA case***.  And yet, Congress determined there was a U.S. interest in U.S. courts adjudication. And the Supreme Court expressly held that Congress *did* intend to open the doors of the federal courts to foreign plaintiffs suing foreign sovereigns, explaining it thusly:

> Congress was aware of concern that our courts might be turned into small international courts of claims, . . . open . . . to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world. . . . [But it] protected against this danger not by restricting the class of potential plaintiffs, but rather by enacting substantive provisions requiring some form of substantial contact with the United States.

*Verlinden*, 461 U.S. at 490 (quotation marks omitted).  Exercising jurisdiction here is consistent with Congress's view of the national interest and its intent.  The Court should decline

---

[49] Although Plaintiffs do not agree that Angolan law necessarily applies to all claims (given the transnational nature of this dispute), "[w]here there is no actual conflict" between the jurisdictions, "a choice-of-law analysis is unnecessary and New York law will apply."  *First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 633 (S.D.N.Y. 2014) (Sullivan, J.).

Defendants' effort to gut the FSIA through the back door of *forum non conveniens*. If the facts of this case do not allow the sort of suit *Verlinden* had in mind to proceed, what would?[50]

$$* \quad * \quad *$$

In sum, Defendants have not shown, as is their burden, that Plaintiffs should be deprived of their chosen forum. Congress contemplated that subject-matter jurisdiction would be proper over Angola, and GE is here. *Forum non conveniens* is reserved for "***rare***" cases – in which "the chosen forum is shown to be ***genuinely inconvenient*** and the selected forum ***significantly preferable***." *Iragorri*, 274 F.3d at 74–75 (emphasis added). Given the substantial interests of the United States and considering all relevant facts – including that Plaintiffs' witnesses and documents are in Portugal, while paltry few of the GE individuals that GE identified in its 26(a) disclosures are in Angola – there is every reason to believe ***Defendants'*** motions are animated by improper "forum shopping," *id.*, and they provide no proper basis to dismiss this case.

## III.   PLAINTIFFS' CLAIMS ARE NOT SUBJECT TO ARBITRATION

### A.   The GE Defendants Cannot Avoid this Suit with a Hodge Podge of Unrelated Contracts Providing for Arbitration of Unrelated Claims

**1.** As the Second Circuit has instructed, to determine whether tort claims fall within the scope of a clause calling for arbitration of claims that "arise out of or relate to" a contract, the Court should "ask[] whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Collins & Aikman Prod. Co. v. Bldg. Sys.*, Inc., 58 F.3d 16, 23 (2d Cir. 1995). Arbitration is <u>not</u> appropriate if the "dispute is in respect of a matter that,

---

[50] Plaintiffs recognize that the Second Circuit has applied *forum non conveniens* in FSIA cases, and assert here that the FSIA's grant of jurisdiction evidences the national interest. At the same time, they submit, solely for preservation purposes, that the doctrine should not apply at all in FSIA cases. *Compare Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390, 394 (2d Cir. 1985).

on its face, is clearly collateral to the contract." *Id.*  Here, Plaintiffs' claims against the GE Defendants are plainly "collateral" to the agreements that they invoke.

The GE Defendants cite three agreements that contain arbitration clauses: (1) a June 2017 Collaboration Agreement between AE and GE International, wherein GE International agreed to provide technical services and support to AE for eight years; (2) a June 2016 Framework Agreement between AE and GE Packaged Power Inc. (not a party here) providing that AE would be the exclusive distributor of certain products and services in Angola, Mozambique, and Cameroon; and (3) a September 2018 supply contract between AE and GE Energy Products France SNC (also a non-party), wherein AE agreed to purchase turbines to be installed at Soyo II ("Soyo II Agreement").  Each contains a clause calling for arbitration of disputes "arising out of or relating to" the relevant contract, two under the LCIA Rules and one under the ICC Rules.[51]

As explained above and in the complaint, however, Plaintiffs claim in this suit that the GE Defendants tortiously interfered with Plaintiffs' contracts with Angola (the AE-MINEA Contracts and the Soyo II Concession) as well as Plaintiffs' business relations, and aided and abetted an expropriation.  The gravamen of these claims is that the GE Defendants procured Angola's termination of Plaintiffs' contracts with Angola and the seizure of Plaintiffs' equipment

---

[51] GE International also argues that the question whether the claims pleaded against it are subject to arbitration under the Collaboration Agreement (sometimes referred to as the question of "arbitrability") is for the arbitrators to decide.  But "arbitrability [is] an issue for judicial determination" *unless* the parties "clearly and unmistakably" provide otherwise.  *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014).  Although it has been held that incorporation by reference of arbitration rules into an arbitration clause (true here) can constitute such "clear and unmistakable" evidence, *see Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005), that is *not* the case where, as here, there are multiple arbitration agreements, because then there is no such clarity.  *Cf. NASDAQ*, 770 F.3d at 1031.  The *Contec* rule also does not apply where, as here, a tort plaintiff "dispute[s] that their [tort] claims fall under the [relevant agreement]" (or indeed any agreement); it is then "proper for this Court to determine which agreement governs Plaintiffs' claims and ... rule on the motion to compel arbitration."  *World GTL Inc. v. Petroleum Co. of Trinidad & Tobago*, 2010 WL 3291673, at *3 (S.D.N.Y. Aug. 11, 2010).

through several means, but principally by falsely and deliberately claiming that Plaintiffs

engaged in "irregularities" in connection with the GE Credit Facility, including by supposedly

falsifying business records (which AE denies) and double-charging Angola for turbines (which

AE also denies).  These assertions have <u>nothing</u> to do with any of the rights or obligations of the

parties to the Collaboration Agreement, the Framework Agreement, or the Soyo II Agreement –

and there is thus no basis to compel arbitration of Plaintiffs' claims.

Consider in that respect *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d

20 (2d Cir. 1995).  There, plaintiff was in the business of purchasing raw fabric, having it dyed

and finished by defendant, and selling the finished product.  The plaintiff's customers were

unhappy with the products, and a dispute arose under dying contracts between plaintiff and

defendant as to who was to blame – the plaintiff, for buying defective fabric, or the defendant,

for its dying practices.  Plaintiff also claimed that defendant defamed plaintiff by making false

statements to its customers.  The Second Circuit held that this defamation claim was <u>not</u> subject

to arbitration under the dying contract, even though "[t]he defamation claim is ... factually quite

closely related to the contract claims," and "resolution of this cause of action will necessitate

examining ***the same evidence regarding … contractual performance***," as truth was a defense.

*Id.* at 28 (emphasis added).  Arbitration of the defamation claim was still inappropriate, the

Circuit held, because "the defamatory statement also ... contained a number of charges extending

beyond core issues of dyeing and finishing goods contracts" – including the charge that plaintiff

was "dishonest and incompetent, and that it acted with intent to defraud its customers."  *Id.*

Much the same is true here.  As in *Leadertex*, Plaintiffs claim that GE falsely told Angola

(AE's customer) that AE was "dishonest . . . and that it acted with intent to defraud" Angola.

