**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - - - - - - - - -x

AENERGY, S.A. and COMBINED CYCLE POWER
PLANT SOYO, S.A.,

                        Plaintiffs,

                  - v. -

REPUBLIC OF ANGOLA, THE MINISTRY OF
ENERGY AND WATER OF THE REPUBLIC OF
ANGOLA, THE MINISTRY OF FINANCE OF THE
REPUBLIC OF ANGOLA, EMPRESA PÚBLICA DE
PRODUÇÃO DE ELECTRICIDADE, EP, AND
EMPRESA NACIONAL DE DISTRIBUIÇÃO DE
ELECTRICIDADE,

               Angolan Defendants,

                - and -

GENERAL ELECTRIC COMPANY; GENERAL
ELECTRIC INTERNATIONAL, INC.; and GE
CAPITAL EFS FINANCING, INC.

               GE Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.
1:20-cv-03569-AJN

ORAL ARGUMENT
REQUESTED


**THE ANGOLAN DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT**


                        **EHRENSTEIN SAGER**
                        2800 Ponce de Leon Boulevard, Suite 1400
                        Coral Gables, Florida 33134
                        Telephone: (305) 503-5930

                        **KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.**
                        500 Fifth Avenue
                        New York, New York 10110
                        Telephone: (212) 986-6000

                        Attorneys for
                        **THE ANGOLAN DEFENDANTS**

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................... 1

II.  ARGUMENT ............................................................................................... 1

   A.   **Plaintiffs' Claim for Breach of Contract Must Be Dismissed Because the Angolan Defendants Are Immune From Jurisdiction Under the FSIA** ................................... 1

      *1.   Plaintiffs' claim for breach of contract is not based upon any act of the Angolan Defendants performed in the United States* ................................... 2

      *2.   The Plaintiffs' claim for breach of contract is not based upon an act of the Angolan Defendants that caused a direct effect in the United States* ........................... 5

   B.   **Plaintiffs' Claims For Takings in Violation of International Law Must Be Dismissed Because the Angolan Defendants Are Immune From Jurisdiction Under the FSIA.** ....................................... 10

   C.   **Plaintiffs' Claims Against the Angolan Defendants Must Be Dismissed Because They Are Subject To Arbitration** ....................................... 17

   D.   ***Forum Non-Conveniens*** **Favors Resolution of Plaintiffs' Claims Against the Angolan Defendants in Angola** ....................................... 19

   E.   **Plaintiffs' Complaint Must Be Dismissed Because International Comity Justifies Abstention** ....................................... 21

   F.   **Plaintiffs' Complaint Must Be Dismissed Because Plaintiffs Failed to State a Claim Upon Which Relief Can Be Granted By Disregarding the Legal Separateness of Each Angolan Defendant** ....................................... 22

III. CONCLUSION ............................................................................................. 23

## TABLE OF AUTHORITIES

**CASES**

Aboutaam v. L'Office Federale De La Culture De La Confederation Susisse,
2019 WL 4640083 (S.D.N.Y. 2019)............................................................................. 12

Altmann v. Republic of Austria,
317 F.3d 954, 968 (9th Cir. 2002) ............................................................................. 13

Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazya JSC,
813 F.3d 98 (2d Cir. 2016)............................................................................. 5, 7, 8, 9

Bahgat v. Arab Republic of Egypt,
No. 13-cv-8894, 2015 WL 13654006, at *5 (S.D.N.Y. Mar. 31, 2015)...................... 13

Bailey v. Grand Trunk Lines New England,
805 F.2d 1097 (2d Cir. 1986)...................................................................................... 15

Banco Nacionale de Cuba v. Sabbatino,
307 F.2d 845 (2d Cir. 1962)........................................................................................ 14

Bolivarian Republic of Venezuela v. Helmerich and Payne,
137 S.Ct. 1312, 1316 (2017)............................................................................... passim

Brandon v. City of New York,
705 F. Supp. 2d 261 (S.D.N.Y. 2010).......................................................................... 22

Chetrri v. Nepal Bangladesh Bank, Ltd.,
2014 WL 4354668, at n.5 (S.D.N.Y. 2014) ................................................................ 13

Chettri v. Nepal Rastra Bank,
834 F.3d 50 (2d Cir. 2016)........................................................................................... 12

Commercial Bank of Kuwait v. Rafidain Bank,
15 F.3d 238, 241 (2d Cir.1994).................................................................................... 7

Cruise Connections Charter Management 1, LP v. Attorney General of Canada,
600 F.3d 661 (D.C. Cir. 2010) ..................................................................................... 9

Crystallex International Corp v. Petroleos de Venezuela SA,
251 F.Supp.3d 758 (D. Del. 2017)............................................................................... 9

F. Palicio y Compania, S.A. v. Brush,
256 F. Supp. 481, 487 (S.D.N.Y.1966)........................................................................ 13

Felix v. City of New York,
344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018)............................................................. 22

First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,
462 U.S. 611 (1983)..................................................................................................... 23

First Options of Chicago v. Kaplan
514 U.S. 945, 115 S. Ct. 1415, 131 L.Ed.2d 648 (1986)............................................ 18

Freund v. Republic of France,
592 F. Supp.2d 540, 565 (S.D.N.Y. 2008)................................................................. 21

Garb v. Republic of Poland,
440 F.3d 579 (2d Cir. 2006)...................................................................................... 3, 4

Greenpeace, Inc. v. State of France,
946 F.Supp. 773, 783 (C.D. Cal. 1996) ..................................................................... 13

Guirlando v. T.C. Ziraat Bankasi A.S.,
602 F.3d 69 (2d Cir. 2010)........................................................................................... 7

Hanil Bank v. PT. Bank Negara Indonesia,
148 F.3d 127 (2d Cir. 1998)................................................................................ 7, 9, 10

Jota v. Texaco, Inc.,
157 F.3d 153, 159–60 (2d Cir. 1998)........................................................................ 22

Kensington International Limited v. Itova,
505 F.3d 147 (2d Cir. 2007)........................................................................................ 7

Kirby Forest Industries, Inc. v. United States,
467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984)............................................... 13

Konowaloff v. Metro. Museum of Art,
10-cv-9126, 2011 WL 4430856, at *8 (S.D.N.Y. Sept.22, 2011) ............................... 13

Martin v. Republic of South Africa,
836 F.2d 91, 95 (2d Cir. 1987)................................................................................. 6, 7

Millicom Int'l Cellular, S.A. v. Republic of Costa Rica,
995 F.Supp. 14, 23 (D.D.C.1998) ............................................................................. 13

Ministry of Supply, Cairo v. Universe Tankships, Inc,
708 F.2d 80 (2d Cir. 1983)........................................................................................... 4

MMA Consultants 1, Inc. v. Republic of Peru,
719 Fed. App'x 47 (2d Cir. 2017)............................................................................... 7

iii

Monterey v. Del Monte Dunes at Monterey, Ltd.,
526 U.S. 687, 721, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) ....................................... 13

Odhiambo v. Republic of Kenya,
764 F.3d 31, 40 (D.C.Cir.2014) ................................................................................... 7, 9

Petersen Energia Inversora, SAU v. Argentine Republic,
2016 WL 4735367 (SD N.Y. 2016) .................................................................................. 7

