# EXHIBIT 28

INTERNATIONAL CHAMBER OF COMMERCE
INTERNATIONAL COURT OF ARBITRATION
ICC CASE NO. 25667 GR (c. 25668/GR)

———————————————————————————————

In the Matter of

GE GLOBAL PARTS & PRODUCTS GMBH (Switzerland) and
GE PACKAGED POWER INC. (USA)

Claimants,

- against –

AENERGY, S.A. (Angola)

Respondent.

———————————————————————————————

**ANSWER TO REQUEST FOR ARBITRATION
AND COUNTERCLAIMS**

———————————————————————————————

Holwell Shuster & Goldberg LLP
425 Lexington Avenue
New York, NY 10017

Lenz & Staehelin
Brandschenkestrasse 24
CH-8027 Zurich

Counsel for Respondent

27 November 2020

## Table of Contents

I.  PARTIES ................................................................................................................................ 2

II.  NATURE AND CIRCUMSTANCES OF THE DISPUTE ......................................................... 4

  1.  AE, GE, and Angola Enter Into Various Contracts ........................................................ 5

  2.  Angola Draws Only $644 Million And GE Receives $376 Million ................................ 8

  3.  GE Prematurely Ships The Turbines And Unilaterally Reallocates The $376 Million Payment ... 10

  4.  The Relationship Between GE And AE Sours .............................................................. 11

III.  RESPONSE TO CLAIMS AND COUNTERCLAIMS ........................................................ 12

  A.  Supply Contracts ........................................................................................................ 12

    1.  **Supply Contract 1 (Contract No. 1027850) (AE/GEPP)** ...................................... 13

    2.  **Supply Contract 2 (Contract No. 1049882) (AE/GE GPP)** .................................. 14

    i.  Response to GE GPP's Claims ................................................................................ 14

    ii.  Counterclaim ......................................................................................................... 14

    3.  **Supply Contract 3 (Contract No. 1018058) (AE/GE GPP)** .................................. 16

    4.  **Supply Contract 4 (Contract No. 1206406) (AE/GE GPP)** .................................. 17

    i.  Response to GE GPP's Claims ................................................................................ 17

    ii.  Counterclaim ......................................................................................................... 17

  B.  "Ancillary" Invoices ................................................................................................... 17

    1.  **Additional Transportation, Storage, Logistics, and Preservation Costs Under Supply Contracts 2, 3, and 4.** .................................................................................... 17

    2.  **BOP Purportedly Sold Under Supply Contract 2.** ............................................... 19

    3.  **BOP And Transportation Supposedly Related To Supply Contract 1.** ................ 21

IV.  PROCEDURAL MATTERS ............................................................................................... 21

  A.  Arbitration Agreement ................................................................................................ 21

  B.  Constitution of the Tribunal ....................................................................................... 22

  C.  Place of Arbitration .................................................................................................... 22

  D.  Applicable Law ........................................................................................................... 22

  E.  Language of Arbitration .............................................................................................. 22

V.  RESERVATION OF RIGHTS ............................................................................................ 22

VI.  PRELIMINARY STATEMENT OF RELIEF SOUGHT ...................................................... 22

Aenergy S.A., formerly known as Aenergia, S.A. ("**AE**" or "**Respondent**"), submits this Answer to the 18 September 2020 Requests for Arbitration (together, the "**Request**") of GE Global Parts & Products GmbH ("**GE GPP**") and GE Packaged Power, Inc. ("**GEPP**," and together with GE GPP, "**Claimants**"), pursuant to Article 5 of the Rules of Arbitration of the International Chamber of Commerce ("**ICC Rules**").[1]  AE also presents below its counterclaims under the contracts forming the basis of this arbitration, requesting an award of $25.15 million on account of those counterclaims.

## I.  PARTIES

1.  Claimant GE GPP is a limited liability company (Gesellschaft mit beschränkter Haftung) organized under the laws of Switzerland.  Claimant GEPP is a limited liability company incorporated under the laws of Delaware, USA.  Claimants are engaged in the business of manufacturing and servicing of power equipment, including turbines and turbine-generator sets.  Claimants are subsidiaries of the General Electric group.  At all material times, the GE group operated through the same representatives and agents as a collective unit without distinction as between the identity of each GE entity. Accordingly, AE refers to the members of the GE group, including the Claimants here, jointly as "**GE**".

2.  Respondent AE is a Portuguese-shareholder-owned corporation constituted under the laws of the Republic of Angola with its registered office located in Luanda, Angola.  AE also maintains offices in Lisbon, Portugal, and its principal executives and employees currently reside in Portugal.  AE was founded in 2012 to deliver reliable power and transportation services to Angola and other countries, including Cameroon, Ghana, and

---

[1] Claimants' Requests for Arbitration were served on AE on 28 September 2020.  On 26 October 2020, AE submitted a request for an extension of its time to submit an Answer until 27 November 2020 ("**26 October 2020 Letter**").  By letter dated 28 October 2020, the Secretariat of the ICC International Court of Arbitration ("**ICC Secretariat**") granted Respondent's request.  On 4 November 2020, pursuant to the parties' agreement, the ICC Secretariat consolidated the arbitrations under Article 10(a) of the ICC Rules.

Mozambique.  Until late 2019, GE was AE's principal supplier of power equipment and

related services.

