UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AENERGY, S.A. and COMBINED CYCLE POWER PLANT SOYO, S.A.,

        Plaintiffs,

   v.

REPUBLIC OF ANGOLA; MINISTRY OF ENERGY AND WATER OF THE REPUBLIC OF ANGOLA; MINISTRY OF FINANCE OF THE REPUBLIC OF ANGOLA; EMPRESA PÚBLICA DE PRODUÇÃO DE ELECTRICIDADE, EP; and EMPRESA NACIONAL DE DISTRIBUIÇÃO DE ELECTRICIDADE,

        Angola Defendants,

   and

GENERAL ELECTRIC COMPANY; GENERAL ELECTRIC INTERNATIONAL, INC.; and GE CAPITAL EFS FINANCING, INC.,

        GE Defendants.

20-CV-3569 (JPC)

---

**PLAINTIFFS' SUR-REPLY MEMORANDUM
IN FURTHER OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Plaintiffs respectfully submit this sur-reply brief to respond to certain new arguments and misstatements in Defendants' replies. The Court should not consider the new arguments. *Lavin v. United States*, 299 F.3d 123, 126 n.1 (2d Cir. 2002). Otherwise, the Court should reject them.

I.  **Binding Case Law Forecloses the New Claim That Arbitrability Is Arbitrable**

Defendants sought dismissal on the basis that Plaintiffs' claims belong in arbitration. Dkt. 71 ("GE Mot.") at 31-34; Dkt. 61 ("Ang. Mot.") at 31-33. But as shown in opposition, "legally distinct" torts that are "factually . . . related" to a contract dispute are not arbitrable where the tort claim "extends to matters beyond the parties' contractual relationship"; this dooms GE's argument. *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995). As for Angola, the disputes are also not arbitrable, and it is settled that litigating through a preliminary injunction (true here) waives arbitration, as does a suit causing economic prejudice (also true here). *Id.* at 26–27; *Satcom Int'l Grp. PLC v. Orbcomm Int'l Partners, L.P.*, 49 F. Supp. 2d 331, 341 (S.D.N.Y. 1999) (Cote, J.), *aff'd*, 205 F.3d 1324 (2d Cir. 1999).

Rather than confront this controlling law or try to rebut the undisputed evidence of prejudice,[1] Defendants newly argue on reply that, as to **all** the agreements they cite, arbitrators should decide arbitrability, and Angola suddenly cites Angolan law. Although GE asserted in its moving brief that arbitrators under the ***Collaboration Agreement*** should address whether the ***tort claims*** made against **GE International** arise under that contract (GE Mot. at 33), GE relied upon

---

[1] With no real basis to distinguish *Leadertex*'s teaching as to the arbitrability of tort claims, GE tries to muddy the waters and elide *Leadertex* by asserting that AE supposedly conceded in arbitration filings that the instant suit arises under the Framework Agreement. GE Reply 18. But in the quoted passages, AE was asserting that the ***contract claim being arbitrated in the LCIA*** arose under the Framework Agreement (that is the "case" being referenced in the LCIA papers). Moreover, the claims are distinct: In the LCIA, AE brings a contract claim under the Framework Agreement, and its right to relief will rise and fall with its contract rights; here, Plaintiffs bring tort claims that would stand even if the Framework Agreement were declared void *ab initio*.

1

a case (*World GTL*) holding just the opposite, and GE did not argue the point as to the other agreements or defendants.  Nor did Angola, as to any agreement.  The Court should not consider these new arguments.[2]  If it does, it should reject them.

