UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                            :
AENERGY, S.A. and COMBINED CYCLE POWER :
PLANT SOYO, S.A.,                                           :
                                                            :
                              Plaintiffs,                   :               20 Civ. 3569 (JPC)
                                                            :
            -v-                                             :                 OPINION
                                                            :               AND ORDER
REPUBLIC OF ANGOLA; MINISTRY OF ENERGY :
AND WATER OF THE REPUBLIC OF ANGOLA; :
MINISTRY OF FINANCE OF THE REPUBLIC OF :
ANGOLA; EMPRESA PÚBLICA DE PRODUÇÃO DE :
ELECTRICIDADE, EP; EMPRESA NACIONAL DE :
DISTRIBUIÇÃO DE ELECTRICIDADE; GENERAL :
ELECTRIC   COMPANY;   GENERAL   ELECTRIC :
INTERNATIONAL,   INC.;   and   GE   CAPITAL   EFS :
FINANCING, INC.,                                            :
                                                            :
                              Defendants.                   :
                                                            :
------------------------------------------------------------------------ X

JOHN P. CRONAN, United States District Judge:

        Plaintiffs Aenergy, S.A. ("AE") and Combined Cycle Power Plant Soyo, S.A. ("Combined

Cycle") are Angolan energy companies.  They bring this suit against two groups: the "Angolan

Defendants," consisting of the Republic of Angola and several arms of the Angolan government,

and the "GE Defendants," consisting of General Electric ("GE") Co. and two GE subsidiaries.

Plaintiffs allege that the Angolan Defendants breached several contracts and illegally seized

Plaintiffs' assets, and that the GE Defendants tortiously interfered with these contracts and

Plaintiffs' future dealings with the Angolan government.

        Before the Court are two motions to dismiss: one from the Angolan Defendants and one

from the GE Defendants.  The Angolan Defendants move to dismiss the Complaint on the grounds

that (1) they are immune from suit under the Foreign Sovereign Immunities Act, (2) this suit is

subject to mandatory arbitration, (3) the Court should exercise its discretionary power under the doctrine of *forum non conveniens* and dismiss this case in favor of a more convenient forum, (4) the Court should abstain from hearing this case due to ongoing court proceedings in Angola, and (5) Plaintiffs failed to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The GE Defendants move to dismiss on the grounds that (1) the doctrine of *forum non conveniens* favors dismissal, (2) this suit is subject to mandatory arbitration, (3) the Court lacks personal jurisdiction over the two GE subsidiaries, (4) Plaintiffs failed to state a claim under Rule 12(b)(6), and (5) principles of international comity warrant dismissal. For the reasons that follow, both motions are granted, and this suit is conditionally dismissed pursuant to the doctrine of *forum non conveniens*.

## I.  Background

### A.  Factual Background

The following facts are taken from the Complaint, the documents attached to it, and the documents it incorporates by reference. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013). Plaintiffs attached several documents to the Complaint that are in the Portuguese language and lack an accompanying certified English translation. *See, e.g.*, Dkt. 10 ("Compl."), Exh. 15, 17, 19, 20. The Court did not consider these non-English materials. For purposes of these motions, the Court accepts the Complaint's allegations as true and construes them in the light most favorable to Plaintiffs. *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

### 1.  Underlying Contracts Among the Angolan Government, AE, and GE

AE is a company constituted under the laws of the Republic of Angola with its principal place of business in Angola. Compl. ¶ 25. Ricardo Leitão Machado, a Portuguese citizen, founded the company in 2012 and owns 99.9% of AE's stock. *Id.* ¶¶ 2, 25. AE's mission is to provide

"cost-effective, reliable, and environmentally-friendly energy solutions" to the people of Angola and neighboring African countries. *Id.* ¶ 48; *see also id.* ¶¶ 2, 47. To that end, AE's business largely focuses on constructing and maintaining Angolan power plants. *See id.* ¶¶ 49, 53. Combined Cycle is a wholly owned subsidiary of AE. *Id.* ¶ 26.

AE built its first power plant in Angola in 2013. *Id.* ¶ 49. As part of this project, AE acquired from GE[1] several turbines, which are massive industrial machines used to generate large amounts of power. *Id.* This cemented a relationship between AE and GE, and for the next several years, the two companies worked together on energy projects for the Angolan government (or "Angola" for short). *Id.* ¶¶ 52-55. Sometime around June 2016, AE agreed to purchase from GE three TM2500 turbines, a specific model of turbine manufactured by GE. *Id.* ¶ 56. AE "did not yet have contracts with Angola to supply those turbines," but bought them so that it would be ready to supply Angola with more turbines if and when the time came. *Id.*

In August 2017, AE entered into thirteen contracts with Empresa Pública de Produção de Electricidade, EP ("PRODEL") and Empresa Nacional de Distribuição de Electricidade ("ENDE"), two Angolan-owned utility companies that are subsidiaries of the Ministry of Energy and Water of the Republic of Angola ("MINEA"). *Id.* ¶ 58. These contracts "were approved by a series of presidential decrees dated July and August 2017." *Id.* ¶ 59. Together, the thirteen agreements provided that AE would "construct, extend, refurbish, and maintain power plants in Angola." *Id.* ¶ 58. Specifically, Angola agreed to pay AE $1.1 billion for eight TM2500 turbines and a variety of other goods and services. *Id.* ¶¶ 61-62. The Court refers to these thirteen contracts collectively as the "AE-MINEA Contracts."

Around this time, AE entered into several supply contracts with GE for various goods and

---

[1] The Complaint often refers to "GE" generally rather than a specific GE entity. The Court follows this same approach unless the Complaint attributes an action to a GE subsidiary.

services (the "GE-AE Supply Contracts"), which AE used to fulfill portions of the AE-MINEA

Contracts and other contracts with Angola. *See id.* ¶ 63. For example, AE and GE International,

Inc. entered into a collaboration agreement through which GE International would provide technical

and other support to AE. *Id.* ¶ 64. Between March and June of 2017, AE agreed to purchase from

"two GE affiliates" eleven TM2500 turbines, *id.* ¶ 65, which brought the total number to fourteen

since AE had already bought three in June of the previous year, *id.* ¶ 66; *see also id.* ¶ 56. Because

the AE-MINEA Contracts called for Angola to purchase only eight turbines from AE, *id.* ¶ 61, this

gave AE an extra six. *Id.* ¶ 66. According to AE, it bought these extra machines "for its own

commercial reasons" and in anticipation of future energy projects with Angola that might come to

fruition. *Id.* ¶ 67; *see also id.* ¶ 56.

To finance the AE-MINEA Contracts, the Ministry of Finance of the Republic of Angola

("MINFIN") secured from GE Capital EFS Financing, Inc. ("GE Capital") a $1.1 billion credit

facility ("the GE Credit Facility"). *Id.* ¶ 69. Through this arrangement, GE Capital would loan

funds to the Angolan government, which would then pay AE the amounts due on the AE-MINEA

Contracts. *See id.* ¶ 71. However, GE Capital recognized that under the GE-AE Supply Contracts,

the ultimate supplier of the turbines (and possibly some of the other goods and services) that AE

would provide Angola was a GE subsidiary known as "GE Power." *Id.* ¶¶ 72-73; *see also id.* ¶ 65.[2]

So the GE Credit Facility created a payment mechanism that allowed GE Capital to transmit funds

directly to GE Power's bank accounts in New York. *Id.* ¶¶ 73, 225.c. In other words, when Angola

wished to draw on the GE Credit Facility to pay invoices owed to AE, "GE Capital could send

payment in U.S. dollars from the United States directly to . . . GE (in its capacity as supplier to

---

[2] Although the Complaint refers to this entity as "GE Power," Compl. ¶ 72, the GE
Defendants say it was actually called "GE Packaged Power," Dkt. 71 at 7 n.2. For purposes of
these motions, the Court uses the Complaint's term.

AE)." *Id.* ¶ 73.

This payment structure eliminated some risk.  Rather than loan cash to Angola, wait for Angola to pay AE, and then wait for AE to pay GE Power, GE Capital instead could cut out the middle men and directly pay its sister entity, GE Power.  *See id.* ¶ 75.  In one fell swoop, Angola's debt to AE and AE's debt to GE would be satisfied.  This meant that these transactions would occur "outside of Angola," *id.* ¶ 74 (internal quotation marks omitted), thus eliminating the possibility of repatriation and avoiding fluctuations in currency exchange rates.  *Id.* ¶¶ 74-75.  Although the $1.1 billion GE Credit Facility was "sizeable and unsecured," and "proposed to extend credit to a sovereign with a low credit rating," GE Co., the parent company, provided a guarantee to GE Capital to permit this transaction to proceed.  *Id.* ¶ 82.

But there was a problem.  GE wrongly believed that under the AE-MINEA Contracts, in addition to other goods and services, Angola had agreed to purchase *twelve* TM2500 turbines from AE and would likely buy an additional two.  *Id.* ¶ 77.  Yet, the AE-MINEA Contracts only required Angola to purchase *eight* turbines.  *Id.* ¶¶ 61, 77.  As discussed, AE had purchased the other six in anticipation of future projects with the Angolan government.  *See id.* ¶¶ 56, 67-68.  This incorrect assumption that GE Power would receive payment for at least twelve of the turbines it sold AE "informed GE's credit-approval process" for the GE Credit Facility.  *Id.* ¶ 78.

GE thus underestimated its total risk exposure on the $1.1 billion loan to Angola.  *Id.* ¶ 79. While GE thought that GE Capital would pay GE Power $354 million of the $1.1 billion (*i.e.*, for fourteen turbines), in reality GE Power would only receive $212.7 million (*i.e.*, for eight turbines). *Id.* ¶ 90.  Thus, GE's risk exposure was $141.3 million greater than it thought.  *Id.*  From an accounting perspective, this misunderstanding led GE to record at least $395 million in revenues and $203 million in profits in 2017 because it expected to "pay[] itself" these amounts before the

end of that year.  *Id.* ¶ 80.[3]  These figures were significant.  For example, the profits from this arrangement accounted for approximately 10% of GE Power's profits for 2017.  *Id.* ¶ 81.