That has nothing to do with the contracts GE invokes to avoid this Court's scrutiny of its

53

conduct.  Indeed, although GE chastises Plaintiffs for not mentioning the Framework Agreement in the complaint, that is because Plaintiffs' tort claims do not depend upon it whatsoever, and GE's failure to contest that Plaintiffs plead tortious-interference claims without referring to the Framework Agreement proves that the tort claim is independent – and not arbitrable.[52]

Nor can GE avoid the clear law in this Circuit by characterizing Plaintiffs' claims as involving "the sale of turbines and services."  GE Br. 35.  Sure – in *Leadertex*, it could have been argued that the defamation claim (like the contract at issue there) concerned the "dyeing of fabric."  But although the contract claim was arbitrable, the defamation claim was not.

Meanwhile, multiple decisions hold that a tortious-interference claim does not arise out of or relate to sales or similar agreements that are <u>not</u> interfered with.  *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987) (interference claim that defendant bribed plaintiff's employee to accept sub-standard goods not "related" to sales contracts between parties); *Altshul Stern & Co., Inc. v. Mitsui Bussan Kaisha, Ltd.*, 385 F.2d 158, 159 (2d Cir. 1967) (wholesaler's claim that manufacturer induced wholesaler's employee to breach employment agreement "on its face unrelated" to sales contracts between parties).[53]

Finally, controlling caselaw also forecloses the GE Defendants' effort to obtain arbitration of this case on the basis that AE is currently arbitrating in the LCIA a separate claim that GE Packaged Power Inc., a GE affiliate, improperly terminated the Framework Agreement,

---

[52] GE points out the complaint says GE falsely stated there was no commercial partnership between AE and GE, and, in one sub-paragraph of the 80-page complaint, AE passingly referred to the Collaboration Agreement's existence as evidence disproving the claim.  GE Br. 33.  *Leadertex* shows this is not enough, even if truth is a defense, as the core of the claim "extends to matters beyond" the contract.  67 F.3d at 28.

[53] GE's effort to invoke arbitration on the basis of exculpation clauses is meritless.  *Amisil Holdings Ltd. v. Clarium Capital Management*, 622 F. Supp. 2d 825, 837 (N.D. Cal. 2007) ("[T]he scope of an indemnification clause is irrelevant to the question of arbitrability.").

causing AE to incur overlapping damages.  The parallel proceedings and overlapping damages are not a reason to compel arbitration here, but simply a consequence of the fact that <u>certain</u> disputes, but <u>not others</u>, were committed to arbitration.  Indeed, in *Collins*, the Circuit affirmed a decision that both rejected arbitration of a tortious-interference claim ***and*** compelled arbitration of contract claims – even though all ***claims arose from the same set of facts and sought precisely the same damages – $4.25 million***.  *Collins*, 58 F.3d at 23; *see also Leadertex*, 67 F.3d at 24 (contract claim arbitrable; tort claim not); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2–3 (1983) ("The fact that if respondent obtains an arbitration order, petitioner will be forced to resolve the dispute with respondent and the related dispute with the architect in different forums … occurs because the relevant federal law, the Arbitration Act, requires piecemeal resolution when necessary to give effect to an arbitration agreement.").[54]

**2.**  GE does not even try to show that Plaintiffs' claims are arbitrable under controlling law.  Instead, seeking to obfuscate the applicable standard, GE addresses only two questions: (1) whether Plaintiffs' tort claims are "intertwined" with the contracts it cites, and (2) whether there is a close relationship between the GE entities.  *See* GE Br. 34-41.  These questions form the test used to determine whether a *third-party* may invoke an arbitration clause under estoppel principles, on the basis that the plaintiff has, by pleading a claim, "receive[d] a 'direct benefit' from a contract containing an arbitration clause."  *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999); *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 97-98 (2d Cir. 1999).

---

[54] The GE Defendants' conduct further shows there is no merit to the claim that factual overlap is enough. In the LCIA, GE Packaged Power defends its termination of the FWA on the basis of supposed non-payment of invoices.  But on the very day the GE Defendants filed their motion here, two GE entities initiated two more arbitrations – in the ICC – for nonpayment of exactly the <u>same invoices</u>.

But as both common sense and GE's own cases make clear, **GE Defendants must <u>also</u> show that the claims pleaded against them fall within the scope of the arbitration clauses in the first place** – and they don't even try.  *Smith/Enron*, 198 F.3d at 97–99 (addressing arbitrability separately from estoppel).[55]  In *JLM Indus., Inc. v. Stolt-Nielsen*, 387 F.3d 163 (2d Cir. 2004), for example, *before* addressing whether a third-party could invoke the arbitration clause under principles of estoppel, the Circuit concluded, after careful analysis, that a Sherman Act claim fell within "the scope of the . . . arbitration clause" because the "Sherman Act claims unquestionably involve[d] *a core issue* of the contracts between the parties."  *Id*. at 176.  This makes eminent sense – it would be absurd if a third-party could claim a right to arbitration that is greater than what the party to the arbitration clause could raise.  So GE <u>must</u> indeed meet the *Leadertex* standard – which it cannot do.[56]

In any event, the estoppel test also shows arbitration to be inappropriate.  "[E]quitable estoppel allows a non-signatory to a written agreement containing an arbitration clause to compel arbitration **where a signatory** to the written agreement **must <u>rely</u> on the terms of that agreement in asserting its claims**."  *GE Energy Power Conversion France SAS, Corp. v. Outokumpu*

---

[55] GE's other cases are to the same effect.  *See Chung Chang v. Warner Bros. Entmt,* 2019 WL 5304144, at *3 (S.D.N.Y. Oct. 21, 2019) (addressing two separate questions: whether "Warner Bros. can[] enforce the arbitration clause" although "not a signatory to the Agreement," and whether the "claims fall beyond the scope of the arbitration clause"); *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 484 (S.D.N.Y. 2013) ("Having determined that these Defendants can require Plaintiffs to arbitrate under the RS Agreement, the next question is whether the dispute falls within the scope of the arbitration clause.").

[56] At the conference on GE's motion for a stay of discovery, Dkt. 70, GE sought to distinguish *Leadertex* by citing *Stolt-Nielsen*, asserting *Stolt-Nielsen* articulated a different standard for third parties invoking arbitration clauses and was later-in-time.  By its plain terms, however, *Stolt-Nielsen* does not dispense with the antecedent question of whether a claim is subject to arbitration – let alone does it address (or displace) the *Leadertex* standard for determining whether tort claims are arbitrable.  Moreover, GE has it backwards: under Circuit law, if there is a conflict, the first-in-time decision controls.  *See Tanasi v. New Alliance Bank*, 786 F.3d 195, 200 n.6 (2d Cir. 2015).

*Stainless USA, LLC*, 140 S. Ct. 1637, 1644 (2020) (emphasis added).  The point is that if the plaintiff **must** use a contract to plead a claim, it is stuck with the contract's arbitration clause.

The complaint, however, does not even mention two of the three agreements cited by GE, and it mentions the third agreement only in passing.  Plaintiffs thus do **not** sufficiently "rely on the terms of" *any* of the GE "agreements in asserting [their tort] claims." *Id.*  The tort claims would stand even if the GE contracts were "void, invalid, or unenforceable." *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 299 (S.D.N.Y. 2005) (estoppel improper where claims would survive if contracts were "void, invalid, or unenforceable").  As a result, though Plaintiffs obviously do not dispute that the GE entities are closely related, estoppel is inappropriate.