Republic of Argentina v. Weltover, Inc.,
504 US 607, 112 S. Ct. 2160, 119 L. Ed.2d 394 (1992) ................................... 5, 6, 7, 9

Republic of Austria v. Altman,
541 US 677, 714 (2004) ................................................................................................. 13

Rogers v. Petroleo Brasileiro,
673 F.3d 131 (2d Cir. 2012) .......................................................................................... 3, 7

Royal & Sun All. Ins. Co. of Canada,
466 F.3d 88 (2d Cir. 2006) ............................................................................................. 21

Rukoro v. Federal Republic of Germany,
976 F.3d 218 (2020) ........................................................................................................ 11

Schuler v. Rainforest All., Inc.,
684 Fed. Appx. 77, 79 (2d Cir. 2017) .......................................................................... 22

SerVaas Inc. v, Republic of Iraq,
653 Fed.Appx 22 (2d Cir. 2011) .................................................................................. 9, 10

Shapiro v. Republic of Bolivia,
930 F.2d 1013 (2d Cir. 1991) .......................................................................................... 4

Shaw Group v. Triplefine International Corporation,
322 F.3d 115 (2d Cir. 2003) .......................................................................................... 18

Skanga Energy & Marine v. Arevenca SA,
875 F. Supp 2d 264 (S.D. N.Y. 2012) ......................................................................... 9, 10

Smith Rocke Ltd. v. Republica Bolivariana de Venezuela,
No. 12 cv-7316, 2014 WL 288705, at *7 (S.D.N.Y. Jan. 27, 2014) ............................ 13

Valambhia v. United Republic of Tanzania,
964 F.3d 1135 (D.C. Cir. 2020) ..................................................................................... 7

iv

<u>Verdi v. City of New York,</u>
306 F. Supp. 3d 532 (S.D.N.Y. 2018)...............................................................................23

<u>Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,</u>
571 F.3d 206, 214 (2d Cir. 2009).....................................................................................16

**STATUTES**

28 U.S.C. § 1332........................................................................................................15

28 U.S.C. § 1605(a)(3)..............................................................................................13

28 U.S.C. § 1610(g)(1)..............................................................................................23

28 U.S.C. § 1605(a)(2)............................................................................................1, 6

**RULES**

Fed. R. Civ. P. 12(b)(6)............................................................................................22

# I.     INTRODUCTION

Plaintiffs' claims against Angola are in the wrong place.  The relief they seek cannot be obtained from this Court because: the Angolan Defendants' are immune from jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"); Plaintiffs' claims are subject to mandatory arbitration; *forum non conveniens* favors resolution in Angola; and international comity justifies abstention. Plaintiffs hide behind a 95-page shroud of invective, innuendo, mischaracterization of facts and misapplication of law, all in a futile endeavor to avoid the reality that their claims must be resolved in Angola—where the parties agreed to arbitrate their disputes; where Plaintiffs and the Angolan Defendants are located; where the contracts between the Plaintiffs and the Angolan Defendants were executed, performed, and terminated; and where the power plant projects which are the subject of the contracts are located.

# II.     ARGUMENT

## A.     Plaintiffs' Claim for Breach of Contract Must Be Dismissed Because the Angolan Defendants Are Immune From Jurisdiction Under the FSIA

The FSIA bars Plaintiffs' claim against the Angolan Defendants for breach of contract. The gravamen of Plaintiffs' Complaint is that the Angolan Defendants wrongfully terminated contracts for Plaintiffs to provide power services and equipment in Angola. See Complaint at ¶¶ 230, 238. Plaintiffs argue that their breach of contract claim is not barred by FSIA because that claim falls within the second[1] and third[2] clause of the "commercial activities" exception to foreign sovereign immunity. Id., at ¶¶ 36, 224-226.  However, as the Angolan Defendants established in their opening brief, the commercial activities exception is not applicable because according to

---

[1] For claims based upon acts of a foreign state "performed in the United States in connection with a commercial activity of a foreign state elsewhere." 28 U.S.C. § 1605(a)(2).

[2] For claims based upon an act of a foreign state "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605 (a)(2).

Plaintiffs' own allegations, their claim is not "based upon" any act of the Angolan Defendants "performed in the United States," nor is it based upon any act of the Angolan Defendants outside the United States which caused a "direct effect" here.

### 1.      *Plaintiffs' claim for breach of contract is not based upon any act of the Angolan Defendants performed in the United States.*

The second clause of the commercial activities exception is inapplicable. The Plaintiffs' claim for breach of contract is not based upon any act performed by the Angolan Defendants in the United States, but is based upon Angola's alleged wrongful termination of the contracts—an act *performed in Angola*.[3]  Indeed, the Plaintiffs explicitly alleged that the terminations occurred in Angola, not the United States.  Specifically, Plaintiffs alleged that the President of Angola adopted a resolution permitting MINEA to terminate the contracts, and that pursuant to that authorization, MINEA in fact sent a termination letter from its office in Luanda to Plaintiffs' office in Luanda formally terminating the contracts. See Complaint at Exhibit 17.

Plaintiffs try to squeeze their claim for breach of contract into this narrow exception to immunity for acts performed "in the United States" based on what they call "massive US dollar payments that Angola directed in the United States." See Opp. at p. 25. Plaintiffs' contention mischaracterizes their own allegations which assert a breach ***based upon*** wrongful termination *in Angola*, not based upon any payments directed here. Furthermore, the record shows: (1) the contracts do not require Angola to make any payments to Plaintiffs in the United States; (2) the contracts expressly require payment to Plaintiffs in kwanzas into bank accounts selected by Plaintiffs; (3) Plaintiffs never instructed the Angolan Defendants to pay them in New York (or anywhere in the United States); (4) Plaintiffs' invoices instruct payment to be made to their

---

[3]  Plaintiffs concede that their claims are based upon the Angolan Defendants' termination of the contracts—an act which occurred outside the territory of the United States. See Plaintiffs' Opposition Brief ("Opp.") at p. 19.

accounts at BAI Europa in Portugal; and (5) Plaintiffs changed their payment instructions (to GE) and required all payments from GE to Plaintiffs to be made to accounts in Lisbon, Madrid, and Dubai. See Abecasis Decl. at ¶ 5.

Plaintiffs have no answer for Rogers v. Petroleo Brasilieiro, 673 F.3d 1131 (2d Cir. 2012) which held that "a threshold requirement under the statute itself…is that the relevant act *was performed in the United States*." Though the Angolan Defendants highlighted Rogers in their opening brief, Plaintiffs nowhere distinguished (or even mentioned) that case in their opposition. Instead, Plaintiffs misconstrue Garb v. Republic of Poland, 440 F.3d 579 (2d Cir. 2006), as putatively supporting the exercise of jurisdiction on the basis of a supposed "causal link" between US dollar payments and the Plaintiffs' claims.  See Opp. at p. 26. But Garb does not provide for jurisdiction on such a tenuous basis, rather it applied the FSIA to bar jurisdiction predicated on a similar causal link.