3.     Respondent's contact details are as follows:

Aenergy, S.A.
Condomínio Palanca Negra, 31,
Talatona, Luanda – Angola
Tel: +244 222 731 853
Attn.:  Ricardo Leitão Machado
(email: rmachado@aenergy.com)

4.     As set forth in its 26 October 2020 Letter, Respondent is represented in these proceedings

by the law firms Holwell Shuster & Goldberg, LLP and Lenz & Staehelin.

Communications with Respondent in relation to this arbitration should be directed as

follows (without copy to Mr. Machado):

Holwell Shuster & Goldberg, LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
United States of America
Tel: +1 (646) 837-5151
Fax: + 1 (646) 837-5150
Attn.:  Vincent Levy
(email: vlevy@hsgllp.com)
Dorit Ungar Black
(email: dblack@hsgllp.com)
Brian Goldman
(email: bgoldman@hsgllp.com)

Lenz & Staehelin
Brandschenkestrasse 24
CH-8027 Zurich
Tel: + 41 (0)58 450 80 00
Fax: + 41 (0)58 450 80 01
Attn.:  Harold Frey
(email: harold.frey@lenzstaehelin.com)
Martin Aebi
(email: martin.aebi@lenzstaehelin.com)

5.     In view of the ongoing COVID-19 situation, Respondent respectfully requests that all

communications be sent by electronic mail until further notice.

II.     **NATURE AND CIRCUMSTANCES OF THE DISPUTE**

6.      This arbitration is just one of several proceedings arising from ***GE's wrongful and***

***successful effort to take over AE's power business in Angola***, an effort that led the

Angolan government to terminate, on 2 September 2019, all of Angola's existing

contracts with AE and to cancel, on 20 November 2019, a 25-year concession to build

and maintain a new power plant in Soyo, Angola.  GE's misconduct in that regard –

including GE's tortious wrongdoing and its improper termination of a 2016 Framework

Agreement (as amended) that had given AE exclusivity in the region[2] – is the subject of

***separate proceedings initiated by AE in the United States and England,*** in which AE

seeks ***well in excess of $500 million in damages***. In order to familiarize the Tribunal with

the broader context of this matter, AE will briefly set out that background below.

7.      This separate ICC arbitration, tactically initiated by GE as a ***mere defensive***

***counterattack***, has a ***very limited scope*** within this broader dispute: GE seeks recovery of

certain purported debts allegedly owed by AE under four contracts governed by Swiss

law for the supply of power turbines and related services and equipment, as well as

purported "ancillary" invoices. These claims have ***no merit*** whatsoever. To the contrary:

not only ***has AE paid all monies due*** under those contracts, ***AE also paid for services***

***and equipment that GE subsequently declared "impossible" to deliver***. Because of this

impossibility, under the contracts and as a matter of Swiss law (Article 119(2) CO), AE

has an ***unjust enrichment claim*** that it raises as ***<u>counterclaims</u>*** in this arbitration.

8.      The factual background of this dispute may be summarized as follows:

---

[2] Copies of the 29 June 2016 Framework Agreement and its 20 March 2017 and 30 December 2017 amendments were attached to the Requests for Arbitration as Exhibits C-1, C-2, and C-3, respectively.  Exhibits submitted with GE GPP's and GEPP's Requests for Arbitration will be referred as GE GPP Ex. C-[ ] and GEPP Ex. C-[ ], respectively.

### 1.   AE, GE, and Angola Enter Into Various Contracts

9.   AE was founded in 2012 by Ricardo Leitão Machado, a Portuguese investor who, relying on his deep insight into the African market, identified ***an opportunity to provide reliable and competitive energy solutions to Angola and other African countries***.  Through his efforts, Machado and his enterprise, AE, were able to deliver power-plant projects to Angola ***at roughly half the cost*** per megawatt that other suppliers were offering before AE's entry – all while providing top-quality maintenance and operation services.  AE was able to do this in large measure by taking a ***stance against*** the sort of ***corruption*** that is rampant in some parts of Africa, including Angola – corruption that had driven up the price of energy.  In the process, AE became the ***first African-incorporated company certified*** (by Bureau Veritas) ***for its anti-bribery practices*** (ISO 37001).

10.   To carry out its mission, AE entered into an ***exclusive commercial partnership with GE to develop the African market*** for energy solutions, including by using GE-manufactured products and GE services.  AE's successful efforts in Angola, including in particular in respect of lowering the per-megawatt costs of power-plant projects, led AE, GE, and Angola to enter into the various contracts noted below.

11.   ***First,*** AE entered into numerous ***contracts with GE***, including many service agreements not at issue here, as well as the four turbine contracts at issue in this arbitration (which provided for the purchase of ***fourteen TM2500 turbines***) ("**Supply Contracts**").  These four Supply Contracts, which are identified by contract number, are summarized below:

|  | GE Definition | Number | Date | Turbines |
|---|---|---|---|---|
| **Supply Contract 1**[3] | AE-GEPP Supply Contract | 1027850 | 29 June 2016 | 3 |
| **Supply Contract 2**[4] | AE-GE GPP Supply Contract No. 1 | 1049882 | 30 March 2017 | 7 |
| **Supply Contract 3**[5] | AE-GE GPP Supply Contract No. 2 | 1018058 | 2 June 2017 | 2 |
| **Supply Contract 4**[6] | AE-GE GPP Supply Contract No. 3 | 1206406 | 30 June 2017 | 2 |
|  |  |  |  | **14** |

12.     As further explained below, the Supply Contracts provided, among other things, that they could be ***terminated for convenience until payment was made by AE***. As was evident to the Parties, this provision was ***of crucial importance for AE*** because AE was a comparatively small company. It was thus of the essence for AE to have the option to terminate the Supply Contracts if it did not secure payment by the end-customer.