**A**.  "[T]he law *reverses* the presumption" in favor of arbitration when it comes to deciding who – a judge or an arbitrator – gets to decide whether claims belong in arbitration (known as "arbitrability").  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) (emphasis added).  Thus, "[c]ourts should *not* assume that the parties agreed to arbitrate arbitrability *unless there is 'clear and unmistakable' evidence that they did so*."  *Id.* at 944 (emphasis added, alterations and citation omitted).  And courts *must* apply the *First Options* rule regardless of the substantive law governing the contract.  *Id.*

Applying these principles, the Circuit has held that the *First Options* presumption is *not* overcome where the parties entered into multiple arbitration clauses, even if one clause is broad and arguably empowers arbitrators to decide arbitrability.  In *Katz v. Feinberg*, there was "a single agreement" that "contain[ed] both a broadly worded arbitration clause and a specific clause assigning a certain decision to an independent accountant."  290 F.3d 95, 97 (2d Cir. 2002).  The Circuit instructed that "the presence of both these clauses creates an ambiguity" as to "the parties' intention to arbitrate questions of arbitrability."  *Id.*  As a result, the Circuit held, *First Options* "assign[s] questions of arbitrability to the district court, not the arbitrator."  *Id.*[3]

---

[2] *Masefield AG v. Colonial Oil Indus., Inc.*, 2005 WL 957344, at *1 n.2 (S.D.N.Y. Apr. 26, 2005) ("[T]he Court did not address defendant's reliance upon *Contec* . . . because it was raised for the first time in defendant's reply papers."); *SOHC, Inc. v. Zentis Food Sols. N. Am.*, LLC, 2014 WL 6603951, at *1 (S.D.N.Y. Nov. 20, 2014) (declining to consider question of arbitrability because not sufficiently raised).

[3] *See also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014) (same).

That case law instructs that the Court should decide arbitrability here, given the multiple arbitration agreements with competing arbitration clauses. *Katz* forecloses the argument that, as to *one* agreement with a broad clause assigning contract disputes to ICC arbitration and a subset to accountants, ICC arbitrators should decide whether contract disputes are arbitrable. *Alstom v. General Electric Co.*, 228 F.Supp.3d 244, 248-49 (S.D.N.Y. 2017) (Furman, J.). The ambiguity is *more* pronounced here, as there are *multiple* agreements; *each* contains an arbitration clause; and the parties dispute whether the claims arise under *any* contract. In this context, multiple sets of arbitrators could claim the right to resolve arbitrability. That necessarily creates ambiguity.

Consider GE's arguments. It asserts Plaintiffs' tort claims arise under three contracts, but it nowhere explains how the Court could possibly decide **which** of the three sets of arbitrators was "clearly and unmistakably" designated to decide where this case belongs. Should the Court dismiss in favor of arbitration under the Collaboration Agreement, the Framework Agreement, or the GE France contract to determine whether it belongs here or in one of the three forums (or in Angola)? Perhaps all three simultaneously – so that three sets of arbitrators can decide (risking conflicting rulings) whether the case falls within the scope of their mandate (and respective contracts)? What's more, AE and GE also entered into many *other* contracts, including four forming the basis for separate ICC arbitrations launched by GE entities against AE in September, *see* Dkt. 95-8, and many other contracts not before the Court. The *First Options* presumption is plainly not overcome by citing numerous arbitration clauses that designate arbitration rules.[4]

---

[4] Similarly, Angola cites 15 contracts. There is no basis to conclude the parties **unambiguously** designated one (or all) of those contractually-crafted arbitrators to address the question of where this case belongs and whether arbitration was waived. Would a "meta-arbitration" be conducted in Portugal or Angola? Under UNCITRAL or CREL? If it goes to multiple panels, what happens if one panel decides that Angola waived its arbitration right but another reaches the opposite conclusion?

In sum, the question whether Plaintiffs *unambiguously* agreed to arbitrate where this case belongs is not close. *SOHC, Inc. v. Zentis Food Sols. N. Am.*, LLC, 2014 WL 6603951, at *1 n.1 (S.D.N.Y. Nov. 20, 2014) ("[T]he presence of multiple arbitration clauses (designating two different potential arbitrators) creates ambiguity."); *Gen. Motors Corp. v. Fiat S.p.A*, 678 F. Supp. 2d 141, 146 (S.D.N.Y. 2009) ("In light of the existence of the two broad arbitration provisions, the Court finds that there is no 'clear and unmistakable evidence,' that the parties intended the question of arbitrability to itself be determined by the ICC." (citing *Contec*, 398 F.3d at 208)). Plaintiffs dispute their claims are subject to *any* agreement; GE invokes three contracts, and Angola cites 15. The *First Options* presumption is not overcome. *World GTL Inc. v. Petroleum Co. of Trinidad & Tobago*, 2010 WL 3291673, at *3 (S.D.N.Y. Aug. 11, 2010).[5]