### 2.  Forged Letters

GE senior executives soon discovered the problem, albeit after GE already had extended the GE Credit Facility to Angola.  *Id.* ¶¶ 83-86.  Looking for a solution, GE asked AE to work with MINEA to amend the AE-MINEA Contracts to cover MINEA's purchase of additional turbines from AE.  *Id.* ¶ 91.  The idea was to keep the overall value of the AE-MINEA Contracts at $1.1 billion, but reduce the amount of other goods and services AE was to provide Angola (*i.e.*, presumably goods and services from AE directly or from suppliers other than GE) under two of the thirteen underlying contracts (Contracts 7 and 11).  *Id.* ¶¶ 93, 96.  This would free up funds to purchase four additional turbines from GE, which in turn would reduce GE's risk exposure on the GE Credit Facility as a greater percentage of the $1.1 billion would go directly to GE entities.  *See id.* ¶ 95.  Although GE was not a party to the AE-MINEA Contracts, GE provided AE with specific language that it hoped would be included in the amended AE-MINEA Contracts.  *Id.* ¶¶ 97-98.

On October 12, 2017, MINEA wrote two letters (the "October 2017 Letters") in which it stated that it wanted to negotiate the purchase of four additional turbines from AE.  *Id.* ¶ 102; *see also* Dkt. 10, Exhs. 2, 3.  Critically, MINEA did not agree to GE's proposed amendments and instead seemed to suggest that Angola might want to enter into a new agreement on top of the $1.1 billion AE-MINEA Contracts.  *See* Compl. ¶ 102; Dkt. 10, Exhs. 2, 3.  This was not what GE wanted.

Wilson da Costa, CEO of GE's Angola business, Compl. ¶ 64, and Leslie Nelson, head of

---

[3] The Complaint does not explain why the 2017 revenue figure is $41 million higher than the $354 million GE Power anticipated as payment for the fourteen turbines, but it presumably accounts for other goods and services besides the turbines under the GE-AE Supply Contracts.

GE Power's Sub-Saharan Africa business, realized this.  *Id.* ¶ 103.  So "GE employees used Adobe Photoshop to fabricate 'signed' versions of the amendment letters that replaced the text of the real letters MINEA had signed . . . with the text GE had requested."  *Id.* ¶ 105.  In other words, these fake letters said that MINEA agreed to amend the AE-MINEA Contracts to purchase four additional turbines, just as GE had wished.  That night, "from the safety and secrecy of his home" in Luanda, Angola, da Costa took photographs with his iPad of the fake letters.  *Id.* ¶ 107.  He then e-mailed the photographs to various GE employees, including a representative of GE Capital, and stated that AE and MINEA amended the AE-MINEA Contracts to include GE's requested language.  *Id.* ¶¶ 107-108.  Nelson forwarded da Costa's e-mail and the fake letters to two GE employees in the United States.  *Id.* ¶ 109.  Problem solved for the time being.

### 3.  The Discrepancy

In December 2017, it was time for AE to get paid for some of the work it had performed under the AE-MINEA Contracts.  *See id.* ¶ 115.  MINEA approved AE invoices totaling approximately $644 million.  *Id.*  On December 24, 2017, MINFIN drew this amount from the GE Credit Facility.  *Id.* ¶ 124.  Pursuant to the GE Credit Facility payment structure, AE agreed that GE Capital could pay approximately 60% of this amount, or $376 million, directly to GE Power as AE's supplier.  *Id.* ¶¶ 124-125.  These funds were transferred from accounts at Deutsche Bank in New York to other accounts in New York.  *Id.* ¶ 225.c.

What did the $376 million payment cover?  According to AE, it paid for various goods and services under the GE-AE Supply Contracts, including eight turbines.  *Id.* ¶ 126.  But according to GE, this amount reflected payment for the following: (1) some goods and services (but fewer than AE thought), including the eight turbines, provided under the GE-AE Supply Contracts; (2) four additional TM2500 turbines; and (3) a portion of the cost of two other TM2500 turbines.  *Id.*  So

after this $376 million payment, "GE considered itself fully paid by AE for twelve of the fourteen turbines subject to the GE-AE [S]upply [C]ontracts." *Id.* Neither AE nor GE initially realized these divergent understandings.

About eight months later, everything began to unravel. *See id.* ¶ 128. Recall that the October 2017 Letters did not definitively reject the proposed amendments to the AE-MINEA Contracts. *See id.* ¶ 102. But on August 9, 2018, Angola issued the *coup de grâce* and told AE and da Costa that it would not amend the AE-MINEA Contracts in the manner in which GE had requested. *Id.* ¶ 128. In other words, it would not reduce the scope of Contracts 7 and 11 in order to purchase four additional turbines. *See id.*

Upon hearing this, AE and MINEA discussed alternative ways in which AE could sell MINEA the additional turbines because, to AE's mind, it still had six extra turbines that it hoped to offload. *Id.* ¶ 134. They agreed to reduce the scope of services under Contact 6, a separate contract from those that GE originally had proposed amending, so that MINEA could purchase four additional turbines for $154 million. *Id.* ¶ 136. This arrangement would still allow MINEA to use the GE Credit Facility, and it would not require additional financing, since at that point Angola had drawn only $644 million of the $1.1 billion line. *Id.* ¶¶ 134-135. João Lourenço, the President of Angola, approved this change to Contract 6. *Id.* ¶ 137.

Of course, this was bad news for GE because GE was under the impression that Angola had already purchased the four additional turbines after amending Contracts 7 and 11. During subsequent meetings in Angola among AE, MINEA, and GE, da Costa took this position and argued that Angola had already paid AE—and therefore GE—for the four additional turbines. *Id.* ¶ 140. At one of these meetings on December 7, 2018, da Costa showed Angola representatives photographs of the fake letters. *Id.* ¶ 141. AE and MINEA immediately "denounced these digital

documents as forgeries." *Id.* ¶142; *see also id.* ¶ 149.d.

MINEA set out to clear things up.  A few days later, it sent "Mr. Sezan of GE" a letter stating that MINEA had "agreed to acquire a total of 8" turbines in the original AE-MINEA Contracts but it appeared that four additional turbines were purchased through the GE Credit Facility.  *Id.* ¶ 149.e (internal quotation marks and emphasis omitted).  MINEA stated that this "constitute[d] a serious irregularity" since "no addendum or valid document ha[d] been issued which would justify changing the scope of the contracts and the prices."  *Id.* (internal quotation marks and emphasis omitted).  Sezan forwarded this to several GE employees, including someone at GE Capital.  *Id.*  On December 17, 2018, Machado (AE's CEO) sent an e-mail to MINEA, da Costa, and Sezan in which he stressed that the October 2017 Letters were conditional in nature and did not authorize the purchase of four additional turbines.  *Id.* ¶ 149.f.

On December 18, 2018, Sezan and da Costa met with MINEA in Angola.  *Id.* ¶ 149.g. During this meeting, the two GE representatives doubled down on GE's position that MINEA had already paid for twelve turbines and claimed that now "AE was seeking double payment for four turbines."  *Id.* ¶ 169.

### 4. Termination of the AE-MINEA Contracts

Eventually, the Angolan government "chose to simply accept Mr. da Costa's versions of the facts" and agreed that MINEA had paid for twelve turbines, not eight.  *Id.* ¶ 147.  MINEA then decided to terminate the AE-MINEA Contracts and looked to GE as a replacement energy partner. *See id.* ¶ 166.  In January 2019, Sezan told Scott Strazik, the CEO of GE's "Gas Power business," *id.* ¶ 85, that Angola "made a decision to transfer AE contracts to GE."  *Id.* ¶ 164 (internal quotation marks omitted).  It seems that at that time, the decision was not final because on February 26, 2019, Sezan told Strazik and another GE representative, both of whom were in the United States, that GE

was reviewing the AE-MINEA Contracts to identify those that GE wished to absorb. *Id.* ¶ 170.  On March 6, 2019, da Costa e-mailed MINEA stating that GE would continue to make the GE Credit Facility available only if MINEA terminated the AE-MINEA Contracts and entered into new contracts with GE. *Id.* ¶ 172.  About one week later, MINEA asked GE to confirm that it would take over the work in the AE-MINEA Contracts, and GE stated that it would. *Id.* ¶¶ 174-175.  GE also confirmed that it did not have "any kind of legal partnership, consortium or joint venture of any sorts" with AE. *Id.* ¶ 175 (internal quotation marks omitted).

In August 2019, President Lourenço adopted a resolution in which he permitted MINEA to terminate the AE-MINEA Contracts and transfer the remaining work to GE. *Id.* ¶ 177.  MINEA once again asked GE to confirm that it was ready to take over the AE-MINEA Contracts. *Id.* ¶ 178.  A summary of this confirmation request was sent to GE executives, including Frederic Ribieras in the United States who "by then was directing GE's activities related to GE's take-over of the AE-MINEA Contracts." *Id.* ¶ 179.  Ribieras expressed a desire to provide "clarity" on the turbine discrepancy before finalizing the new contracts, *id.* (internal quotation marks omitted), but nothing came of this, *id.* ¶ 180.

On September 2, 2019, Angola sent AE a letter formally terminating the AE-MINEA Contracts. *Id.* ¶ 181.  The letter justified the termination by citing "irregularities" regarding AE's acquisition of extra turbines beyond the initial eight Angola had agreed to purchase. *Id.* ¶ 183.  This letter also informed AE that MINEA would award the remaining work under the AE-MINEA Contracts to GE. *Id.* ¶ 182.

### 5.  Seizure of AE's Turbines

The termination letter further noted that four of the six additional turbines that AE had purchased from GE belonged to Angola because they were "purchased on behalf of MINEA." *Id.*

¶ 206 (internal quotation marks omitted).  On November 29, 2019, Angola initiated an *ex parte* proceeding before the Luanda Provincial Court in Angola, and the court issued an injunction that allowed Angola to seize some of AE's property.  *See id.* ¶¶ 212-216.