*        *        *

In sum, none of the agreements cited by GE commits to arbitration any claim for tortious interference with AE's customers and customer relationships.  When AE bought turbines from GE entities, it agreed disputes under the purchase contracts would be decided in ICC arbitration.  When AE obtained exclusivity rights (which it had until May 2019), it agreed disputes about those rights would be decided in LCIA arbitration.  That patchwork of arbitration clauses, however, does not reveal an intent to arbitrate the tort claims pleaded here.  Indeed, as *Leadertex* instructs, it cannot be said that, in entering into those arbitration clauses, AE reasonably expected to commit to arbitration a dispute over whether GE's employees tortiously interfered with AE's customer relations by falsely telling Angola that AE fabricated documents and improperly used state funds.  As a result, it should not be a surprise to GE that AE filed a breach-of-contract claim in the LCIA, that GE filed its own breach of contract claims in the ICC, and that AE filed tort claims here.  The Court has no basis to refer Plaintiffs' tort claims to arbitration.

57

### B.    The Claims Against the Angola Defendants Are Not Subject to Arbitration

#### 1.  The Angola Defendants Waived Any Right to Arbitration

Angola's effort to obtain dismissal in favor of arbitration (and its misbegotten assertion that Plaintiffs have "conceal[ed]" arbitration clauses, Ang. Br. 31) comes with some chutzpah. While it argues arbitration now in late 2020, back in October 2019, right after terminating the AE-MINEA Contracts and declaring that it owned AE's turbines, the Angolan government launched litigation in Angola and obtained a judicial decree enjoining AE's turbines based on allegations Plaintiffs dispute here.  Raimundo Decl. ¶¶ 4, 5.  AE appeared in suit to avoid a default and introduced evidence, which the court declined to consider.  Angola <u>never</u> sought arbitration; instead, after winning its *ex parte* injunction, Angola filed a plenary action seeking ***permanent judicial relief***.  It is now too late to do so.

**a.**  Arbitration is like any other contract right – it may be waived, by "the taking of action inconsistent with the right to arbitrate."  *Satcom Int'l Grp. PLC v. Orbcomm Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 341 (S.D.N.Y. 1999) (Cote, J.), *aff'd* 205 F.3d 1324 (2d Cir. 1999).  Angola plainly waived whatever rights it had to arbitrate: "by filing its lawsuit [in Angola] and litigating it at length, [Angola] acted inconsistently with its contractual right to arbitration."  *Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 160 (2d Cir. 2010).  Angola cannot now suddenly be heard to ask for arbitration of Plaintiffs' claims simply because it does not like Plaintiffs' chosen forum for its damages action.  *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. NCR Corp.*, 376 F. App'x 70, 72 (2d Cir. 2010) (movant waived arbitration right by litigating issues in state court); *see PPG Industries, Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 108 n.2 (2d Cir. 1997) ("We have previously stated that the prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in

58

waiver of the right to arbitrate.  It is irrelevant that the prior litigation occurred as part of a separate action or in a different court." (quotation marks and citation omitted)).[57]

Moreover, a litigant can – as Angola has – also waive arbitration by litigating as a defendant before raising arbitration.  *Cf. Leadertex*, 67 F.3d at 22, 26.  Here, in contesting Plaintiffs' Angolan administrative actions on the contracts, Angola "could have invoked the arbitration clause at the outset of the litigation . . . but it chose not to"; it delayed responding, all while aggressively litigating the turbine-restraint proceeding.  *Id.* at 26; *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991) (waiver given long delay before raising arbitration, while "engag[ing] in extensive pretrial litigation, apparently designed to wear down his opponent").

Even today, Angola continues to take action inconsistent with arbitration – it continues to press ahead in Angola court, and seeks dismissal here in favor of those lawsuits.[58]  *Cf. Khan v. Parsons Global Services, Ltd.*, 521 F.3d 421 (D.C. Cir. 2008) (filing a motion for summary judgment or in the alternative arbitration is a waiver); *see Apollo Theater Foundation, Inc. v. W. Int'l Syndication*, 2004 WL 1375557, at *3 (S.D.N.Y. June 21, 2004) ("A party may waive its right to arbitration . . . by expressly indicating that it wishes to resolve its claim before a court.").

---

[57] *See, e.g.*, *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995) ("[W]e . . . hold that an election to proceed before a nonarbitral tribunal for the resolution of a contractual dispute is a presumptive waiver of the right to arbitrate."); *In re Merrill Lynch Auction Rate Sec. Litig.*, 2010 WL 532855, at *3 (S.D.N.Y. Feb. 8, 2010) ("[E]leven months elapsed between LSED's initial filings in state and federal court and the filing of the instant motion to compel arbitration.  During these eleven months, LSED expressed its desire to litigate rather than arbitrate.").  Thus, for example, in *Grumhaus v. Comerica Securities, Inc.*, the Seventh Circuit explained that the party seeking arbitration waived their right by filing an action in state court, notwithstanding that "the causes of action brought in the state court . . . are different from those in the arbitration claim," because "it is all one dispute, stemming entirely from Comerica's action in liquidating the [] stock belonging to the [party seeking arbitration]."  223 F.3d 648, 652–53 (7th Cir. 2000).

[58] Ang. Br. 44 ("The Angola proceedings were initiated first, and the Angolan courts . . . exercised their jurisdiction over the parties, the subject matter, and indeed the property" first).

**b.**  The Circuit generally requires "prejudice" for a waiver – a fact-specific inquiry that considers, *e.g.*, whether the non-moving party filed motions or incurred costs or delay.  *Satcom*, 49 F. Supp. 3d at 340.  "Customarily, waiver is urged against the defendant and the inquiry for the court is whether the defendant litigated enough and the other side has suffered sufficient prejudice such that the defendant's waiver of the right to arbitrate may be inferred."  *Id.* at 341.

But when the moving party filed a suit, discerning a waiver is easy enough:  "[T]he act of a plaintiff filing suit without asserting an arbitration clause constitutes substantial invocation of the judicial process….  [S]hort of directly saying so in open court, it is difficult to see how a party could more clearly 'evince a desire to resolve a . . . dispute through litigation rather than arbitration.'"  *Nicholas v. KBR, Inc.*, 565 F. 3d 904, 908 (5th Cir. 2009) (alterations omitted).[59]

And here, whatever equity the prejudice standard is meant to safeguard, it is plainly met.  Judge Cote's decision in *Satcom* is instructive – and, given that it was affirmed by the Circuit on the basis of Judge Cote's reasoning, 205 F.3d 1324, controlling.  There, the party requesting arbitration first filed suit and took it through a preliminary-injunction ruling; faced with a loss, it moved to compel arbitration.  In finding the right to arbitration waived, Judge Cote observed that "begin[ning] a litigation" and prosecuting it through a preliminary injunction was plainly prejudicial.  49 F. Supp. 2d at 340–41.  Similarly, the Second Circuit in *Zwitserse Maatschappij Van Levensverzekering en Lijfrente v. ABN International Capital Mkts. Corp.*, held that the moving party waived arbitration (causing the requisite prejudice) because it had earlier filed suit in the Netherlands and obtained discovery there.  996 F.2d 1478, 1480 (2d Cir. 1993).

---

[59] The Fifth Circuit, like the Second, requires a showing of prejudice.  Plaintiffs assert the prejudice test is met but, to preserve the issue, also assert it should not be required.  *Accord Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 389–91 (7th Cir.1995) (not requiring prejudice to find waiver).