In Garb, Jewish plaintiffs and their heirs who owned real property in Poland during the Holocaust sued Poland for expropriation of their property.  The plaintiffs argued that the value of their confiscated property became part of Poland's general fisc, and that Poland's later acquisition of property in the United States was connected to its expropriation of plaintiffs' property.  Based on FSIA, the trial court dismissed the plaintiffs' claims.  On appeal, the Second Circuit affirmed, finding that the commercial activity exception did not apply because the commercial treatment of that property was not sufficiently "in connection" with Poland's taking of the property.  Id., at 586-87.  Use of funds added to Poland's general fisc which later purchased property in New York was simply "too attenuated and not substantive enough" to satisfy the requirement that the foreign sovereign's conduct abroad be "in connection with" its commercial activity to justify application

3

of this exception to immunity. Id., at 587. Plaintiffs misleadingly cite Garb for the inverse of its

holding—suggesting that *any* "causal link" is sufficient.

Equally misplaced is Plaintiffs' footnote reliance on Ministry of Supply, Cairo v. Universe

Tankships, Inc, 708 F.2d 80 (2d Cir. 1983), and Shapiro v. Republic of Bolivia, 930 F.2d 1013 (2d

Cir. 1991), for the same proposition.[4]  Both cases are easily distinguished because each involved

application of the *first* clause of the commercial activity exception,[5] whereas Plaintiffs here pled

an exception to sovereign immunity based only on the second and third clause of the commercial

activities exception.  See Complaint at ¶¶ 223-225. Moreover, both cases are factually inapposite.

In Tankships, a time charterer's claims were "based upon" plaintiff's entire course of activity in

arranging *in the United States* for the purchase of wheat and its shipment to Egypt. Similarly, in

Shapiro the foreign sovereign conducted commercial activity in the United States by issuing

promissory notes to United States entities and placing the notes in escrow here.  In contrast, here

Plaintiffs have not alleged (nor can they) that their claim for breach of contract is based upon the

Angolan Defendants' commercial activity here. Instead, the Angolan Defendants' termination of

the contracts *in Angola* is the foundation of Plaintiffs' breach of contract claim.

Because the termination of contracts which underlies Plaintiffs' claim occurred in Angola,

not in the United States, Plaintiffs' contract claim is not "based upon" any conduct of the Angolan

Defendants that was performed in the United States. Accordingly, the second clause of the

commercial activity exception does not apply and Plaintiffs' claims must be dismissed.

---

[4] See Opp. at p. 15.
[5] For claims based upon a commercial activity carried on in the United States by a foreign state.  This exception was
not pled in Plaintiffs' complaint which relies exclusively on clause 2 and 3 of the commercial activity exception.

>    **2.    *The Plaintiffs' claim for breach of contract is not based upon an act of the Angolan Defendants that caused a direct effect in the United States.***

Clause 3 of the commercial activity exception also does not apply because the Plaintiffs' claim for breach of contract is not based upon an act by the Angolan Defendants outside the territory of the United States in connection with a commercial activity of the Angolan Defendants elsewhere which act "caused a direct effect in the United States." Because the contracts required no performance from Angola in the United States (a fact nowhere contravened by the allegations of the complaint or the Plaintiffs' arguments and declarations), the Plaintiffs failed to adequately allege and cannot establish that the Angolan Defendants' supposed breach of contract "caused a direct effect" here as required by Republic of Argentina v. Weltover[6] and Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazya JSC.[7]

In their opposition, Plaintiffs cobble together a list of ostensible facts in a failed effort to show a "direct effect" here. Specifically, Plaintiffs point out that the notice terminating the power plant contracts recites that under the GE Capital credit facility, AE was contracted on the condition that it be in technical partnership for performance of the power plant contracts. See Opp. at p. 20. Plaintiffs also note that Angola's termination of the power plant contracts was based on irregularities in AE's use of Angola's funds and that the GE Capital credit facility contemplated payment to GE in dollars, and included a direct payment structure. Id. Plaintiffs further observe that before the contracts were terminated, Angola directed GE Capital to disburse funds from the

---

[6] In Weltover, bond holders sued Argentina for breach of contract arising from Argentina's non-payment on bonds. The trial court denied Argentina's motion to dismiss based on FSIA, the Second Circuit affirmed, and on appeal, the Supreme Court affirmed, finding that the rescheduling of bond payments had a direct effect here because the United States was contractually designated as the place for performance for Argentina's payment obligation. Republic of Argentina v. Weltover, Inc., 504 US 607, 112 S. Ct. 2160, 119 L. Ed.2d 394 (1992).

[7] In Atlantica, purchasers of subordinated debt securities sued the sovereign wealth fund of Kazahkstan for securities fraud. The trial court denied the defendants' motion to dismiss based on FSIA, and the Second Circuit affirmed, finding that the defendants' alleged misrepresentations directly affected purchasers of securities in the United States. Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazya JSC, 813 F.3d 98 (2d Cir. 2016).

credit facility to GE and AE accounts.  Id., at p. 21.  Lastly, Plaintiffs mention that the Angolan Defendants' termination of the power plant contracts affected GE and its bottom line because GE contracted to complete the work under the power plant contracts.  Id. at p. 22.

None of Plaintiffs' assertions demonstrate a "direct effect" in the United States.  Plaintiffs confuse the sequence of "cause" and "effect."  By definition, cause precedes effect.  Here, all but one of the "effects" identified by Plaintiffs predate the termination of contracts which supposedly "caused" those "effects."  Plaintiffs identify as "effects" terms of the credit facility, contracts and payments from the credit facility—all of which existed before the termination of the contracts which supposedly "caused" those effects.  As a matter of straightforward logic and temporal analysis, any supposed wrongful termination could not have *caused* *effects* which predated the alleged termination.  As a result, these purported "effects" cannot serve as the basis for application of Clause 3 of the commercial activity exception.

The *only* post-termination "fact" identified by Plaintiffs is that the Angolan Defendants contracted with GE to complete the work required by the power plant contracts, thereby affecting GE's bottom line.  First, that simply has not happened.  The Angolan Defendants have not contracted with GE to complete the work required by the power plant contracts.  See Supplement to Declaration of Henrique Abecasis, ¶ 8 ("Abecasis Decl. Supp.").  Further, even if it were true, any impact of such an agreement to GE's bottom line is not a "direct effect" caused by the Angolan Defendants' termination of Plaintiffs' contracts.  As the Supreme Court explained in Weltover, for purposes of the third clause of § 1605(a)(2), "an effect is direct if it follows as an immediate consequence of the defendant's ... activity." Republic of Argentina, 112 S. Ct. at 2168.  "The common-sense interpretation of a 'direct effect' is one which has no intervening element but rather flows in a straight line without deviation or interruption." Martin v. Republic of South Africa, 836

F.2d 91, 95 (2d Cir. 1987).  Under this definition, the Angolan Defendants' supposed decision to contract with GE to complete performance of the terminated AE contracts in Angola is not a "direct effect."  The Angolan Defendants' alleged decision to hire GE would not be an "immediate consequence" flowing in a straight line without deviation or interruption *from* their termination of the AE contracts. In fact, the Angolan Defendants have not contracted with GE for completion of the work under the power plant contracts. And moving forward, nothing *requires* the Angolan Defendants to hire GE.  Angola remains free to choose not to recontract for completion of this work, to perform the work itself, or to contract with any other party—in the United States or elsewhere.