13.     ***Second,*** shortly after the last three Supply Contracts were signed, in July/August 2017, Angola's state-owned energy companies signed a total of thirteen power contracts with AE, worth approximately $1.148 billion ("**On-Sale Contracts**").  These contemplated, among other things, that AE would sell and install ***eight*** new GE-manufactured TM2500 turbines for use by the Angolan government.

14.     ***Third,*** at around the same time, Angola obtained financing from GE to pay for its obligations to AE under the thirteen On-Sale Contracts.  Angola's Finance Ministry thus secured a $1.1.-billion credit facility structured and signed by GE Capital ("**GE Credit Facility**").  GE entered into the GE Credit Facility so that the amounts drawn by Angola under the GE Credit Facility would be used by AE to pay GE for the goods and services to be provided by GE under the Supply Contracts.  At the time, it was expected that Angola would draw the full $1.1 billion by year-end 2017; that the money would be used by Angola to pay all its obligations to AE under the On-Sale Contracts in one payment; and that AE would in turn satisfy all its own obligations to GE.

---

[3] GE GPP Ex. C-4.

[4] GE GPP Ex. C-5.

[5] GE GPP Ex. C-6.

[6] GE GPP Ex. C-7.

15.   As noted, however, AE had signed *Supply Contracts* with GE *covering six more turbines (a total of 14) than the number of turbines Angola had agreed to buy from AE (eight)*.  AE had contracted for these additional turbines so as to be ready to provide them to Angola should Angola wish to buy them; AE also wanted to develop the market in Cameroon, and to have turbines ready to sell there.

16.   In late August and early September 2017, AE and GE agreed to work together to try to sell these additional six turbines to Angola under the existing On-Sale Contracts or otherwise. Regardless of whether that occurred, Scott Strazik, a senior executive of General Electric Co., had promised to AE's Machado "*personally and as an Officer of GE*" that GE would "*work to solve this*" together, adding that, "*[i]f the [extra] TM's land in Angolan contract, great; but if they don't, we will work to another solution.*" In other words, it was well-understood that AE would not pay for these excess turbines unless they could be sold to Angola or another customer.

17.   In September 2017, while the effort to amend the On-Sale Contracts was still ongoing, AE and GE amended three of the Supply Contracts in order to prepare for the anticipated draw-down of the GE Credit Facility. These amendments (a) brought the contract prices of these Supply Contracts in line with the GE Credit Facility and (b) made the entire contract price due upfront.  The purpose of these amendments was to permit AE to pay off the Supply Contracts in full as part of the anticipated $1.1 billion disbursement from the GE Credit Facility.  Significantly for purposes of this arbitration, the *contract price of Supply Contract 3* (for two turbines plus transportation) *was changed to $47 million*, and the *contract price for Supply Contract 4* (for two turbines, transportation, and additional equipment) *was changed to $49 million*.  Moreover, Supply Contract 2 was amended to make *all amounts* to be paid under the agreement immediately due and payable.

18.   In October 2017, Angola's state-owned entities signed *non-binding* letters of intent ("**October 2017 Letters of Intent**") stating that they would consider amending two of

the thirteen contracts (On-Sale Contract #7 and On-Sale Contract #11) to reduce their scope and make room to instead purchase *four additional turbines* from AE. Conversely, GE believed that amending the last contract (On-Sale Contract #12) to make room for the *remaining two turbines would require a presidential decree*, which could not be obtained by the end of 2017, when Angola was anticipated to draw the funds from the GE Credit Facility.

### 2.   Angola Draws Only $644 Million And GE Receives $376 Million

19.   Although it had been anticipated that Angola would immediately draw $1.1 billion under the GE Credit Facility and pay AE that amount upfront – thus permitting AE to pay off the Supply Contracts upfront – Angola approved AE-issued invoices for only approximately $644 million, and decided to draw only that amount in December 2017. Everyone assumed Angola would make a further drawdown in early 2018 on the balance of the facility, permitting AE to earn additional revenues with which to pay GE.

20.   In light of these developments, *AE and GE reached certain agreements as to the use of the $644 million* that Angola would draw from the GE Credit Facility at year-end 2017.

21.   Of the $644 million that Angola drew down, AE and GE agreed that *AE would pay a gross amount of approximately $376 million directly to GE* to satisfy various of AE's obligations to Claimants and their affiliates under various contracts.

22.   As noted above, there were multiple contracts between AE and GE, including not just the Supply Contracts but also multiple services contracts not at issue in this arbitration proceeding that were anticipated to be paid as part of the $1.1 billion drawdown. In December 2017, AE and GE did *not* reach agreement as to which specific GE invoices would be satisfied by this global payment of $376 million.

23.   There was, however, an *express understanding and agreement between AE and GE that one of the Supply Contracts for two turbines – with a contract amount of $47 million (corresponding to Supply Contract 3) – would* <u>*not*</u> *be paid as part of this disbursement*.

8

In that regard, as noted, the parties had agreed in August/September 2017 that AE would try to sell two turbines to Angola by way of an amendment to On-Sale Contract #12. Because GE believed a presidential decree was necessary to effectuate that amendment, it was agreed by AE and GE in December 2017 that the parties would ***defer payment*** of this amount until that decree was obtained and Angola drew further on the GE Credit Facility (assuming no prior termination by AE or other solution was reached).