**B**. There are additional reasons to reject Angola's new arguments. As noted, Angola does not dispute Plaintiffs' showing that, under this Circuit's law, it has waived arbitration by actively litigating matters in Angolan court. And it is settled that "[w]hen the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver." *Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 80-81 (2d Cir. 2017).[6]

Angola seeks to avoid Second Circuit law by citing Angolan law, which is both improper at this stage and wrong. Angola's opening papers invoked *U.S.* law – *not* Angolan law – and

---

[5] Having *affirmatively* cited *World GTL* in its opening brief as the sole authority to argue that *First Options* is overcome for the *tort claims* against GE International, GE now realizes the case comes out the wrong way and seeks to *distinguish* it on the basis that one of the agreements there did not contain an arbitration clause. But that can only hurt GE. Indeed, in *World GTL*, unlike here, there was only <u>one</u> set of arbitrators to whom the case could have been sent. Not so here – where there is *more* ambiguity.

[6] *Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d 597, 614 (S.D.N.Y. 2020) (Liman, J.) ("[C]ourts may properly adjudicate waiver-based objections to arbitration when the type of waiver alleged is that the party seeking arbitration has participated in litigation."); *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83 (2d Cir. 1998) ("[D]istrict court could properly decide" a "defense of waiver" "when the party seeking arbitration had already participated in litigation on the dispute.").

argued that "[f]ederal law strongly favors agreements to arbitrate, particularly in international commercial transactions." Ang. Mot. at 31. Having proceeded in this way, Angola cannot switch course on reply. Fed. R. Civ. P. 44.1; *see also Al Maya Trading Establishment v. Glob. Exp. Mktg. Co.*, 2014 WL 3507427, at *3 (S.D.N.Y. July 15, 2014).

In any event, the effort fails. As noted, under *First Options*, the "clear and unmistakable" standard applies as a matter of federal law, regardless of the law governing the agreement, 514 U.S. at 944, and the Circuit has held that the *First Options* presumption applies to international agreements, *Telenor Mobile Comms. AS v. Storm LLC*, 584 F.3d 396, 405–06 (2d Cir. 2009).

Also, Angola does not show that Angolan law conflicts with U.S. law. Although its "expert" asserts that defending an administrative case and obtaining a ***pre-arbitration injunction*** is not waiver (Dkt. 93 at 18), he provides ***nothing*** but his say-so for these propositions. *SEC v. Gibraltar Global Sec., Inc.*, 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015) (disregarding declaration of foreign lawyer who "provides no legal support for his opinion" as "*ipse dixit*"). Worse, his declaration does not even address the only question presented here: whether a party waives arbitration by obtaining a preliminary injunction ***not in support of an arbitration, but as part of a plenary action for permanent relief***. That is what occurred here. Angola obtained an injunction and filed a plenary action; Angola's expert does not dispute *that* was a waiver.

## II. Angola's Belated FSIA Arguments Are Improper and Wrong

On the FSIA, although Angola's motion accepted almost all the complaint's allegations, Angola tries to escape that choice on reply. That is improper, and its arguments are also wrong.