Angolan police officers and other Angolan authorities came to AE's warehouses in Angola and "took all the property that was there, including not just the turbines, but also spare small engines, oil, equipment, parts, etc."  *Id.* ¶ 216.  AE claims that the value of this seized property totaled $112.8 million, and Angola did not provide any compensation to AE.  *Id.* ¶¶ 216-217.  AE alleges that its property was "targeted and expropriated at least in part" because AE is primarily owned by a Portuguese man and "because of the stance AE had taken against corruption" in Angola.  *Id.* ¶ 220.

### 6.  Termination of the Soyo II Power Plant Contract

Besides the AE-MINEA Contracts, AE also had contracted with Angola to build and operate a power plant called Soyo II, located in the Zaire province of Angola.  *Id.* ¶ 201.  In August 2018, Angola awarded a 25-year concession and various related contracts to Combined Cycle, the wholly owned AE subsidiary, to "build and do various work related to [this] new power plant."  *Id.*  The Court refers to this arrangement as the "Soyo II Concession."  As part of this project, AE had agreed to purchase from GE equipment manufactured in the United States.  *Id.*  However, on October 23, 2019, President Lourenço terminated the Soyo II Concession as well, and MINEA sent a termination letter citing the "same purported irregularities invoked in support of Angola's decision to terminate the AE-MINEA Contracts."  *Id.* ¶ 202.

### 7.  AE's Legal Proceedings in Angola

Following MINEA's termination of the AE-MINEA Contracts, AE sought relief in Angola. First, AE filed an administrative appeal with MINEA, asking MINEA to reconsider its decision to

terminate the AE-MINEA Contracts.  *Id.* ¶ 195.  MINEA denied this on September 30, 2019 and concluded that "Angola had purchased twelve turbines; that AE was responsible for creating the [f]orged [l]etters; and that there was no relationship whatsoever between AE and GE beyond a customer-supplier relationship."  *Id.*  AE appealed this decision to President Lourenço, who denied the appeal in a one-sentence decision on November 13, 2019.  *Id.* ¶ 196.

Before seeking judicial review in the Angolan Supreme Court, AE filed an action in this District seeking evidence from GE pursuant to 28 U.S.C. § 1782.  *In re Aenergy, S.A.*, No. 19 Misc. 542 (VEC) (S.D.N.Y.).  Section 1782 provides a mechanism through which a district court may order discovery "for use in a proceeding in a foreign or international tribunal."  28 U.S.C. § 1782.  The Honorable Valerie E. Caproni granted this request, and GE produced discovery, some of which AE submitted to the Angolan Supreme Court.  *See* Compl. ¶¶ 21, 197; Dkt. 71 ("GE Defendants' Motion") at 2-3; *see also* Compl. ¶ 22 n.1.

AE filed its appeal of President Lourenço's decision in the Angolan Supreme Court on January 10, 2020.  Compl. ¶ 197; *see* Dkt. 59, Exh. 26 at 140.  At the time of the filing of the Complaint, Plaintiffs contended that the Angolan government, the respondent in that proceeding, had not responded to AE's filings, and the Angolan Supreme Court had "done nothing."  Compl. ¶ 198.  However, in a submission recently filed on May 3, 2021, Plaintiffs acknowledge that Angola submitted its opposition brief on September 9, 2020, but maintain that the Angolan Supreme Court was slow in serving that filing on Plaintiffs.  Dkt. 119 at 4, Exh. 2 ¶ 18.  The Angolan Defendants further have advised the Court that, on March 25, 2021, AE "filed a 'réplica,' or reply submission," in the Angolan Supreme Court proceeding, which seems to be analogous to a reply brief responding to Angola's opposition.  *See* Dkt. 112 ¶ 2, Exh. A.

## B.  Procedural History

On May 7, 2020, Plaintiffs AE and Combined Cycle initiated this action with the filing of the Complaint against the Angolan Defendants and the GE Defendants.  Dkt. 1.[4]  Specifically, the Angolan Defendants include the Republic of Angola, MINEA, MINFIN, PRODEL, and ENDE, and the GE Defendants include GE Co., GE International, and GE Capital.  *See* Compl. ¶¶ 27-34. The Complaint alleges ten causes of action against these various entities.  *Id.* ¶¶ 227-298.

Against the Angolan Defendants alone, Plaintiffs assert six claims: (1) breach of contract with regard to the AE-MINEA Contracts; (2) breach of contract with regard to the Soyo II Concession; (3) unjust enrichment; (4) taking of physical assets in violation of international law; (5) taking of intangible assets in violation of international law; and (6) conversion.  *Id.* ¶¶ 227-277. As for the GE Defendants, Plaintiffs assert two claims against only them: (1) tortious interference with contract and (2) tortious interference with prospective business relations.  *Id.* ¶¶ 278-289. Finally, the Complaint asserts an accounting claim and an aiding and abetting claim against all Defendants.  *Id.* ¶¶ 290-298.

On September 18, 2020, the GE Defendants moved to dismiss the claims against them.  Dkt. 50.  They argue that the Court should dismiss this case on the grounds of *forum non conveniens* and international comity, as well as because Plaintiffs' claims are subject to mandatory arbitration.  GE Defendants' Motion at 14-41, 49-50.  In the alternative, the GE Defendants also argue that the Court lacks personal jurisdiction over GE International and GE Capital, and that in all events Plaintiffs have failed to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *Id.*

---

[4] On May 7, 2020, the Honorable Valerie E. Caproni granted Plaintiffs' application to file the Complaint and accompanying exhibits provisionally under seal and with redactions, and ordered the GE Defendants to state their position on whether such treatment was warranted.  Dkt. 6.  The GE Defendants confirmed that they did not seek such treatment.  Dkt. 8.  Plaintiffs then filed the unredacted Complaint and unsealed exhibits on May 21, 2020.  *See* Compl., Exhs. 1-20.

at 41-49.

On September 29, 2020, the Angolan Defendants also moved to dismiss.  Dkt. 58.  They too focus primarily on threshold issues, arguing that the Court lacks jurisdiction under the Foreign Sovereign Immunities Act, Plaintiffs' claims are subject to mandatory arbitration, *forum non conveniens* warrants dismissal, and the Court should abstain from hearing this case while proceedings in Angola remain ongoing.  Dkt. 61 ("Angolan Defendants' Motion") at 12-45.  The Angolan Defendants also argue that Plaintiffs failed to state a claim under Rule 12(b)(6).  *Id.* at 45-47.  This case was reassigned to the undersigned on September 29, 2020.

On November 2, 2020, Plaintiffs filed a memorandum of law in opposition to both motions to dismiss.  Dkt. 79 ("Opposition").  On November 30, 2020, Plaintiffs submitted a letter informing the Court of "newly discovered facts" relevant to Plaintiffs' claim that the Angolan Defendants took their physical assets in Angola in violation of international law.  Dkt. 91 at 3.  Each group of Defendants filed a reply memorandum of law on December 2, 2020.  Dkts. 92, 96.  The Court granted Plaintiffs' request to file a sur-reply brief, Dkts. 98, 101, which Plaintiffs subsequently filed, Dkt. 102 ("Sur-Reply").  The Court held oral argument on April 19, 2021.  Following oral argument, the Court allowed all parties to submit supplemental letter briefs, which the parties filed on April 26, 2021 and May 3, 2021.  *See* Dkts. 113-123.

## II. Discussion

"[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'"  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)); *see also Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 389 (2d Cir. 2011).  Therefore, "[a] district court may dispose of an action by a *forum non conveniens* dismissal,

bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant." *Sinochem Int'l Co.*, 549 U.S. at 432.

*Forum non conveniens* is a device that permits a court to dismiss a case "when an alternative forum has jurisdiction to hear [the] case, and . . . trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." *Id.* at 429 (alterations in original) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447-48 (1994)). "A district court's decision to dismiss by reason of *forum non conveniens* is confided to the sound discretion of the district court, to which substantial deference is given." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981)); *accord Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc) ("The decision to dismiss a case on *forum non conveniens* grounds lies wholly within the broad discretion of the district court and may be overturned only when . . . that discretion has been *clearly abused*." (emphasis in original) (internal quotation marks omitted)).

In *Iragorri*, the Second Circuit set forth a three-step process for resolving a motion dismiss on the basis of *forum non conveniens*. *Iragorri*, 274 F.3d at 71-75; *accord Pollux Holding Ltd.*, 329 F.3d at 70. First, the court must determine the degree of deference afforded to the plaintiff's choice of forum. *Iragorri*, 274 F.3d at 73. Second, the court must consider "whether an adequate alternative forum exists." *Id.* Third, if such a forum exists, the court must "balance factors of private and public interest to decide, based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant." *Pollux Holding Ltd.*, 329 F.3d at 70. A court may dismiss a case under this

doctrine "only if the chosen forum is shown to be genuinely inconvenient and the selected [alternative] forum significantly preferable." *Iragorri*, 274 F.3d at 74-75.

## A. Plaintiffs' Choice of Forum

Under the first step, "[a]ny review of a *forum non conveniens* motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'" *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 157 (2d Cir. 2005) (quoting *Piper Aircraft Co.*, 454 U.S. at 255). Nonetheless, the "degree of deference" afforded a plaintiff's choice of forum "varies with the circumstances" and "moves on a sliding scale depending on several relevant considerations." *Iragorri*, 274 F.3d at 71. A district court should afford greater deference when it appears that the plaintiff or the lawsuit has a "bona fide connection to the United States and to the forum of choice" and "considerations of convenience favor the conduct of the lawsuit in the United States." *Id.* at 72. The Second Circuit has recognized that relevant factors for this determination include "the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Id.* On the other hand, a plaintiff's choice of forum deserves less deference if "the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons—such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum." *Id.*

"A domestic [plaintiff's] choice of its home forum receives great deference, while a foreign [plaintiff's] choice of a United States forum receives less deference." *Monegasque De Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 498 (2d Cir. 2002); *accord Piper Aircraft Co.*, 454 U.S. at 256 ("Because the central purpose of any *forum non conveniens*

inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference."); *Norex Petroleum Ltd.*, 416 F.3d at 154 ("[L]ess deference is afforded a foreign plaintiff's choice of a United States forum." (internal quotation marks omitted)); *Palacios v. Coca-Cola Co.*, 757 F. Supp. 2d 347, 352 (S.D.N.Y. 2010) ("[T]he greatest deference is afforded a plaintiff's choice of its home forum, while 'less deference' is afforded a foreign plaintiff's choice of a United States forum." (internal citations omitted)), *aff'd*, 499 F. App'x 54 (2d Cir. 2012). Still, a plaintiff's foreign status is not dispositive, *Norex Petroleum Ltd.*, 416 F.3d at 157, and "the fact that [a] plaintiff is foreign does not . . . render the forum choice completely undeserving of respect," *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478 (GEL), 2006 WL 3230301, at *3 (S.D.N.Y. Nov. 7, 2006). But the Second Circuit has cautioned that "when a foreign plaintiff chooses a U.S. forum, it 'is much less reasonable' to presume that the choice was made for convenience," rather than "forum-shopping reasons, such as the perception that United States courts award higher damages than are common in other countries." *Iragorri*, 274 F.3d at 71.