If filing a parallel suit and ***obtaining discovery*** shows an intentional relinquishment – and if ***seeking and <u>losing</u> a preliminary injunction*** is enough – then surely ***filing suit and <u>winning</u> a preliminary injunction*** restraining property, and then invoking arbitration when one's adversary sues in an independent forum for violations of international law, shows waiver and prejudice. That is particularly so where, as here, AE submitted evidence and argument to dispute the judicial order (using discovery materials obtained here); the court issued a ruling rejecting AE's defense; and Angola is now seeking to use the judicial order it obtained in Angola as a shield to defeat this Court's jurisdiction – while continuing to press the suit in Angola (requiring Plaintiffs to answer on the merits) and asking this Court to defer to that proceeding. *Satcom*, 205 F.3d 1324; *Com-Tech Associates v. Computer Associates Int'l, Inc.*, 938 F.2d 1574, 1577 (2d Cir. 1991) (waiver where, *inter alia*, defendants "ma[d]e motions going to the merits of their opponent's claims"); *cf. Farr & Co. v. Cia. Intercontinental de Navegacion de Cuba, S.A.*, 243 F.2d 342, 348 (2d Cir. 1957) (finding no waiver as "no property was attached").

Moreover, "prejudice" does not just refer to litigation prejudice of the type Judge Cote found – which is present in spades; "waiver may be based on a finding of economic prejudice." *Leadertex*, 67 F.3d at 26–27. In that case, the plaintiff's "inventory was being held in [the adversary's] warehouse" as "security for [certain] disputed invoices" during the action. *Id.* at 24, 27. The hardship to plaintiff's business during the attachment was prejudice enough, as was the economic prejudice caused by the delay in seeking arbitration. *Id.*

Here, Angola's decision to publicly expropriate Plaintiffs' property rights – and to amplify the effects by launching a civil action that it has maintained for more than one year – has utterly ruined Plaintiffs' business, making its continued operations in the energy markets all but impossible. *See* Machado Decl. ¶ 18. Worse yet, it has done all this publicly – the turbine

61

proceedings, and lurid allegations of shady dealings levied against Plaintiffs by Angola in civil suits, were covered extensively in the media – causing Plaintiffs immeasurable reputational damage and economic loss. *Id.* Given the profound prejudice Angola has caused, it is only appropriate for Plaintiffs to want to vindicate their reputation through a public suit.

      **c.** This is also not just a question of "waiver," but of basic contract law. It is black-letter law that a breaching party cannot itself insist on performance of a contract. Although a defendant who previously signed an arbitration clause does not breach the arbitration contract by failing to assert arbitration as a defense, a plaintiff who sues in spite of an arbitration clause breaches its contractual obligation by filing suit – and the plaintiff therefore cannot insist on performance by the defendant in that action or a subsequent action. *See Nadeau v. Equity Residential Props. Mgmt. Corp.*, 251 F. Supp. 3d 637, 644 (S.D.N.Y. 2017) ("[D]efendant's refusal to arbitrate constitutes a material breach of the Arbitration Agreement, and therefore defendant cannot compel arbitration"); *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 695 (7th Cir. 2009) (although couching it in "waiver" terms, holding that moving party could not insist on arbitration because it had itself breached first: "[movant] waived its right to insist on arbitration [in a U.S. action] by bringing [a parallel] suit [in Italy] . . . upon a 'further controversy' between the parties in violation of the arbitration clause in its settlement agreement with American Gabbanelli."). In this case, Angola did not just waive its arbitration rights; it breached its purported arbitration obligations by filing suit and thus, prejudice or no prejudice, is now in no position to invoke the arbitration clauses that it repudiated.

      **2. The Cited Arbitration Clauses Do Not Apply**

      Given Angola's waiver of arbitration and breach of the arbitration agreement, the Court need not spend time on the scope of the claimed arbitration right. Plainly, though, the parties'

dispute does not fall within the scope of the arbitration clauses, as the cited clauses are *not* "*best construed to encompass the dispute.*" *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 97 (2d Cir. 2014) (emphasis in original) (quotations and alterations omitted).  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011).  "[A]s with any other contract, the parties' intentions control." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010).

In assessing whether a dispute is subject to an arbitration clause, courts distinguish between broad and narrow clauses, and as to the latter "the conduct in issue [must be] on its face within the purview of the clause" to compel arbitration.  *Sportvision, Inc. v. MLB Advanced Media, LP*, 2020 WL 1957450, at *5–6 (S.D.N.Y. Apr. 23, 2020) (quoting *Chevron U.S.A. Inc., By & Through Chevron Res. Co. v. Consol. Edison Co. of New York*, 872 F.2d 534, 537–38 (2d Cir. 1989)).  The clauses here are narrow and do not cover Plaintiffs' claims.

Unlike the clauses in the GE contracts, the arbitration clauses cited by Angola uniformly cover <u>only</u> disputes that arise from the "interpretation or execution" of the relevant contract (or, equivalently, its "performance") – not "termination."  *Cf., e.g.*, *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 174 & n.7 (3d Cir. 2014) (clause covering "disputes . . . regarding the performance or interpretation of the Agreement" is "narrow in scope").[60]  Angola identifies no

---

[60] *See also, e.g.*, *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) (contrasting broad clauses with those "intended to cover a much narrower scope of disputes, *i.e.*, only those relating to the interpretation and performance of the contract itself"); *UPS v. Lexington Ins. Grp.*, 2013 WL 1897777, at *3 (S.D.N.Y. May 7, 2013) ("The Arbitration Clause at issue is narrow – it is limited to disputes over an interpretation of the terms of the Policy."); *N.H. Ins. Co. v. Canali Reins. Co., Ltd.*, 2004 WL 769775, at *3 (S.D.N.Y. Apr. 12, 2004) (same); *Fabry's S.R.L. v. IFT Int'l, Inc.*, 2003 WL 21203405, at *5 (S.D.N.Y. May 21, 2003) (same).

dispute as to the "interpretation" of any contract between Plaintiffs and Angola.[61]  It also identifies no dispute related to "execution" or "performance," terms that plainly refer, in context, to "execution" or "performance" of *the work* – given that, in Contract 1 for example, the first clause refers to contract scope, and the second to the work's "execution."  Levy Decl. Ex. E.

The contracts make clear in other ways that termination disputes would not be arbitrable. Indeed, the arbitration clauses are virtually the same, and most of them were signed at basically the same time in 2017, meaning they must be interpreted *in pari materia*.[62]  But several contracts, in entirely different provisions, provide expressly that AE could resort to a "***judicial***" forum for "termination" disputes.  *E.g.*, Levy Decl. Ex. E at Cl. 33 (allowing either party to terminate for failure to comply with contract, and permitting remedy via "judicial or arbitral" proceeding).  Thus, the arbitration clauses Angola cites plainly capture disputes arising during the life of the energy contracts about matters such as whether the work was adequately performed or executed, but they manifestly do not cover **termination** or **repudiation** disputes. The point is underscored by the fact that the contracts provide for different arbitration rules – some refer to CREL and others to UNCITRAL – and the arbitration locations are not the same;

---

[61] *See UPS*, 2013 WL 1787777, at *3 (denying arbitration; clause covered "interpretation" dispute, but claims "merely requires an application of the facts to the undisputed terms"); *AXA Verischerung AG v. N.H. Ins. Co.*, 708 F. Supp. 2d 423, 428 (S.D.N.Y. 2010) ("[A]rbitration clauses limited to interpretative disputes are widely understood to cover only those disputes that can be resolved by reference to the terms of the contract."); *Fabry's*, 2003 WL 21203405, at *5–6 (denying motion to compel arbitration on breach of contract claim where defendant "does not argue" that "dispute . . . concerning the amount of money it owes . . . arises out of differing interpretations of the Agreement").