Numerous published decisions confirm that the Angolan Defendants' alleged hiring of GE after termination of the AE contracts (which has not happened) would not yield a "direct effect" in the United States.  As explained in the opening brief, Weltover and Atlantica, confirm the principle that in contract cases (as here), a breach of a contractual duty causes a "direct effect" in the United States sufficient to confer FSIA jurisdiction so long as the United States "is the place of performance." Atlantica, 813 F.3d at 108-09.[8]  Plaintiffs overlooked this clear standard and failed to identify *any* obligation in the United States which the Angolan Defendants allegedly failed to perform.

Ignoring Weltover, Plaintiffs suggest that *any* effect in the United States will suffice, whether on Plaintiffs or not.  See Opp. at p.24. Plaintiffs rely primarily on *dicta* from Atlantica to support this contention. In Atlantica, the Court found the defendant's tortious misrepresentations

---

[8]  See also MMA Consultants 1, Inc. v. Republic of Peru, 719 Fed. App'x 47 (2d Cir. 2017); Rogers v. Petroleo Brasileiro, 673 F.3d 131 (2d Cir. 2012);  Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69 (2d Cir. 2010); Kensington International Limited v. Itova, 505 F.3d 147 (2d Cir. 2007); Hanil Bank v. PT. Bank Negara Indonesia, 148 F.3d 127 (2d Cir. 1998); Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 241 (2d Cir.1994); Odhiambo v. Republic of Kenya, 764 F.3d 31, 40 (D.C.Cir.2014); Valambhia v. United Republic of Tanzania, 964 F.3d 1135 (D.C. Cir. 2020); Petersen Energia Inversora, SAU v. Argentine Republic, 2016 WL 4735367 (SD N.Y. 2016), *aff'd.* 895 F.3d 194 (2d Cir. 2018).

caused a direct effect in the United States because "at least some of the investors in the subordinated notes—including Gliksberg and the Kibliskys—suffered an economic loss in this country as a result of those misrepresentations." <u>Atlantica</u> 813 F.3d at 110. As the Court stated:

> For these reasons, the fact that Plaintiffs here have shown a direct effect on Gliksberg and the Kibliskys *in the United States* is more than sufficient to satisfy the direct-effect clause with respect to Plaintiffs' entire lawsuit.

<u>Id.</u> (emphasis added).  Only in addressing the defendant's counter-argument that *some* investors were not in the United States, and therefore were not injured here, did the court further expound:

> …[T]he premise of SK Fund's argument—that Plaintiffs must demonstrate a direct effect *on themselves* in the United States to overcome FSIA immunity—is incorrect; the FSIA requires only that SK Fund's alleged misrepresentations had a direct effect *in* the United States. In other words, had all of the Plaintiffs been foreigners*, they could have successfully premised FSIA jurisdiction on the effect that SK Fund's alleged misrepresentations had on non-party United States investors, provided that Plaintiffs could adequately establish the existence of United States investors so affected*.

<u>Atlantica</u>, 813 F.3d at 111 (emphases added).

In the hypothetical circumstance that all plaintiffs were foreign, the Court projected that they could still obtain jurisdiction if they could establish the existence of other US investors harmed here in the same way by the defendant's tortious misrepresentations.  Unlike that hypothetical, here Plaintiffs seek an exception to immunity not based on the similar *harmful effect* suffered by other tort victims in the United States.  No—Plaintiffs claim the exception applies based on the *beneficial effect* on GE caused by the Angolan Defendants' alleged breach of Plaintiffs' contracts.  Plaintiffs' misinterpretation of Atlantica's *dicta* ignores the Court's express limitation of FSIA jurisdiction to circumstances where a foreign plaintiff could establish the existence of other similarly *harmed* parties here.  <u>Id.</u> ("Plaintiffs could adequately establish the existence of United States investors so affected").  <u>Atlantica</u>'s *dicta* cannot fairly be twisted to provide jurisdiction under Clause 3 based on a *beneficial* domestic effect caused by an alleged

breach of contract abroad.  The <u>Weltover</u> rule has never been applied as Plaintiffs suggest, and of the 40 published opinions which cite <u>Atlantica</u>, not one has held that the direct effect of a breach of contract need not be felt by the plaintiff in order to trigger this FSIA exception.

Plaintiffs misconstrue <u>Cruise Connections Charter Management 1, LP v. Attorney General of Canada,</u> 600 F.3d 661 (D.C. Cir. 2010),[9] as also standing for the (incorrect) proposition that Plaintiffs may avoid the FSIA jurisdictional bar even if they are unharmed.  Plaintiffs omit subsequent authority from the D.C. Circuit which clarified <u>Cruise Connections</u> and confirmed that, to overcome immunity under clause 3 the contract at issue must provide for or contemplate US performance in order for an "effect" to be "direct."  <u>Odhiambo v. Republic of Kenya</u>, 764 F.3d 31, 40 (D.C. Cir. 2014) ("To summarize, this Court's cases draw a very clear line:… breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States").[10]

Plaintiffs also mistakenly rely on <u>SerVaas Inc. v. Republic of Iraq</u>, 653 Fed.Appx 22 (2d Cir. 2011), <u>Hanil Bank v. PT Bank Negara of Indonesia</u>, 148  F.3d 127 (2d Cir. 1998) and <u>Skanga Energy & Marine v. Arevenca</u> SA 875 F. Supp 2d 264 (S.D. N.Y. 2012). Consistent with <u>Weltover,</u>

---

[9] In <u>Cruise Connections</u>, a US-based company sued the Royal Canadian Mounted Police for breach of contract pursuant to which Cruise Connections would supply three cruise ships to Vancouver to house staff needed for the 2010 Olympic Games.  The trial court dismissed based on FSIA, and on appeal, the Second Circuit reversed, finding direct effects in the United States caused by the breach because Canada's breach of the contract caused the cancellation of two subcontracts here to which plaintiff was a party.

[10] <u>See also</u> <u>Crystallex International Corp v. Petroleos de Venezuela SA</u>, 251 F.Supp.3d 758 (D. Del. 2017) (From *Cruise Connections*, Crystallex discerns the proposition that it need not show any direct effect of PDVSA's actions on Crystallex itself, so long as it shows some direct effect on the United States. But the Court does not read *Cruise Connections* as supporting so broad a conclusion.  The termination of the main contract at issue in *Cruise Connections* resulted in the cancellation of two subcontracts to which the plaintiff was a party.  Consequently, "no intervening event stood between [the Canadian agency's] termination of the contract and the lost revenues from the travel agency contract and the Charter Party Agreements.")

these cases found "direct effects" in the United States caused by a foreign sovereign's failure to pay in the United States *as required* by contract. See  SerVaas, 686 F.Supp.2d 346, 355-56 (S.D. N.Y. 2010) ("Defendants failed to pay SerVaas in the United States pursuant to the parties' agreement"); Hanil, 148 F.3d at 132 (Indonesia failed to deliver funds to Hanil's account in New York as required by contract); Skanga, 875 F. Supp. 2d at 271-272 (direct effect requirement fulfilled where sovereign required plaintiff to pay defendants in New York).