24.     GE's approval of the $644 million disbursement confirms the foregoing.  In seeking GE's internal approval for the draw, one of GE Capital's employees explained that "*external counsel advice is that a change to the scope of OSC 12 … would be sufficiently material to require a Presidential re-approval*" and that, "*[a]s a result, **the funded GE scope will now be 12 TMs, not 14TMs, and $47M less**, unless and until a change in OSC 12 is Presidentially-approved.*"

25.     At the time, AE and GE also exchanged various documents showing that On-Sale Contract #12 had a potential "scope" for GE of $47 million (corresponding to the two turbines subject to Supply Contract 3, which turbines AE was seeking to sell to Angola), but that ***GE would not be receiving that $47 million amount***.

26.     Similarly, on 30 December 2017, GE circulated internally a mapping showing that the $376 million disbursement would be used to pay off nearly all amounts under Supply Contracts 1, 2, and 4 – but the ***$47 million price of contract "1018058" (i.e., Supply Contract 3) would not be paid*** as part of the December 2017 disbursement.

27.     Communications between AE and GE immediately postdating the December 2017 disbursement further confirm the foregoing, as they show that AE and GE were focused on the mechanics of the second disbursement – including "*funding on TM#13/#14*" to be folded into "*contract 12*".

### 3. GE Prematurely Ships The Turbines And Unilaterally Reallocates The $376 Million Payment

28. Nonetheless, in early January 2018, and without advance notice to or approval by AE, *GE shipped to AE in Angola <u>all the turbines</u>* that were subject to the Supply Contracts but had not yet been shipped.  GE did so even though Angola had not finalized projects for at least six of the turbines (the four turbines subject to the October 2017 Letters of Intent and the two additional turbines AE and GE hoped to fold into On-Sale Contract #12); even though, as noted, AE and GE had agreed that the $47 million corresponding to Supply Contract 3 would remain unpaid until a solution was worked out; and even though AE retained a right to terminate Supply Contract 3 for convenience until payment.

29. When AE learned of the shipment, *AE asked GE by email why the turbines were being sent and who had authorized the shipment*.  Following these emails, GE's Mr. Nelson (the head of the power business for sub-Saharan Africa) spoke to AE's Mr. Machado by telephone, and asked him to *store the turbines in Angola – in the spirit of partnership – until the parties figured out a practical solution to the problem caused by GE's premature shipment*.  When AE agreed to do so, this was again firmly premised on the pre-existing understanding that *AE would not be required to accept delivery or pay for these turbines* unless they could be sold to Angola or another end-customer.

30. At around this time, GE apparently also modified its *internal allocation of the $376 million payment*, applying these proceeds to pay off all "contract price" amounts set forth in the Supply Contracts, other than the $47 million corresponding to the unfunded scope of On-Sale Contract #12.[7]  However, rather than leave Supply Contract 3 unpaid – as had been agreed between AE and GE – GE decided, apparently *for its own accounting reasons*, to book payment for Supply Contract 3 in full and to leave unpaid certain invoices under Supply Contract 2 and Supply Contract 4.  Public sources suggest that this

---

[7] GE had earlier decided that it would prioritize the amounts due under the Supply Contracts over the service contracts not at issue in this arbitration.

internal re-allocation occurred because GE had prematurely booked revenues on these contracts, and attempted to remedy this accounting issue.[8]

31.   ***AE never agreed to this internal allocation***, which contravened the Parties' existing arrangement.  As explained, AE and GE had agreed that the $47 million amount corresponding to Supply Contract 3 would only be paid off, along with any other amounts due and owing (including under services contracts not at issue in this proceeding), at the time of the anticipated second draw by Angola from the GE Credit Facility.  Accordingly, ***GE did <u>not</u> request payment*** on account of any of the invoices now placed in issue.

### 4.   The Relationship Between GE And AE Sours

32.   Although the Angolan government had issued the October 2017 Letters of Intent stating Angola would consider amending On-Sale Contract ##7 and 11 to include four of the six excess turbines, by August 2018, Angola's priorities had changed, and the Angolan government stated that it wished to maintain the contracts as drafted.

33.   Discussions between AE and Angola continued, and, by the fall of 2018, Angola settled on a different approach.  At that time, Angola proposed, and AE agreed, to reduce the scope of a different contract with AE – a long-term service contract for the maintenance of a power plant – by $154 million to make room to acquire four turbines and related work from AE while permitting financing by the GE Credit Facility.

34.   Angola's approach threatened to eat into GE's margins, and it was at this stage that GE initiated its wrongful efforts to take over AE's business – conduct that is the subject of

---

[8] It thus appears that GE allocated a partial payment to all the contracts and sent the turbines to AE to book the revenues on the sales. In that respect, it was reported in the *Wall Street Journal* in October 2019 that "*[a]n internal probe two years ago [i.e., in 2017] found that in at least two quarters, GE recorded sales of mobile power turbines to a customer in Angola [i.e., Aenergy] before they were transferred, according to people familiar with the investigation. It found that nearly $100 million of sales had been prematurely booked, usually just as a quarter was ending, and needed to be moved to different periods[.]*"  *See* Thomas Gryta, *Larry Culp's GE Plan: A Fix, not a Renovation*, Wall St. J. (Oct. 7, 2019) *available at* https://www.wsj.com/articles/some-expected-larry-culp-to-break-apart-ge-instead-hes-trying-to-fix-it-11570460349.

the main proceedings initiated by AE in New York (in the United States District Court for the Southern District of New York) and London (in an LCIA arbitration), in which AE seeks well in excess of $500 million in damages.