***Undisputed Facts.*** To resolve Angola's FSIA arguments, the Court need only resolve factual questions if they are disputed; for allegations Angola accepted as true in briefing, only their legal sufficiency need be addressed. *See Rukoro v. Fed. Republic of Germany*, 976 F.3d

5

218, 224 (2d Cir. 2020); *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010).  Angola claims the Supreme Court altered this settled law in *Bolivarian Republic of Venezuela v. Helmerich & Payne*, 137 S. Ct. 1312 (2017).  But in *Helmerich*, the lower court, based on **undisputed facts**, stripped the sovereign of immunity because the facts "might" meet the expropriation standard, *id.* at 1318; in vacating, the Supreme Court held "the relevant factual allegations must make out a legally valid claim," not just "[a] good argument," and noted that courts should resolve fact disputes, *id.* at 1316, 1324.  Since then, the Circuit reaffirmed that on FSIA motions, courts should accept "the allegations in the complaint and any undisputed facts," and resolve **only** "disputed issues of fact."  *Rukoro*, 976 F.3d at 224.  Angola cannot, as it has attempted, wait until reply to sandbag the Court and Plaintiffs with ginned-up fact disputes.

      ***Commercial Activity Exception – Direct Effects***.  In its opening brief, Angola chose **not** to dispute the complaint's "allegations concerning the effect on GE in the United States," and instead argued these "are irrelevant."  Ang. Mot. 24.  Plaintiffs pointed out that legal position is foreclosed by Circuit law.  Dkt. 79 ("Opp.") 24 & n.13 (citing *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98 (2d Cir. 2016); *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir. 1994)).  In reply, Angola says that the statement of law cited by Plaintiffs was a dictum in *Atlantica* (Dkt. 92 ("Ang. Reply") at 8), but even if it were dictum, it is still right, and it was a holding in *Rafidain*.  *See* Opp. 24 n.13.

      Angola also makes a brand new ***fact*** argument, via its Portuguese lawyer, claiming that Angola "ha[s] not contracted with GE to complete the work required by the power plant contracts."  Ang. Reply 15; Dkt. 94 (Abecasis Supp. Decl.).  It is improper on reply to concoct a new fact dispute.  Anyway, even if it is literally true there are no contracts to cover **all** the work, that would not meet Angola's burden of persuasion:  Discussions promptly ensued between GE

6

and Angola to complete some work (Dkts. 10-23 & 80-18), and Plaintiffs allege some work was contracted for.  And Plaintiffs have evidence that GE *did* perform work.  Bettencourt Decl. ¶¶ 4-6.  In any event, if no further work occurred, the termination still had direct U.S. effects, including ***direct losses*** for GE (as AE was hired to provide GE products and services, and those contracts will not be completed) and the failure to make further U.S. payments under the loan that Angola described as integral to the AE-MINEA Contracts upon their repudiation.  Opp. 19-25.  There is thus no warrant for dismissal – let alone pre-discovery.[7]

***Expropriation – Nationality***.  Angola asserted in its opening papers, again without disputing the complaint's allegations, that the Circuit's decision in *Bailey* (Ang. Mot. 29), means Plaintiffs were Angolan and there was no wrongful taking.  In opposition, Plaintiffs disputed *Bailey* was relevant, and noted that the complaint alleged they were treated as Portuguese.  In reply, Angola doubles down on its inapposite case and asserts that "nowhere does the complaint plead that the Angolan Defendants acted with discriminatory purpose." Ang. Reply. 14.  This is false, plain and simple.  Plaintiffs allege that "[t]he Angola Defendants' expropriation of Plaintiffs' assets is ***discriminatory*** and ***based on Plaintiffs' foreign status***." Compl. ¶¶ 257, 269.

And the point is that Plaintiffs were "treat[ed]" as foreign "because of the nationality of [their] shareholders," so "it is of no particular significance that" they are "organized under [Angolan] law." *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 185 (2d Cir. 1967).  The complaint also makes additional undisputed allegations in that respect – including that AE was

---

[7] As Angola did not challenge the "direct effects" allegations on its motion, Plaintiffs informed the Court in September that jurisdictional discovery was not required (Dkt. 84 at 25:4-6), and the Court stayed discovery on Defendants' motion.  If the Court accepts and credits Angola's untimely submission, Plaintiffs should be permitted discovery; indeed, one of the topics of discovery Plaintiffs had been pressing GE for before the stay was discovery into post-termination discussions and contracts between Angola and GE.  *See First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 177 (2d Cir. 1998).

treated as "foreign" under Angola's investment law when it signed its contracts, *id.* ¶¶ 251, 263, *see also id.* ¶ 220.  GE's Angolan lawyer acknowledges Plaintiffs are considered foreign-owned. Dkt. 53 (Vale Decl.) at 20 ¶ 2.4.3.2.  Having signed contracts against a legal background that treated Plaintiffs as foreign, Angola cannot now perform an about-face when convenient to it.