Here, Plaintiffs' choice of forum is afforded only minimal deference. To begin, this District is neither Plaintiff's home forum. Plaintiffs are Angolan companies whose principal places of business are in Angola. Compl. ¶¶ 25-26. Because Plaintiffs are foreign entities, their choice of a United States forum is afforded "less deference." *Monegasque De Reassurances S.A.M.*, 311 F.3d at 498; *see also Iragorri*, 274 F.3d at 71 ("Even if the U.S. district was not chosen for . . . forum shopping reasons, there is nonetheless little reason to assume that it is convenient for a foreign plaintiff.").

Further, only one of eight Defendants is at home in this District. The Republic of Angola and the instrumentalities of the Angolan government (MINEA, MINFIN, PRODEL, and ENDE) are citizens of Angola. Compl. ¶¶ 27-31. Of the three GE Defendants, only one is a citizen of New

York.  GE Co. is incorporated in New York and has its principal place of business in Massachusetts. *Id.* ¶ 32.  This affords Plaintiffs' choice of forum some minor deference.  The other two GE Defendants, GE International and GE Capital, are citizens of both Delaware and Connecticut.  *Id.* ¶¶ 33-34.  Thus seven of eight Defendants are not at home in this forum, and five are not even at home in this country.  Still, it is safe to say that this District would be relatively convenient for all GE Defendants since they are either at home here or in a nearby district.  *See Iragorri*, 274 F.3d at 72-73.  But since "litigants rarely are concerned with promoting their adversary's convenience at their own expense, a plaintiff's choice of the defendant's home forum over other fora where [the] defendant is amenable to suit and to which the plaintiff and the circumstances of the case are much more closely connected suggests the possibility that [the] plaintiff's choice was made for reasons of trial strategy." *Pollux Holding Ltd.*, 329 F.3d at 74.

The Court also affords Plaintiffs' choice of forum less deference because Plaintiffs chose to do business in Angola with various Angolan government entities.  Courts routinely have little sympathy for plaintiffs—even American plaintiffs—who conduct business in foreign lands and later try to cry foul here.  *See, e.g.*, *BFI Grp. Divino Corp. v. JSC Russian Aluminum*, 298 F. App'x 87, 91 (2d Cir. 2008) (concluding that the district court did not abuse its discretion in determining that the plaintiff's choice of forum was not entitled to significant deference in part because the plaintiff "had chosen to invest in Nigeria"); *Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 696 (S.D.N.Y. 2003) ("[W]here an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon [United States] citizenship as a talisman against *forum non conveniens* dismissal is diminished." (alteration in original) (quoting *Sussman v. Bank of Isr.*, 801 F. Supp. 1068, 1073 (S.D.N.Y. 1992))), *aff'd*, 98 F. App'x 47 (2d Cir. 2004); *see also Monegasque De Reassurances*

18

*S.A.M.*, 311 F.3d at 499 (affirming the district court's *forum non conveniens* dismissal in part because the plaintiff "voluntarily conducted business with . . . a Ukrainian company, and must have anticipated the possibility of litigation in Ukraine"); *Blanco v. Banco Indus. de Venez., S.A.*, 997 F.2d 974, 981 (2d Cir. 1993).

Perhaps even more telling is the fact that before coming to this Court, AE first chose a different forum to litigate the termination of the AE-MINEA Contracts: Angola.  As discussed above, thus far, AE has not found success in those Angolan proceedings.  Plaintiffs' decision to file suit in this District thus smacks of forum shopping rather than a genuine pursuit of convenience. "Such a tactical maneuver is not protected by the deference generally owed to the plaintiffs' choice of forum."  *Base Metal Trading SA*, 253 F. Supp. 2d at 698 (affording little deference to the plaintiffs' choice of forum because they only came to the United States after "pursu[ing] various remedies in the Russian court system with unsatisfactory results"); *see also Banco de Serguros del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 261 (S.D.N.Y. 2007) (concluding the plaintiff's choice of forum merited "little, if any, deference" in part because "other civil and criminal matters pertaining to the same alleged events and losses as this case have been proceeding in Uruguayan venues").

Moreover, because seven of ten parties to this action are Angolan, and the main events underlying this suit took place in Angola, a substantial number of witnesses and a significant portion of relevant evidence are located in Angola or other places abroad.  *See* Opposition at 38-39 (noting that nine of the witnesses GE identified in its initial disclosures reside in the United States, but recognizing that potential witnesses also include twenty Angolan state officials, seventeen European individuals, and nine individuals who reside in Africa or Asia).  And to the extent there was relevant evidence found only in the United States, AE took action under 28 U.S.C. § 1782 to

ensure that it already arrived in Angola.  *See In re Aenergy, S.A.*, 451 F. Supp. 3d 319, 321

(S.D.N.Y. 2020) ("[AE] has sought non-party discovery pursuant to 28 U.S.C. § 1782 from [GE]

in aid of foreign litigation in Angola.").  Plaintiffs' conclusory assertion that "there must be more

[evidence] here" beyond what GE produced pursuant to the section 1782 order, Opposition at 38,

is far from persuasive.  Thus, the limited number of witnesses in this forum and the fact that much

of the relevant evidence will be found in Angola further weighs against Plaintiffs' choice of forum.

*See, e.g.*, *Owens v. Turkiye Halk Bankasi A.S.*, No. 20 Civ. 2648 (DLC), 2021 WL 638975, at *4

(S.D.N.Y. Feb. 16, 2021) (granting a motion to dismiss on the ground of *forum non conveniens* in

part because "almost all of the relevant evidence [was] located in Turkey").

      In an attempt to justify their choice of forum, Plaintiffs point to the transfer of funds under

the GE Credit Facility "into bank accounts located in New York."  Opposition at 35 (internal

quotation marks omitted).  This is the only New York-based event mentioned in the Complaint.

*See* Compl. ¶ 225.c.  In support of their position, Plaintiffs primarily rely on *Skanga Energy &*

*Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264 (S.D.N.Y. 2012).  *See* Opposition at 36.  In

*Skanga*, a Nigerian company agreed to transfer several million dollars into one of the defendant's

New York bank accounts in exchange for petroleum products.  *Skanga Energy & Marine Ltd.*, 875

F. Supp. 2d at 266-67.  After the transfer of funds, the defendants never delivered the products, and

the plaintiffs sued.  *Id.* at 266.  The court held that the plaintiff's choice of forum was entitled

"considerable deference" because there was a "bona fide connection between the subject matter of

[the plaintiff's] lawsuit and the chosen forum."  *Id.* at 273.  Central to the court's conclusion was

that the plaintiff alleged its "money disappeared down the rabbit hole in New York, and [the

plaintiff] wishe[d] to follow it."  *Id.*

      Unlike in *Skanga*, the transaction on which Plaintiffs rely does not form the basis for any of

Plaintiffs' substantive claims.  Plaintiffs do not allege, for example, that the GE Credit Facility payment structure was improper or that this transfer of funds was wrongful.  In fact, "AE agreed that GE Capital could send the money that AE agreed to pay GE for GE goods and services straight to GE Power rather than routing it first to AE."  Compl. ¶ 123.  Moreover, the New York bank transfer occurred in late December 2017, *id.* ¶ 225.c, long before the events that gave rise to this suit, such as the December 2018 meetings at which da Costa allegedly showed fabricated documents to Angolan officials, *id.* ¶¶ 140-141, the September 2019 termination of the AE-MINEA Contracts, *id.* ¶ 181, or the late 2019 seizure of AE's assets, *id.* ¶¶ 212-216.  Accordingly, the mere fact that the underlying financing agreement here was routed through New York banks does not afford Plaintiffs' choice of forum much deference.  *See Pollux Holding Ltd.*, 329 F.3d at 71-72, 74 (concluding that wire transfers, among other activity, afforded the plaintiffs "only a faint connection to the United States"); *Owens*, 2021 WL 638975, at *4 (granting a motion to dismiss on the basis of *forum non conveniens* because the underlying facts involved "an alleged fraudulent scheme orchestrated primarily in Turkey" despite the fact that the "scheme permitted the funds to move through New York financial institutions").  Instead, the Court agrees that an "allegation that Defendants utilized money wires and bank accounts in New York," without more, gives "no indication that New York is a convenient, or even relevant, forum." *Banco de Serguros del Estado*, 500 F. Supp. 2d at 261.  This is particularly so when the facts underlying Plaintiffs' core claims— *i.e.*, breach of contract, taking, and tortious interference—all occurred in Angola.  *See, e.g.*, Compl. ¶¶ 59 (discussing a series of Angolan presidential decrees that approved the AE-MINEA Contracts), 107 (explaining da Costa photographed the fake letters in Angola), 139-142 (discussing meetings between MINEA, AE, and GE in Angola at which GE's alleged forgery came to light), 177 (noting that the President of Angola adopted a resolution to permit MINEA to terminate the AE-MINEA

Contracts), 181 (explaining that the Angolan government sent AE in Angola a formal termination letter), 202 (discussing the President of Angola's termination of the Soyo II Concession), 216 (explaining that Angolan authorities seized AE's assets at AE's warehouses in Angola).