[62] *See This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (1941) (agreements "were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one"); Restatement (Second) of Contracts § 202 (1981) ("[A]ll writings that are part of the same transaction are interpreted together."). As the President's termination decree made clear, Angola has treated all the AE-MINEA Contracts as part of the same overarching transaction; thus, the contracts should be read together.

some specify Portugal and others Angola.  Thus, it cannot reasonably be inferred that the parties

agreed to submit a dispute about a single act of repudiation to 15 different arbitrations.

Instead, as the contracts make plain, "termination" disputes, which are not the same thing

as "performance" or "execution" disputes, could be subject to a ***judicial forum***.  *See State of New*

*York v. Oneida Indian Nation of New York*, 90 F.3d 58, 62 (2d Cir. 1996) (reversing district court

that "failed to recognize" the "language excluding a certain class of disputes from arbitration";

"Where the parties to an arbitration agreement specifically have excluded a certain type of claim

from mandatory arbitration, it is the duty of courts to enforce not only the full breadth of the

arbitration clause, but its limitations as well."); *cf. Chelsea Family Pharmacy, PLLC v. Medco*

*Health Solutions, Inc.*, 567 F.3d 1191, 1196 (10th Cir. 2009) (clause that "does exclude such

matters such as termination of the agreement" is "narrow").[63]

## IV.    THERE IS NO BASIS TO ABSTAIN ON COMITY OR OTHER GROUNDS

Defendants also argue that the Court should abstain in favor of proceedings in Angola,

but the argument is plainly at odds with the facts and Second Circuit law.[64]  Defendants, in

essence, point simply to the fact of the Angolan proceedings, and rehash their *forum non*

*conveniens* arguments.  Ang. Br. 44-45; GE Br. 49-50.  Even if the proceedings were considered

parallel under the case law, this is not enough to meet their burden on this point – putting aside

---

[63] Notably, the Tenth Circuit "adopted [its] scope-of-agreement test from the Second Circuit." *Hungry Horse LLC v. E Light Elec. Servs., Inc.*, 569 F. App'x 566, 571 n.2 (10th Cir. 2014). *See also Ji Dong Cheng v. HSBC Bank USA, N.A.*, 2020 WL 3165214 at *3 (E.D.N.Y. June 15, 2020) (narrowly reading arbitration clause; agreement contained jury-waiver clause, which "would be anomalous absent an understanding that [certain] disputes could be litigated in court."); *Microsoft Corp. v. Samsung Elecs. Co.*, 60 F. Supp. 3d 525, 530 (S.D.N.Y. 2014) (when two dispute-resolution provisions apply, arbitration permitted "only if the question at issue is on its face within the purview of the clause." (quotation marks omitted)).

[64] The Angolan Defendants seek dismissal on abstention grounds, while the GE Defendants seek dismissal or a stay.  Ang. Br. 42; GE Br. 49.  This does not change the analysis; "a stay is as much a refusal to exercise federal jurisdiction as a dismissal."  *Moses H. Cone*, 460 U.S. at 28.

that the United States Supreme Court is presently considering whether courts even have the

power to abstain in FSIA cases (a proposition Plaintiffs dispute).  *See Republic of Hungary v.*

*Simon*, No. 18-1447; *Federal Republic of Germany v. Philipp*, No. 19-351.

"The mere existence of parallel foreign proceedings does not negate the district courts'

'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  *Royal & Sun*

*Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006) (quoting

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  Indeed:

> [W]hatever factors weigh in favor of abstention, "[o]nly the clearest of justifications will
> warrant dismissal."  *Colorado River*, 424 U.S. at 819.  The task of a district court
> evaluating a request for dismissal based on a parallel foreign proceeding is not to
> articulate a justification *for* the exercise of jurisdiction, but rather to determine whether
> exceptional circumstances exist justify the surrender of that jurisdiction.  The exceptional
> circumstances that would support such a surrender must, of course, raise considerations
> which are not generally present as a result of parallel litigation, otherwise the routine
> would be considered exceptional, and a district court's unflagging obligation to exercise
> its jurisdiction would become merely a polite request.

*Id.* at 93.  Thus, the "general rule is that concurrent proceedings regarding the same question are

tolerated."  *Leopard Marine & Trading, Ltd. v. Easy St., Ltd.*, 896 F.3d 174, 191 (2d Cir. 2018)

(quotation marks and alterations omitted).  A litany of cases thus rejects Defendants' position.[65]

The Circuit has also rejected Angola's assertion that abstention is appropriate on the

ground that a foreign court has "jurisdiction over a *res*" (the turbines).  Ang. Br. 44 n.11.  **This**

---

[65] *See, e.g.*, *NovaSparks SA v. EnyxFPGA*, 344 F. Supp. 3d 666, 679 (S.D.N.Y. 2018) ("Because this
action has connections to the United States that are more than merely tenuous, the fact that this action also
has foreign connections is not an exceptional circumstance that justifies the grant of a stay.") (quotation
marks omitted); *Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 391 (S.D.N.Y. 2010) ("No
exceptional circumstances exist here.  Indeed, the circumstances Defendants cite – for example, the
similarity of the parties and issues presented and the burden of litigating in two forums simultaneously –
are commonly present when a parallel foreign proceeding is ongoing."); *Klonis v. Nat'l Bank of Greece,
S.A.*, 487 F. Supp. 2d 351, 356 (S.D.N.Y. 2006) ("Most of the arguments advanced by defendant relate to
facts which will generally exist in parallel litigations, including the identity of the parties and issues . . .
which are insufficient to overcome the obligation of this Court to exercise its jurisdiction.").

*case* is an action for damages – Plaintiffs' ***only*** action for damages against Angola[66] – and "the prior exclusive jurisdiction doctrine does not generally apply to situations where one action is in rem and the other in personam."  *Leopard Marine & Trading, Ltd. v. Easy St., Ltd.*, 896 F.3d 174, 192 (2d Cir. 2018) ("The adjudication of rights in personam simply does not impede the possession or control of the property required for maintenance of an in rem action.").[67]

Nor does it matter that this case concerns "Angola's public works contracts … paid for from Angola's public funds."  Ang. Br. 45.  In *Bugliotti v. Republic of Argentina*, a case centering on "defaulted Argentine sovereign debt" that was "entered . . . into a complex governmental tax-credit program," the Second Circuit vacated as "an abuse of discretion" the district court's abstention "in deference to the pending . . . proceeding in Argentina."  952 F.3d 410, 411–12, 415 (2d Cir. 2020).  As justification for abstention, "[t]he district court cited 'the importance of the Tax Credit Program to the Republic' and Argentina's 'greater interest' in the litigation."  *Id.* at 415.  The Circuit explained that these are "considerations that would be present in virtually every case implicating an important foreign governmental program," and "we have singled out only one type of foreign governmental program – namely, foreign bankruptcy regimes – as categorically sufficient to trigger comity-based abstention."  *Id.*  So too here.