Because the contracts required no performance from the Angolan Defendants in the United States, but instead only required performance from the Angolan Defendants exclusively in Angola, the Plaintiffs failed to adequately allege and cannot establish that the Angolan Defendants' purported breach of contracts "caused a direct effect" here.  Accordingly, Plaintiffs' claims for breach of contract do not fall within the commercial activity exception to immunity for acts abroad which cause a "direct effect" in the United States.  Therefore, Plaintiffs' claims for breach of contract must be dismissed.

**B.**     **Plaintiffs' Claims For Takings in Violation of International Law Must Be Dismissed Because the Angolan Defendants Are Immune From Jurisdiction Under the FSIA.**

Plaintiffs pled that their "takings claims" fall within the FSIA exception to immunity for "cases in which rights in property taken in violation of international law." See Complaint at ¶ 37. A high standard governs whether Plaintiffs are entitled to the expropriation exception to immunity. Plaintiffs must do far more than simply allege such a taking.  To circumvent FSIA immunity, the expropriation exception requires an actual finding of a taking of property in violation of international law.  Bolivarian Republic of Venezuela v. Helmerich and Payne, 137 S. Ct. 1312, 1316 (2017) ("..state and federal courts can maintain jurisdiction to hear the merits of a case *only if they find that the property in which the party claims to hold rights was indeed "property taken*

*in violation of international law*.") (emphasis added); see also <u>Rukoro v. Federal Republic of Germany</u>, 976 F.3d 218 (2020) (affirming dismissal of expropriation claims based on <u>Helmerich</u> standard).  Plaintiffs have fallen woefully short of satisfying this high standard.

Application of <u>Helmerich</u> here establishes that the Angolan Defendants' alleged taking does not qualify for the expropriation exception to immunity.  Plaintiffs' assertions in opposition, cannot support a *finding* that Plaintiffs' property was taken in violation of international law.  First, there has been no "taking"—only the exercise of precautionary remedies against Angolan Plaintiffs pursuant to Angolan law.   These precautionary remedies include a prejudgment attachment to avoid dissipation of assets; an administrative seizure pursuant to Angolan procurement law; and a seizure to preserve evidence as part of a criminal investigation.  <u>See</u> Abecasis Decl. at Exhibit 23-25.  Plaintiffs falsely represent that the President and MINEA transferred *ownership* of Plaintiffs' property to state owned enterprises.[11]  As Plaintiffs know, *ownership* has never been transferred and remains with the Plaintiffs. *Possession* has been temporarily delivered to IGAPE, a court appointed trustee, pending further proceedings.  <u>See</u> Abecasis Decl. at ¶¶ 15-17, and Exhibit 25.

Plaintiffs seek to evade this fact based on a rank misrepresentation of the words contained in a Presidential decree.  Plaintiffs "quote" the decree, contorted with no less than three sets of ellipses, to make it appear that the President determined *ownership* of the property.  However, the relevant language of the decree states:

> The Minister of Power and Water is hereby authorized to act in any such way that he deems necessary or consequent to operate the termination of the aforementioned agreements, including the final settling of accounts with Aenergia, S.A., the

---

[11] Plaintiffs repeatedly mischaracterize the record, repeatedly saying that Angola took "*ownership*" of the property and gave it to PRODEL or ENDE.  <u>See</u> Opp. at p. 29; ("…Angola gave *ownership* to state commercial enterprises." "[T]he turbine proceedings cannot save Angola from suit--because it came after the President had already adjudicated Angola's *ownership*…".  "…[I]t is enough that the President and MINEA decreed *ownership* before the judicial proceedings.")

confirmation of the physical and financial execution limits of said agreements, and ***to take administrative possession of the equipment included within the agreements' scope, pursuant to Section 320(5) of Law. nr. 9/16 of July 16 (the Procurement Act)***, and to take all precautions that are adequate to protect the public interest, namely in what pertains to ***the possession of the four turbines*** acquired under the GE Capital Limitada credit line.

See Abecasis Decl. at Exhibit 19 (emphases added). Nothing in the forgoing decree refers to any transfer of *ownership*—only *possession* pursuant to Angola's Procurement Act which permits the government to obtain possession of the equipment and material necessary to complete the scope of the contracted work, subject to judicial or arbitral process to fix a fair price.  See Abecasis Decl. at ¶¶ 15-16.[12]

Plaintiffs similarly play loose with facts in their effort to distinguish Chettri v. Nepal Rastra Bank, 834 F.3d 50 (2d Cir. 2016) and Aboutaam v. L'Office Federale De La Culture De La Confederation Susisse, 2019 WL 4640083 (S.D.N.Y. 2019) which both recognize that a temporary asset freeze in furtherance of a criminal investigation does not qualify as a "taking" under FSIA. Plaintiffs argue those cases are inapposite because they deal with criminal investigations, not civil proceedings—inferring that no such criminal proceedings are pending.  See Opp. at p. 26-27.  In so doing, Plaintiffs conveniently overlook the criminal investigator's report of seizure of assets as part of the criminal investigation of the transactions at issue. See Abecasis Decl. at Exhibit 23. Plaintiffs offer no case holding that a prejudgment transfer of *possession* qualifies as a taking and disregard ample authority that before a plaintiff can show a taking in violation of international law, a plaintiff must first show that it has exhausted domestic remedies in the foreign state that is alleged

---

[12] Plaintiffs similarly mischaracterized the MINEA termination letter, which never mentions ownership and refers only to administrative possession pursuant to Angola's Procurement Act. See Abecasis Decl. at Exhibit 20.

to have caused the injury.[13]  This the Plaintiffs cannot do, as both their administrative appeal of

the President's decision and the main action on the merits remain pending.

Even if a "taking" did somehow occur (again, it did not), there could not possibly have

been any "violation of international law" because international law does not address a foreign

government's domestic taking of the property of its own citizens.  See opening brief at p. 28.

Because Plaintiffs are Angolan, the Angolan government's alleged taking of their property simply

does not constitute a violation of international law.[14]

---

[13] Republic of Austria v. Altman, 541 US 677, 714 (2004) (Breyer, J. concurring) ("Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate, or their application is unreasonably prolonged"); Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 721, 119 S. Ct. 1624, 143 L.Ed.2d 882 (1999) (requirement of exhausting available post-deprivation remedies under United States law);  Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 10, 104 S. Ct. 2187, 81 L.Ed.2d 1 (1984) (same); Republic of Austria v. Altmann, 541 U.S. 677, 714 (2004) (Scalia, J., concurring) ("A plaintiff who chooses to litigate in this country in disregard of the post-deprivation remedies in the "expropriating" state may have trouble showing a "tak[ing] in violation of international law." 28 U.S.C. § 1605(a)(3)"); Chetri v. Nepal Bangladesh Bank, Ltd., 2014 WL 4354668, at n.5 (S.D.N.Y. 2014) (noting the exhaustion requirement but declining to rule on the issue); Millicom Int'l Cellular, S.A. v. Republic of Costa Rica, 995 F. Supp. 14, 23 (D.D.C.1998) (a prudential exhaustion requirement exists based on international law principles, and therefore 'a claimant cannot complain that a 'taking' or other economic injury has not been fairly compensated, and hence violates international law, unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury."); Greenpeace, Inc. v. State of France, 946 F. Supp. 773, 783 (C.D. Cal. 1996) (a claimant cannot complain that a taking violates international law unless the claimant has first pursued and exhausted domestic remedies in the foreign state).