35.     As explained in those proceedings, GE successfully took over AE's relationship with Angola by *falsely accusing* AE of *falsifying documents*, *falsely stating* that AE was *double-charging Angola for turbines*, unlawfully engaging in *direct negotiations with Angola*, and *improperly terminating the Framework Agreement* in May 2019 – all of which led Angola to terminate its contracts with AE in September and November 2019.

36.     It was *only after these events – and after Angola denied AE's administrative challenge to the termination of the On-Sale Contracts – that GE suddenly demanded payment* for the invoices at issue in this arbitration.  On 26 November 2019, GE sent AE a letter stating that, in light of AE's administrative challenge, GE had refrained from demanding payment of the invoices now placed in issue, but that, now that Angola had denied AE's appeal, GE was demanding payment of approximately $66 million "*within thirty days of this letter*".  The letter added that, in light of the denial of AE's appeal, performance of GE's remaining obligations under the Supply Contracts had become "*impossible*."

37.     It was only after AE sued GE for more than $500 million that GE filed this ICC arbitration.

### III.     RESPONSE TO CLAIMS AND COUNTERCLAIMS

#### A.     Supply Contracts

38.     In this arbitration, GE claims that AE owes GE $47,693,220 under "contract" invoices issued under the Supply Contracts.  GE also claims additional amounts under so-called "ancillary" invoices, which are treated below in Section III.B.  AE categorically rejects all of these claims as they have no merit as a matter of fact or law.

39.     At the outset, AE states that it disputes GE's decision to allocate $47 million toward Supply Contract 3, and that it holds GE to its allocation of at least $266 million (out of

the $376 million GE received in December 2017) toward the Supply Contracts (as opposed to the service contracts not at issue in this arbitration).

40. Correcting for GE's $47 million misallocation, the "contract prices" set forth in Supply Contracts 1, 2, and 4 were fully paid.  It follows that (a) AE does not owe money to GE under those contracts, and (b) instead it is GE that owes *$25.15 million* to AE, for services and equipment that AE paid for under the contracts but that were not provided.  By way of its counterclaims, AE seeks reimbursement of this amount.

41. No sums are due under Supply Contract 3 either.  As explained, no payment was made by AE under that Supply Contract.  Thus, AE has now terminated it for convenience, which AE may do without any fees, while inviting GE GPP to retrieve the two turbines.

### 1.    Supply Contract 1 – # 1027850 (AE-GEPP Supply Contract)

42. GEPP claims it is still owed $693,220 on invoice #F4825110 under Supply Contract 1 purportedly outstanding since September 2016.  This invoice related to a "progress payment" corresponding to "10% of [the] equipment price" under Supply Contract 1.[9]

43. It appears to be undisputed that AE <u>did</u> pay GEPP $6 million for this invoice, via payment in Kwanza (the Angolan currency).[10]  This was expressly permitted pursuant to Article 3 of Supply Contract 1, as amended by Amendment No. 1 dated 30 March 2017:[11]

> "This amount may be paid in Kwanza or in US Dollars. If paid in Kwanza, the FX rate used shall be the spot rate on the day of payment. Additionally, a premium of 12.5% shall be applied to act as a hedge during the period that Seller will spend in converting the amount to USD."

---

[9] GEPP Ex. C-16.

[10] An August 2017 GE internal email stated: "*Also a clarification on the $5.3 paid in Kwanza, the amount paid was actually ~$6MM but we had contractually agreed to apply a 12.5% hedge for fx, which gets us to the $5.3MM.  But [i]n the EFS files, this amount is taken as $6MM, and I think this is what we should take it as, since the difference will not be paid by the SG Loan anyway.*"

[11] GEPP Ex. C-10.

44.     The $693,000 apparently corresponds (although not exactly) to a 12.5% hedge that GE applied to cover currency risk during conversion to USD.

45.     On the proper construction of the contract as amended, the hedge was not an additional payment due, but rather a float that could be used to cover any amount by which value was lost during a reasonable period of conversion.  GEPP does not assert there was a material fall in the value of Kwanza during conversion.

46.     Tellingly, the hedge sum itself was never invoiced for, the amount of $693,000 does not appear on the latest statement of account addressed to AE's auditors in December 2019, and GE's own internal documents show that the contract price of $6 million was paid. Thus, AE has satisfied all of its payment obligations under Supply Contract 1.

> ### 2.      Supply Contract 2 – # 1049882
> ### (AE-GE GPP Supply Contract No. 1)

> #### i.      Response to GE GPP's Claims

47.     GE GPP claims it is still owed $47 million under the Supply Contracts and has allocated $4,410,000 million of this "past-due" amount to invoice #110000686/2017 issued under Supply Contract 2.  As explained above, however, it was agreed between AE and GE that the $47 million that was left outstanding corresponded to Supply Contract 3.  *See* paras 23-27, 30-31, 39-40.  As a result, no amounts are due under Supply Contract 2.

> #### ii.      Counterclaim

48.     For its counterclaim under Supply Contract 2, AE states that GE GPP owes AE $20.15 million for the value of services that were paid for but not provided.

49.     Supply Contract 2 covered, among other things, the purchase of seven TM2500 turbines, the transportation of those turbines to the site in Angola where those seven turbines would be installed, and the installation and commissioning of those seven turbines.[12]

---

[12] GE GPP Exs. C-5 at Section 2 (Contract Price), C-9 (Contract Amendment #1).