***Expropriation – Exhaustion***.  In seeking dismissal of the taking claim, Angola also says that AE failed to exhaust domestic remedies.  Ang. Reply 12-13.  This was not raised before, and is waived.  It is also wrong.  Exhaustion, which would at best be prudential, is not required. *Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 415 (D.C. Cir. 2018).[8]  Moreover, any such requirement is excused.  AE filed administrative proceedings **last January**, but Angola **has still not responded**, though it had **30 days** to do so.  And the turbine proceeding has been a sham.

***Expropriation – Turbine Ownership and Operation***.  Faced with eyewitness testimony placing the turbines in PRODEL's possession, Angola responds with smears and misstatements – but no rebuttal evidence that would discharge its "burden of proving, by a preponderance of the evidence, that the alleged [FSIA] exception does not apply."  *Rukoro*, 976 F.3d at 224.  Angola claims "Plaintiffs concede that neither PRODEL nor ENDE *presently* own the property."  Ang. Reply 15.  That is wrong.  Plaintiffs argued that "Angola gave ***ownership*** to ***state commercial enterprises*** (PRODEL and ENDE)."  Opp. 29; *id.* at 27-29, 32-33.[9]  Anyway, what matters is whether it "is owned *or operated*" by a state entity.  28 U.S.C. § 1605(a)(3) (emphasis added).

Angola also insists – notwithstanding satellite images and the eyewitness testimony – that the seized turbines remain in the "[p]ossession" of "IGAPE, a court appointed trustee, pending

---

[8] *See Washington v. Barr*, 925 F.3d 109, 116 (2d Cir. 2019) ("[W]here Congress has not clearly required exhaustion," it is a prudential requirement).

[9] Angola speaks out of both sides of its mouth; it also accuses Plaintiffs of "falsely represent[ing] that the President and MINEA transferred *ownership* . . . to state owned enterprises."  Ang. Reply 11.

further proceedings." Ang. Reply 11.  Notably, Angola never disclaims (or presents evidence disproving) that the equipment at PRODEL's facilities was AE's turbines; instead, it relies on illegible handwritten notes that were not part of the record in the Luanda court.  Meanwhile, remarkably, IGAPE's Chairman was quoted yesterday in the media to say that the turbines have "***never*** been under IGAPE's physical control." Levy Decl. Ex. B (emphasis added).  Moreover, the media reported that on November 4, 2020, MINEA's Minister was at PRODEL's power plant in Lubango, and pictures taken during the visit showed the Minister and the seized turbine trailers; a press statement noted that Angola was building out the plant's capacity.  And MINEA posted this information publicly.  Where?  On Facebook, with photos.  *Id.* ¶ 3 & Ex. A.

### III. The Court Should Disregard Defendants' *Forum Non* Misstatements

Unable to meet their 'heavy burden' to show this forum is so inconvenient and Angola so preferable as to require rejection of Plaintiffs' forum selection, Defendants have little choice but to mischaracterize Plaintiffs' claims and arguments, as well as law and fact.  We address some of their misstatements, though there are many others.  *Compare, e.g.*, GE Reply 2 (asserting N.Y. disbursement is "no[t] relevant"), *with* Opp. 35-36 (describing centrality of disbursement); *see also* Opp. 1-2, 9, 12-13, 20-23, 48, 68, 70.