Shifting focus away from New York banks, Plaintiffs also argue that *forum non conveniens* dismissal here is improper because Plaintiffs are treated as a "foreign group" in Angola and thus the Court should afford deference to their chosen forum.  Opposition at 35 (internal quotation marks omitted).  Plaintiffs cite no authority for why they should be considered a "foreign group" when both AE and Combined Cycle are incorporated in Angola and have their principal places of business there, Compl. ¶¶ 25-26, but seem to base this theory on the fact that AE's majority owner is Portuguese, *see id.* ¶¶ 257, 263; Opposition at 35.  In any case, Plaintiffs say *Bigio v. Coca-Cola Co.*, 448 F.3d 176 (2d Cir. 2006) is "on point."  Opposition at 35.  Plaintiffs are wrong.  In *Bigio*, the Egyptian government seized the plaintiffs' property because they were Jewish, and the plaintiffs then fled Egypt for Canada.  448 F.3d at 178.  Years later, the Egyptian government ordered that the property be returned to the plaintiffs, but an Egyptian state-owned entity instead sold or leased the property to Coca-Cola Co.  *Id.*  "Unable to obtain relief in the Egyptian courts," the plaintiffs sued Coca-Cola in the United States.  *Id.*  The Second Circuit held that the district court erred in dismissing the case on the basis of *forum non conveniens*.  *Id.* at 180.  Central to the court's decision was the fact that the only defendant was a United States company and the dispute was "primarily over whether a United States company should be liable in damages."  *Id.*

In sharp contrast, Plaintiffs sued not only a United States company, but also the Republic of Angola and several Angolan government entities.  The issues here are not simply whether a United States company is liable for damages, but also include, for instance, whether a sovereign state violated international law by seizing Plaintiffs' assets and whether GE tortiously interfered (likely

22

according to Angolan law) with that government's energy contracts.  *See* Compl. ¶¶ 249-271, 278-283.  Further, while it was clear that the refugee plaintiffs in *Bigio* would not obtain justice from the Egyptian courts, Plaintiffs here are simultaneously litigating an action in an Angolan court based on these same facts.  *Id.* ¶ 197; Dkt. 112, Exh. 1.  It is far from clear how that case will be resolved. Plaintiffs also baldly assert that Angola expropriated their assets "based on Plaintiffs' foreign status—that is, Portuguese," but do not plead any facts to support a discriminatory animus.  Compl. ¶ 257.  So to the extent that Plaintiffs here (two corporations) analogize themselves to the plaintiffs in *Bigio*—three Jewish refugees fleeing persecution in Egypt and a company that they controlled— such that they should be considered a "foreign group," this readily fails.  *Bigio* does not control here.

Plaintiffs also argue that deference is warranted because subject-matter and personal jurisdiction are proper against all Defendants.  Opposition at 36.  The Angolan Defendants argue that the Court lacks subject-matter jurisdiction over Plaintiffs' claims against them, Angolan Defendants' Motion at 12-31, and the GE Defendants argue that personal jurisdiction is lacking as to both GE subsidiaries, GE Defendants' Motion at 41-44.  The Court does not reach these issues. Regardless, although Plaintiffs "should not be compelled to mount a suit in a district where [they] cannot be sure of perfecting jurisdiction over the defendant," *Iragorri*, 274 F.3d at 73, here all Defendants agree they can be sued in Angola, *see* Angolan Defendants' Motion at 36; GE Defendants' Motion at 18.

Plaintiffs' remaining arguments for why their choice of forum deserves great deference are similarly unavailing and only show that Plaintiffs' choice deserves less deference.  Plaintiffs argue deference is warranted because they "forewent their jury right" in order to sue here.  Opposition at

36 (emphasis omitted).[5]  This affords Plaintiffs' choice of forum some deference.  *See Accent Delight Int'l Ltd. v. Sotheby's*, 394 F. Supp. 3d 399, 410 (S.D.N.Y. 2019) ("[W]eighing in favor of deference is the fact that Plaintiffs cannot intend to exploit the generosity of American juries because they have waived any right to a jury trial.").  Finally, Plaintiffs rely on the fact that some relevant documents are in the English language, not the Portuguese language, and that all parties "have retained highly competent New York counsel who are fully capable of litigating this dispute in this forum."  Opposition at 40 (emphasis omitted) (quoting *Ancile Inv. Co. v. Archer Daniels Midland Co.*, No. 08 Civ. 9492 (PAC), 2009 WL 3049604, at *6 (S.D.N.Y. Sept. 23, 2009)).  These considerations also warrant some minimal degree of deference to Plaintiffs' choice of forum, but they are outweighed by the substantial number of witnesses and key evidence located outside the United States, as discussed above.

For the reasons stated, the Court concludes that Plaintiffs' choice of forum here may be driven by forum shopping.  This action has only an attenuated connection to this District but an obvious connection to Angola.  Thus in sum, and considering the "totality of circumstances," *Norex Petroleum Ltd.*, 416 F.3d at 157, the Court affords minimal deference, not great deference, to Plaintiffs' choice of forum.

## B.  Adequate Alternative Forum

The Court next must determine whether there is an "adequate alternative forum" in which Plaintiffs could pursue these claims.  *Iragorri*, 274 F.3d at 73.  An adequate alternative forum exists if (1) "the defendants are amendable to service of process there" and (2) the alternative forum "permits litigation of the subject matter of the dispute."  *Pollux Holding Ltd.*, 329 F.3d at 75.  All

---

[5] The Complaint does not contain a jury demand and the parties submitted a proposed case management plan and scheduling order that provided that the case is not to be tried to a jury, Dkt. 67 ¶ 16.

Defendants here consent to service in Angola.  *See* Angolan Defendants' Motion at 36 ("The Angolan Defendants are certainly amendable to service in Angola."); GE Defendants' Motion at 18 ("The GE Defendants consent to service in Angola.").  Thus the first element of the alternative forum test is satisfied.  *See Palacios*, 757 F. Supp. 2d at 355 (concluding that the defendant showed it was amendable to service of process in Guatemala because it said so in its memorandum in support of its motion to dismiss).

Next, the Court must determine whether an Angolan forum would "permit[] litigation of the subject matter" of this dispute.  *Pollux Holding Ltd.*, 329 F.3d at 75.  "The availability of an adequate alternative forum does not depend on the existence of the identical cause[s] of action in the other forum."  *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998).  Instead, the foreign court must be able "to litigate the essential subject matter of the dispute."  *Palacios*, 757 F. Supp. 2d at 357 (internal quotations omitted).  So long as some of Plaintiffs' claims could be brought in Angola, *BFI Grp. Divino Corp.*, 298 F. App'x at 91-92, "the forum permits litigation of the subject matter of the dispute," *Monegasque De Reassurances S.A.M.*, 311 F.3d at 499.

In support of their motion, the GE Defendants submitted a declaration from Angolan law professor Sofia Vale.  Dkt. 53.  Professor Vale concluded that in Angola, Plaintiffs could bring similar claims to those alleged in the Complaint.  *Id.* ¶¶ 2.4-2.4.8.4.  Plaintiffs do not argue otherwise.  *See* 4/19/2021 Tr. at 56-57; *see also* Opposition at 49-50.  In Plaintiffs' own words, their claims involve "humdrum commercial-law principles."  Opposition at 49.  Their claims would thus seem to exist in most jurisdictions around the world.  Moreover, it appears that at least some of Plaintiffs' claims are brought under Angolan law, which suggests they certainly could be heard by an Angolan court.  *See Pollux Holding Ltd.*, 329 F.3d at 75 ("[W]ith several of appellants' claims

asserted under English statutory law, there can be no doubt that England permits litigation to resolve commercial disputes of the type presented in this case."). That Plaintiffs' taking claims are brought under international law, *see* Compl. ¶¶ 249-271, also does not mean they cannot be brought in Angola. *See Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 553 (S.D.N.Y. 2001) ("The United States . . . has no special public interest . . . in providing a forum for plaintiffs pursuing an international law action against a United States entity that plaintiffs can adequately pursue in the place where the violation actually occurred."), *aff'd*, 303 F.3d 470 (2d Cir. 2002). For these reasons, the Court easily concludes that Angola would "permit[] litigation of the subject matter of the dispute." *Monegasque De Reassurances S.A.M.*, 311 F.3d at 499.

Although they did not argue it in their Opposition or Sur-Reply, Plaintiffs now argue (due to the Court's questioning at oral argument) that they may not be able to bring their breach of contract claims against Angola. Dkt. 115 at 3. Plaintiffs rely on a declaration from another Angolan law professor which states that these claims are "subject to a mandatory legal limitation of 180 business days" and "[i]f the 180 business days run from the date MINEA gave notice of termination of AE's 13 contracts," the "180-day limit" has expired. *Id.*, Exh. 4 ¶ 3. Plaintiffs therefore do not argue that their claims will definitely be barred because they do not seem to know when the accrual period began. *See id.* at 3 ("*if* the period [for accrual purposes] began the day of the termination notice" (emphasis added)). So assuming this limitation applies to these claims (which Defendants contest, *see* Dkts. 113 at 1, 117 at 1, 120 at 2, 121 at 1), it is not certain that the limitations period has run. And this says nothing of Plaintiffs' other eight claims for unjust enrichment, taking of physical assets in violation of international law, taking of intangible assets in violation of international law, conversion, tortious interference with contract, tortious interference with prospective business relations, accounting, and aiding and abetting. Compl. ¶¶ 241-298. Thus even

if Plaintiffs' two breach of contract claims against the Angolan Defendants may not be brought, Angola still "permits litigation of the subject matter of the dispute," *Monegasque De Reassurances S.A.M.*, 311 F.3d at 499, because the availability of an adequate alternative forum does not depend on the existence of an identical cause of action in the other forum for each claim.  *See PT United Can Co.*, 138 F.3d at 74; *BFI Grp. Divino Corp.*, 298 F. App'x at 91-92.

Still, "[a]n alternative forum is not adequate where there is 'a complete absence of due process or an inability of the forum to provide substantial justice to the parties.'"  *Palacios*, 757 F. Supp. 2d at 355 (quoting *Monegasque De Reassurances S.A.M.*, 311 F.3d at 499).  Plaintiffs argue that Angola is not an adequate forum because the nation is plagued by corruption and its legal system affords no due process.   Opposition at 41 ("Plaintiffs' [w]ell-[f]ounded [c]orruption [c]oncerns [u]nderline [t]heir [c]hoice of [f]orum."); *id.* ("Angola has so far refused to accord AE basic due process."); *see, e.g.*, Compl. ¶¶ 22 n.1 ("AE is pessimistic that the [Angolan] Court will provide AE any due process."), 24 ("To date, the Angolan legal system has provided AE no due process."), 193 ("[C]orruption is rampant . . . and there is no due process of law [in Angola]."), 198 ("[T]he Angolan Supreme Court has done nothing—disregarding its own procedural deadlines without explanation.").  This argument fails.