---

[66] *Pace* the Angolan Defendants, Ang. Br. 12, Plaintiffs are *not* seeking damages in the Angolan Supreme Court.  Indeed, as explained above, damages are not available in those proceedings, as GE's Angolan lawyer acknowledges.  Vale Decl. at 3-5 (distinguishing cases from "Proceedings Regarding Breach of Contract and Damages Claims").  And in the Angolan Supreme Court complaint itself, after reserving the right to seek damages in a ***separate proceeding***, AE sets forth the sole relief that it seeks – reinstatement of the contracts.  Raimundo Decl. ¶¶ 20, 21.

[67] *See id.* at 193 ("The Panamanian proceeding is one in rem, but the present case, an action in personam, merely adjudicates *rights* in the res.  Our declaration of rights in the res does not impair the Panamanian court's possession of the res or its authority over it.  The prior exclusive jurisdiction doctrine does not apply, and thus does not create an exceptional circumstance that would permit abstention.").

## V.      GE'S PERSONAL-JURISDICTION OBJECTIONS ARE MERITLESS

GE Co., incorporated in New York, does not dispute it is subject to general personal

jurisdiction here.  To establish specific jurisdiction over GE Capital and GE International,

Plaintiffs need only make a "prima facie" showing that these two defendants purposefully

directed their activities to New York and that exercising jurisdiction is reasonable.  *In re*

*Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673–74 (2d Cir. 2013); *Ball v. Metallurgie*

*Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) ("If the defendant is content to

challenge only the sufficiency of the plaintiff's factual allegation, . . . the plaintiff need persuade

the court only that its factual allegations constitute a prima facie showing of jurisdiction.").

As explained, GE Capital and GE International purposefully availed themselves of the

privilege of conducting their affairs in New York when they engaged in the acts detailed in the

complaint surrounding the New-York-based payments of $644 million that are at the core of this

case.  *See* Compl. ¶¶ 125-126, 225.  Having routed these payments through New York, they

cannot now say it is unreasonable to exercise jurisdiction here over claims that are "related" to,

and "not completely unmoored from," the payments and their regularity.  *Universal Trading &*

*Inv. Co., Inc. v. Credit Suisse (Guernsey) Ltd.*, 560 F. App'x 52, 55 (2d Cir. 2014).[68]

Moreover, the connection between the various GE Defendants cannot be ignored.  "GE"

is a multinational conglomerate that operates as a single enterprise via different business units,

each of which consists of a number of subsidiaries that operate in various sectors.  GE tells the

world _it_ operates in those segments (including Power, Aviation, etc.).  Even in this case, the GE

---

[68] *NIKE, Inc. v. Wu*, 349 F. Supp. 3d 346, 356 (S.D.N.Y. 2018) (personal jurisdiction proper; movant "demonstrably used their New York-based correspondent accounts to facilitate U.S. dollar wire transfers"); *Gucci*, 135 F. Supp. 3d at 98 (personal jurisdiction proper; movant "could have chosen to process ... wire transfers through correspondent accounts elsewhere, ... but it did not").

Defendants argue that they should be able to invoke the contracts of their affiliates precisely because the GE companies share a "close relationship," GE Br. 34; in their initial disclosures, they identified "GE" employees not by reference to the legal entity they worked for but instead on the basis that they were "associated with General Electric"[69]; and they have sought to seal documents with the declaration of counsel for "GE Gas Power, a business division of General Electric Company," alleging disclosure would harm "the GE Gas Power business," Dkt. 76.

It should come as no surprise that at least one federal court has rebuked GE for its misuse of the corporate form. That court, after a trial, stated that GE had a habit of forming business units that did not correspond to legal entities – calling out "GE Power" and "GE Capital" – for either "convenience" or "obfuscation." *See Canatxx Energy Ventures, Inc. v. Gen. Elec. Capital, Corp.*, 2007 WL 9735888, at *2 (S.D. Tex. Apr. 10, 2007) ("The record has sufficient evidence of the General Electric Company's affiliate labyrinth. If the Court or jury was confused on this matter, the fault lies in the fact that GE Power and GE Capital have failed to be candid with the Court concerning the various GE entities. Curiously, the evidence shows that within various corporations, employees formed entities that were not registered as such for their own convenience and perhaps for obfuscation concerning which entity was involved.").

Much the same is true here, for when they did the acts alleged in the complaint, the officers and employees of GE Co., GE International, and GE Capital worked together as one – reflecting the fact that "'***GE*** [wa]s the lender as well as the beneficiary,'" and acting to support the "***broader GE company***." Compl. ¶¶ 74, 86 (emphasis added; quoting GE document). The

---

[69] For example, they specified that Welela Dawit had been "CFO, GE Power Services" and Paolo Marone is or was "CFO, GE Power." Levy Decl. Ex. C at 6, 8. Those are presumably "business units" rather than legal entities. Indeed, although GE's Rule 26(a) disclosures states that AE's witnesses worked for "Aenergy, S.A.," a legal entity, GE does not disclose which entities *any* of its employees worked for. *Id.*

GE employees working for the "GE Power" business in this case were alleged to have reported to, and to be acting under the direction and control of, GE Co. officers in the United States, including Scott Strazik and Frederic Ribieras.  Compl. ¶¶ 85, 109, 149(i), 161-162, 164, 170, 179.  "GE Capital" employees were themselves working in concert with these individuals – how could they not, considering that the tortious conduct concerned statements about payments made under the GE Capital line; for example, GE Capital's Galvin told his "GE Power" compatriots they should "delete" the damning evidence of Mr. da Costa's involvement before sharing the letters with Angola.  Compl. Ex. 12; *see also* Levy Decl. Ex. S (email approving disbursement of payment, reflecting involvement of "GE Co.," "GE Power," and "GE Capital").

Consider also GE's October 2019 letter, sent after the termination (Levy Decl. Ex. R) – the letter, sent to MINEA on "GE International Inc." letterhead with a "GE" logo and "GE Africa" brand, addressed the prospect of Angola building a relationship with the nebulous "GE," discussed entering into a "framework agreement," described power projects "GE" could take over, and addressed financing prospects.  And it was signed by Sezan as "CEO, GE Gas Power, SSA" – presumably a reference to GE Co's "Gas Power" business and "sub-Saharan Africa."[70]

In the circumstances, it is appropriate and reasonable, at least at the pleading stage, to subject the GE Defendants to jurisdiction in New York, where GE Co. was incorporated and is generally at home.  The GE Defendants acted as a "single economic unit," *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (personal jurisdiction over parents and subsidiaries proper where they, *inter alia*, "operate[d] as a single economic unit"), and/or, for

---

[70] Plaintiffs named GE International as a defendant on the basis of this and other documents.  Although GE claims GE Packaged Power Inc. was the real interested entity, Plaintiffs have not seen anything showing that is so; given the lack of clarity, they reserve their rights in that regard.

purposes of personal jurisdiction, GE Capital and GE International should be deemed agents of GE Co., *see GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009) (finding personal jurisdiction under agency theory; inquiry turned on "the realities of the relationship in question rather than the formalities of agency law").