[14] See Altmann v. Republic of Austria, 317 F.3d 954, 968 (9th Cir. 2002), opinion amended on denial of reh'g, 327 F.3d 1246 (9th Cir. 2003), and aff'd on other grounds, 541 U.S. 677 (2004) (and especially, Breyer, J., concurring and noting consensus view that § 1605(a)(3)'s reference to violations of international law does not cover expropriations of property belonging to a country's own nationals; see also, Bolivarian Republic, 137 S.Ct. at 1312 ("A sovereign's taking or regulating of its own nationals' property within its own territory is often just the kind of foreign sovereign's public act (a "jure imperii") that the restrictive theory of sovereign immunity ordinarily leaves immune from suit"); Bahgat v. Arab Republic of Egypt, No. 13-cv-8894, 2015 WL 13654006, at *5 (S.D.N.Y. Mar. 31, 2015), aff'd, 631 Fed. App'x 69 (2d Cir. 2016) (a violation of international law requires that the state take the property of a national of another state); Smith Rocke Ltd. v. Republica Bolivariana de Venezuela, No. 12 cv-7316, 2014 WL 288705, at *7 (S.D.N.Y. Jan. 27, 2014) (violation of international law first requires that the state take the property of a national of another state); Konowaloff v. Metro. Museum of Art, 10-cv-9126, 2011 WL 4430856, at *8 (S.D.N.Y. Sept.22, 2011) ("[I]t is not contrary to international law for a sovereign to take the property of its own nationals."), aff'd, 702 F.3d 140 (2d Cir. 2012);  F. Palicio y Compania, S.A. v. Brush, 256 F. Supp. 481, 487 (S.D.N.Y.1966) ("confiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law");  Restatement (Third) of Foreign Relations §712 (A state is responsible under international law for injury resulting from a taking by the state of the property *of a national of another state*).

Relying on <u>Banco Nacionale de Cuba v. Sabbatino</u>, 307 F.2d 845 (2d Cir. 1962), Plaintiffs try to escape the inconvenient fact that Plaintiffs are Angolan by arguing that Plaintiffs are owned by Machado, a Portuguese national whose property purportedly was taken with discriminatory purpose.  Plaintiffs' legal argument is flawed because it is predicated on authority which has been supplanted.  In <u>Banco,</u> the Court held that Cuba's discriminatory expropriation of American owned sugar companies occurred in violation of international law.  But <u>Banco</u> is inapplicable because: (1) the Second Circuit's decision on which Plaintiffs rely was reversed by the United States Supreme Court based on the act of state doctrine;[15]  (2) on remand, the Court predicated its decision that it was of "no particular significance that Plaintiff was organized under Cuban law" on the intervening enactment of the "Hickenlooper Amendment" which protected against expropriation of the assets of foreign companies beneficially owned 50% of more by United States citizens; and (3) the case was decided more than a decade prior to enactment of the FSIA, which contains no similar protection for foreign investors in foreign entities.

Plaintiffs' factual argument fares no better.  Even a cursory review of the Complaint yields no allegation of discrimination.  Indeed, although the Complaint alleges that Plaintiffs are owned by Machado, nowhere does the complaint plead that the Angolan Defendants acted with discriminatory purpose. Nor could the Plaintiffs plausibly allege (let alone establish under the <u>Helmerich</u> standard) that the Angolan Defendants' "taking" was discriminatory. Machado, the supposed victim of alleged discrimination, is not a party.  Neither Machado nor the Plaintiffs alleged or have shown that they have been treated differently than any other business with non-Portuguese ownership under the same circumstances. Plaintiffs' foreign ownership was noted in the hearing leading to transfer of possession, but only because foreign ownership is a factor to

---

[15] <u>Banco Nacionale de Cuba v. Sabbatino</u>, 376 U.S. 398, 84 S. Ct. 923, 11 L. Ed. 2d 804 (1964).

consider when assessing the potential for transfer or dissipation of the assets pending final adjudication. See Abecasis Decl. at ¶¶ 15-16.

Plaintiffs criticize the Angolan Defendants' reliance on Bailey v. Grand Trunk Lines New England, 805 F.2d 1097 (2d Cir. 1986), as standing for the proposition that corporate citizenship in the FSIA context is determined in accordance with 28 U.S.C. § 1332.  But, Plaintiffs offer no authority establishing any other basis for determination of the corporation's nationality in takings cases, and ignore Helmerich, which makes clear that foreign ownership is insufficient to establish a violation of international law. Helmerich, 137 S. Ct. at 1312 (recognizing that "no authority unmistakably contemplates a discrimination exception" to the takings rule, and that plaintiff failed to clear "the higher hurdle" of demonstrating that the discrimination exception has "crystallized into an international norm that bears the heft of customary law"). In any event, the Plaintiffs cannot seriously contend that Plaintiffs are not Angolan nationals.

Finally, there is no jurisdictional nexus between the "taken" property and the United States. If the Angolan Defendants do not *own* the property, there is no jurisdictional nexus between the property and the US sufficient to trigger the FSIA exception. Plaintiffs concede that neither PRODEL nor ENDE *presently* own the property. The best Plaintiffs can muster is speculation that at some point in the future they "*will be* the users and holders of title to the expropriated property." See Opp. At p. 32 (emphasis added). That prediction is not sufficient to establish any nexus between the property and the United States such that FSIA immunity may be overcome.

Plaintiffs' late-filed "new evidence" (Dkt. No. 91) in the declaration of Clara Tsiba is no evidence at all.  As an attorney for Plaintiffs, Ms. Tsiba is an advocate–not a truth-telling witness. Further, her declaration offers no foundation establishing how she knows the facts to which she attests.  For example, Ms. Tsiba declares that from outside PRODEL's property, she identified the

seized turbines.  Yet, she offers no facts which establish how she knows that she was looking at turbines at all (as opposed to some other containers).  Neither did Ms. Tsiba provide any foundation to establish how she knows that the boxes she saw were the seized turbines as opposed to some other turbines.  She provided no identifying serial numbers, no statement or document from PRODEL or IGAPE, or other information matching the turbines she claims to have seen with the seized turbines.  Similarly, Ms. Tsiba provides no foundation for how she knows that cement pads were for turbines or how she determined that turbines were prepared for transport.  Is Ms. Tsiba qualified as an engineer, a logistics technician, or energy turbine technician–in addition to being Plaintiffs' advocate?  Lastly, Ms. Tsiba's description of vague squares and shadows on purported satellite images suffers the same infirmity.  Not only does Ms. Tsiba provide no foundation establishing her ability to interpret the images, but the images themselves have not been properly authenticated and are inadmissible.[16]  For all of these reasons, Plaintiffs' "new evidence" should not even be considered.