50.   At the time of termination of the On-Sale Contracts, however, five of the seven turbines sold under Supply Contract 2 remained at storage facilities in Angola, as they had been neither delivered to the final site nor commissioned.  GE GPP must reimburse AE the value of the transportation and installation services, which were paid for but not supplied.

51.   Supply Contract 2 included a charge of $28 million covering both "offshore" and "onshore" transportation.[13]  GE states that invoice F4826798 for $28 million corresponding to these services was fully paid.  GE GPP Request paras 22-23.  But the onshore transportation was not provided to AE, given that the turbines remained in storage.  Because the contract, Section 4(b)(ii), states that *"Title to Services shall transfer to Buyer as performed,"* GE owes AE at least the value of the onshore transportation services, which AE preliminarily estimates at $17 million ($3.4 million per turbine).

52.   Supply Contract 2 also included a charge of $4.41 million for installation and commissioning services.[14]  GE states that the invoice corresponding to this amount (110000686/2017) was not paid for (GE GEPP Request paras 22-23) – a position that AE disputes, *see* paras 23-27, 30-31, 39-40.  Five of the seven turbines sold under Supply Contract 2 were not installed, so GE GPP must reimburse AE the value of the services that were paid for under the $4.41 invoice but not provided by GE.  A charge of $4.41 million for seven turbines corresponds to a per-turbine charge of $630,000.  Accordingly, GE GEPP must reimburse AE $3.15 million for the five turbines.

53.   Indeed, the case for awarding AE these monies is particularly compelling given what GE did right after Angola terminated the On-Sale Contracts:  Within a few weeks, GE was having discussions with Angola in which it proposed to move these five turbines to locations selected by Angola and to install the turbines there – the very services that AE

---

[13] GE GPP Exs. C-5 at Section 2 (Contract Price), C-9 (Contract Amendment #1).

[14] GE GPP Exs. C-5 at Section 2 (Contract Price), C-9 (Contract Amendment #1).

paid GE to perform but which it did not perform while the On-Sale Contracts were in place.

### 3. Supply Contract 3 – # 1018058 (AE-GE GPP Supply Contract No. 2)

54.    As noted, GE GPP wrongly asserts that the contract price of $47 million under Supply Contract 3 has been *"paid in full"*.[15] As explained above, this assertion rests on a faulty and purely internal allocation by GE of AE's $376 million payment, an allocation that apparently occurred for GE's own accounting reasons, *see* paras 23-27, 30-31, 39-40. This allocation contravened GE's and AE's agreement that Supply Contract 3 would remain unpaid.  In the meantime, AE has duly exercised its right to terminate Supply Contract 3 for convenience in accordance with Section 8, and no longer has any obligations under that agreement.[16]

55.    To explain: Section 8 of Supply Contract 3 gave AE the right to terminate the contract for convenience at any time *"until any notice of RTS [Readiness to Ship] has been given"*.[17] Section 4(a) of Supply Contract 3 (*"Delivery"*) in turn provided that the *"[e]quipment shall be delivered in accordance with the Delivery Schedule in Attachment 5"*. And Attachment 5 (*"Scheduled Major Component RTS Date(s)"*) provided that no shipment would occur before payment – and no payment was ever made.

56.    Of course, GE could not deprive AE of its right to terminate for convenience by unilaterally shipping the turbines to AE (for whatever reason), *see* paras 28-29. Accordingly, AE duly exercised its right to terminate Supply Contract 3 for convenience without any fee being imposed upon AE, inviting GE to retrieve the turbines (which remain in storage) – meaning that no amounts are due under Supply Contract 3.

---

[15] GE GPP Request para. 32.

[16] Ex. R-1.

[17] GE GPP Ex. C-6.

### 4.     Supply Contract 4 – # 1206406
### (AE-GE GPP Supply Contract No. 3)

#### i.     Response to GE GPP's Claims

57.    GE GPP claims that it is owed $42,590,000 million under Supply Contract 4 for partial

payment of an invoice for two turbines (#F4826551, for $34,590,000) and non-payment

of an invoice for transportation of the two turbines (#F4826689, for $8,000,000).  As

explained, however, this is based on a misallocation of the payment received by GE in

December 2017.  In fact, only Supply Contract 3 remains unpaid, and all "contract"

invoices under Supply Contract 4 were fully paid.  *See* paras 23-27, 30-31, 39-40.  As a

result, GE's claim is denied.

#### ii.     Counterclaim

58.    Supply Contract 4, as amended, included $5 million in equipment, called "Balance of

Plant" or "BOP," including for "Mobile Liquid Fuel Conditioning Trailer," "First Fill

Lube Oils," and "eBOP."[18]  GE GPP states the invoice corresponding to this amount

(F4826800) was paid by AE.  GE GEPP Request paras 41-42.[19]  GE, however, did ***not***

provide the equipment.  As a result, GE must reimburse AE the $5 million.

### B.     "Ancillary" Invoices

59.    GE also claims to be owed $13,384,011 under the Supply Contracts – corresponding to

amounts set forth in 16 so-called "ancillary" invoices.

#### 1.     Additional Transportation, Storage, Logistics, and Preservation Costs
#### Under Supply Contracts 2, 3, and 4.