To begin, Plaintiffs did not "abandon th[e] position" that "they filed here due to corruption in the Angolan courts."  GE Reply 1.  Plaintiffs' opposition brief expressly states that corruption "concerns <u>do</u> underscore the legitimacy of Plaintiffs' choice of forum" – *i.e.*, they help explain Plaintiffs' good-faith decision to sue here.  Opp. 41; *see also* Dkt. 82 ¶ 19 (Machado attesting to motivation).  Nor is it true that Plaintiffs concede Angola has abided by the rule of law: ***Before*** the turbine injunction, Plaintiffs did publicly express hope on the internet that Angola would follow "the rule of law" (GE Reply 1 n.1), and filed administrative actions in a

last effort to get Angola to do so (and to avoid a claim of failing to exhaust remedies).  Hope springs eternal, but does not always survive contact with reality.[10]

GE also states "Plaintiffs' only claim of inconvenience in Angola" is "the self-serving" declaration "of their founder" referring to "threats."  GE Reply 7.  But GE does not rebut Plaintiffs' showing that nearly all of Plaintiffs' witnesses are in **Portugal**, and that substantially all of GE's witnesses are outside of Angola, with many here.  Opp. App. A & B.  Government officials aside, the only key witness said to be in Angola is da Costa, but it is undisputed he spends significant time outside of Angola and he told Machado he would testify here – GE's silence as to what da Costa's attorney may have said about *that* speaks volumes.

Citing out-of-date documents pulled from LinkedIn and AE's website, Defendants claim Angola is a proper forum because Plaintiffs have substantial operations there, with "34 out of 66" employees there, including Pizarro (while stating Morgado lives in Ghana).  GE Reply 7; Ang. Reply 19-20.  But since those internet postings, as Machado *swore*, Plaintiffs' business was destroyed, over 200 employees were fired, and executives and documents repatriated to Portugal.  Plaintiffs have only 7 employees on payroll in Angola – not one a key witness – and neither Pizarro nor Morgado lives where GE asserts.  Ferreira Decl. ¶¶ 2, 3; Pizarro Decl. ¶ 2; Morgado Decl. ¶¶ 2-4.  And GE's claim that "Plaintiffs' communications" are "largely located in Angola" (GE Reply 12) is contradicted by the ***only*** evidence in point.  Dkt. 82 (Machado Decl) ¶ 10.[11]

---

[10] Angola and GE claim that Plaintiffs ***were required*** to exhaust remedies in Angola first (GE Reply 24-25; Ang. Reply 12-13) and ***also*** say that Plaintiffs ***conceded*** Angola is an appropriate forum for this damages suit by filing administrative cases (which have gone unanswered for nearly one year despite the 30-day clock for responding, and have thus become largely irrelevant in terms of their potential for effective relief).  This argument is typical of Defendants' heads-I-win, tails-you-lose strategy.

[11] GE also cites a June 2019 interview in which Mr. Machado supposedly said he had been "living in Angola for the past 15 years" as inconsistent with Mr. Machado's statement that he was last in Angola in December 2018.  GE Reply 11-12.  This is no smoking gun.  The interview was done in Lisbon

## CONCLUSION

Defendants' motions to dismiss should be denied, or else leave should be granted to amend the complaint or obtain discovery.  Moreover, the Court should decline to consider Defendants' untimely arguments or reject them on the merits.

        HOLWELL SHUSTER & GOLDBERG LLP

        By:  /s/ *Vincent Levy*
           Vincent Levy
           Scott M. Danner
           Gregory Dubinsky
           Brian T. Goldman

           425 Lexington Avenue
           New York, New York 10017
           (646) 837-5151

        *Attorneys for Plaintiffs*

---

before the termination of the contracts, and a recording (available on the website) discloses he actually said, "[t]he last 15 years, I was living in Angola, working in climate change" and that he "founded" AE "five years ago."  Perhaps Mr. Machado, who is not a native English speaker, could have been more precise, but he meant that he had started living in Angola 15 years prior, that he was working in climate change, and he started AE 10 years later.  He did not say (or mean to say) he was then residing in Angola.