The Second Circuit is "reluctant to find foreign courts 'corrupt' or 'biased.'"  *Monegasque De Reassurances S.A.M.*, 311 F.3d at 499.  Indeed it has "repeatedly emphasized" that "[i]t is not the business of [American] courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation."  *Blanco*, 997 F.2d at 982 (first alteration in original) (internal citations and quotation marks omitted); *accord PT United Can Co.*, 138 F.3d at 73 ("[C]onsiderations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards.").  Thus, "[t]he 'alternative forum is

27

too corrupt to be adequate' argument does not enjoy a particularly impressive track record." *Base Metal Trading SA*, 253 F. Supp. 2d at 706 (quoting *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) (collecting cases)).

Plaintiffs concede that "corruption concerns are generally insufficient" to show that an alternative forum is inadequate.  Opposition at 41.  But Plaintiffs ask the Court to conclude that their corruption concerns are sufficient because "there is much more here." *Id.*  Plaintiffs rely on three sources to show that no adequate Angolan forum exists: (1) AE's experience litigating in Angola; (2) U.S. Department of State reports discussing corruption in Angola; and (3) a GE internal document that noted there is "inherent corruption risk in Angola." *Id.* at 41-42 (internal quotation marks omitted).  None of these show that Angolan courts have "inadequate procedural safeguards" such that *forum non conveniens* dismissal is improper.  *See PT United Can Co.*, 138 F.3d at 73.

With regard to AE's experience litigating many of these very issues in Angola, Plaintiffs' main gripe seems to be that an Angolan court held an *ex parte* proceeding at which it issued an injunction that allowed Angola to seize some of AE's turbines and other assets.  Compl. ¶¶ 212-214; Opposition at 42.  Plaintiffs cite no authority for why such a proceeding renders a judicial system inadequate.  The Court readily dismisses this argument especially when courts in this country hold *ex parte* hearings in appropriate circumstances, such as to hear certain applications for injunctive relief and to freeze certain assets.

In their Complaint, but not in their Opposition, Plaintiffs seem to argue that Angolan courts are corrupt in part because the Angolan Supreme Court is moving too slowly and has missed unspecified procedural deadlines.  *See* Compl. ¶ 198 ("[T]o date, the Angolan Supreme Court has done nothing—disregarding its own procedural deadlines without explanation—and the Angolan state, the respondent in those administrative proceedings, has also not responded to AE's filings.").

28

To the extent Plaintiffs continue to raise this argument even after Angola has filed a brief in opposition to AE's motion, *see* Dkt. 119 at 4, it fails.  First, the Court notes that prior to AE's appeal to the Angolan Supreme Court, other aspects of the Angolan government heard and rejected AE's claims.  *See* Compl. ¶¶ 195 (alleging that MINEA denied AE's administrative appeal in a letter), 196 (alleging that the President of Angola denied AE's appeal of MINEA's decision in a "one-sentence decision").  Further, Plaintiffs charged the Angolan Supreme Court with having "done nothing" less than four months after AE filed its appeal.  *See* Dkt. 59, Exh. 26 at 140.  Plaintiffs fail to explain why this relatively short amount of time caused them to conclude that the Angolan Supreme Court would not provide them "any due process."  *See* Compl. ¶ 22 n.1.

Plaintiffs next point to a 2019 State Department Country Report for Angola that recognized "political influence in the decision-making process" of Angola's "judicial system" and commented that "[g]overnment corruption at all levels was widespread."  Opposition at 42 (quoting U.S. Dep't of State, 2019 Country Reports on Human Rights Practices: Angola, at 6, 16, https://www.state.gov/reports/2019-country-reports-on-human-rights-practices/angola/).  The Complaint also alleges that Angola "intends to live up to its poor international reputation," citing a 2018 State Department investment report that said the Angolan judicial system "lacks resources and independence to play an effective role," Angola's "legal framework is obsolete," its "[c]ourts remain wholly dependent on political power," and "[c]orruption remains pervasive and institutionalized" throughout the country.  Compl. ¶ 23 (quoting U.S. Dep't of State, 2018 Investment Climate Statements: Angola, https://www.state.gov/reports/2018-investment-climate-statements/angola/).  The Complaint goes on to generally allege that "the U.S. State Department has recognized that Angola's legal system does not provide due process, and advises that corruption in the country is pervasive."  *Id.* ¶ 27; *see also id.* ¶ 193 & n.6.

While Plaintiffs cherry-pick portions of these reports that discuss problems with Angolan courts, they ignore aspects that paint a somewhat brighter picture of the judiciary in Angola.  For example, the 2018 report also notes that Angolan courts "base their judgments on legislation" and the Angolan constitution "guarantee[s] judiciary independence."  U.S. Dep't of State, 2018 Investment Climate Statements: Angola, https://www.state.gov/reports/2018-investment-climate-statements/angola/.  Further, that report notes that "[t]here is a general right of appeal" in Angola and discusses several methods of "enforcing judgments."  *Id.*

Regardless, the vague, general statements on which Plaintiffs rely do little to show that Angola is not an adequate forum.  *See Palacios*, 757 F. Supp. 2d at 359 ("[C]onclusory State Department summaries are not dispositive of the adequacy inquiry[.]"); *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 524-25 (S.D.N.Y. 2006) (rejecting State Department reports as "insufficient to demonstrate the inadequacy of Turkey as an alternative forum"), *aff'd*, 343 F. App'x 623 (2d Cir. 2009); *Base Metal Trading SA*, 253 F. Supp. 2d at 708 n.23 (concluding that State Department reports on Russia "provide[d] only minimal information about the Russian judiciary" and "d[id] not suffice to show the Russian forum inadequate").  Indeed, courts have dismissed cases on the basis of *forum non conveniens* despite portions of State Department reports suggesting corruption in a foreign forum.  *See, e.g.*, *Palacios*, 757 F. Supp. 2d at 359 n.7 (dismissing on the ground of *forum non conveniens* even after recognizing that the State Department's 2009 report on Guatemala noted that "[t]here were numerous reports of corruption, ineffectiveness, and manipulation of the judiciary" (internal quotation marks omitted)); *Aguinda*, 142 F. Supp. 2d at 545 (dismissing on the ground of *forum non conveniens* despite noting that the State Department's 2000 report on Ecuador "describe[d] Ecuador's legal and judicial systems as politicized, inefficient, and sometimes corrupt so far as certain human rights practices [were] concerned" (internal quotation marks omitted)).

Furthermore, Plaintiffs' reliance on an internal GE document that discussed "inherent corruption risk in Angola," Opposition at 42 (internal quotation marks omitted), is far from persuasive.  This statement is found in a 2017 report that GE apparently used to assess whether GE Capital should extend the GE Credit Facility to Angola.  Compl., Exh. 1 at 6.  At that time, Angola was preparing for a new president after its former leader announced he would step down following nearly four decades in power.  *See id.* at 5.  The GE document suggests that GE was concerned the outgoing regime might use the transition period to "enrich themselves by awarding over-inflated contracts to their supporters."  *Id.*  While the report recognized "inherent corruption risk in Angola, *particularly in infrastructure development and construction*," *id.* at 6 (emphasis added), it did not discuss Angolan courts at all.  Thus, this document does nothing to suggest that an Angolan judicial forum lacks procedural safeguards or is inadequate to hear this case.

Plaintiffs' decision to do business in Angola is relevant for this part of the analysis as well.  When they decided to do business in Angola and with the Angolan government, Plaintiffs made a decision to subject themselves to Angolan law.  In *Blanco*, the Second Circuit rejected a claim that Venezuela was not an adequate alternative forum saying that "it [was] at least anomalous for a Venezuelan corporation to contract with a Venezuelan bank for the financing of a housing project in Venezuela, specify in both pertinent contracts that litigation concerning them may be brought in Venezuela, and then argue to an American court that the Venezuelan system of justice is so endemically incompetent, biased, and corrupt as not to provide an adequate forum for the resolution of such contractual disputes."  997 F.2d at 981; *see also Monegasque De Reassurances S.A.M.*, 311 F.3d at 499 (rejecting the plaintiff's argument that Ukraine was an inadequate forum in part because the plaintiff "voluntarily conducted business with . . . a Ukrainian company, and must have anticipated the possibility of litigation in Ukraine"); *BFI Grp. Divino Corp.*, 298 F. App'x at 92

(affirming the district court's dismissal on *forum non conveniens* grounds and rejecting the plaintiff's argument that Nigerian courts were inadequate in part because of the plaintiff's "desire to engage in a multi-million dollar operation in Nigeria," which showcased a "willingness to conduct business in Nigeria"). So too here. Plaintiffs claim that Angola is a wholly inadequate forum is hard to accept when they incorporated in Angola and did business in Angola with the Angolan government.

Relatedly, AE's ongoing Angolan proceedings are also relevant to this step of the analysis. Despite Plaintiffs' pleas that Angola—the country with which they chose to do more than $1 billion worth of business—is corrupt and its judicial system will afford them no due process, Plaintiffs initially looked to that country's system for recourse. After Angola's termination of the AE-MINEA Contracts, AE pursued an administrative action, filed an appeal with the President of Angola, and then sought judicial review from the Angolan Supreme Court. Compl. ¶¶ 194-197. AE even utilized the laws of this country, *see* 28 U.S.C. § 1782, to provide the Angolan Supreme Court with relevant evidence from GE. *See* Compl. ¶ 22 n.1. As recently as March 25, 2021, Plaintiffs filed a brief in the Supreme Court in Angola arguing that the Angolan litigation should remain in that tribunal rather than be decided by an arbitrator. *See* Dkt. 112 ¶ 2, Exh. A. Why would Plaintiffs bother to do any of this if they truly believed that in Angola "there is no due process of law"? Compl. ¶ 193. Plaintiffs do not say. But the fact that Plaintiffs have sought relief in the Angolan judiciary cuts against Plaintiffs' claims that Angola is an inconvenient forum. *See Base Metal Trading SA*, 253 F. Supp. 2d at 707 (finding Russia to be an adequate alternative forum where, among other things, the plaintiff had "pursued relief in the Russian courts until the results were not to their liking").