Moreover, even if the Court assumes the entities were independent, then the complaint easily meets the standard for "conspiracy jurisdiction," which is "best conceived of as an example of the well-established principle that a defendant's contacts with the forum State may be intertwined with his transactions or interactions with other parties." *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 293 (S.D.N.Y. 2019) (quotation marks and alterations omitted). As the Second Circuit explained it in *Charles Schwab Corp. v. Bank of Am. Corp.*, "the appropriate test for alleging a conspiracy theory of jurisdiction" is that "the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." 883 F.3d 68, 87 (2d Cir. 2018). The test "is extraordinarily broad," *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 326 (S.D.N.Y. 2020), and plainly met here.

The facts of *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284 (S.D.N.Y. 2019), are illustrative. The defendants there were foreign entities alleged to have schemed together to fix prices in the currency market. *Id*. at 294. As to the existence of a conspiracy, the Court relied on three principal facts: the defendants coordinated FX trades together, met together to discuss these trades, and exchanged sensitive information. *Id*. at 292. Here, too, the GE Defendants met together, worked together on related transactions, effectuated the disbursement in and out of New York from the GE Credit Facility, falsely blamed AE for supposedly double-charging

71

Angola for turbines (which is a "fact" within GE Capital's possession), and used these supposed "irregularities" to take over AE's contracts – all under the supervision of GE Co. officers in the United States.  At the pleading stage, this is more than enough to proceed.[71]

## VI.   THE COURT SHOULD REJECT DEFENDANTS' RULE 12(B)(6) OBJECTIONS

### A.   Defendants' "Group Pleading" Objection Is Meritless

Finally, after they finish their alphabet soup of jurisdictional objections, Defendants get around to addressing the merits of the claims.  But as to most of the claims – including for breach of contract, expropriation, tortious interference, unjust enrichment, and others – they do not assert that the pleaded facts, assumed true, fail to establish a particular element.  Instead, Defendants level the puzzling argument that the complaint is insufficiently precise because it engages in "group pleading."  The argument fails on the law and the facts.

Rule 8 required Plaintiffs to set forth "a short and plain statement of the claim showing that [they are] entitled to relief."  Defendants appear to believe there is a proscription emanating from Rule 8's "short and plain statement" standard prohibiting "group pleading" in this case, but the decisions they cite for this proposition, all in the antitrust context, stand for a very different point:  in certain *antitrust* cases – where *a conspiracy* is an *element* of the relevant claim – and where pleading *parallel conduct* is not enough to state a plausible antitrust conspiracy, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) – identifying the particular members of the conspiracy (rather than "group pleading") is required.  *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 233 (S.D.N.Y. 2019); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp.

---

[71] Although AE obtained limited document discovery in the Section 1782 proceeding, Plaintiffs have not obtained discovery on the personal-jurisdiction questions presented by GE's motion.

3d 380, 388 (S.D.N.Y. 2019); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016).  Defendants do not cite *a single case* outside the antitrust context in support.

Regardless, the complaint clearly provides sufficient detail about individual defendants, even under Defendants' misguided view of the law.  In the interest of clarity, the GE and Angola Defendants are indeed "cluster[ed]" into groups.  *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 478 (S.D.N.Y. 2017).  But to paraphrase Judge Englemayer's decision rejecting a similar argument as Defendants make here – in an antitrust case where, unlike here, plaintiffs were required to plead a conspiracy to state a claim – Plaintiffs' "lengthy complaint" is also "rife with specifics [and] contain[s] many allegations against individual defendants that are quite particular, both as to the actor and the act."  *Id.*  Indeed, despite Defendants' assertions, the complaint "often name[s] the executive or business unit . . . who took a concrete action[.]"  *Id.* Given all this, and the fact that Plaintiffs claim Defendants are individually and collectively liable, "it is natural that the [Complaint] express some factual allegations collectively."  *Id.*

Moreover, although the Angola Defendants assert that Count I improperly lumps them together, even though only PRODEL and ENDE signed the AE-MINEA Contracts,[72] they plainly do <u>not</u> seek dismissal of the claims pleaded against Angola, MINEA, and MINFIN on the basis that they are not contracting parties.  It would be difficult to do so, given that, as the complaint pleads, the President and MINEA were the ones who terminated the contracts, with the President of Angola issuing a decree authorizing MINEA and MINFIN to proceed, and determining that PRODEL and ENDE had been acting "in representation of" MINEA.  *See* Abecasis Decl. Ex. 19 at 2.  MINEA then terminated the contracts on PRODEL and ENDE's

---

[72] At least one of the contracts (Contract 3) is expressly signed by MINEA.  Levy Decl. Ex. G.

behalf.  And after that, the Public Prosecutor initiated a civil suit arresting the turbines, which are now said to be in the custody of IGAPE, the shareholder of PRODEL and ENDE, whose task is to hold state assets.  The Angola Defendants acted as one.  *Crystallex*, 932 F.3d at 140; *Zappia*, 215 F.3d at 252.

As for the GE Defendants – and putting aside that the labyrinthine GE organization is plainly a "single enterprise" – they can only take shots at the complaint by ignoring what it actually says, to a degree that is comical.  They state that, as to GE Co., Plaintiffs only claim "it (1) exists . . . and (2) provided an internal parent 'guarantee,'" GE Br. 46, but the complaint recites how the GE team was acting under the direction and control of **GE Co. officers**, including Scott Strazik.  *See supra* at 14, 22, 70.  Similarly, as to GE International, they state "Plaintiffs allege only that GE International signed two contracts with AE:  (1) a 'Channel Partner' agreement, and (2) a 'Collaboration Agreement,'" GE Br. 46, but the complaint details numerous tortious acts by Messrs. da Costa and Sezan, both of whom presented themselves as acting on GE International's behalf.[73]  As for GE Capital, the complaint details how GE Capital employees participated in the false narrative that Angola bought 12 turbines from AE (although they knew AE's invoices to MINEA covered only eight, Compl. ¶ 155), and how Galvin of GE Capital told his comrades in arm they should not tell Angolan authorities what they knew about the Fake Letters, *id*.

---

[73]  The complaint recites that da Costa had authority to bind GE International by contract (given that he signed the Collaboration Agreement, *see* Compl. ¶ 64).  And in Exhibit 20, Sezan sought to take over AE's work, after he had helped tortiously procure the breach, by letter sent from "GE International Inc."

In sum, the complaint does not violate some inchoate "group pleading" rule.  And it is telling that, rather than seek dismissal of the contract and tort claims for failure to state claims, Defendants seek refuge in inapposite antitrust decisions having nothing to do with this case.

### B.    Plaintiffs State an Aiding-and-Abetting Claim Against GE

In Count IX, Plaintiffs allege that GE aided and abetted Angola's unlawful conversion, expropriation, and related conduct.  Although GE says it may not be liable because Plaintiffs are domestic entities, the Second Circuit says otherwise.  *See supra* Point I.B.3.

The balance of GE's arguments also fails.  *First*, GE asserts Plaintiffs failed to exhaust their remedies, but Angola does not itself make this argument, which means it is waived because it is not jurisdictional.[74]  In any event, GE is wrong:  "[N]othing in the text of the FSIA's expropriation exception requires exhaustion."  *Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 415 (D.C. Cir. 2018), *cert. granted*, No. 19-351, 2020 WL 3578677 (U.S. July 2, 2020).