Even, assuming *arguendo*, that Ms. Tsiba's descriptions are accurate, they do not establish a "taking."  She presumes that the turbines are in fact Plaintiffs' property, not Angola's–an issue very much in dispute and being litigated by Plaintiffs in Angola.  Moreover, Ms. Tsiba's "new evidence" ignores the precautionary remedy ordered by the Angolan court, as well as the administrative possession authorized by Angola's procurement law. If Plaintiffs believe that IGAPE has handled the seized items inappropriately, Plaintiffs can (and should) raise that concern

---

[16] See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009) (affirming exclusion of photographs for lack of a proper foundation, and recognizing, "The standard for admissibility of photographs requires the witness to recognize and identify the object depicted and testify that the photograph is a fair representation of what it purports to portray… Although [the witness] identified the photographs as 'pictures of the relieving platform at 1000 Zerega Avenue,' counsel failed to follow up with the customary question as to whether the photographs fairly and accurately portrayed the area shown.")

with the Angolan court which oversees IGAPE, rather than raising it with this case where IGAPE

is not even a party.  See Abecasis Decl. at ¶¶ 12-16, and Exhibit 25.

C.   **Plaintiffs' Claims Against the Angolan Defendants Must Be Dismissed Because They Are Subject To Arbitration.**

Plaintiffs agreed in writing, not once, but *fifteen times* to arbitrate any disputes under

Angolan law. In opposition, Plaintiffs now argue that the Angolan Defendants waived their right

to arbitrate by participating in proceedings pending before Angolan courts. Alternatively, Plaintiffs

contend that their claims fall outside the scope of the arbitration clauses here. Plaintiffs' arguments

are misplaced and should be made to arbitrators, not to this Court.

In this case arbitrability must be determined in the first instance by the arbitrators. Angolan

law, which the parties agreed govern these contracts, <u>requires</u> that the arbitrators decide

arbitrability in the first instance and <u>prohibits</u> courts from considering arbitrability until <u>after</u> an

arbitral award has been rendered.  Specifically, Article 31 of the Voluntary Arbitration Law of

Angola states in relevant part:

> ***The Arbitral Tribunal shall have the power to rule on its own jurisdiction***, even
> if, to this end, it is necessary to review both the defects of the Arbitration Agreement
> or the contract in which such agreement is comprised and the applicability of such
> agreement to the dispute. …3. The ruling of the Arbitral Tribunal in which it
> declares itself as having jurisdiction to rule on the matter ***may only be reviewed by***
> ***the Judicial Court after the arbitral award has been rendered***, by means of set
> aside or appeal proceedings challenge or by means of opposition to enforcement,
> under the terms of Articles 34 and 39 hereof.

<u>See</u> Declaration of Lino Diamvutu at ¶ 2.4.4 ("Diamvutu Decl.") (emphases added).  Furthermore,

under Angolan law, the arbitrator's threshold determination of arbitrability includes jurisdiction to

consider any argument that the right to arbitrate has been waived.  <u>Id.</u>

Circumventing the Angolan law which governs the parties' agreements, Plaintiffs

unavailingly rely on US law—but the result is the same. Here, courts first determine the issue of

arbitrability unless there is "clear and unmistakable evidence" that the parties intended the question

of arbitrability to be decided by the arbitrator.  First Options of Chicago v. Kaplan 514 U.S. 945, 115 S. Ct. 1415, 131 L.Ed.2d 648 (1986).  Such clear and unmistakable evidence can be found here from reference in the arbitration agreement to rules of arbitration which mandate that the arbitrators are authorized to determine their own jurisdiction.  See Shaw Group v. Triplefine International Corporation, 322 F.3d 115 (2d Cir. 2003) (agreement that arbitration will occur pursuant to rules of the International Chamber of Commerce specifically permitted arbitrators to determine arbitrability).  In this case, the agreements all reference the Voluntary Arbitration Law of Angola and either UNCITRAL or CREL rules of arbitration. As reflected above, the Voluntary Arbitration Law establishes the arbitrators' exclusive authority to determine the scope of their jurisdiction.  Likewise, both the UNCITRAL and CREL arbitration regimes afford arbitrators the authority to determine the scope of their own jurisdiction. See Diamvutu Decl. at ¶ 2.4.6.  Thus, regardless of which jurisdiction's law applies, the question of arbitrability must be decided in the first instance by the arbitrators and not by this Court.

Even assuming this Court wants to consider the merits of Plaintiffs' arguments, those arguments fail.  Under Angolan law, litigation to obtain a provisional remedy is not deemed a waiver of the right to arbitrate.  See Diamvutu Decl. at ¶ 2.4.3, 2.5.  Likewise, the Angolan Defendants did not waive their right to arbitrate by defending an unarbitrable administrative proceeding challenging the presidential decree to terminate the agreements.  Id.  Finally, under Angolan law, the Plaintiffs' claims fall within the scope of the arbitration clauses.  Id., at ¶ 2.3. Plaintiffs' claims against the Angolan Defendants must be dismissed in favor of arbitration.

**D.**  ***Forum Non-Conveniens* Favors Resolution of Plaintiffs' Claims Against the Angolan Defendants in Angola.**

Plaintiffs' opposition to *forum non conveniens* dismissal may be summarized as follows: (i) New York is not inconvenient; (ii) Angola is not the Plaintiffs' home; and (iii) Angola is unsafe or corrupt. Plaintiffs' opposition rings hollow.

New York is clearly an inconvenient forum for litigation of the disputes as between the Plaintiffs and the Angolan Defendants. All of the material events between these parties occurred in Angola.  The agreements were executed, performed, and terminated in Angola. The "seizure" of equipment and transfer of its possession (though, again, not ownership) occurred in Angola pursuant to judicial proceedings in Angola. Angolan law governs the parties' agreements. All of the documents between Plaintiffs and the Angolan Defendants are written in Portuguese. The Angolan Defendants' witnesses to the material events on which Plaintiffs base their claims are in Angola and will testify in Portuguese.[17]  Nonetheless, Plaintiffs assert "critical" documents are in English and "key" personnel are in New York and Portugal. That may or may not be true as between Plaintiffs and the GE Defendants, but it is clearly false as between Plaintiffs and the Angolan Defendants. It is absurd for Plaintiffs to seriously contend that New York is not "genuinely inconvenient" to the witnesses and evidence surrounding Plaintiffs' claims against the Angolan Defendants.

Plaintiffs assert Angola is not their home and emphasize their connections to Portugal. Plaintiffs misleadingly contend that "AE's key personnel all reside in Portugal (along with AE's documents)." (Machado Decl., ¶ 7.)  But Plaintiffs cannot honestly deny that their operations are in Africa, as AE's website proclaims:

---

[17] As reflected by Ms. Tsiba's declaration, many of Plaintiffs' witnesses will also necessarily be in Angola including for example, those from whom she heard "rumors" concerning the turbines, and the people who moved the equipment.

> "We were born in Africa.  We take pride in our Home and we are committed to making this continent an even better place. Among offices, delegations and ongoing projects, we are mostly represented on the African continent. WELCOME TO AFRICA. WELCOME TO AENERGY."

See Abecasis Decl. Supp. at Exhibit A.  As Plaintiffs themselves broadcast, Plaintiffs' "home" is in Angola. Plaintiffs are Angolan companies doing business in Angola declaring all the while that Africa is their home.  Plaintiffs cannot now be heard to say that their home is elsewhere.