60.    Seven of the 16 "ancillary" invoices state that AE supposedly owes GE GPP money for

transportation, storage, logistics, or preservation of the turbines sold under Supply

Contracts 2, 3, and 4 –beyond the amounts set forth (and invoiced) under the Supply

---

[18] GE GPP Exs. C-7 at Section 2 (Contract Price), C-40 (Contract Amendment #1).

[19] GE GPP Ex. C-45 (invoice).

Contracts.[20]  These ancillary invoices total $3,852,646.  AE disputes that it owes any

portion of this amount under Supply Contracts 2, 3, and 4.

61.    Significantly, in Supply Contracts 2, 3, and 4, GE agreed to transport the turbines all the

way to the site of installation in Angola and charged AE transportation costs.

62.    As explained above, moreover, the Supply Contracts were drafted and/or amended to

provide for a lump-sum payment of all amounts due thereunder – i.e., for all goods and

all services provided under them.  This was done to permit AE to pay all its obligations to

GE as part of Angola's drawing of $1.1 billion from GE Capital.

63.    Thus, as originally drafted, Supply Contracts 3 and 4 expressly stated that "100%" of the

amounts due under the contract – including for "*transportation*" – would be due upon

presentation of GE's invoices.[21]  The contracts thus made clear no further amount would

be due by AE to GE for transportation and related matters (such as logistics and storage).

Moreover, the Supply Contracts further stated that, "*[f]or the avoidance of doubt, the*

*Lump Sum Payment constitutes the **total aggregated compensation due for the entire***

***Scope** to be provided by the Seller and **for all Seller's obligations** and rights hereunder*

*which entail any amount to be paid by the Buyer to the Seller (**including all the costs and***

***expenses for the offshore transportation and onshore transportation**)*."[22]  Although

these two Supply Contracts were amended to alter the contract prices, the amendment did

not change the lump-sum payment requirement.[23]  Under the plain text of Supply

Contracts 3 and 4, therefore, there is no basis to invoice AE additional or "ancillary"

---

[20] These invoices are F4826994 for $145,418 (GE GPP Ex. C-27), F4827025 for $14,195 (GE GPP Ex. C-29), F4828466 for $2,815,721 (GE GPP Ex. C-32), F4826993 for $30,652 (GE GPP Ex. C-38), F4828465 for $408,004 (GE GPP Ex. C-39), F4826995 for $30,242 (GE GPP Ex. C-46), and F4828467 for $408,414 (GE GPP Ex. C-47).

[21] GE GPP Exs. C-6 at Section 3 (Supply Contract 3), C-7 at Section 3 (Supply Contract 4).

[22] GE GPP Exs. C-6 at Section 3 (Supply Contract 3) (emphasis added), C-7 at Section 3 (Supply Contract 4).

[23] GE GPP Exs. C-33 (Supply Contract 3 amendment), C-40 (Supply Contract 4 amendment).

amounts for transportation, logistics, preservation, or storage.  (In addition, no "ancillary" amounts could be due under Supply Contract 3 because the Parties agreed to defer payment until a solution was found for the 13th and 14th turbines, which remained in storage, and because that contract has now been terminated for convenience.)

64.  As originally drafted, Supply Contract 2 did not provide for a lump-sum, advanced payment for transportation.  Instead, Supply Contract 2 originally stated that amounts to be paid for transportation would be paid "*[u]pon submission of [GE's] invoices for transportation with supporting documents, pro rata for each shipment*."[24]  Supply Contract 2, however, was amended to bring its payment terms in line with the GE Credit Facility and with Supply Contracts 3 and 4, *see* para 17.  As amended, Supply Contract 2 stated that "100%" of the transportation price would be paid "*upon presentation of Sellers invoice, **within September 30th 2017***," even ***without*** 'supporting documents'.[25] This amendment forecloses GE's attempt to charge additional monies for transportation or related storage and logistics services under Supply Contract 2 via unilateral "ancillary" invoices, because it makes clear there would be a single lump-sum payment of $28 million for all "transportation" costs under Supply Contract 2, and that all contract invoices would be issued by September 2017.  (The latest ancillary invoice was issued in 2019.)

### 2.   BOP Purportedly Sold Under Supply Contract 2.

65.  Three of the 16 ancillary invoices state that AE supposedly owes GE GPP money for, apparently, various 'BOP' equipment purchased by AE, allegedly under Supply Contract 2.[26]  The invoices total $6,095,099.  AE disputes that it owes any of this amount under Supply Contract 2.

---

[24] GE GPP Ex. C-5 at Section 3 (Supply Contract 2).

[25] GE GPP Ex. C-9 (Supply Contract 2 amendment).

[26] These invoices are F4826333R for $878,850 (GE GPP Ex. C-28), F4827400 for $4,220,634 (GE GPP Ex. C-30), and F4828410 for $995,615 (GE GPP Ex. C-31).

66.    As signed in March 2017, Supply Contract 2 provided for AE to acquire approximately

$33.5 million of equipment (beyond the turbines) from GE GPP, consisting of "balance

of plant" and "spare parts."[27]  In April 2017, AE and GE signed a "Contract Change

Order" for AE to purchase "5 simplex centrifuges," and increasing the contract price by

$878,850 to cover these centrifuges.[28]  In September 2017, however, ___*after*___ this Contract

Change Order, AE and GE *again* amended Supply Contract 2, and ___*decreased the total*___

___*contract price to $180,542,127*___ – thus ___*overriding*___ the intervening "Contract Change

Order" for the 5 simplex centrifuges.[29]

67.    GE GPP has not submitted any further amendment to Supply Contract 2 nor any "Change

Order" post-dating the September 2017 amendment, and AE is not aware of any such

amendment.  Moreover, although Supply Contract 2 included in attachment 3 the

standard term that AE would have the "*option to purchase the additional Equipment or*

*Services which are described in Attachment [9] ('Options')*," Attachment 9 to Supply

Contract 2, the "*Options Schedule*," stated simply "*None Included*."[30]

68.    As a result of the foregoing, AE has no obligation under Supply Contract 2 (or any other

Supply Contract) to pay GE GPP the $6,095,099 set forth in these "ancillary" invoices.

For the same reasons, AE disputes that this Tribunal has jurisdiction to consider any

claims based on these purported invoices, as they are not related to Supply Contract 2,

which sets forth the contract price due thereunder and stated that 100% of the amounts

due thereunder would be paid at once (and they were).[31]

---

[27] GE GPP Ex. C-5 at Section 3 (Supply Contract 2).

[28] GE GPP Ex. C-8.

[29] GE GPP Ex. C-9.

[30] GE GPP Ex. C-5 at Section 3 (Supply Contract 2).

[31] As explained, AE had a number of contracts with GE and also placed a number of orders for
parts and equipment having nothing to do with the Supply Contracts.

### 3.      BOP And Transportation Supposedly Related To Supply Contract 1.

69.     The remaining six ancillary invoices (out of 16), totaling $3,436,266, supposedly relate to

Supply Contract 1.  One invoice is apparently for optional BOP under Supply Contract

1.[32]  Two invoices are for installment payments under a change order to purchase stairs.[33]

Two invoices are for installment payments under a change order to purchase control

systems.[34]  And the final invoice is for storage and transportation.[35]

70.     AE will respond to GE's claim for these "ancillary" amounts once GE provides a more

complete explanation as to their basis.  Among others, GE's assertion that these amounts

are outstanding and relate to Supply Contract 1 is inconsistent with the assumption that

Supply Contract 1 would be paid off by AE as part of the disbursement process from the

GE Credit Facility.  Indeed, to the extent GE declined to allocate funds from the

December 2017 disbursement toward these invoices, AE would like to understand why.

Regardless, it was agreed by the parties in late 2017 that any amounts owed under the

various contracts between AE and GE that were not paid off as part of the December

2017 disbursement would only be paid off once the balance of the funds was drawn by

Angola from the GE Credit Facility, which never happened.

## IV.      PROCEDURAL MATTERS

### A.      Arbitration Agreement

71.     AE agrees that claims under the Supply Contracts are subject to the arbitration clauses

in those Supply Contracts.  AE, however, contests that the Tribunal has jurisdiction to

adjudicate purported claims raised under "ancillary" invoices that are not related to the

---

[32] Invoice F4826198 for $1,740,200 (GEPP Ex. C-20).

[33] The change order is at GEPP Ex. C-9.  The amounts are reflected in invoices F4826267 for $15,287 (GEPP Ex. C-22) and F4826476 for $86,626 (GEPP Ex. C-23).

[34] The change order is at GEPP Ex. C-8.  The amounts are reflected in invoices F4826266 for $76,018 (GEPP Ex. C-21) and F4827481 for $380,090 (GEPP Ex. C-25).

[35] Invoice F4827206 for $1,138,045 (GEPP Ex. C-24).

Supply Contracts containing the arbitration clauses on which these proceedings are based.

**B.      Constitution of the Tribunal**

72.    By separate communication of 26 October 2020, AE nominated Prof. Dr. Pascal Pichonnaz as its Co-arbitrator.  According to the Parties' agreement and as reflected in the ICC Secretariat's 4 November 2020 email, the Presiding Arbitrator will be jointly nominated by the Co-arbitrators in consultation with the Parties.

**C.      Place of Arbitration**

73.    Pursuant to the ICC Secretariat's email of 4 November 2020, the place of this arbitration will be Zurich, Switzerland.

**D.      Applicable Law**

74.    The Parties agree that the laws of Switzerland govern the Supply Contracts.  AE does not accept, however, that the laws of Switzerland apply to purported claims raised by Claimants under so-called "ancillary" invoices not based on the Supply Contracts.

**E.      Language of Arbitration**

75.    Pursuant to the Parties' agreement as confirmed in the ICC Secretariat's letter of 28 October 2020, the language of this arbitration will be English.

**V.      RESERVATION OF RIGHTS**

76.    AE reserves all its rights, including the right to supplement and modify the defenses, counterclaims, and request for relief set forth herein, to seek documentary production and other information from Claimants, and to submit briefs, documents, memoranda, exhibits and other evidentiary materials during the proceedings herein.

**VI.     PRELIMINARY STATEMENT OF RELIEF SOUGHT**

77.    AE respectfully requests the Tribunal to issue an Award:

     a.      dismissing Claimants' claims in their entirety;

     b.      awarding AE $25.15 million on its counterclaims, plus pre- and post-award interest;

c.   awarding AE its attorneys' fees and other costs and expenses incurred as a result of this arbitration; and

d.   such other and further relief as the Tribunal deems appropriate under the circumstances.

Date:   27 November 2020

Respectfully submitted

Vincent Levy
Dorit Ungar Black
Brian Goldman
**Holwell Shuster & Goldberg LLP**
425 Lexington Avenue
New York, NY 10017

Harold Frey
Martin Aebi
**Lenz & Staehelin**
Brandschenkestrasse 24
CH-8027 Zurich

Counsel for Respondent