Indeed, Plaintiffs tip their hand when they groan that the Angolan Supreme Court is not

moving fast enough.  *See* Compl. ¶ 22 n.1 ("[G]iven [the Angolan Supreme Court's] failure to cause the matter to progress, AE is pessimistic that the Court will provide AE any due process."); *see also* ¶ 198 ("[T]he Angolan Supreme Court has done nothing."); Dkt. 119 at 3 (arguing that Angola is an inconvenient forum because one study found that in Angola, the time "between filing a complaint and receiving restitution[] takes an average of 1,296 days" (internal quotation marks omitted)). Setting aside the fact that Plaintiffs initially raised these complaints after very little time had passed since the filing of their appeal with the Angolan Supreme Court (less than four months), *see* Dkt. 59, Exh. 26 at 140, and that the litigation is now moving along, *see* Dkt. 119 at 4, these complaints suggest that Plaintiffs are primarily concerned that the Angolan Supreme Court is just not fast paced enough for them.  This is far from enough to show that Angola is an inadequate forum.  New York courts are not a fallback option for foreign plaintiffs whenever their homeland's wheels of justice may not spin fast enough for their liking.

The Court finds that Plaintiffs' vague concerns about "corruption" in Angola and a lack of "due process" in Angolan courts do little to show that Angola lacks "procedural safeguards," *PT United Can Co.*, 138 F.3d at 73, or is an inadequate forum, particularly when Plaintiffs are already litigating there.  The Court thus concludes that Angola offers an "adequate alternative forum" for Plaintiffs to pursue these claims.  *Iragorri*, 274 F.3d at 73.

## C.  Balancing the Private and Public Interests

Because Plaintiffs' choice of forum is entitled to minimal deference, and Angola offers an adequate alternative forum for this litigation, the Court turns to the final step of the *forum non conveniens* framework: weighing the relevant private and public interest factors first set out in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947).  *See Pollux Holding Ltd.*, 329 F.3d at 70.  For the following reasons, the Court concludes that both the private and public interest factors weigh in

favor of dismissal.

### 1. Private Interest Factors

The private interest factors under *Gilbert* include: "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri*, 274 F.3d at 73-74 (quoting *Gilbert*, 330 U.S. at 508); *accord Pollux Holding Ltd.*, 329 F.3d at 74-75. In considering these factors, "the court should focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues." *Monegasque De Reassurances S.A.M.*, 311 F.3d at 500 (quoting *Iragorri*, 274 F.3d at 74). The private factor analysis essentially calls for a court to compare "the hardships [the] defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74.

Here, the private interest factors weigh heavily in favor of litigating this case in Angola. The underlying events took place almost entirely on Angolan soil among Angolan parties. *See, e.g.*, Compl. ¶¶ 1-17. The underlying contracts between Plaintiffs and the Angolan government provided that Plaintiffs would construct and maintain power plants in Angola for the ultimate benefit of the Angolan people. *Id.* ¶¶ 58-62. The alleged breaches of the AE-MINEA Contracts and the Soyo II Concession occurred in Angola. *See, e.g.*, *id.* ¶¶ 177, 181, 202. For example, the Complaint alleges that President Lourenço adopted a resolution that terminated the AE-MINEA Contracts and transferred the work to GE. *Id.* ¶ 177. The Angolan government then sent a termination letter to AE in Angola. *Id.* ¶ 181. Angolan authorities subsequently seized AE's property in Angola. *Id.* ¶ 216. The GE Defendants' supposed fraud that led to these events also

occurred in Angola.  GE employees, presumably in Angola, created fake letters using Adobe Photoshop, *id.* ¶ 105, and the CEO of GE Angola, operating "from the safety and secrecy of his home in Luanda," took photographs of the fake letters, *id.* ¶ 107.  At a meeting with MINEA and AE (again, presumably in Angola), da Costa showed these letters in an effort to "support his false claims."  *Id.*  ¶ 141.  Plaintiffs do not even allege that the only Defendant at home in New York, GE Co., directly participated in the allegedly tortious activity in Angola.

The primary New York-based activity that Plaintiffs point to is the transfer of funds to New York bank accounts and the fact that these transfers affected GE's accounting objectives in the United States.  *Id.* ¶¶ 74-75, 225.c; Opposition at 48; 4/19/2021 Tr. at 40 ("Our case fundamentally at its core is about this attainment that happened in New York in the United States, whereby GE Capital sent money to GE Power in the United States, to pay for turbines that were manufactured, in whole or in part, in the United States, related to contracts in Angola for the supply and installation and provision of those very same U.S. manufactured GE turbines.  That's at the core of the case.").  This activity does not directly involve the "precise issues that are likely to be actually tried."  *Monegasque De Reassurances S.A.M.*, 311 F.3d at 500 (quoting *Iragorri*, 274 F.3d at 74).  Whatever conduct allegedly occurred in the United States "'pale[s] by comparison [to] the magnitude of the factual and legal links' to the alternative forum."  *Palacios*, 757 F. Supp. 2d at 361 (alterations in original) (quoting *Turedi*, 460 F. Supp. 2d at 527).[6]

---

[6] The Court notes that the Complaint alleges other events with a connection to the United States generally, albeit not New York.  For example, Plaintiffs allege that GE's Nelson forwarded the fake letters to at least two GE executives in the United States, Compl. ¶ 109, and that at some point, GE's Ribieras in the United States was "directing GE's activities related to GE's take-over of the AE-MINEA Contracts," *id.* ¶ 179; *see also id.* ¶ 225.g.  Further, the Complaint touches on the fact that the turbines at issue were shipped from the United States and paid for in United States currency.  *Id.* ¶ 225.d-e.  Finally, the Complaint notes that GE Co., incorporated in New York, *id.* ¶ 32, guaranteed the GE Credit Facility that GE Capital provided to Angola.  *Id.* ¶ 225.b.  Plaintiffs do not rely on these facts for support of their position that litigating this case here makes sense.  Even so, the Court finds that these stray connections to the United States—which also do not

Because the core facts here occurred primarily in Angola, the "relative ease of access to sources of proof," *Iragorri*, 274 F.3d at 73, weighs in favor of dismissal. Much of the evidence and many of the witnesses are likely located in Angola and other parts of Africa or, at best, Europe. Plaintiffs focus on the fact that "roughly half of GE's witnesses reside" in the United States. Opposition at 47 (emphasis omitted). To be sure, the Court recognizes that it would be convenient for these witnesses if this action remained in this Court. But this does not meaningfully move the needle. The Angolan government is at the heart of this case, and many Angolan state officials within MINEA, MINFIN, PRODEL, and ENDE—and perhaps even high-ranking members of President Lourenço's administration—would serve as witnesses in this case. *See* Opposition at 38 (noting that there are at least twenty Angolan state officials that could serve as witnesses). There are also many employees or former employees of AE and GE who seem to reside in Angola, other parts of Africa, or Europe. *See id.* at 38-39.

All parties agree that many potential witnesses reside outside of New York and on other continents around the globe. Thus many documents and witnesses are likely beyond the reach of the Court's power to compel production, which also weighs in favor of dismissal. *See, e.g.*, *Palacios*, 757 F. Supp. 2d at 361 n.10. For example, in *Allstate Life Insurance Co. v. Linter Group Ltd.*, the Second Circuit affirmed a district court's dismissal of an action on the ground of *forum non conveniens* because "key witnesses" in Australia were not "within the subpoena power of the federal court" and thus could not be "compelled to appear at trial in New York." 994 F.2d 996, 1001 (2d Cir. 1993); *see also Blanco*, 997 F.2d at 982 (affirming the district court's dismissal on the basis of *forum non conveniens* in part because "most, if not all, of the witnesses whose testimony would be required [were] located in Venezuela" and there was "no process available to compel their

---

directly concern the claims brought by Plaintiffs—are significantly outweighed by the amount of relevant activity that occurred in Angola.

appearance in New York").[7]  And even if the Court could compel some witnesses to come to New York to testify, or they agreed to do so, this would be very costly.  *See Palacios*, 757 F. Supp. 2d at 361 ("The cost of obtaining the attendance of cooperative witnesses at trial also mitigates, albeit modestly, in favor of dismissal.").

Plaintiffs argue that "modern technologies" make the location of witnesses and documentary evidence less important, particularly during the COVID-19 pandemic.  Opposition at 44-45 (internal quotation marks omitted).  But the location of witnesses and evidence remains a valid consideration under binding Second Circuit precedent, *see Iragorri*, 274 F.3d at 74, and courts continue to assess it.  *See, e.g.*, *Owens*, 2021 WL 638975, at *4 (granting a motion to dismiss on the ground of *forum non conveniens* in part because "it appear[ed] that almost all of the relevant evidence [was] located in Turkey").  And even so, Plaintiffs' argument cuts both ways.  If technological advances make the location of witnesses and documents "less important to the *forum non conveniens* analysis," Opposition at 44 (quoting *Petersen Energía Inversora S.A.U. v. Argentine Republic*, No. 15 Civ. 2739 (LAP), 2020 WL 3034824, at *11 (S.D.N.Y. June 5, 2020)), any evidence in the United States might just as easily be transmitted electronically to Angola.

Other practical problems also support dismissal on *forum non conveniens* grounds.  For

---

[7] During oral argument, Plaintiffs raised for the first time a new theory that they did not posit in their Opposition.  Plaintiffs now say that the Court may be able to compel da Costa and Nelson, two witnesses that all parties seem to agree would be essential at trial, to testify here pursuant to 28 U.S.C. § 1783.  The Court will not consider arguments raised for the first time during oral argument.  *See Saray Dokum Ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics, Inc.*, No. 17 Civ. 7495 (JPC), 2021 WL 1199470, at *7 (S.D.N.Y. Mar. 30, 2021) (collecting cases).  Even so, section 1783 only applies to "a national or resident of the United States."  28 U.S.C. § 1783(a).  It is far from certain that either of these witnesses fit this requirement.  *Compare* Dkt. 119 at 1 *with* Dkt. 120 at 2-3.  And even if the Court could subpoena them under section 1783, the Court would still exercise its discretion to dismiss this suit on *forum non conveniens* grounds.  Although these witnesses would certainly be important, there presumably would be many other essential witnesses who could not be subpoenaed under section 1783, including officials from the Angolan government.

example, it appears that the parties here did business primarily in Portuguese, the official language of Angola. Plaintiffs downplay the number of relevant documents that would require translation from Portuguese to English if the case were tried in this District. *See* Opposition at 47. Although many of GE's documents may be in English, it seems that the vast majority, if not all, of AE's and the Angolan Defendants' documents are in Portuguese. For example, for purposes of this motion, the Court could not review the majority of AE-MINEA Contracts because they are in Portuguese. *See* Dkt. 59, Exhs. 1-13; *cf. id.*, Exh. 17 (providing translations of only the arbitration clauses in each contract). These contracts are at the center of some of the claims here, and thus they would have to be translated from Portuguese to English.

Similarly, trial testimony from non-English speaking witnesses (or those that may speak some English but nonetheless would prefer to testify in another language) would require the assistance of interpreters. The Court thus would have to rely heavily on the accuracy of translations to assess much of the evidence here. This ordeal would be a costly, difficult endeavor. Cost considerations are a "legitimate part of the *forum non conveniens* analysis." *Palacios*, 757 F. Supp. 2d at 362 (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 107 (2d Cir. 2000)). The fact that many relevant documents and potential witness testimony would be in Portuguese and thus would require translation weighs "strongly in favor" of dismissal on *forum non conveniens* grounds. *Blanco*, 997 F.2d at 982 (explaining that the fact that documentary evidence and trial or deposition testimony would be in Spanish and thus require translation to English "militate[d] strongly in favor of Venezuela as a more appropriate forum" because such difficulties would "result in significant cost to the parties and delay to the court"); *see also Monegasque De Reassurances S.A.M.*, 311 F.3d at 500 (holding that the private interest factors "tip[ped] decided in favor of *forum non conveniens* dismissal" in part because "the pertinent documents [were] in the Ukrainian language"); *Palacios*,

757 F. Supp. 2d at 361 (concluding that the need for "[t]ranslation of all Spanish language testimony and relevant documents" weighed in favor of dismissal); *Flores v. S. Peru Copper Corp.*, 253 F. Supp. 2d 510, 542 (S.D.N.Y. 2002) (noting that the private interest factors weighed in favor of *forum non conveniens* dismissal because many documents were in Spanish, many witnesses spoke only Spanish, and thus "the translation requirements alone, of testimony and documents, would double the length of the trial"). In contrast, Angola's official language is Portuguese, putting Angolan courts in a much better position to consider evidence in Portuguese and receive witness testimony in their country's native tongue.

Finally, as part of their private interest factors analysis, Plaintiffs claim that an Angolan forum would be inconvenient as compared to New York because Machado has "grave security concerns" about returning to Angola, citing a declaration provided by Machado. Opposition at 44 (citing Dkt. 82 (the "Machado Declaration" or "Machado Decl.") ¶¶ 3-6). The Machado Declaration provides that he "received specific threats upon [his] life related to the termination of the contracts." Machado Decl. ¶ 4. He notes that he and his family "employ heightened security measures" in Lisbon, Portugal, where they reside. *Id.* ¶ 5. Machado states that if he were to return to Angola to testify he "would fear for [his] safety and indeed [his] life." *Id.* ¶ 6. Plaintiffs' opposition also claims that Machado "was specifically warned not to return" to Angola, Opposition at 44, but this finds no support in the Machado Declaration. Following oral argument, Plaintiffs submitted under seal a new declaration from Machado and one from a member of his security team. *See* Dkt. 115 at 3. These declarations offer some additional, limited details, but provide no substantiation for Machado's claims.

As owner of 99.9% of AE's stock, and as someone who took part in many of the key events at issue here, Machado likely would be an important witness in this action and thus his ability to

testify in a given forum is relevant.  However, his declarations fails to provide any details about the alleged threats he received.  Machado's claims also are called further into question because AE—a company Machado controls—is currently seeking "reinstatement of the contracts" it held with the Angolan government through its action before the Angolan Supreme Court.  *See* Opposition at 67 n.66; *see also id.* at 16.  Plaintiffs fail to explain why AE continues to try to do business with Angola when its CEO and majority owner apparently would fear for his life if he ever had to return to the country.  *See* Machado Decl. ¶ 3.[8]  In any case, the Court assumes Machado's fears are legitimate, and thus his concerns weigh slightly against dismissing this action.  *See Iragorri*, 274 F.3d at 75. But because all other private interest factors weigh in favor of dismissal, the Court is unpersuaded that such fears tip the balance in a meaningful way.

### 2.  Public Interest Factors

The *Gilbert* public interest factors that the Court must consider include: "administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the interest in having localized controversies decided at home; and avoiding difficult problems in conflict of laws and the application of foreign law."  *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 480 (2d Cir. 2002); *see also Gilbert*, 330 U.S. at 508-09; *Iragorri*, 274 F.3d at 74.  The first two factors are neutral.  There is no indication that Angolan courts are more or less congested than this District, and Plaintiffs concede that they "g[ave] up on the right to have

---

[8] Plaintiffs now claim that the contract reinstatement remedy they are currently seeking in the Angolan Supreme Court is either "irrelevant," 4/19/2021 Tr. at 50, or "moot," Dkt. 115 at 2. For support, they cite their March 25, 2021 "réplica" in which they stated (according to a translation from Portuguese to English provided by the Angolan Defendants) that "[t]he passage of time and the grave effects of the damages caused by the illegal recission of the contracts and the consequent destruction of [AE's] business activities make it very difficult for [AE] to reintegrate into its contracts."  Dkt. 112, Exh. 1 at 24 ¶ 127.  It is far from clear that this means that Plaintiffs no longer seek to win the equitable remedy at issue in the pending Angolan proceeding.

a jury hear their claims against GE."  Opposition at 36.  However, the remaining factors weigh in favor of dismissal.

First, "the interest in having localized controversies decided at home," *Aguinda*, 303 F.3d at 480, strongly suggests an Angolan forum should hear this dispute.  This case has little to do with New York and a lot to do with Angola.  At the heart of this case are contracts between Angolan energy companies and the Angolan government to provide power to the Angolan people.  Whatever interest New York has in the conduct of GE in Angola is outweighed by the interest of Angola in adjudicating this dispute.  *See Turedi*, 460 F. Supp. 2d at 528 (finding that the "United States' interest in adjudicating alleged violations of international law . . . as well as charges of corporate misconduct occurring in the United States and involving large American businesses" was outweighed by Turkey's interest in "resolving charges of violations of local and international law by Turkish police").  Again, the fact that funds moved through New York banks does not change this.  "Were such a minimal contact with New York to be deemed significant, this Court, located in one of the world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York." *Lan Assocs. XVIII, L.P. v. Bank of Nova Scotia*, No. 96 Civ. 1022 (JFK), 1997 WL 458753, at *6 (S.D.N.Y. Aug. 11, 1997).

Further, there is a strong likelihood that in addressing the merits, the Court would need to confront "difficult problems in conflict of laws and the application of foreign law." *Aguinda*, 303 F.3d at 480.  According to the Angolan Defendants, Angolan law governs the AE-MINEA Contracts and the Soyo II Concession, and each contract states that disputes will be resolved by arbitration in Angola or Portugal (with the exception of Contract 3, which apparently does not indicate venue).  *See* Angolan Defendants' Motion at 9-10.  Plaintiffs dispute this.  Opposition at

41

49-50 & n.49.  Although the Court here does not decide which law would apply, this contested issue mitigates in favor of dismissal too.  Even though federal courts often must apply foreign law, the doctrine of *forum non conveniens* "is designed in part to help courts avoid conducting complex exercises in comparative law."  *Piper Aircraft Co.*, 454 U.S. at 251.

*     *     *

Angolan companies that do business in Angola and with the Angolan government surely cannot be surprised that they must litigate their claims in Angola.  *See Online Payment Solutions Inc. v. Svenska Handelsbanken AB*, 638 F. Supp. 2d 375, 382 (S.D.N.Y. 2009) (concluding that the owner of a company that "chose to establish and operate [his business] in Sweden and England . . . should therefore not be surprised that he would need to litigate his corporation's claims in those jurisdictions"); *cf. Guidi v. Inter-Cont'l Hotels Corp.* 224 F.3d 142, 147 (2d Cir. 2000) ("This is not a case where the plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts.").

Although Plaintiffs' choice of forum warrants minimal deference, Angola is an adequate alternative forum.  While some private interest factors weigh in Plaintiffs' favor, the private and public interest factors overall weigh strongly in favor of dismissal.  The Court thus concludes that dismissal on the basis of *forum non conveniens* is warranted.  Accordingly, the Court need not, and does not, reach Defendants' other arguments.  *See Sinochem Int'l Co.*, 549 U.S. at 432.

However, in order to ensure that this case is heard on the merits in Angola, the Court concludes that conditional dismissal is proper.  *See Blanco*, 997 F.2d at 984 ("[F]orum non conveniens* dismissals are often appropriately conditioned to protect the party opposing dismissal."); *Owens*, 2021 WL 638975, at *6.  Dismissal is conditioned on all Defendants agreeing to accept service in Angola and to waive the assertion of any statute of limitations defenses that

42

may have arisen since the filing of this action.

### III. Conclusion

For the reasons stated, the GE Defendants' motion to dismiss and the Angolan Defendants' motion to dismiss are conditionally granted on the basis of *forum non conveniens*.  Within thirty days of the filing of this Opinion and Order, the parties shall submit an agreement to litigate in Angola in accordance with the conditions outlined above.  The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 50 and 58.

SO ORDERED.

Dated: May 19, 2021
       New York, New York

JOHN P. CRONAN
United States District Judge