*Second*, GE asserts corporations cannot be liable for violations of international law under the Alien Tort Statute (which is not at issue here).  GE overlooks that "[i]n this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the AT[S]."  *Mastafa v. Chevron Corp.*, 770 F.3d 170, 181 (2d Cir. 2014) (quoting *Khulumani v. Barclay Nat'l Bank, Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007)) (defendants were two corporations); *see id.* at 195 ("aiding and abetting" is "a theory of liability . . . that is cognizable under customary international law").[75]  As Judge

---

[74] *Washington v. Barr*, 925 F.3d 109, 116 (2d Cir. 2019) ("[W]here Congress has not clearly required exhaustion," it is a prudential, not jurisdictional, requirement); *see also Mulvaney v. City of Rochester*, 2019 WL 2250014, at *10 (W.D.N.Y. May 22, 2019) (denying motion to dismiss aiding and abetting claim because underlying claim survived).

[75] Thus, in 1793, Chief Justice John Jay instructed a jury that "whosoever of the citizens of the United States, shall render himself liable to punishment or forfeiture, under the law of nations, by committing, aiding, or abetting hostilities against any of the said powers" would be liable in "prosecutions." *Henfield's Case*, 11 F. Cas. 1099, 1103 (C.C.D. Pa. 1793).

Katzmann has explained – conducting a survey of international law – "a private actor may be held responsible for aiding and abetting the violation of a norm that requires state action or action under color of law," and "[i]t is of no moment that a private actor could be held liable as an aider and abettor . . . when that same person could not be held liable as a principal." *Khulumani*, 504 F.3d at 281 (Katzmann, J., concurring).

  *Third*, GE claims that it may not be liable for aiding and abetting conversion of property in Angola, but its only cited case is about whether a *sovereign* is immune under the FSIA. *Hammerstein v. Fed. Republic of Germany*, 2011 WL 9975796, at *4 (E.D.N.Y. Aug. 1, 2011). That has nothing to do with *GE*'s liability.

  *Last*, GE asserts in a passing sentence that the complaint fails to plead adequate facts to support the claim.  But as set forth in the complaint, the basis of Angola's expropriation was the false narrative perpetrated by GE about AE's purported "irregularities," and the complaint and its exhibits show close cooperation by GE and Angola on this.  *See* Levy Decl. Exs. R, S.

### C. The Court Should Construe Plaintiffs' Accounting Claim as a Constructive-Trust Claim

  GE also seeks dismissal of Plaintiffs' accounting claim for failure to plead a fiduciary duty.  Plaintiffs respectfully request that the Court construe Count Nine as a claim for a constructive trust, which is essentially the same cause of action, but does not require a fiduciary relationship.  *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 353–54 (2d Cir. 1992) ("Although a fiduciary relationship is one of the factors cited by New York courts, the absence

---

  *See also* Gibson Dunn, *Kiobel Three Years On: Alien Tort Statute Scope and Litigation Trends*, at 56 (2016) ("Plaintiffs often rely on aiding and abetting liability in ATS claims against corporations"; discussing Second Circuit standard), *available at* https://www.gibsondunn.com/wp-content/uploads/documents/publications/WebcastSlides-Kiobel-Litigation-Scope-and-Trends-2015-05-24.pdf

of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity.  New York courts have consistently stressed the need to apply the doctrine with sufficient flexibility to prevent unjust enrichment in a wide range of circumstances.").  There would be little, if any, prejudice to Defendants in so doing at this stage.

## CONCLUSION

GE – at home in the United States – and Angola – whom Congress determined is susceptible to suit on these facts – seek by their motions to avoid an independent forum, "not because of genuine concern with convenience but because of [] forum-shopping reasons." *Iragorri,* 274 F.3d at 75.  They claim that Angola – where Plaintiffs' employees have faced threats to their person that have prevented them from travel there since 2018, where compulsory process is not available, and where the court system has refused to hear AE's evidence in at least one proceeding – is more convenient and better suited than a U.S. court.  And they claim Angola has more interest in this dispute than the United States or New York, although the case centers on a U.S. industrial giant's lies about irregularities in respect of a $644 million U.S. dollar payment occurring in New York to achieve accounting and financial goals in the United States, by tortiously procuring Angola's repudiation of $1.1 billion energy contracts calling for the use of U.S. goods.

The Court should reject Defendants' transparent gambit to avoid meaningful scrutiny of their illegal actions.  Alternatively, the Court should permit Plaintiffs to remedy any defect it may identify in the complaint (which has never been amended) through amendment or discovery.

Dated:  New York, New York
       November 2, 2020

                      HOLWELL SHUSTER & GOLDBERG LLP

                      By: /s/ *Vincent Levy*
                          Vincent Levy
                          Scott M. Danner
                          Gregory Dubinsky
                          Brian T. Goldman

                          425 Lexington Ave., 14th Floor
                          New York, New York 10017
                          Tel: (646) 837-5151
                          vlevy@hsgllp.com

                          *Attorneys for Plaintiffs*

**APPENDIX A**

**AE and GE Witnesses Identified in GE's Initial Disclosures**[1]

| Party | Name | Location |
|---|---|---|
| AE | José Leitão Amaro | Portugal |
| | Pedro Bento | Portugal |
| | Diogo Bettencourt | Portugal |
| | Vasco Caetano de Faria | Portugal |
| | António Ferreira | Portugal |
| | Gustavo Garcia | Portugal |
| | Ricardo Jorge | Dubai |
| | Angelo Jose | Angola |
| | Ricardo Leitao Machado | Portugal |
| | Gavin Mandy | France |
| | Luis Morais | Portugal |
| | Jorge Neto Morgado | Portugal |
| | Silvia Pinheiro | Portugal |
| | Ivo Pizarro | Portugal |
| | Vitor Silva | Portugal |
| | Pedro Sousa | Portugal |
| GE | Agostinho Aragao | Angola |
| | Wilson da Costa | Angola |
| | Welela Dawit | Nigeria |
| | Susan Flanagan | USA |
| | Brad Galvin | USA |
| | Adam Hunt | UK |
| | Willy Ireri | Kenya |
| | Sharad Jain | UK |
| | Mohammed Kudia | USA |
| | Raghuveer Kurada | UK |
| | Paolo Marone | USA |
| | Joe Mastrangelo | USA |
| | Getty Melaku | USA |
| | Caroline Ndungu | Kenya |
| | Leslie Nelson | Ghana |
| | Frederic Ribieras | USA |
| | Elisee Sezan | Ghana |
| | Scott Strazik | USA |
| | Brian Ward | USA |

---

[1] Location sources: For AE witnesses, Machado Decl.  For GE witnesses, Levy Decl. Ex. A, save for Mr. Mastrangelo, apparently a former GE employee located in the United States rather than Switzerland.

**APPENDIX B**

**Location of AE and GE Witnesses Identified in GE's Initial Disclosures**

| Country | Witnesses |
|---------|-----------|
| Portugal | 13 |
| USA | 9 |
| Angola | 3 |
| UK | 3 |
| Ghana | 2 |
| Kenya | 2 |
| Nigeria | 1 |
| Dubai | 1 |
| France | 1 |