Last, Plaintiffs' concerns regarding supposed security and corruption in Angola fall flat. The Republic of Angola strongly rejects the offensive and patronizing notion that its judicial and legal framework is inadequate to adjudicate important commercial disputes.  Furthermore, Plaintiffs' large presence in Angola and their many ties to the country undermine their stated concerns.  These concerns were no impediment for Plaintiffs to conduct business in Angola. Corruption and security concerns were no barrier to Plaintiffs' execution of the 15 contracts on which they now sue, which contracts select Angola as the place to resolve any dispute.  Corruption and security concerns were no obstacle to Plaintiffs initiating an appeal to the Angolan Supreme Court of the President's decision to terminate the agreements—nor did these concerns prevent Plaintiffs from opposing the provisional remedies ordered by the Provincial Court in Luanda, or defending the main action on the merits.  Nor did these concerns prevent Plaintiffs from operating in Angola and being paid hundreds of millions of dollars by Angola. As corporations organized under the laws of Angola, and doing business there, Angola is, in Plaintiffs' own words, the Plaintiffs' home.  Plaintiffs' feigned fears about Angola must be set aside to permit resolution of the parties' dispute in Angola—as the parties expressly agreed.

**E.     Plaintiffs' Complaint Must Be Dismissed Because International Comity Justifies Abstention**

Plaintiffs argue that there is no basis to abstain on comity or other grounds.  They further contend that abstention would be "plainly at odds with the facts and Second Circuit Law."  See Opp. at p. 65.  To frame the issue in such broad terms, Plaintiffs select seemingly favorable quotes from legal authority while ignoring the actual guidance provided by those cases.  For instance, Royal & Sun All. Ins. Co. of Canada, 466 F.3d 88 (2d Cir. 2006), instructs that "proper" consideration of comity principles will require the "evaluation of various factors, such as the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction." Royal & Sun All. Ins. Co. of Canada, 466 F.3d at 94. As argued in the opening brief, when these factors are weighed, the balance tips heavily in favor of abstention.

Moreover, though Plaintiffs assert that a sovereign's "public works" contracts are subject to adjudication in the United States, Plaintiffs fail to appreciate that their Complaint not only asks this Court to adjudicate another sovereigns' public works contracts, but also to award relief that would invalidate both the judicial process of a sovereign nation, and the acts of a sovereign nations' highest-ranking government official—its president. In so doing, Plaintiffs ignore decisions that caution directly against exercise of jurisdiction under such circumstances. Importantly, "[i]nternational comity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." Freund v. Republic of France, 592 F. Supp.2d 540, 565 (S.D.N.Y. 2008) (internal citations omitted). The Second Circuit instructs that, "[u]nder these principles, United States courts ***ordinarily refuse to review acts of foreign***

*governments and defer to proceedings taking place in foreign countries*...." <u>Jota v. Texaco, Inc.</u>, 157 F.3d 153, 159–60 (2d Cir. 1998) (quoting *Pravin,* 109 F. 3d at 854) (emphasis added) (internal quotations omitted).

In <u>Schuler v. Rainforest All., Inc.</u>, 684 Fed. Appx. 77, 79 (2d Cir. 2017), the court affirmed judgment on the pleadings against a plaintiff challenging an unfavorable ruling from a Mexican court. The court held: "By pursuing their claims here, the [plaintiffs] are essentially asking an American court to overrule the Mexican courts' judgment that the [plaintiffs] failed to prove ownership of property located in Mexico." <u>Id.</u> The Plaintiffs in this case are doing the same thing—asking a United States Court to oversee (and potentially overrule) the Angolan President and the Angolan courts (or Angolan arbitrators). Concerning uniquely Angolan issues arising from Angolan contracts between Angolan parties concerning Angolan power plant projects to provide electricity to the Angolan people. Abstention is proper here. This Court should not be lured into usurping the Angolan government's authority or that of its courts to adjudicate actions within its borders and concerning its citizens.

    **F.**    <u>**Plaintiffs' Complaint Must Be Dismissed Because Plaintiffs Failed to State a Claim Upon Which Relief Can Be Granted By Disregarding the Legal Separateness of Each Angolan Defendant**</u>

Plaintiffs' claims against the Angolan Defendants should be dismissed because Plaintiffs failed to respond to the Angolan Defendants' Fed. R. Civ. P. 12(b)(6) arguments. "Courts may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." <u>Felix v. City of New York</u>, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018) (dismissing a plaintiff's claim where it failed to respond to arguments for dismissal) (internal quotations and citations omitted); <u>see also</u> <u>Brandon v. City of New York</u>, 705 F. Supp. 2d 261 (S.D.N.Y. 2010) (deeming a plaintiff's claims abandoned where it failed to raise

arguments in opposition to defendant's motion for judgment on the pleadings); Verdi v. City of New York, 306 F. Supp. 3d 532 (S.D.N.Y. 2018) (dismissing a plaintiff's negligence claims where it failed to respond to defendant's arguments for dismissal).

Pursuant to First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U.S. 611 (1983), abrogated by statute on other grounds, 28 U.S.C. § 1610(g)(1) ("Bancec"), the Angolan Defendants requested dismissal of the Complaint because Plaintiffs improperly lumped all 5 Angolan Defendants into Counts I-VI, IX, and X, and failed to plead any allegations of alter ego, control, or fraud.  Plaintiffs failed to address this argument in their response to the Motion to Dismiss.

Even if the Plaintiffs addressed the Angolan Defendants' arguments in their response, the Complaint still would have to be dismissed.  In Bancec, the Supreme Court mandated that a plaintiff must plead a legitimate basis for disregarding the legal separateness of a sovereign government and its agencies or instrumentalities when they are joined as defendants.  Here, the Complaint fails to assert ***any*** allegations sufficient to justify casting aside ordinary principles of separateness required by Bancec.  Accordingly, the Complaint must be dismissed.

### III.   CONCLUSION

Justice demands the righteous resolution of the parties dispute.  The parties cannot obtain a righteous resolution in the wrong place—and as established in the opening brief and this Reply, this Court is the wrong place to resolve this uniquely Angolan dispute.  The FSIA bars this Court's jurisdiction over the Angolan Defendants.  The parties agreed to arbitrate this dispute in Angola and under Angolan law.  Related proceedings concerning the same subject matter and some of the same parties are already pending in Angola—which clearly provide the more convenient forum for resolution. The law, common sense, practicality and fairness command that Plaintiffs claims

against the Angolan Defendants must be dismissed without prejudice to their proper prosecution

in arbitration in Angola under Angolan law.


Dated: December 2, 2020


**EHRENSTEIN SAGER**                    **KLEINBERG, KAPLAN, WOLFF &**
                                        **COHEN, P.C.**

By: _Michael Ehrenstein_

Michael Ehrenstein                      Marc R. Rosen
Brett Sager                             Robert M. Tuchman

2800 Ponce de Leon Boulevard, Suite     500 Fifth Avenue
1400                                    New York, New York 10110
Coral Gables, Florida 33134             Telephone: (212) 986-6000
Telephone: (305) 503-5930


Attorneys for Defendants
**REPUBLIC OF ANGOLA, THE MINISTRY OF ENERGY AND WATER OF THE
REPUBLIC OF ANGOLA, THE MINISTRY OF FINANCE OF THE REPUBLIC OF
ANGOLA, EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP, AND
EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE**